# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| KAYLA GORE; JAIME COMBS; L.G.; and K.N., <br><br> *Plaintiffs*, <br><br> v. <br><br> WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health, <br><br> *Defendants*. | Civil Action No. 3:19-0328 <br><br> Jury Trial Demanded |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Kayla Gore, Jaime Combs, L.G., and K.N.[1] (collectively, "Plaintiffs"), by and through their attorneys, file this Complaint for Declaratory and Injunctive Relief against Defendants William Byron Lee, in his official capacity as Governor of the State of Tennessee, and Lisa Piercey, in her official capacity as Commissioner of the Tennessee Department of Health (collectively, "Defendants"), and respectfully allege as follows:

## INTRODUCTION

1.      Plaintiffs are transgender persons born in Tennessee who wish to correct their respective Tennessee birth certificates to accurately reflect their sex, consistent with each one's gender identity.  They seek access to birth certificates they can use without the unnecessary and

---

[1] Plaintiffs L.G. and K.N. have filed separate motions to proceed using their initials, rather than their full names, in order to protect their privacy regarding their transgender status and their medical condition and treatment.

potentially harmful disclosure of their transgender status and without being exposed to discrimination and other harms, including harassment and violence.

2. Plaintiffs Kayla Gore, Jaime Combs, L.G., and K.N. are women born in Tennessee, yet the Tennessee Department of Health incorrectly identifies them as male on their birth certificates.

3. Possessing accurate identification documents that are consistent with a person's gender identity—a person's core internal sense of their own gender—is essential to their basic social and economic well-being. A birth certificate is a critical and ubiquitous identification document used in many settings to verify an individual's identity. Access to employment, education, housing, health care, banking, travel, and government services all hinge on having appropriate and accurate personal documentation that reflects a person's true identity. Not only are birth certificates themselves commonly used for such purposes, but they are often required for obtaining other essential identification documents.

4. For transgender people, the sex designation on their original birth certificate is inaccurate because they were assigned the incorrect sex at birth. Correcting the sex designation on their birth certificate is thus critically important for transgender people. Indeed, few things are as essential to one's personhood and navigating the world as being able to correctly and accurately identify one's gender to the world.

5. While the State of Tennessee provides non-transgender (*i.e.*, cisgender) people born in Tennessee with accurate birth certificates—birth certificates that reflect their true sex, consistent with their gender identity—the State of Tennessee categorically bars transgender people born in Tennessee from obtaining birth certificates that reflect their true sex, consistent with their gender identity, and let alone in a manner that does not disclose their transgender status (hereinafter

2

the "Birth Certificate Policy").  To be sure, understanding the importance of having an accurate birth certificate for purposes of identification, the State of Tennessee permits cisgender persons born in Tennessee to correct the sex listed on their birth certificates, but specifically prohibits transgender persons born in Tennessee from doing the same.

6.     Tennessee's categorical refusal to correct the gender marker on transgender persons' birth certificates to accurately reflect their sex in a manner consistent with their gender identity, regardless of what steps such persons have taken to live in a manner consistent with their gender identity, stands in sharp contrast to the approach taken by the overwhelming majority of jurisdictions in the United States, nearly all of which allow transgender persons to correct the gender marker on their birth certificates to match their gender identity and accurately reflect their sex.  Indeed, this categorical bar is inconsistent with Tennessee's own policy of permitting transgender persons to correct the gender marker on their driver licenses to match their gender identity.

7.     In practical terms, Tennessee's Birth Certificate Policy effectively deprives transgender persons born in Tennessee access to birth certificates they can use.  This policy categorically barring transgender people from correcting the gender marker on their birth certificates subjects transgender people to invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence and establishes a barrier to transgender persons' full engagement in society.  For transgender people who suffer from gender dysphoria, being denied the ability to correct the gender marker on their birth certificates also interferes with their medical treatment and may increase their dysphoria and distress.

8.     Tennessee's Birth Certificate Policy, which each Defendant enforces, violates the United States Constitution's guarantees of equal dignity, equal protection of the laws, fundamental

rights of liberty and privacy, freedom of expression, and freedom from compelled speech. These constitutional guarantees protect personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity, such as a person's gender identity.

9.      No compelling, important, or even legitimate governmental justification supports Tennessee's refusal to provide transgender people with accurate birth certificates that match their gender identity.

## JURISDICTION AND VENUE

10.      This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state of rights secured by the United States Constitution.

11.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws and the Constitution of the United States.

12.      Venue is proper in Middle District of Tennessee under 28 U.S.C. § 1391(b) because all Defendants reside within the district, Defendants reside and have offices within the district, and/or a substantial part of the events that gave rise to Plaintiffs' claims occurred, and will continue to occur, within the district.

13.      This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

14.      This Court has personal jurisdiction over Defendants because they are domiciled in Tennessee and/or have otherwise made and established contacts with Tennessee sufficient to permit the exercise of personal jurisdiction over them.

4

**PARTIES**

A.     **The Plaintiffs**

*Plaintiff Kayla Gore*

15.     Plaintiff Kayla Gore is a 33-year-old woman who was born and currently resides in Memphis, Tennessee.  She is transgender.  Kayla Gore wishes to correct her Tennessee birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, as determined by her gender identity.

*Plaintiff Jaime Combs*

16.     Plaintiff Jaime Combs is a 51-year-old woman who was born in Elizabethton, Tennessee and currently resides in Nashville, Tennessee.  She is transgender.  Jaime Combs wishes to correct her Tennessee birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, as determined by her gender identity.

*Plaintiff L.G.*

17.     Plaintiff L.G. is a 30-year-old woman who was born in Tennessee and currently resides in Kentucky.  She is transgender.  L.G. wishes to correct her Tennessee birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, as determined by her gender identity.

*Plaintiff K.N.*

18.     Plaintiff K.N. is a 31-year-old woman who was born in Tennessee and currently resides in California.  She is transgender.  K.N. wishes to correct her Tennessee birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, as determined by her gender identity.

### B. **The Defendants**

19.     Defendant William Byron Lee ("Governor Lee") is sued in his official capacity as Governor of the State of Tennessee. In his capacity as governor, Governor Lee executes the laws of the state, including the Vital Records Act of Tennessee (hereinafter the "Vital Records Act"), and supervises the implementation and enforcement of the Vital Records Act. Pursuant to Tenn. Code Ann. § 68-1-102, Governor Lee has the power to appoint the Commissioner of the Department of Health for the State of Tennessee, who serves at the pleasure of the governor. Governor Lee has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from living consistent with their gender identity, namely the prohibition against correcting the gender marker on their birth certificates. Governor Lee is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

20.     Defendant Lisa Piercey ("Commissioner Piercey") is sued in her official capacity as Commissioner of the Department of Health in the State of Tennessee. Commissioner Piercey supervises the activities of the Department and enforces Tennessee's vital records laws, including the Vital Records Act. Commissioner Piercey has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting their birth certificates to accurately reflect their sex, consistent with their gender identity. Commissioner Piercey's administration and enforcement of the vital records laws are actions under the color of state law. Commissioner Piercey is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

## STATEMENT OF FACTS

**Background Information Regarding Sex, Gender Identity, and Gender Dysphoria**

21.     A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity.  These characteristics may not always be in alignment.

22.     The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth.  Typically, a person is assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth.  Other sex-related characteristics (such as a person's chromosomal makeup or gender identity, for example) are typically not assessed or considered at the time of birth.

23.     Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex.  Every person has a gender identity.

24.     There is a medical consensus that gender identity is innate, has biological underpinnings (including sexual differentiation in the brain), and is fixed at an early age.  As such, efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

25.     For the majority of people, their gender identity matches their sex assigned at birth. That is not the case, however, for transgender people.

26.     Transgender persons are people whose gender identity diverges from the sex they were assigned at birth.  A transgender man's sex is male (even though he was assigned the sex of female at birth) and a transgender woman's sex is female (even though she was assigned the sex of male at birth).

7

27.     Cisgender persons are people whose gender identity aligns with the sex they were assigned at birth.  A cisgender man's sex is male (and he was assigned the sex of male at birth) and a cisgender woman's sex is female (and she was assigned the sex of female at birth).

28.     External reproductive organs are not determinative of a person's sex.

29.     Gender identity is the critical determinant of a person's sex, including for transgender people whose sex-related characteristics are not in typical alignment.

30.     Gender identity and transgender status are thus inextricably linked to one's sex and are sex-related characteristics.

31.     Attempts to change a person's gender identity to bring it into alignment with the person's sex assigned at birth are not only unsuccessful but also dangerous, risking psychological and physical harm, including suicide.

32.     Living in a manner consistent with one's gender identity is critical to the health and well-being of transgender people.

33.     The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria.  Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth.

34.     Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013) ("DSM-V"), as well as by other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.  If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, suicidal ideation, and even self-harm.

8

35.     Treatment of gender dysphoria is usually provided pursuant to the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, published by the World Professional Association of Transgender Health ("WPATH").  Medical treatment for gender dysphoria must be individualized and tailored to the medical needs of each patient.

36.     The process by which transgender people come to live in a manner consistent with their gender identity, rather than their sex assigned at birth, is known as transition.  The refusal to treat a person in a manner consistent with their gender identity is harmful to that person's dignity and well-being.

37.     The steps that transgender people take to transition, as well as to treat their gender dysphoria, vary with each individual's specific needs, but these steps generally include one or more of the following: (1) social transition; (2) hormone therapy; and/or (3) gender-confirming surgery.

38.     Social transition entails a transgender person living in a manner consistent with the person's gender identity.  For example, for a transgender man, social transition may include, among other things, changing his first name to a name typically associated with men; using male pronouns; changing his identity documents to indicate his male gender; wearing clothing and adopting grooming habits stereotypically associated with men; and otherwise living as a man in all aspects of life.

39.     Social transition requires that a transgender woman or a transgender man be recognized, respectively, as a woman or a man, and treated as such by family members, coworkers, and others in the community.

40.     Social transition is thus an important aspect of transition for a transgender person.

9

41. Social transition is also part of necessary medical treatment for many transgender people with gender dysphoria. While social transition is adequate treatment for gender dysphoria for some transgender people, others may require medical care as well.

42. Whether other treatment is medically necessary or even appropriate, however, depends on a person's individualized needs and health. A person's ability to access treatment—particularly gender-confirming surgery—may also be limited by financial resources, insurance coverage, provider availability, and other barriers to health care access.

43. The various components associated with transition—social transition and gender-confirming medical care—do not change a person's sex, but instead bring a person's physical appearance and lived experience into better alignment with their true sex, as determined by their gender identity.

44. Living in a manner consistent with one's gender identity is thus critical to the health and well-being of transgender people, as well as a key aspect of treatment for those who suffer from gender dysphoria.

45. Being able to possess identity documents consistent with one's gender identity is necessary for a person's optimal physical and mental health.

46. There is no medical or scientific basis for refusing to acknowledge a transgender person's true sex, as determined by their gender identity, based on whether that person has undergone surgery or any other medical treatment. Indeed, the WPATH specifically acknowledges that surgical procedures are not required for social gender recognition and therefore should not be a prerequisite for identity document or record changes.

47. Depriving transgender people of birth certificates that match their gender identity harms their health and well-being. This deprivation also interferes with the international standards

10

of care for gender dysphoria by impeding a transgender person's ability to live in a manner consistent with their gender identity, and can aggravate symptoms of gender dysphoria.

**The Need for Accurate Birth Certificates Matching One's Gender Identity**

48. A person's birth certificate is a trusted and essential government-issued document that serves as proof of a person's identity. For this reason, the government makes a copy of a birth certificate available to the person reflected on the birth certificate, rather than merely reserving it for the government's own use.

49. The birth certificate also reflects the government's recognition of a person's identity, including the person's sex, just as a marriage certificate reflects government recognition of a person's relationship.

50. The use of birth certificates to demonstrate identity is ubiquitous in our society. Birth certificates are commonly used in a wide variety of contexts and are one of the primary ways of proving age and citizenship. In the ordinary course of life, a birth certificate is often required directly by employers and educational institutions for enrollment, or at a minimum, is required as a prerequisite to securing other important identification documents (such as driver licenses, state identification cards, social security cards, passports, and other state and federal identification documents).

51. Birth certificates are also commonly used in determining eligibility for enrolling in government programs, establishing school records, and proving age.

52. Because of these and other instances in which a birth certificate serves as proof of identity or citizenship, every person needs a birth certificate that accurately reflects their identity. However, transgender people born in Tennessee, unlike cisgender people born in Tennessee, do not have access to accurate birth certificates.

53.     The gender marker originally placed on a transgender person's birth certificate is inaccurate because it is based on visual assumptions about that person's sex made at the time of their birth, without taking into consideration relevant factors that determine a person's sex, including most importantly, gender identity.

54.     Depriving transgender persons of birth certificates that accurately reflect their sex, consistent with their gender identity, forcibly discloses private and sensitive information about them in contexts where it would otherwise remain undisclosed (such as when seeking employment or when voting), regardless of whether a person's transgender status may otherwise be known by others (for example, by friends or family), and regardless of a person's desire not to disclose that personal information.

55.     Transgender persons denied an accurate birth certificate are thus deprived of significant control over the circumstances surrounding disclosure of their transgender status, including when, where, how, and to whom their transgender status is disclosed.

56.     Being compelled to present a birth certificate that inaccurately reflects a transgender person's sex can often subject that person to serious invasions of privacy. A person's transgender status (and medical diagnosis of gender dysphoria) constitutes deeply personal and sensitive information over which a transgender person has a reasonable expectation of privacy, and the disclosure of which can jeopardize a person's safety and risk bodily harm.

57.     An inaccurate birth certificate thus subjects transgender people to invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence.

58.     Indeed, as a result of being forced to use identification documents that are inconsistent with who they are, transgender persons experience high rates of discrimination (including being denied service or asked to leave public accommodations, workplaces, or housing),

harassment, and violence.  A national survey conducted by the National Center for Transgender Equality in 2015 revealed that nearly one third of respondents who had shown an identification document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.

59.     More generally, not having accurate identity documents can be a barrier to full engagement in society for transgender people, who, because they are unable to obtain accurate birth certificates, often forego opportunities and protections that non-transgender people holding accurate identification currently enjoy in Tennessee.  Transgender people experience substantial discrimination and harassment in a wide variety of contexts, including with respect to employment, education, public accommodations, health care, housing, and interactions with the government, including law enforcement.  Transgender persons are also disproportionately targeted for hate crimes.  These realities make the involuntary disclosure of a person's transgender status particularly harmful and dangerous.

60.     Furthermore, denying transgender persons accurate birth certificates, consistent with their gender identity, undermines rather than serves the purpose of verifying that a transgender person is, in fact, the same person reflected on that person's birth certificate.  For example, a transgender man who has taken steps to bring his body and lived experience into alignment with his true sex, consistent with his gender identity, will correctly be perceived as male by others. Forcing that man to use a birth certificate that inaccurately states he is female will cause others to question whether he is the same person reflected on the birth certificate, exposing him to invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence.

61.     The State of Tennessee's refusal to provide transgender persons with a birth certificate that matches their gender identity constitutes a stigmatizing refusal to acknowledge their

sex, which is particularly harmful given that a birth certificate is the quintessential identity document. This refusal deprives Plaintiffs of their equal dignity.

**Tennessee's Birth Certificate Policy**

62.     The Tennessee Department of Health is the agency within the state responsible for public health. As such, the Tennessee Department of Health, which includes the Tennessee Office of Vital Records, exercises responsibility for the registration, issuance, correction, and changes to Tennessee birth certificates.

63.     Governor Lee oversees all agencies within the State of Tennessee, and Commissioner Piercey oversees the Department of Health, which includes the Office of Vital Records.

64.     Tennessee birth certificates include, *inter alia*, the given name and surnames of the newborn child, the date of birth, the names of the child's parents, and the sex of the child.

65.     Upon information and belief, it is the practice of the State of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on observations about the external genitalia of newborns.

66.     Recognizing that the information in a birth certificate may sometimes be inaccurate or need updating, the Vital Records Act and the regulations promulgated and enforced by Defendants permit the correction of errors and updating of birth certificate records.

67.     For example, pursuant to Tenn. Comp. R. & Regs. 1200-07-01-.10, in cases in which a person has lawfully changed their name, such person may present a duly authenticated copy of the court order changing their name and request an amended certificate of birth.

68.     Similarly, pursuant to Tenn. Comp. R. & Regs. 1200-07-01-.04, following the adoption of a child, a new birth certificate reflecting only the names of the adoptive parents and in the new name of the adopted child must be substituted for the original registered birth certificate.

14

The original registration certificate of the birth of the adoptee, decree of adoption, and other documents are kept under seal and can only be opened upon a court order or upon a directive from the Tennessee Department of Children's Services.

69. Likewise, pursuant to Tenn. Comp. R. & Regs. 1200-07-01-.10, and as documented on the public website for the Office of Vital Records, the sex listed on a person's birth certificate may be corrected if the change is substantiated by (1) a signed and notarized affidavit showing the full name, date of birth, the sex as it is shown on the certificate and the sex as it should be correctly listed, and (2) documentary evidence showing the correct sex of the individual.

70. However, Tennessee's Vital Records Act provides, in part, that "[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." Tenn. Code Ann. § 68-3-203(d). Based on this provision, Defendants enforce a policy, custom, or practice that categorically prohibits transgender persons born in Tennessee from correcting the sex listed on their birth certificates so that it matches their true sex, consistent with their gender identity, regardless of what steps such persons have taken to live in a manner consistent with their gender identity. This is Tennessee's Birth Certificate Policy challenged herein.

71. So while Defendants have promulgated rules and regulations permitting persons born in Tennessee the ability to correct the sex listed on a person's birth certificate in order to accurately identify the sex of such person, Defendants categorically prohibit transgender persons born in Tennessee from correcting the sex listed on their birth certificates in a manner consistent with their gender identity.

72. As such, Tennessee's Birth Certificate Policy stands in sharp contrast to the approach taken by the vast majority of states, the District of Columbia, and Puerto Rico, all of which permit transgender people to correct the gender marker on their birth certificate to accurately

reflect their sex, consistent with their gender identity. These states typically do not require that transgender persons undergo particular medical procedures, such as surgery, in order to correct the gender marker on their birth certificates.

73.     Similarly, the U.S. Department of State permits corrections to the gender marker on a person's passport. Other federal agencies, including the Social Security Administration, have similar standards for changing a person's gender marker in agency records.

74.     Tennessee's Birth Certificate Policy also stands in stark contrast to Tennessee's own policy permitting transgender people to correct the gender marker on their driver licenses and state identification cards to accurately reflect their sex, consistent with their gender identity. The Tennessee Department of Safety and Homeland Security ("Department of Safety") permits transgender people to correct the sex designation on their driver licenses so that the licenses accurately reflect their sex, as determined by their gender identity, even absent a changed birth certificate. Like the federal government, the Department of Safety does not require transgender persons to have any particular medical procedure, such as surgery, to do so. The Department of Safety only requires that the person requesting the gender marker correction provide either (1) a statement from a physician that "necessary medical procedures to accomplish the change in gender are complete," or (2) a court order recognizing a gender change.

75.     Any requirement that individuals undergo gender affirmation surgery in order to correct the sex designation on their birth certificates is inconsistent with the positions of mainstream medical organizations (such as the American Medical Association), which support the correction of the gender marker in transgender people's identity documents, and oppose any requirement of specific medical care, including surgeries, in order for transgender people to make such corrections.

76.     Tennessee's Birth Certificate Policy is not supported by any compelling, important, or even legitimate government interest.

77.     The Birth Certificate Policy lacks any necessary, narrowly-tailored, substantial, or even rational relationship to any valid government interest.

**Plaintiff Kayla Gore**

78.     Plaintiff Kayla Gore is a 33-year-old woman who was born and continues to reside in Memphis, Tennessee.  With the exception of one year, Ms. Gore has lived in Memphis her entire life.

79.     Ms. Gore wishes to correct her Tennessee birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female, as determined by her gender identity.

80.     Below is a picture of Ms. Gore:



17

81. Ms. Gore is a community advocate who has dedicated most of her career towards serving lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people in Tennessee. Presently, Ms. Gore is a Southern Regional Organizer with TLC@SONG, which seeks to lift the barriers and break the isolation that prevents LGBTQ people in the South, particularly people of color, from participating fully in our economic, social, and political life. Prior to her work with TLC@SONG, Ms. Gore worked as the Transgender Services Specialist at OUTMemphis, a Memphis-based community center that provides education, programming, and services for LGBTQ people in the Mid-South. Ms. Gore is also one of the founders and the director of My Sistah's House, a nonprofit that provides resources and emergency shelter to transgender and gender nonconforming people in the Memphis area.

82. Ms. Gore is transgender. She was assigned the sex of male at birth, and her Tennessee birth certificate identifies her as male. However, she is female. Ms. Gore's identity as a woman is just as deep-seated as that of women who were assigned female at birth.

83. Ever since she was a young child, Ms. Gore knew that she was girl. As a young child, Ms. Gore began showing interest in expressing her female gender identity, including by wearing feminine clothes, makeup, and high heels. However, at that time, she was discouraged from expressing her female gender identity and so ceased expressing herself in that way.

84. By her early twenties, Ms. Gore began expressing her female gender identity again and soon after, began identifying as a female. By 2012, Ms. Gore was living openly as the woman that she is.

85. Since beginning to live openly as a woman, Ms. Gore has taken steps to bring all aspects of her life into conformity with her female gender identity, including steps to socially and medically transition.

18

86.     Ms. Gore has undergone clinically appropriate medical treatment for gender dysphoria. The steps she has taken in her transition have brought Ms. Gore's body characteristics and outside appearance into alignment with her female gender identity.

87.     The general public and community perceive Ms. Gore as the woman she is.

88.     In addition to the medical transition steps Ms. Gore has taken, Ms. Gore has begun the process of changing her name and gender marker on her identification documents. In 2017, Ms. Gore changed her name from the traditionally male name she was given at birth to a traditionally female one.

89.     Ms. Gore has corrected her name and gender marker to be consistent with her female gender identity in all her identity documents except her birth certificate. This includes, *inter alia*, her Tennessee state identification card, Tennessee voter registration card, and social security records.

90.     Ms. Gore also wants to correct both her name and the gender marker on her birth certificate. However, as a result of Tennessee's Birth Certificate Policy, Ms. Gore has not been able to do so. Because of the Birth Certificate Policy, Ms. Gore is prohibited from correcting the sex designation on her birth certificate. Thus, for Ms. Gore, changing her name on her birth certificate would be futile as the birth certificate would still disclose her transgender status.

91.     As a result of the Birth Certificate Policy, the sex designation on Ms. Gore's birth certificate still incorrectly identifies her as male, which is inconsistent with her female gender identity and other identification documents.

92.     Ms. Gore reasonably fears that possessing a birth certificate that fails to reflect her female gender identity increases the likelihood that she will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence.

93.     Ms. Gore has experienced first-hand the discrimination and hostility that many transgender people experience when presenting identification that conflicts with their gender identity.  For example, on several occasions, Ms. Gore has had to present her birth certificate in the context of securing employment.  Because her birth certificate inaccurately states that she is male, providing this document has led directly to Ms. Gore being "outed" as transgender, and being subjected to awkward, deeply personal, and invasive questions by prospective employers about her transgender status and transition.  Ms. Gore has also felt dissuaded at times from pursuing employment opportunities because of the scrutiny her birth certificate would cause.

94.     Ms. Gore is personally aware of the high incidence of violence and harassment directed at transgender persons as well as the high rates of employment and housing discrimination faced by transgender people, particularly transgender women of color like herself, in Tennessee.

95.     Ms. Gore is stigmatized and harmed by Tennessee's Birth Certificate Policy.

96.     As a result of Tennessee's Birth Certificate Policy, Ms. Gore's current Tennessee birth certificate reflects the sex she was incorrectly assigned at birth, erroneously stating that she is male and forcing her to use an identity document that inaccurately portrays her identity.

97.     Defendants' refusal to issue a birth certificate accurately reflecting that Ms. Gore is female is a persistent and stigmatizing reminder that the State of Tennessee does not recognize her as a woman.  That refusal impedes her ability to function successfully as a woman in all aspects of her life, including any time she presents her birth certificate to others.

98.     Ms. Gore also objects to the state's message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

99.     Ms. Gore is harmed by Tennessee's Birth Certificate Policy, which prevents her from obtaining identity documents that are congruent with her gender identity.

100.     Being denied a birth certificate that accurately reflects her sex, consistent with her gender identity, is psychologically and emotionally harmful to Ms. Gore, who is faced with the persistent reminder that the State of Tennessee does not acknowledge her gender identity or recognize her core personhood.

**Plaintiff Jaime Combs**

101.     Plaintiff Jaime Combs is a 51-year old woman who was born in Elizabethton, Tennessee and currently resides in Nashville, Tennessee.

102.     Ms. Combs wishes to correct her Tennessee birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female, as determined by her gender identity.

103.     Below is a picture of Ms. Combs:



104.     Ms. Combs obtained a degree in cosmetology and owned her own salon in Tennessee for several years.  Ms. Combs is now retired and serves on the boards of Nashville Pride and Connectus Health.

105.     Ms. Combs is transgender.  She was assigned the sex of male at birth, and her Tennessee birth certificate identifies her as male.  However, she is female.  Ms. Combs's identity as a woman is just as deep-seated as that of women who were assigned female at birth.

106.     Ms. Combs knew as young as five years old that she was not like the other boys or girls she saw around her.  Ms. Combs knew she was female, but did not think it was possible for her to live as female and felt compelled by her environment to live as male.

107.     Ms. Combs attended East Tennessee State University and Johnson Bible College for a few years.  Ms. Combs, however, felt a conflict between her pursuit of an education at Johnson Bible College and her gender identity, and ultimately obtained a degree in cosmetology. Shen then pursued a career in the beauty industry, eventually owning a salon.

108.     On or about 1996, Ms. Combs legally changed her name from the traditionally male name she was given at birth to her current traditionally female name.  In 1996, Ms. Combs corrected her name on her driver's license, Social Security records and passport.

109.     In 1999, Ms. Combs consulted with medical and mental health professionals and began to undergo medically necessary treatment, specifically gender affirming surgery, to align her body with her gender identity.  Ms. Combs took these steps to bring her outside appearance into alignment with her female identity, so she would appear to the general public as the woman she is.

110.     After completing surgery, Ms. Combs corrected the gender marker on her driver's license, Social Security records, and U.S. passport.

111.     Yet, as a result of the Birth Certificate Policy, the sex designation on Ms. Combs's birth certificate still incorrectly identifies her as male, which is inconsistent with her female gender identity and other identification documents.

112.     Ms. Combs reasonably fears that possessing a birth certificate that fails to reflect her female gender identity increases the likelihood that she will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence.

113.     Ms. Combs has experienced first-hand the hostility, discrimination, and harassment that transgender people often experience when presenting identification that conflicts with their lived gender.  For example, when Ms. Combs applied for her passport in 2013, she was required to submit her birth certificate alongside her driver's license.  As Ms. Combs had changed her gender marker on her driver's license years prior, her driver's license and birth certificate conflicted.  To explain the discrepancy, Ms. Combs was required to submit documentation from her primary care provider.  Only after Ms. Combs' application was rejected twice and she submitted a letter documenting the results of a physical examination by a gynecologist was Ms. Combs issued a passport.

114.     Ms. Combs's inability to correct the gender marker on her birth certificate has negatively affected Ms. Combs in other ways.  By way of example, Ms. Combs was married to a man for seven years.  When divorcing, Ms. Combs was told that Tennessee would not consider her marriage to be legal because Tennessee did not, at the time, recognize marriage between same-sex couples, and was threatened with disclosure of her transgender status.  Ms. Combs was therefore concerned that if she contested the divorce, her transgender status would become publicly known.  At the time, Ms. Combs was not open about her transgender status and was worried that

this would affect her salon business. As a result, due to these concerns, Ms. Combs signed uncontested divorce papers allowing her husband to retain control over all of their joint assets.

115.    Ms. Combs is personally aware of the high incidence of violence and harassment directed at transgender persons, as well as the high rates of employment and housing discrimination faced by transgender persons in states like Tennessee.

116.    Ms. Combs is stigmatized and harmed by Tennessee's Birth Certificate Policy.

117.    As a result of Tennessee's Birth Certificate Policy, Ms. Combs's current Tennessee birth certificate reflects the sex she was incorrectly assigned at birth, erroneously stating that she is male and forcing her to use an identity document that inaccurately portrays her identity.

118.    Defendants' refusal to issue a birth certificate accurately reflecting that Ms. Combs is female is a persistent and stigmatizing reminder that the State of Tennessee does not recognize her as a woman. That refusal impedes her ability to function successfully as a woman in all aspects of her life, including any time she presents her birth certificate to others.

119.    Ms. Combs also objects to the state's message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

120.    Ms. Combs is harmed by Tennessee's Birth Certificate Policy, which prevents her from obtaining identity documents that are congruent with her gender identity.

121.    Being denied a birth certificate that accurately reflects her sex, consistent with her gender identity, is psychologically and emotionally harmful to Ms. Combs, who is faced with the persistent reminder that the State of Tennessee does not acknowledge her gender identity or recognize her core personhood.

**Plaintiff L.G.**

122. Plaintiff L.G. is a 30-year-old woman who was born in Tennessee and currently resides in Kentucky. L.G. moved to Kentucky five years ago for a job. L.G.'s family, who she visits often, still live in Tennessee.

123. L.G. wishes to correct her Tennessee birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female, as determined by her gender identity.

124. L.G. is transgender. She was assigned the sex of male at birth, and her Tennessee birth certificate marks her as male. However, she is female. L.G.'s identity as a woman is just as deep-seated as that of women who were assigned female at birth.

125. From a young age, L.G. has identified as female. L.G. first attempted to come out as transgender and live openly as a girl while in high school but she experienced negative reactions from her community. Those negative reactions ultimately led L.G. to attempt suicide.

126. By age 24, however, L.G. knew she needed to be true to herself and began openly identifying as female. Though L.G. had to once again come out to her family, her parents were more supportive this time.

127. Around this same time, L.G. began to socially and medically transition in order to align her lived experience and body characteristics with her female gender identity. Since then, L.G. has lived as her true self—a woman—in all aspects of her life.

128. L.G. has undergone clinically appropriate medical treatment for gender dysphoria. The steps she has taken in her transition have brought L.G.'s body characteristics and outside appearance into alignment with her female gender identity.

129. The general public perceives L.G. as the woman she is. Indeed, L.G.'s transgender status is not publicly known, including by her co-workers.

130. L.G. has sought to align her lived experience with her gender identity.

25

131.    In early 2014, L.G. legally changed her traditionally male name to a name traditionally associated with women.

132.    L.G. has sought to update the name and correct the gender marker on her personal identity documents.

133.    Following her legal name change, L.G. changed her name on her birth certificate but, as a result of Tennessee's Birth Certificate Policy, was declined on several occasions when she tried to correct the gender marker on her certificate.

134.    L.G. also changed her name on her Tennessee driver license.  However, due in part to the Birth Certificate Policy as well as lack of awareness of the Department of Safety staff of the department's own policy and general negative attitudes towards transgender people, L.G. was prohibited on multiple occasions from correcting the sex designation on her driver license, both in Tennessee and thereafter in Kentucky after she moved there—often with demeaning and embarrassing commentary on her transgender status.  It was only after years of self-advocacy and multiple attempts that L.G. was able to correct the gender marker on her driver license to accurately reflect her sex as female.

135.    Aside from updating the name and gender marker on her driver license, L.G. has corrected her name and gender marker in her social security records and U.S. Passport to be consistent with her female gender identity.

136.    Yet, as a result of the Birth Certificate Policy, the sex designation on L.G.'s birth certificate still incorrectly identifies her as male, which is inconsistent with her female gender identity and other identification documents.

26

137.    L.G. reasonably fears that possessing a birth certificate that fails to reflect her female gender identity increases the likelihood that she will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence.

138.    L.G. has experienced first-hand the hostility, discrimination, and harassment that transgender people often experience when presenting identification that conflicts with their lived gender.  For example, on one occasion, L.G. had to go to the doctor in Kentucky.  Because L.G. had to present identification inconsistent with her gender identity (the gender marker in her driver license had not yet been corrected), L.G.'s transgender status was forcibly disclosed and she was harassed by the staff member at the desk for the disparity between her identification document and her female gender identity and expression.  Thereafter, when L.G. finally saw the doctor, the doctor asked inappropriate and deeply invasive questions about her life while he was physically examining her, making her feel unconformable and humiliated.

139.    On another occasion, prior to being able to correct the gender marker on her driver license, L.G. was involved in multiple-car traffic accident caused when another driver rear-ended a car behind her.  When the police arrived, the officer asked to see everyone's identification.  After examining L.G.'s identification, the officer approached L.G. and said, in sum and substance, "You know, there's an issue with your ID – the gender is wrong."  As a result of the mismatch between L.G.'s identification and her gender identity, L.G. was forced to disclose her transgender status and go through invasive and uncomfortable questions.

140.    The process to correct her gender marker on her state-issued identification documents was also very humiliating to L.G.  She often faced scorn from staff at state agencies, including staff at the Tennessee Department of Safety, and received disinformation regarding what documents or other supporting documentation was required to obtain an identification with the

27

correct gender marker.  During the several years it took L.G. to correct the gender marker on her driver license, she suffered humiliation, expense, and frustration.  Upon information and belief, L.G. would not have had such difficulty correcting the gender marker on her driver license if she had been able to correct the gender marker on her Tennessee birth certificate, in the first place.

141.     L.G. is personally aware of the high incidence of violence and harassment directed at transgender persons, as well as the high rates of employment and housing discrimination faced by transgender persons in states like Kentucky and Tennessee.

142.     L.G. is stigmatized and harmed by Tennessee's Birth Certificate Policy.

143.     As a result of Tennessee's Birth Certificate Policy, L.G.'s current Tennessee birth certificate reflects the sex she was incorrectly assigned at birth, erroneously stating that she is male and forcing her to use an identity document that inaccurately portrays her identity.

144.     Defendants' refusal to issue a birth certificate accurately reflecting that L.G. is female is a persistent and stigmatizing reminder that the State of Tennessee does not recognize her as a woman.  That refusal impedes her ability to function successfully as a woman in all aspects of her life, including any time she presents her birth certificate to others.

145.     L.G. also objects to the state's message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

146.     L.G. is harmed by Tennessee's Birth Certificate Policy, which prevents her from obtaining identity documents that are congruent with her gender identity.

147.     Being denied a birth certificate that accurately reflects her sex, consistent with her gender identity, is psychologically and emotionally harmful to L.G., who is faced with the

28

persistent reminder that the State of Tennessee does not acknowledge her gender identity or recognize her core personhood.

**Plaintiff K.N.**

148.    Plaintiff K.N. is a 31-year-old woman who was born in Tennessee and currently resides in California.

149.    K.N. wishes to correct her Tennessee birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female, as determined by her gender identity.

150.    K.N. is transgender.  She was assigned the sex of male at birth, and her Tennessee birth certificate marks her as male.  However, she is female.  K.N.'s identity as a woman is just as deep-seated as that of women who were assigned female at birth.

151.    From an early age, K.N. struggled with being perceived as a boy by others and identified in a more feminine manner.  Growing up, K.N. presented in a very effeminate way and had shoulder-length hair, which at times led people to identify her as female.

152.     K.N. went through a long internal process before fully recognizing her female gender identity.

153.    In 2016, K.N. came out as transgender to friends and family.  Since then, K.N. has lived as her true self—a woman—in all aspects of her life.

154.    Around this time, K.N. began to socially and medically transition in order to align her lived experience and body characteristics with her female gender identity.

155.    That same year, K.N. was diagnosed with gender dysphoria.  In consultation with her medical and mental health professionals, K.N. began to undergo clinically appropriate medical treatment to relieve her gender dysphoria and bring her body into alignment with her gender

identity. The steps K.N. has taken in her transition have brought her body characteristics and outside appearance into alignment with her female identity.

156.     The general public and community perceive K.N. as the woman she is. Indeed, K.N.'s transgender status is not publicly known, including by some of her co-workers.

157.     K.N. has sought to align her lived experience with her gender identity.

158.     K.N. has changed her name from a traditionally male name to a traditionally female one.

159.     K.N. has corrected her name and gender marker to be consistent with her female gender identity in all her identity documents except her birth certificate. This includes, *inter alia*, her driver license, social security records, and U.S. Passport.

160.     K.N. also wants to correct both her name and the gender marker on her birth certificate. However, as a result of Tennessee's Birth Certificate Policy, K.N. has not been able to do so. Because of Tennessee's Birth Certificate Policy, K.N. is prohibited from correcting the sex designation on her birth certificate. Thus, for K.N., updating her name on her birth certificate would be futile as the birth certificate would still disclose her transgender status.

161.     Because of Tennessee's Birth Certificate Policy, the sex designation on K.N.'s birth certificate still incorrectly identifies her as male, which is inconsistent with her female gender identity and other identification documents.

162.     K.N. reasonably fears that possessing a birth certificate that fails to reflect her female gender identity increases the likelihood that she will be subjected to invasions of privacy, prejudice, discrimination, distress, harassment, or violence.

163.     Indeed, the incorrect gender marker on K.N.'s birth certificate has subjected her to invasive and unnecessary questions in situations that require her to present her birth certificate.

For instance, to obtain a corrected driver license and passport, K.N. was required to produce her birth certificate. The clerks then questioned her about this incongruity, which made K.N. very uncomfortable and anxious. K.N. avoids presenting her birth certificate in the employment context by presenting her corrected passport but continues to worry about situations that require presentation of her birth certificate.

164.　　K.N. is personally aware of the high incidence of violence and harassment directed at transgender persons, as well as the high rates of employment and housing discrimination faced by transgender persons across the United States.

165.　　K.N. is stigmatized and harmed by Tennessee's Birth Certificate Policy.

166.　　As a result of Tennessee's Birth Certificate Policy, K.N.'s current Tennessee birth certificate reflects the sex she was incorrectly assigned at birth, erroneously stating that she is male and forcing her to use an identity document that inaccurately portrays her identity.

167.　　Defendants' refusal to issue a birth certificate accurately reflecting that K.N. is female is a persistent and stigmatizing reminder that the State of Tennessee does not recognize her as a woman. That refusal impedes her ability to function successfully as a woman in all aspects of her life, including any time she presents her birth certificate to others.

168.　　K.N. also objects to the state's message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

169.　　K.N. is harmed by Tennessee's Birth Certificate Policy, which prevents her from obtaining identity documents that are congruent with her gender identity.

170.　　Being denied a birth certificate that accurately reflects her sex, consistent with her gender identity, is psychologically and emotionally harmful to K.N., who is faced with the

31

persistent reminder that the State of Tennessee does not acknowledge her gender identity or recognize her core personhood.

**Tennessee's Birth Certificate Policy Harms Plaintiffs**

171.     The Birth Certificate Policy violates Plaintiffs' fundamental right to privacy by forcing the disclosure of highly personal and sensitive information, such as their transgender status and medical condition, to others whom Plaintiffs might not trust or wish to know such information.

172.     The forced disclosure of Plaintiffs' transgender status impermissibly exposes them to prejudice, discrimination, distress, harassment, and violence.

173.     Moreover, transgender people, regardless of whether they suffer from gender dysphoria, are harmed when they are prevented from taking steps to align their lived experiences with their true sex, as determined by their gender identity.   The bar to having identification documents, such as a birth certificate, that reflect a transgender person's true sex not only stigmatizes them, but also inhibits their ability to self-define and express their identity.

174.     When the government denies recognition of a transgender person's true sex, it necessarily imposes significant harms on that individual.   The government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining— indeed denying—their very identity and existence, it also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

175.     The State of Tennessee's refusal to respect a transgender person's identity on the quintessential identity document—birth certificates—serves as a scarlet letter, a reminder that the State of Tennessee considers transgender persons to be second-class citizens, unworthy of recognition, equal dignity, and respect.   Such refusal deprives transgender persons born in Tennessee, including Plaintiffs, of their constitutional rights.

32

176.     At all times relevant hereto, Defendants' administration and enforcement of the Birth Certificate Policy are actions under color of state law.

177.     Plaintiffs have been, and continue to be, injured by Defendants' conduct.

178.     Plaintiffs state all causes of action herein against all Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge Tennessee's Birth Certificate Policy both facially and as applied to them, in order to remedy the violation of their constitutional rights.

## CAUSES OF ACTION

### COUNT I – DEPRIVATION OF EQUAL PROTECTION IN VIOLATION OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

179.     Plaintiffs hereby incorporate by reference and reallege all of the preceding paragraphs of this Complaint as though fully set forth herein.

180.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

181.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex as well as discrimination based on transgender status is presumptively unconstitutional and subject to heightened scrutiny.

182.     Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender identity, transgender status, gender transition, and nonconformity with sex stereotypes.

183.     Tennessee's Birth Certificate Policy facially and intentionally discriminates against transgender people based on sex.  When the government lists a person's sex on their birth certificate, the government literally creates a classification based on sex.  In the case of transgender

33

individuals, like Plaintiffs, this classification reflects a sex contrary to their true sex, as determined by their gender identity, causing harm as a result.

184.    The Birth Certificate Policy facially and intentionally discriminates based on transgender status by depriving transgender people who were born in Tennessee—and them alone— of a birth certificate that accurately reflects their sex and that is consistent with their gender identity.

185.    Discrimination because a person is transgender constitutes (1) discrimination based on a sex, which requires courts to apply, at minimum, intermediate scrutiny when evaluating the constitutionality of the government's discrimination, and (2) discrimination based on transgender status, which requires courts to apply strict scrutiny to such discrimination.

186.    Government discrimination against transgender people because of their transgender status bears indicia of a suspect classification requiring strict scrutiny by the courts:

    a.    Transgender people have suffered a long history of extreme discrimination and continue to suffer such discrimination to this day;

    b.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination, and have been and continue to be regularly targeted for discrimination by legislation, regulations, and other government action;

    c.    A person's gender identity or transgender status bears no relation to a person's ability to contribute to society; and

    d.    Gender identity is a core, defining trait that is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition

34

of equal treatment. Gender identity is also generally fixed at an early age and highly resistant to change.

187.    Tennessee's Birth Certificate Policy treats transgender individuals differently than cisgender individuals who are similarly situated.

188.    The Birth Certificate Policy facially and intentionally discriminates based on sex and transgender status by depriving transgender people—and only transgender people—born in Tennessee of birth certificates that accurately reflect their sex and that are consistent with their gender identity. Cisgender people are not deprived of birth certificates that accurately reflect their sex and that are consistent with their gender identity.

189.    The Birth Certificate Policy facially and intentionally discriminates on the basis of sex and transgender status by depriving all transgender people—and only transgender people—born in Tennessee of access to an accurate birth certificate that they can use without sacrificing their privacy, health, safety, dignity, and autonomy. Cisgender people born in Tennessee are not deprived of birth certificates that they can use without sacrificing their privacy, health, safety, dignity, and autonomy.

190.    The Birth Certificate Policy deprives transgender people born in Tennessee, including Plaintiffs, of their right to equal dignity and stigmatizes them as second-class citizens in violation of the Equal Protection Clause.

191.    By enforcing the Birth Certificate Policy, Defendants deny transgender people born in Tennessee, including Plaintiffs, of their right to equal dignity, liberty, and autonomy because, unlike cisgender persons born in Tennessee, transgender persons born in Tennessee are deprived of a birth certificate that accurately reflects who they are.

35

192.     The Birth Certificate Policy, thus, deprives transgender people born in Tennessee, including Plaintiffs, of their equality and dignity by stigmatizing them and branding them as second-class citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment.

193.     The Birth Certificate Policy deprives transgender people born in Tennessee, including Plaintiffs, of the ability to secure certain benefits to which they would otherwise be entitled.

194.     The Birth Certificate Policy is not narrowly tailored to further a compelling government interest, substantially related to an important government interest, or even rationally related to a legitimate government interest.

195.     Accordingly, Defendants are liable for their violation of the Fourteenth Amendment rights of Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Tennessee's Birth Certificate Policy unconstitutional and enjoining its enforcement.

### COUNT II – DEPRIVATION OF DUE PROCESS
### IN VIOLATION OF THE FOURTEENTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION

196.     Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 178 of this Complaint as though fully set forth herein.

197.     The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

198.     The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

36

199.    The substantive protections of the Due Process Clause, as well as other constitutional provisions, give rise to a right to privacy, protecting information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure. Government infringement of these protections requires courts to apply strict scrutiny to such government action.

200.    Forced disclosure of a person's transgender status violates that person's fundamental right to privacy. The fact that a person is transgender constitutes highly personal and intimate information. A reasonable person would find the involuntary disclosure of one's transgender status to be deeply intrusive.

201.    The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity at risk. This harm burdens and interferes with the ability of transgender persons to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary.

202.    Tennessee's Birth Certificate Policy violates transgender persons', including Plaintiffs', fundamental right to privacy by causing disclosure of their transgender status and by depriving them of significant control over the circumstances around such disclosure. Moreover, Tennessee's existing practice of showing a strike-out line for permissible corrections to birth certificates, as delineated by Tenn. Comp. R. & Regs. 1200-07-01-.10, is similarly violative of the Fourteenth Amendment, because to the extent it applies to transgender individuals, this practice would disclose a person's transgender status on the face of the birth certificate.

203.    There are no adequate safeguards to prevent the harm caused by the involuntary disclosure of one's transgender status. For example, a person may need to disclose their birth

certificate directly to third parties, without any of the privacy safeguards that may exist where the government discloses information to third parties.

204.    The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity. These protections extend to personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity.

205.    The fundamental protections of an individual's autonomy encompass the right to define and express one's gender identity, including a right not to be treated in a manner contrary to one's sex, as defined by one's gender identity, by the government. The right to define and express one's gender identity is indeed among the most intimate imaginable, relating to matters that individuals are uniquely positioned to understand and define for themselves.

206.    When the government identifies individuals by their sex in official documents, the constitutional protections that shelter individual and bodily autonomy, dignity, and personhood prohibit the government from interfering with the right to live in accordance with one's gender identity.

207.    By enforcing Tennessee's Birth Certificate Policy, Defendants deny recognition of a transgender person's true sex and necessarily impose significant harms on that person. The government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining, indeed denying, their very identity and existence, but also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

38

208. By enforcing Tennessee's Birth Certificate Policy, Defendants unduly burden and unconstitutionally interfere with the fundamental right to autonomy in one's person and identity to which all transgender persons born in Tennessee, including Plaintiffs, are entitled.

209. There is no compelling, important, or even legitimate interest in the government causing transgender persons to involuntarily disclose their transgender status to third parties every time they present their birth certificate to such persons. Furthermore, there is no compelling, important, or even legitimate interest in the government interfering with the right of transgender persons to autonomy in one's person and identity.

210. Accordingly, Defendants are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Tennessee's Birth Certificate Policy unconstitutional and enjoining its enforcement.

**COUNT III – ABRIDGEMENT OF FREE SPEECH
IN VIOLATION OF THE FIRST AMENDMENT
OF THE UNITED STATES CONSTITUTION**

211. Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 178 of this Complaint as though fully set forth herein.

212. The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983 and applicable to the states through the Fourteenth Amendment, provides that a state "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

213. The freedom of speech protected by the First Amendment is multifaceted. The First Amendment protects both the right to speak and the right to refrain from speaking. A claim of compelled speech requires speech to which the speaker objects that is compelled by some governmental action.

39

214.     The Birth Certificate Policy violates the First Amendment rights of transgender people, including Plaintiffs, to refrain from speaking by forcing them to identify with a sex that was incorrectly assigned to them at birth and conflicts with who they are.   It also prevents transgender people from accurately expressing their gender identity.

215.     The Birth Certificate Policy also forces transgender people to disclose their transgender status, thereby compelling them to disclose private, sensitive, and personal information that they may not want to be publicly known or that may expose them to discrimination, harassment, and violence.

216.     The Birth Certificate Policy further violates the First Amendment rights of transgender people, including Plaintiffs, to refrain from speaking, compelling them instead to endorse the government's position as to their own gender, as well as on the meaning of sex generally, through the birth certificate they must show to others.  The gender marker listed on Plaintiffs' birth certificates conveys the state's message that sex is determined solely by the appearance of external genitals at the time of birth and never deviates from that—a message that is inconsistent with the medical and scientific understanding of sex and to which each Plaintiff strongly objects.

217.     The Birth Certificate Policy violates the First Amendment right of transgender people, including Plaintiffs, to speak by preventing them from accurately expressing their gender.

218.     The Birth Certificate Policy is not narrowly tailored to serve any compelling governmental interest.

219.     Accordingly, Defendants are liable for violating the First Amendment rights of the Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Tennessee's Birth Certificate Policy unconstitutional and enjoining its enforcement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendants on all claims as follows:

a. Enter a declaratory judgment that the actions of Defendants complained of herein, including the enforcement of Tennessee's Birth Certificate Policy, are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and the Free Speech Clause of the First Amendment to the United States Constitution;

b. Permanently enjoin Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, from enforcing Tennessee's Birth Certificate Policy, including from refusing to provide birth certificates to transgender persons that accurately reflect their sex, consistent with their gender identity;

c. Order Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, to permit transgender persons born in Tennessee to correct their birth certificates to accurately reflect their true sex, consistent with their gender identity, without adhering to the practice delineated in Rules of the Tenn. Comp. R. & Regs. 1200-07-01-.10 of using a strikeout line to change one's name, and with no record of the correction appearing upon the face of the certificate as provided by Tenn. Code Ann. § 68-3-203(f);

d. Order Defendants to immediately issue corrected birth certificates to Plaintiffs Kayla Gore, Jaime Combs, L.G., and K.N. accurately reflecting their true sex, consistent with their gender identity, without adhering to the practice delineated in Rules of the Tenn. Comp. R. & Regs. 1200-07-01-.10 of using a strikeout line to change one's name, and with

41

no record of the correction appearing upon the face of the certificate as provided by Tenn. Code Ann. § 68-3-203(f);

e. Award Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

f. Grant such other and further relief in favor of Plaintiffs as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

Dated: March 3, 2020.

Respectfully submitted,

/s/ John T. Winemiller

Gavin R. Villareal*
Maddy Dwertman*
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
Phone: (512) 322-2500
Facsimile: (512) 322-2501
gavin.villareal@bakerbotts.com
maddy.dwertman@bakerbotts.com

Brandt Thomas Roessler*
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
Phone (212) 408-2500
Facsimile: (212) 408-2501
brandt.roessler@bakerbotts.com

Kathryn S. Christopherson*
BAKER BOTTS L.L.P.
1001 Page Mill Rd., Bldg. One, Suite 200
Palo Alto, CA 94304-1007
Phone: (650) 739-7500
Facsimile: (650) 739-7699
kathryn.christopherson@bakerbotts.com

John T. Winemiller
MERCHANT & GOULD P.C.
800 S. Gay Street, Suite 2150
Knoxville, TN 37929
Phone: (865) 380-5960
Facsimile: (612) 332-9081
JWinemiller@merchantgould.com

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
Telephone: (212) 809-8585
Facsimile: (212) 809-0055
ogonzalez-pagan@lambdalegal.org

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
Telephone: (404) 897-1880
Facsimile: (404) 897-1884
tborelli@lambdalegal.org

42

Sasha Buchert*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, DC 20006
Telephone: (202) 804-6245
sbuchert@lambdalegal.org

*Counsel for Plaintiffs*
*\* Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically

using the Court's CM/ECF system, which provides electronic notice of the filing to all counsel of

record, including:

Herbert H. Slatery III
Attorney General and Reporter

Dianna Baker Shew
Senior Assistant Attorney General
dianna.shew@ag.tn.gov
Sara E. Sedgwick
Senior Assistant Attorney General
sara.sedgwick@ag.tn.gov
PO Box 20207
Nashville, TN 37202

*s/ John T. Winemiller*
John T. Winemiller