**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| KAYLA GORE; JAIME COMBS; L.G.; and K.N., | |
| *Plaintiffs*, | |
| v. | No. 3:19-CV-00328 |
| WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health, | DISTRICT JUDGE RICHARDSON MAGISTRATE JUDGE HOLMES |
| *Defendants*. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**</u>

## Table of Contents

Page

I.   INTRODUCTION ........................................................................................ 1

II.  FACTUAL BACKGROUND........................................................................ 1

     A.  Sex and Gender Identity................................................................... 1

     B.  The Parties ........................................................................................ 2

     C.  Tennessee's Birth Certificate Policy................................................ 3

     D.  How the Birth Certificate Policy Harms Transgender Persons,
         Including Plaintiffs........................................................................... 5

III. ARGUMENT ............................................................................................... 5

     A.  Tennessee's Birth Certificate Policy Violates the Right to Privacy and
         Constitutionally-Protected Liberty Interests of Transgender Persons. ........................ 5

         1.  Tennessee's Birth Certificate Policy infringes on Plaintiffs'
             fundamental rights and liberty interests to decisional privacy, individual
             dignity, and autonomy. ...................................................................... 6

         2.  The Birth Certificate Policy infringes upon the fundamental right to
             informational privacy of transgender persons..................................... 8

             a.    Plaintiffs' transgender status is of an intimate and
                   sensitive nature, and defines significant portions of their
                   personhood............................................................................. 9

             b.    Disclosure of Plaintiffs' transgender status places
                   their personal safety and bodily integrity in jeopardy. ................. 11

     B.  Tennessee's Birth Certificate Policy Deprives Tennessee-born
         Transgender Persons of Equal Protection, in Violation of the
         Fourteenth Amendment. ................................................................... 12

         1.  The Birth Certificate Policy is subject to heightened scrutiny
             because it impermissibly discriminates against transgender
             people based on sex.                                    ................. 13

         2.  Discrimination based on transgender status is subject to
             heightened scrutiny. .......................................................................... 15

     C.  Tennessee's Birth Certificate Policy Violates Tennessee-born
         Transgender Persons' First Amendment Rights to Free Speech. .............................. 17

         1.  Tennessee's Policy impermissibly compels transgender
             persons to speak and identify with a sex and identity
             contrary to who they are. ................................................................. 18

i

2. Tennessee's Birth Certificate Policy impermissibly compels Plaintiffs to endorse a government-preferred view about sex. ...................... 19

3. The speech at issue belongs to, and is naturally attributed to, Plaintiffs. ................................................................................... 20

D. The Birth Certificate Policy Fails Any Level of Scrutiny. ......................... 21

IV. CONCLUSION .................................................................................................. 25

CERTIFICATE OF SERVICE ................................................................................. 27

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cty., Fla.,*
    318 F. Supp. 3d 1293 (M.D. Fla. 2018)...........................................................14, 15

Adkins v. City of New York,
    143 F. Supp. 3d 134 (2015) ...........................................................................11

*Arroyo Gonzalez v. Rossello Nevares,*
    305 F. Supp. 3d 327 (D.P.R. 2018)............................................................. *passim*

*Barnes v. City of Cincinnati,*
    401 F.3d 729 (6th Cir. 2005) ...........................................................................14

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dept. of Educ.,*
    208 F. Supp. 3d 850 (S.D. Ohio 2016) .............................................................16

*Bloch v. Ribar,*
    156 F.3d 673 (6th Cir. 1998) .................................................................6, 9, 10

*Bowen v. Gilliard,*
    483 U.S. 587 (1987)..........................................................................................15

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)...................................................................................15, 22

*Darnell v. Lloyd,*
    395 F. Supp. 1210 (D. Conn. 1975) .................................................................10

*Dillinger v. Schweiker,*
    762 F.2d 506 (6th Cir. 1985) ...........................................................................21

*Doe v. Blue Cross & Blue Shield of Rhode Island,*
    794 F. Supp. 72 (D.R.I. 1992)..........................................................................10

*Does v. Muñoz,*
    507 F.3d 961 (6th Cir. 2007) .............................................................................6

*In re E.P.L.,*
    891 N.Y.S.2d 619 (Sup. Ct. 2009).....................................................................11

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
    884 F.3d 560 (6th Cir. 2018), *cert. granted in part*, 139 S. Ct. 1599 (2019) ...................14, 15

iii

*Eisenstadt v. Baird,*
    405 U.S. 438 (1972)......................................................................................................24

*Evancho v. Pine-Richland Sch. Dist.,*
    37 F. Supp. 3d 267 (W.D. Pa. 2017).....................................................13, 14, 15, 16

*F.V. v. Barron,*
    286 F. Supp. 3d 1131 (D. Idaho 2018) ........................................................ *passim*

*Fabian v. Hosp. of Cent. Conn.,*
    172 F. Supp. 3d 509 (D. Conn. 2016).....................................................................14

*Flack v. Wis. Dep't of Health Servs.,*
    328 F. Supp. 3d 931 (W.D. Wis. 2018) ..................................................................16

*Foster v. Andersen,*
    No. 18-2552-DDC-KGG, 2019 WL 329548 (D. Kan. Jan. 25, 2019)..............10, 11

*Foster v. Anderson,*
    No. 18-2552-DDC-KGG, ECF No. 33 (D. Kan. June 21, 2019).............................22

*Glenn v. Brumby,*
    663 F3d 1312 (11th Cir. 2011) ...............................................................................14

*Golinski v. Office of Pers. Mgmt.,*
    824 F. Supp. 2d 968 (N.D. Cal. 2012) ....................................................................16

*Grimm v. Gloucester Cty. Sch. Bd.,*
    400 F. Supp. 3d 444 (E.D. Va. 2019) .....................................................................15

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
    471 U.S. 539 (1985)................................................................................................18

*Hartwell v. Houghton Lake Cmty. Sch.,*
    755 F. App'x 474 (6th Cir. 2018) .............................................................................6

*Heller v. Doe,*
    509 U.S. 312 (1993)................................................................................................22

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995)...........................................................................................18, 19

*K.L. v. State Dept. of Admin. Div. of Motor Vehicles,*
    3 AN-11-05431-CI, 2012 WL 2685183 (Alaska Super. Mar. 12, 2012)..............10, 22, 23, 24

*Kallstrom v. City of Columbus,*
    136 F.3d 1055 (1998).....................................................................................9, 11, 12

iv

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019) ..........................................................................14

*Lambert v. Hartman,*
    517 F.3d 433 (6th Cir. 2008) ..........................................................................6, 9

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ..........................................................................................7

*Love v. Johnson,*
    146 F. Supp. 3d 848 (E.D. Mich. 2015) ................................................. *passim*

*Miami Herald Pub. Co. v. Tornillo,*
    418 U.S. 241 (1974) ........................................................................................18

*NAACP v. State of Ala. ex rel. Patterson,*
    357 U.S. 449 (1958) ........................................................................................19

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) ....................................................................................21

*New Doe Child #1 v. Cong. of United States,*
    891 F.3d 578 (6th Cir. 2018) ......................................................................20, 21

*Obergefell v. Hodges,*
    135 S. Ct. 2584 (2015) ........................................................................1, 6, 7, 8

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California,*
    475 U.S. 1 (1986) ...........................................................................................18

*Pavan v. Smith,*
    137 S. Ct. 2075 (2017) ....................................................................................23

*Phillips v. Cane,*
    No. C13-596 RSM, 2013 WL 4049047 (W.D. Wash. Aug. 9, 2013) ....................11

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992) ......................................................................................7, 9

*Powell v. Schriver,*
    175 F.3d 107 (2d Cir. 1999) ........................................................................10, 11

*Ray v. Himes,*
    No. 2:18-cv-272, slip op. (S.D. Ohio Sept. 12, 2019) .................................. *passim*

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ..........................................................................................7

v

*Romer v. Evans,*
    517 U.S. 620, 632 (1996) ..................................................................................22

*Rosa v. Park W. Bank & Tr. Co.,*
    214 F.3d 213 (1st Cir. 2000) ..............................................................................14

*Scarbrough v. Morgan Cty. Bd. of Educ.,*
    470 F.3d 250 (6th Cir. 2006) ..............................................................................12

*Schroer v. Billington,*
    424 F. Supp. 2d 203 (D.D.C 2016) .....................................................................14

*Seal v. Morgan,*
    229 F.3d 567 (6th Cir. 2000) ..........................................................................6, 21

*Sessions v. Morales-Santana,*
    137 S. Ct. 1678 (2017) ...................................................................................21, 22

*Smith v. City of Salem,*
    378 F.3d 566 (6th Cir. 2004) ..............................................................................14

*Stanley v. Georgia,*
    394 U.S. 557 (1969) ............................................................................................19

*Sterling v. Borough of Minersville,*
    232 F.3d 190 (3d Cir. 2000) ...............................................................................10

*Turner Broad. Sys., Inc. v. F.C.C.,*
    512 U.S. 622 (1994) ............................................................................................17

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973) ............................................................................................22

*United States v. Virginia,*
    518 U.S. 515 (1996) .......................................................................................13, 21

*United States v. Windsor,*
    133 S. Ct. 2675 (2013) ........................................................................................13

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    135 S. Ct. 2239 (2015) ........................................................................................19

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ..............................................................................................7

*Whalen v. Roe,*
    429 U.S. 589 (1977) ..............................................................................................6

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    858 F.3d 1034, 1051 (2017)..................................................................11, 14, 23

*Windsor v. United States,*
    699 F.3d 169 (2d Cir. 2012)...........................................................................15

*Wooley v. Maynard,*
    430 U.S. 705 (1977)..................................................................................17, 20

**Statutes**

U.S. Const. Amend. I ...................................................................................17, 18, 19

U.S. Const. Amend. XIV .................................................................................5, 12, 22

Tenn. Code Ann. § 68-3-101 *et seq*...........................................................................3

Tenn. Code Ann. § 68-3-203 ......................................................................................3

Tenn. Code Ann. § 68-3-203(d)..............................................................................4, 16

Tenn. Code Ann. § 68-3-203(f) ...............................................................................4, 25

Tenn. Code Ann. § 68-3-311(b)(2) ............................................................................3

Tenn. Comp. R. & Regs. 1200-07-01-.04.................................................................23

Tenn. Comp. R. & Regs. 1200-07-01-.10.............................................................3, 23

Tenn. Comp. R. & Regs. 1200-07-01-.10(11)(a)(2) ..................................................4

Tenn. Comp. R. & Regs. 1340-01-13-.12(6) ...........................................................24

Tenn. Comp. R. & Regs. 0450-01-.05 .................................................................18, 20

Tenn. Op. Att'y Gen. No. 14-70, 2014 WL 3700672 (July 16, 2014)........................4

Tenn. Op. Att'y Gen. No. 19-01, 2019 WL 845668 (Feb. 8, 2019) ..........................14

Tenn. Op. Att'y Gen. No. 88-43, 1988 WL 410159 (Feb. 29, 1988) ..........................4

**Other Authorities**

Chai R. Feldblum, *The Right to Define One's Own Concept of Existence:
    What Lawrence Can Mean for Intersex and Transgender People,*
    7 Geo. J. Gender & L. 115, 116 (2006) ....................................................................7

Scott Skinner-Thompson, *Outing Privacy*,
110 Nw. U. L. Rev. 159, 171-72 (2015) ................................................................8

House Bill 79 ................................................................................................................16

Senate Bill 98 ..............................................................................................................16

Model State Vital Statistics Act ....................................................................................17

Vital Records Act of 1977 ............................................................................................16

## I. INTRODUCTION

At the heart of liberty lies a person's ability "to define and express their identity." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015). A birth certificate is the quintessential, primary identity document routinely used to verify a person's identity. It influences a person's ability to go through most of aspects of life in our society, as it affects access to employment, education, housing, health care, banking, travel, and government services.

For Tennessee-born transgender people, the sex designation (*i.e.*, gender marker) on their original birth certificate is inaccurate because they were assigned the incorrect sex at birth. Correcting this designation is critically important for transgender people. While Tennessee provides cisgender people born in the state with accurate birth certificates reflecting their sex, consistent with their gender identity, it categorically bars transgender people born in the state from obtaining birth certificates that reflect their sex, consistent with their gender identity (the "Birth Certificate Policy" or "Policy"). This is undisputed. Tennessee permits cisgender persons to correct the sex listed on their birth certificates to reflect who they are, but specifically prohibits transgender persons from doing so. Thus, while Tennessee recognizes the need to correct inaccurate sex designations on birth certificates, it denies that ability to transgender people.

The Policy violates Plaintiffs' constitutional rights to due process, equal protection, and freedom of expression. Because Defendants cannot articulate any adequate justification for the Policy, the Court should grant summary judgment to Plaintiffs.

## II. FACTUAL BACKGROUND

### A. Sex and Gender Identity

Multiple factors determine a person's sex, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. Decl. of Randi Ettner, Ph.D. ¶ 18 (**Exh 1**); Decl. of Shayne Sebold Taylor, M.D. ¶ 19 (**Exh**

**2**). These factors may not always be in alignment. Ettner Decl. ¶ 16; Taylor Decl. ¶ 20. Gender identity—a person's internal sense of their own gender—is the primary factor in determining a person's sex. Ettner Decl. ¶ 20; Taylor Decl. ¶ 30. It is a deeply felt and core component of human identity. Ettner Decl. ¶ 19; Taylor Decl. ¶ 21. The medical consensus is that gender identity is innate and attempts to change a person's gender identity are unethical and harmful to the person's health and well-being. Ettner Decl. ¶ 25; Taylor Decl. ¶ 29. Biological factors, including neurodevelopmental characteristics of a person's brain with respect to sex, play an immutable role in gender identity development. Ettner Decl. ¶ 24; Taylor Decl. ¶¶ 21-22.

The phrase "sex assigned at birth" refers to the sex recorded on a birth certificate at the time of birth. Ettner Decl. ¶ 16; Taylor Decl. ¶ 18. Typically, individuals are assigned a sex based solely on the appearance of external genitalia at the time of birth. Ettner Decl. ¶ 16; Taylor Decl. ¶ 18. A cisgender person is someone whose gender identity aligns with the sex they were assigned at birth. Ettner Decl. ¶ 22; Taylor Decl. ¶ 54. A transgender person is someone whose gender identity diverges from the sex they were assigned at birth. Ettner Decl. ¶ 16; Taylor Decl. ¶ 26.

### B. <u>The Parties</u>

Plaintiffs are transgender persons born in Tennessee. Decl. of Kayla Gore ¶¶ 2, 4-5 (**Exh 3**); Decl. of Jaime Combs ¶¶ 3, 5-6 (**Exh 4**); Decl. of L.G. ¶¶ 2, 6-7 (**Exh 5**); Decl. of K.N. ¶¶ 2, 4-5 (**Exh 6**). They are women. Gore Decl. ¶ 4; Combs Decl. ¶ 5; L.G. Decl. ¶ 6; K.N. Decl. ¶ 4. Their gender identity and expression are female, but they were each incorrectly assigned the sex of male at birth. Gore Decl. ¶ 5; Combs Decl. ¶ 6; L.G. Decl. ¶ 7; K.N. Decl. ¶ 5. Each of them has undergone appropriate, necessary steps to better align their body, appearance, and lived experience with their female gender identity. Gore Decl. ¶ 9; Combs Decl. ¶ 10; L.G. Decl. ¶¶ 10-12; K.N. Decl. ¶¶ 7-9.

Like many transgender persons, Plaintiffs have successfully corrected some of their other identity documents in Tennessee and elsewhere (*e.g.*, driver's licenses and passports) to accurately

reflect who they are, consistent with their gender identity. Gore Decl. ¶ 12; Combs Decl. ¶ 11; L.G. Decl. ¶¶ 14-16; K.N. Decl. ¶ 11. Unsurprisingly, they also wish to correct their Tennessee birth certificates to accurately reflect their gender identity and name. Gore Decl. ¶ 23; Combs Decl. ¶ 22; L.G. Decl. ¶ 25; K.N. Decl. ¶ 22. But the Policy prohibits them from correcting their birth certificates in a manner that does not disclose their transgender status. Gore Decl. ¶¶ 13, 15; Combs Decl. ¶ 12; L.G. Decl. ¶ 15; K.N. Decl. ¶¶ 12, 14.

William Byron Lee, the Governor of the State of Tennessee, and Lisa Piercey, the Commissioner of the Tennessee Department of Health, are responsible for enforcing the Vital Records Act, Tenn. Code Ann. § 68-3-101 *et seq.*, and are sued in their official capacities.

### C.    Tennessee's Birth Certificate Policy

Tennessee's Vital Records Act (the "Act") provides that all birth certificates must include, *inter alia*, a newborn's date of birth, place of birth, sex, given name and surnames, and parents' names. *See*, *e.g.*, Tenn. Code Ann. § 68-3-311(b)(2). It is the practice of the State of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on the observations by third parties about the external genitalia of newborns. *See* Defs.' Mem. Mot. to Dismiss (ECF No. 29) at 11-12 & n.6; *cf.* Decl. of Omar Gonzalez-Pagan, Ex. B (RFA No. 21).[1]

Recognizing that information on a birth certificate may sometimes be inaccurate or need updating, the Act, and the regulations promulgated and enforced by Defendants, permit the correction of errors and updating of birth certificate records. *See* Tenn. Code Ann. § 68-3-203; Tenn. Comp. R. & Regs. 1200-07-01-.10. For example, according to Regulation 1200-07-01-.10 and the public website for the Office of Vital Records, the sex listed on a person's birth certificate may be

---

[1] Except where otherwise specified, exhibit numbers herein (*e.g.*, Ex. __) refer to exhibits to the Declaration of Omar Gonzalez-Pagan, filed separately.

corrected if the change is substantiated by a signed and notarized affidavit showing the full name, date of birth, the sex as it is shown on the certificate and the sex as it should be correctly listed, as well as documentary evidence showing the correct sex of the individual. Ex. C at 3.

The Act, though, provides, "[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." Tenn. Code Ann. § 68-3-203(d). Based on this, Defendants enforce a policy, custom, or practice that categorically prohibits Tennessee-born transgender persons from correcting the sex listed on their birth certificates to match their sex, consistent with their gender identity, regardless of what steps they have taken to live in a manner consistent with their gender identity. *See*, *e.g.*, Tenn. Op. Att'y Gen. No. 14-70, 2014 WL 3700672 (July 16, 2014) (designation of sex on police booking sheets, warrants and other court records must match birth certificate, regardless of gender-confirming surgery); Tenn. Op. Att'y Gen. No. 88-43, 1988 WL 410159 (Feb. 29, 1988) (person's sex determined at birth for purposes of obtaining Tennessee marriage license). This is the Birth Certificate Policy challenged here.

Further, under Regulation 1200-07-01-.10(11)(a)(2), Defendants typically require drawing a single line through an item to be amended on a birth certificate. Enforcing this requirement with respect to transgender persons, who commonly change their names to better match their gender identity (and, if successful here, to correct the sex designation), discloses their transgender status on the face of the birth certificate and exposes them to harm. Any corrections to the name or sex designation of a transgender person's birth certificate should instead follow the procedure outlined by Tenn. Code Ann. § 68-3-203(f): "[N]o record of the amendment shall appear upon the face of the certificate; provided, that a record of all evidence submitted relative to the amendment, along with the registrar's analysis of the evidence, shall be maintained by the office of vital records."

4

**D.** **How the Birth Certificate Policy Harms Transgender Persons, Including Plaintiffs**

Tennessee's Policy erects a barrier to full engagement in society by transgender persons and subjects them to invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence. Gore Decl. ¶¶ 17, 19-20; Combs Decl. ¶¶ 15-19; L.G. Decl. ¶¶ 16, 19-20; K.N. Decl. ¶¶ 19-20; Ettner Decl. ¶¶ 40-47; Taylor Decl. ¶¶ 48-64. These concerns are particularly acute in Tennessee. Ex. D; *cf.* Taylor Decl. ¶ 54. Tennessee's Policy forces the disclosure of highly personal and sensitive information, such as a person's transgender status and medical condition, to anyone demanding the document, including individuals who one might not trust or wish to know such information. *Cf.* Ettner Decl. ¶ 15, 40, 47; Taylor Decl. ¶¶ 50-52.

For transgender persons who experience gender dysphoria,[2] being denied the ability to correct the gender marker on their birth certificates interferes with their medical treatment and increases their dysphoria and distress. Ettner Decl. ¶ 42-43; Taylor Decl. ¶¶ 52, 58. Moreover, transgender persons, whether or not they experience gender dysphoria, are harmed when prevented from aligning their lived experience with their sex, as determined by the gender identity. Taylor Decl. ¶ 31. The bar to having identification documents—in this case, birth certificates—that accurately reflect who they are stigmatizes transgender people and places them at personal risk and contributes to negative health care outcomes.

**III.** **ARGUMENT**

**A.** **Tennessee's Birth Certificate Policy Violates the Right to Privacy and Constitutionally-Protected Liberty Interests of Transgender Persons.**

No state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Besides "requiring fair procedures," the Due Process Clause "includes

---

[2] Gender dysphoria is the clinical distress caused by the discordance between a person's gender identity and the sex to which they were assigned at birth. Ettner Decl. ¶ 26; Taylor Decl. ¶¶ 34-35.

'heightened protection against government interference with certain fundamental rights and liberty interests,' including the right to privacy." *Ray v. Himes*, No. 2:18-cv-272, slip op. at 13 (S.D. Ohio Sept. 12, 2019) (Ex. A) (quoting *Does v. Muñoz*, 507 F.3d 961, 964 (6th Cir. 2007)). There are two types of interests "protected by the right to privacy." *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008). The first "is the interest in 'independence in making certain kinds of important decisions.'" *Id*. (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977)). The second "is the 'interest in avoiding disclosure of personal matters.'" *Id.* (quoting *Whalen*, 429 U.S. at 599).

Any state policy that implicates a fundamental right or constitutionally protected liberty interests is reviewed with strict scrutiny and can be upheld only if it is narrowly tailored to a compelling governmental interest. *See Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000). Here, the Policy implicates Plaintiffs' interests protected by the fundamental right to privacy, as well as their constitutionally protected liberty interests in individual dignity and autonomy.

1.  Tennessee's Birth Certificate Policy infringes on Plaintiffs' fundamental rights and liberty interests to decisional privacy, individual dignity, and autonomy.

Among the fundamental rights and liberty interests protected by the Due Process Clause are "'certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs.'" *Hartwell v. Houghton Lake Cmty. Sch.*, 755 F. App'x 474, 477 (6th Cir. 2018) (quoting *Obergefell*, 135 S. Ct. at 2597). Transgender persons possess this liberty and right in equal measure with all others. "Our sexuality and choices about sex … are interests of an intimate nature which define significant portions of our personhood." *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998). And "[m]uch like matters relating to marriage, procreation, contraception, family relationships, and child rearing, there are few areas which more closely intimate facts of a personal nature than one's transgender status." *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (quotation omitted).

6

Few decisions are as deeply personal and integral to any individual's own concept of personhood as their decision to live consistent with their own gender identity and choose whether and to whom to disclose their transgender status. The Constitution promises all persons the liberty "to define and express their identity." *Obergefell*, 135 S. Ct. at 2593; *see also Lawrence v. Texas*, 539 U.S. 558, 574 (2003) ("At the heart of liberty is the right to define one's own concept of existence") (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992)). It protects the right of every individual to possess and control their own person and to define and express their own personal identity. *Obergefell*, 135 S. Ct. at 2597.

The ability to live in accord with, to express, and to have legal recognition of one's identity and sex, as defined by one's gender identity, is therefore entitled to protection under the Due Process Clause. A person's core internal sense of their gender is profoundly central to their personal identity in ways the Constitution protects: "[T]he liberty interest recognized by the court in *Lawrence*—the right 'to define one's own concept of existence'—is an interest that speaks directly … to the efforts of transgender people to define their gender identity and expression." Chai R. Feldblum, *The Right to Define One's Own Concept of Existence: What Lawrence Can Mean for Intersex and Transgender People*, 7 Geo. J. Gender & L. 115, 116 (2006) (quoting *Lawrence*, 559 U.S. at 574). This is as true for a transgender person as it is for a cisgender person. And to be sure, the ability to define one's identity is "fundamental to our concept of constitutionally ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 727 (1997); *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984) ("ability independently to define one's identity … is central to any concept of liberty").

A person's liberty interest in their core personal identity, and living in accordance with that identity, is severely infringed if the government denies recognition of and acts to thwart it. Just as requiring a cisgender woman to mis-identify herself as a man on government-issued documents would be an inconceivable intrusion on individual liberty, so too does the Policy impermissibly

7

intrude on the liberty of Tennessee-born transgender persons to identify themselves in a manner consistent with their gender identity. The ability to live in accord with and express one's sex, as determined by one's gender identity, is "so fundamentally important … that the government may not, absent satisfying a heightened level of scrutiny, infringe or burden an individual's autonomy or freedom to make [such a] decision[]." Scott Skinner-Thompson, *Outing Privacy*, 110 Nw. U. L. Rev. 159, 171-72 (2015); *see also Arroyo Gonzalez*, 305 F. Supp. 3d at 333-34.

The conclusion that a birth certificate must accurately reflect a transgender person's sex is further bolstered by the fact that, like sexual orientation, gender identity is recognized by the courts—as well as medical and scientific experts—as immutable. *See* Ettner Decl. ¶¶ 24-25; Taylor Decl. ¶¶ 21, 28. Because Plaintiffs—like other transgender persons—have no choice in their gender identity, the Policy improperly interferes with transgender persons' personal dignity and autonomy. Here, Plaintiffs "only real path" to the full and correct recognition of their true selves, consistent with their gender identity, along with access to government services and participation in public life, is the ability to correct their birth certificates to properly identify who they are. *See Obergefell*, 135 S. Ct. at 2594. Defendants, who alone can confer on Tennessee-born Plaintiffs accurate birth certificates, deprive them of far more than a piece of paper. They deprive Plaintiffs of the dignity and autonomy to identify as who they are and to live with the security and protection of accurate government identity documentation on which others can rely.

Because the forcible disclosure of a person's transgender status interferes with deeply personal decisions, Tennessee's Policy implicates and infringes upon transgender persons' fundamental rights to decisional privacy, liberty, dignity, and individual autonomy.

      2.    <u>The Birth Certificate Policy infringes upon the fundamental right to informational privacy of transgender persons.</u>

The right to informational privacy extends "to the interests that implicate a fundamental

liberty interest," *Bloch*, 156 F.3d at 684, or where such "interest[s] at stake … implicate either a fundamental right or one implicit in the concept of ordered liberty," *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1061 (1998). An informational-privacy interest of constitutional dimension exists "(1) where the release of personal information could lead to bodily harm (*Kallstrom*), and (2) where the information released was of a sexual, personal, and humiliating nature (*Bloch*)." *Lambert*, 517 F.3d at 440; *see also Ray*, slip op. at 14; *Love v. Johnson*, 146 F. Supp. 3d 848, 853 (E.D. Mich. 2015).

The Policy forces the disclosure of protected information—namely, a person's transgender status. Such disclosure arises from both the prohibition against gender marker corrections and the required display of corrections, as provided by Regulation 1200-07-01-.10. Both indicate the birth certificate-holder is transgender. In doing so, the Policy violates Plaintiffs' constitutionally protected right to informational privacy. As articulated above, the disclosure relates to "interests that implicate a fundamental liberty interest," *Bloch*, 156 F.3d at 684, "or one implicit in the concept of ordered liberty," *Kallstrom*, 136 F.3d at 1061. And, as shown below, the disclosure relates to the informational-privacy interests recognized in *Bloch* and *Kallstrom*. *See Arroyo Gonzalez*, 305 F. Supp. 3d at 333; *Love*, 146 F. Supp. 3d at 856; *see also Ray*, slip op. at 23-24 ("The Court finds that under both *Kallstrom* and *Bloch*, Plaintiffs have adequately alleged that Defendants' Policy of refusing to change birth certificates to reflect gender identity implicates a release of personal information that is of a 'sexual, personal, and humiliating nature' and 'could lead to bodily harm,' resulting in a violation of Plaintiffs' informational right to privacy." (citations omitted)).

       a.    <u>Plaintiffs' transgender status is of an intimate and sensitive nature, and defines significant portions of their personhood.</u>

Informational privacy includes "interests of an intimate nature which define significant portions of our personhood." *Bloch*, 156 F.3d at 685; *cf. Casey*, 505 U.S. at 851. Every federal court

to consider the question has agreed that information about a person's transgender status and gender identity is intimate and involves core aspects of personhood. *See Ray*, slip op. at 23; *Arroyo Gonzalez,* 305 F. Supp. 3d. at 334; *Love*, 146 F. Supp. 3d at 855; *K.L. v. State Dept. of Admin. Div. of Motor Vehicles*, 3 AN-11-05431-CI, 2012 WL 2685183, at *6 (Alaska Super. Mar. 12, 2012); *Doe v. Blue Cross & Blue Shield of Rhode Island*, 794 F. Supp. 72, 74 (D.R.I. 1992); *Darnell v. Lloyd*, 395 F. Supp. 1210, 1214 (D. Conn. 1975). Indeed, per the Sixth Circuit, a person's "sexuality and choices about sex … are interests of an intimate nature which define significant portions of our personhood … that we regard as highly personal and private." *Bloch*, 156 F.3d at 685; *cf. Sterling v. Borough of Minersville*, 232 F.3d 190, 196 n.4 (3d Cir. 2000) ("disclosure of one's sexual orientation" is "protected by the right to privacy," as "such information is intrinsically private"). In sum, a person's transgender status is particularly private, intimate, personal information. *See*, *e.g.*, *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999); *Ray*, slip op. at 23; *Foster v. Andersen,* No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019); *Arroyo Gonzalez,* 305 F. Supp. 3d at 333; *see also* Ettner Decl. ¶¶ 14-15; Taylor Decl. ¶¶ 58-60.

"Disclosing that one is transgender involves a deep personal choice which the government cannot compel, unless disclosure furthers a valid public interest." *Arroyo Gonzalez,* 305 F. Supp. 3d at 333. The *forced* disclosure of a person's transgender status through the government's refusal to issue accurate identity documents thus violates the constitutionally protected right to informational privacy. *See id.*; *Love*, 146 F. Supp. 3d at 856; *K.L.*, 2012 WL 2685183, at *8. By prohibiting correction of the inaccurate sex designation on the birth certificates of transgender persons born in Tennessee, the Policy infringes upon Plaintiffs' fundamental right to privacy with regards to intimately personal and sensitive information.

b.    <u>Disclosure of Plaintiffs' transgender status places their personal safety and bodily integrity in jeopardy.</u>

In addition, forced disclosure of a person's transgender status places their personal safety and bodily integrity in jeopardy. *See Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (2017); *Phillips v. Cane*, No. C13-596 RSM, 2013 WL 4049047, at *6 (W.D. Wash. Aug. 9, 2013); *In re E.P.L.*, 891 N.Y.S.2d 619, 621 (Sup. Ct. 2009). Being transgender "is likely to provoke … hostility and intolerance from others." *Powell*, 175 F.3d at 111-12. "The forced disclosure of the transgender status of plaintiffs and other transgender persons by way of inaccurate birth certificates exposes them to prejudice, discrimination, distress, harassment, and violence," as well as "to a substantial risk of stigma, … intimidation, … and danger." *Arroyo Gonzalez*, 305 F. Supp. 3d at 332, 333; *see also Ray*, slip op. at 15-16; *Foster*, 2019 WL 329548, at *2; *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1137 (D. Idaho 2018) ("Transgender people who present mismatched identification are verbally harassed, physically assaulted, denied service or benefits, or asked to leave the premises."); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (2015). These fears are borne out by transgender people's experiences, including those of Plaintiffs. Gore Decl. ¶ 20; Combs Decl. ¶¶ 15, 17; L.G. Decl. ¶¶ 13, 16, 20; K.N. Decl. ¶ 20; Ettner Decl. ¶¶ 40, 43; Taylor Decl. ¶¶ 50-54. According to a 2015 study, nearly a third of transgender people who show an identification document with a name or gender that does not match their gender presentation are verbally harassed, denied benefits or service, asked to leave, or assaulted. Ex. F at 7; *see also* Ettner Decl. ¶¶ 44-45; Taylor Decl. ¶¶ 50-51.

Like *Love* and *Kallstrom*, this case involves the risk of serious bodily harm: "Similar to *Kallstrom*, the Court finds no reason to doubt that where disclosure of this highly intimate information may fall into the hands of persons harboring such negative feelings, the Policy creates a very real threat to Plaintiffs' personal security and bodily integrity." *Love*, 146 F. Supp. 3d at 856.

"[T]he *Kallstrom* court unambiguously identified the right to personal security and bodily integrity '*from a perceived likely threat.*'" *Id.* at 854 (quoting *Kallstrom*, 136 F.3d at 1064). "*Kallstrom* does not require courts to wait until plaintiffs are actually assaulted, or worse, to recognize a very real threat to transgender individuals['] personal security and bodily integrity upon disclosure of their status." *Ray*, slip op. at 19 (cleaned up). Here, Plaintiffs have offered a plethora of evidence demonstrating that the Policy poses a serious threat to their personal security and bodily integrity. *Cf. Ray*, slip op. at 19-20; *Love*, 146 F. Supp. 3d at 855.

In addition to the well-documented history of discrimination, harassment, and violence transgender people experience when they must present inaccurate identification documents, Plaintiffs point to their own first-hand experiences and knowledge. The Policy has instigated hostility, discrimination, and even threats of violence against Plaintiffs. Gore Decl. ¶¶ 16, 20; Combs Decl. ¶¶ 15, 17; L.G. Decl. ¶¶ 13, 16, 20, 22; K.N. Decl. ¶¶ 17, 20. As a result, Plaintiffs fear future violence if they cannot control whether and when to disclose their transgender identity. Gore Decl. ¶¶ 17, 19, 22; Combs Decl. ¶¶ 19, 21; L.G. Decl. ¶¶ 19, 21, 24; K.N. Decl. ¶¶ 19, 21.

## B. <u>Tennessee's Birth Certificate Policy Deprives Tennessee-born Transgender Persons of Equal Protection, in Violation of the Fourteenth Amendment.</u>

The Equal Protection Clause "protects against invidious discrimination among similarly situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). "Equal protection requirements restrict state legislative action that is inconsistent with bedrock constitutional guarantees, such as equality in treatment." *F.V.*, 286 F. Supp. 3d at 1140.

"The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough*, 470 F.3d at 260. Here, because of the Policy,

transgender persons born in Tennessee, including Plaintiffs, "are being distinguished by governmental action from those whose gender identities are congruent with their assigned sex." *Evancho v. Pine-Richland Sch. Dist.*, 37 F. Supp. 3d 267, 285 (W.D. Pa. 2017).[3] The Policy prohibits *only* transgender persons, including Plaintiffs, from having birth certificates that accurately reflect their sex, as determined by their gender identity. It treats transgender persons born in Tennessee differently from similarly situated cisgender persons based on impermissible considerations, specifically sex and transgender status, and it impermissibly infringes upon transgender persons' exercise of their fundamental rights to privacy, liberty, autonomy, and free speech. Plaintiffs thus do not seek special treatment in desiring to correct the sex designation on their birth certificates. Rather, they seek the same remedy that cisgender people enjoy: the ability to correct the sex designation on their birth certificates in manner consistent with their gender identity. *See* Ex. C.

The Birth Certificate Policy therefore creates a permanent underclass of people who are singled out and denied an accurate government-issued birth certificate based simply on their constitutionally protected personal characteristics. This second-class status cannot be squared with the basic dictates of the equal protection guarantee, which "withdraws from [the] Government the power to degrade or demean" any person in the way the Policy does. *See United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).

> 1. <u>The Birth Certificate Policy is subject to heightened scrutiny because it impermissibly discriminates against transgender people based on sex.</u>

It is incontrovertible that "all gender-based classifications … warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (quotation omitted). Here, the Policy requires

---

[3] Requiring a strike-out line for the corrections it allows, as delineated in Regulation 1200-07-01-.10, similarly violates the equal protection guarantee as applied to transgender individuals, because it results in disclosure of a person's transgender status on the face of the birth certificate, inflicting harms not imposed on similarly situated cisgender persons.

heightened scrutiny because (1) on its face, it is a classification based on sex, as Defendants admit, Ex. B (RFA Nos. 22 and 23), and (2) any policy that treats transgender people differently "is inherently based upon a sex-classification." *Whitaker*, 858 F.3d at 1051.

At minimum, the Policy warrants heightened scrutiny because "discrimination on the basis of transgender and transitioning status is necessarily discrimination based on sex." *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018), *cert. granted in part*, 139 S. Ct. 1599 (2019); *see also Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566, 573-75 (6th Cir. 2004); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019); *Whitaker*, 858 F.3d at 1051; *Glenn v. Brumby*, 663 F3d 1312, 1319-20 (11th Cir. 2011); *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213 (1st Cir. 2000).[4]

Refusing to treat a transgender woman like other women is necessarily based on "notions of how sexual organs and gender identity ought to align," which is impermissible sex stereotyping. *Harris Funeral Homes*, 884 F.3d at 576. Discrimination based on sex "is not only discrimination because of maleness and discrimination because of femaleness," but also "discrimination because of the properties or characteristics by which individuals may be classified as male or female." *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016).

Sex "is not a cut-and-dried matter of chromosomes," *Schroer v. Billington*, 424 F. Supp. 2d 203, 211 (D.D.C 2016), or external genitalia. *See* Ettner Decl. ¶ 18; Taylor Decl. ¶ 19; *see also Adams by & through Kasper v. Sch. Bd. of St. Johns Cty., Fla.*, 318 F. Supp. 3d 1293, 1298 (M.D. Fla. 2018); *Evancho*, 237 F. Supp. 3d at 278 (noting expert testimony "that external sex organs are one (but by no means the only or most accurate) indicia of a person's sex and gender"). To the

---

[4] *Cf.* Tenn. Op. Att'y Gen. No. 19-01, 2019 WL 845668 (Feb. 8, 2019) (concluding "a crime committed against a person because he or she is transgender [is] necessarily committed because of, at least in part, the person's gender").

contrary, a robust body of case law has held that gender identity is a critical determinant of sex itself. *See*, *e.g.*, *Adams*, 318 F. Supp. 3d at 1298 ("neurological sex and related gender identity are the most important and determinative factors"); *F.V.*, 286 F. Supp. 3d at 1144 ("[T]here is medical consensus that gender identity plays a role in an individual's determination of their own sex."); *Evancho*, 237 F. Supp. 3d at 288-89; *see also* Ettner Decl. ¶¶ 19-20; Taylor Decl. ¶¶ 28-30. Indeed, the Sixth Circuit held in *Harris Funeral Homes* that existing precedent "preclude[s]" a reading of "'sex' to mean only individuals' chromosomally driven physiology and reproductive function." 884 F.3d at 575.

Defendants urge the same "preclude[d]" understanding of "sex" in defense of the Policy. "The policy at issue uses some … factors to define sex and ignores others." *Grimm v. Gloucester Cty. Sch. Bd.*, 400 F. Supp. 3d 444, 457 (E.D. Va. 2019). "In determining the physical characteristics that define male and female and the characteristics that are disregarded, the Board has crafted a policy that is based on stereotypes about gender." *Id.*

Put simply, the Policy impermissibly discriminates based on sex, whether it is based on the sex classification on its face or its operation discriminating based on transgender status.

2. <u>Discrimination based on transgender status is subject to heightened scrutiny.</u>

In identifying whether a classification is suspect or quasi-suspect, courts consider whether: (a) the class has historically been "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (b) the class's defining characteristic "bears [any] relation to ability to perform or contribute to society," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985); (c) the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Gilliard*, 483 U.S. at 602; and (d) the class is "a minority or politically powerless," *id.*; *see also Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012).

15

While all four considerations need not be met to warrant heightened scrutiny, *see Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012), all indicia are present for transgender people. "[T]ransgender people as a class have historically been subject to discrimination or differentiation; … they have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society; … as a class they exhibit immutable or distinguishing characteristics that define them as a discrete group; and … as a class, they are a minority with relatively little political power." *Evancho*, 237 F. Supp. 3d at 288; *see also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018); *F.V.*, 286 F. Supp. 3d at 1145; *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dept. of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016).

The record here demonstrates that transgender people have historically been subjected to discrimination, Ettner Decl. ¶¶ 44-45; Taylor Decl. ¶¶ 50-51, 53-56; Ex. D; Ex. F; Ex. G; Ex. H; exhibit immutable or distinguishing characteristics that define them as a discrete group, Ettner Decl. ¶¶ 19, 21-22, 24-25; Taylor Decl. ¶¶ 26, 28-29; which bear no relation to ability to perform or contribute to society, Ettner Decl. ¶¶ 22, 29; Taylor Decl. ¶¶ 29, 40; Ex. I at 4; and are a minority with relatively little political power, Taylor Decl. ¶ 27; Ex. J, Ex. K.

Furthermore, the Policy is not facially neutral. It *specifically* targets transgender people for discrimination: "The sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." Tenn. Code Ann. § 68-3-203(d). "Sex change surgery," more appropriately called gender affirming surgery, is a step some transgender people undertake to align their bodies, appearance, and lived experiences with their gender identity. Ettner Decl. ¶ 33; Taylor Decl. ¶ 46. By definition, cisgender people have no need to undergo gender affirming surgery.

The legislative history includes proof of the State's intentional discrimination. The original bills for the Vital Records Act of 1977 (House Bill 425 and Senate Bill 162)—consistent with the

current practice of over 95% of the states and with the Model State Vital Statistics Act (the "Model Act") published by the National Center for Health Statistics—*expressly authorized* the amendment of the sex designation on Tennessee-issued birth certificates following gender affirming treatment. Ex. L; Ex. M; Ex. Q. But the bills were amended on the floor to *expressly prohibit* these amendments in response to "controversy" at the time. Ex. N at 6-7; *see also* Ex. O at 5; Ex. M. This included press coverage of Renee Richards's participation in the professional women's tennis circuit, including a match held in Tennessee, Ex. R; Ex. S, as well as press coverage of the provision of gender affirming treatment, with doctors even then noting that sex was more than genitalia or chromosomes. Ex. T.

Defendants' Policy clearly prohibits *all* transgender people from obtaining accurate birth certificates, consistent with their gender identity, regardless of any care they have received or any steps they have taken to live in accordance with their gender identity.

### C. Tennessee's Birth Certificate Policy Violates Tennessee-born Transgender Persons' First Amendment Rights to Free Speech.

The State of Tennessee may not make any "law abridging the freedom of speech." U.S. Const. Amend. I. Tennessee's refusal to correct transgender persons' birth certificates to accurately reflect their sex, consistent with their gender identity, violates the First Amendment. Not only does the Policy deprive transgender persons of the right and ability to choose *whether* to speak publicly about their gender identity, but it also compels them to make *particular* speech endorsing a state-favored view concerning the nature of sex. The Policy thus strikes at the heart of the First Amendment, denying transgender persons the freedom to "decide for [themselves] the ideas and beliefs deserving of expression, consideration, and adherence," and instead "requir[ing] the utterance of a particular message favored by the Government." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994); s*ee also Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

Summary judgment for Plaintiffs is warranted because Tennessee raises no factual dispute as to Plaintiffs' characterization of the face or application of its Policy, and because the Policy is a broad affront to the freedoms protected by the First Amendment.

1. Tennessee's Policy impermissibly compels transgender persons to speak and identify with a sex and identity contrary to who they are.

The First Amendment protects Plaintiffs' freedom to decide *not* to speak, and which ideas, facts, or even earnestly held beliefs they may wish to disclose. *See Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 11 (1986) ("There is necessarily … a concomitant freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 559 (1985))); *see also Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 254 (1974). The autonomy to control one's speech—specifically, the discretion to withhold "statements of fact the speaker would rather avoid"—has special value because it empowers the speaker not to publicize "content that in someone's eyes [is] misguided, or even hurtful." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995).

The Policy, as applied, robs Tennessee-born transgender people of their "freedom not to speak publicly" and to withhold "fact[s] the speaker would rather avoid." *Pac. Gas & Elec. Co.*, 475 U.S. at 11; *Hurley*, 515 U.S. at 574 (1995). All Tennessee-born persons are required, in a variety of contexts, to produce their birth certificates to access and enjoy a host of government benefits and to participate in public and private life. *See*, *e.g.*, Tenn. Comp. R. & Regs. 0450-01-.05 (requiring presentation of birth certificate for application as licensed clinical counselor); *see also* Ex. B (RFA No. 11) ("Defendants admit that some Tennessee statutes and regulations may contemplate the use of birth certificates as personal identification documents."). Yet for transgender Tennesseans, producing a birth certificate that conflicts with their gender identity (and, in many cases, one that

conflicts with other identification documents, as well as their gender expression and appearance), results in the public disclosure of their transgender status.

The First Amendment operates to protect transgender Tennesseans' rights to choose whether to disclose their transgender status, not just in the traditional spirit of protecting free expression of ideas, but also in recognition of the harms that may result from some private or especially personal disclosures. *Hurley*, 515 U.S. at 574. The First Amendment has long protected the need for people to keep their memberships in vulnerable groups anonymous because of fear of bodily harm. *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958). And the harm caused by compelled speech "takes on an added dimension" where, as here, the privacy of *intimate* information is at stake—"[f]or also fundamental is the right to be free … from unwanted governmental intrusions into one's privacy." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

The intrusion causes Plaintiffs harm at each disclosure and chills their participation in public life. Transgender Americans, including Plaintiffs, are and have been subject to all manner of discrimination, threats, and serious physical violence because of their transgender status. Gore Decl. ¶ 20; Combs Decl. ¶¶ 15, 17; L.G. Decl. ¶¶ 13, 16, 20; K.N. Decl. ¶ 20. "Forcing disclosure of transgender identity chills speech and restrains engagement in the democratic process in order for transgender[] [people] to protect themselves from the real possibility of harm and humiliation." *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. Transgender people's right to control when and if they disclose their transgender status is essential to both a robust democratic ideal of free expression and to their personal safety and security.

      2.    <u>Tennessee's Birth Certificate Policy impermissibly compels Plaintiffs to endorse a government-preferred view about sex.</u>

The First Amendment prohibits the government from "compel[ling] a private party to express a view with which the private party disagrees." *Walker v. Texas Div., Sons of Confederate*

*Veterans, Inc.*, 135 S. Ct. 2239, 2253 (2015). Therefore, the state may not make private citizens the "couriers" of a message the state favors. *Wooley*, 430 U.S. at 717; *New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 593 (6th Cir. 2018). Yet Tennessee's Birth Certificate Policy unconstitutionally forces Plaintiffs to act in a manner that endorses the State's viewpoint that the sex printed on Plaintiffs' birth certificates is, or was at any time, accurate.

Birth certificates are often necessary to confirm identity. *See*, *e.g.*, Tenn. Comp. R. & Regs. § 0450-01-.05; Ex. B (RFA No. 11). When presenting their birth certificates for identification purposes, Plaintiffs have no choice but to endorse the state's view that the sex designation on their birth certificate is, or was at some point, accurate. Plaintiffs disagree with Tennessee that sex is an externally presenting binary, determined exclusively by a person's genitalia and observable at birth. Instead, they endorse the modern understanding—one shared by most medical professionals—that sex is multi-factorial and primarily determined by gender identity. Ettner Decl. ¶¶ 18-20; Taylor Decl. ¶¶ 19, 30. The Policy forces Plaintiffs to silence that speech and disagreement and to agree with the accuracy of the sex designation on their uncorrected birth certificates.

When transgender persons present their birth certificates and indicate, as they must, that they are the person named on the certificate, they "appear to endorse the government message" as to the accuracy of the sex designation on the certificate. *Wooley*, 430 U.S. at 717. Because this is Tennessee's chosen message, and decidedly not one that Plaintiffs wish to promote, the State's refusal to correct transgender persons' birth certificates unconstitutionally compels speech.

3.    The speech at issue belongs to, and is naturally attributed to, Plaintiffs.

When Plaintiffs, or any persons, present their birth certificates for identification, any recipient of the certificate would reasonably infer the message—that the gender marker and other information printed thereon is accurate—is an expression of the presenter, not of the government. The "key analysis" for concluding when speech would be attributed to the presenter rather than the

government asks whether "the private parties are closely linked with the expression in a way that makes them appear to endorse the government message." *New Doe Child #1*, 891 F.3d at 593 (quotation omitted). That association resolves the important question of "whether observers would attribute, or actually have attributed [the speech at issue] to Plaintiffs rather than to the Government." *Id.*

Unlike the speech at issue in *New Doe Child #1*, where Plaintiffs objected to a government motto appearing on widely circulated currency, here, Plaintiffs are certain to be intimately associated with the speech at issue. And unlike the monuments in *Summum* that were displayed by the government, birth certificates are routinely presented by private citizens for identification purposes. Any person handed a birth certificate would reasonably assume that the presenter of the certificate is endorsing its accuracy and authenticity, and that the speech associated with that message belongs to the presenter.

### D. The Birth Certificate Policy Fails Any Level of Scrutiny.

Tennessee's Policy infringes upon Plaintiffs' constitutionally protected rights to privacy, autonomy, dignity, and free speech. *See* Parts III.A & III.C, *supra*. It is therefore subject to strict scrutiny and presumed to be unconstitutional. *See Seal*, 229 F.3d at 574; *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (noting laws "compelling individuals to speak a particular message" "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."); *see also Dillinger v. Schweiker*, 762 F.2d 506, 508 (6th Cir. 1985).

Tennessee's Policy also impermissibly discriminates against Plaintiffs based on sex and transgender status. *See* Part III.B, *supra*. Therefore, the Policy is subject to heightened (at minimum, intermediate) scrutiny, and Defendants must justify it by showing it "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement

of those objectives." *Virginia*, 518 U.S. at 533 (cleaned up); *see also Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (same).

But even if the Policy were subject only to rational basis review, it would still fail. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be obtained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). The justifications offered must have a "footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-38 (1973). And even when the government offers an ostensibly legitimate purpose, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446. "Moreover, the classification must substantially serve an … interest *today*, for in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality … that once passed unnoticed and unchallenged." *Morales-Santana*, 137 S. Ct. at 1690 (cleaned up).

Several courts have held that policies barring transgender people from obtaining identity documents matching their gender identity lack any adequate governmental justification. *See*, *e.g.*, *Arroyo Gonzalez*, 305 F. Supp. 3d at 333; *F.V.*, 286 F. Supp. 3d at 1142; *Love*, 146 F. Supp. 3d at 856; *K.L.*, WL 2685183, at *7. And a federal court approved a consent judgment decreeing Kansas's policy barring transgender people from correcting the gender marker on their birth certificates to violate the Fourteenth Amendment. *See Foster v. Anderson*, No. 18-2552-DDC-KGG, ECF No. 33 (D. Kan. June 21, 2019) (Ex. E).

The Policy cannot be justified by an interest in the integrity or accuracy of birth certificates. If anything, the Policy, as applied to transgender persons, undermines such a goal by purporting to certify plainly inaccurate information with respect to transgender persons' sex. Just like the "absence

of any procedure for changing the sex designation on an individual's license does not bear a close and substantial relationship to the furtherance of the state's interest in accurate documentation and identification," *K.L.*, 2012 WL 2685183, at *7, the same is true with regard to birth certificates. By "not allowing transgender[] individuals to change their sex designation," their certificates "will inaccurately describe the discernable appearance of the [] holder by not reflecting the holder's lived gender expression of identity." *Id.* Tennessee disregards this salient fact and instead arbitrarily compels transgender persons to present themselves with an inaccurate sex designation. There is no rational connection between forcing a person to be dishonest about their sex and any interest in maintaining the integrity and accuracy of birth certificates.

Similarly, the Policy cannot be justified as necessary to capture some purportedly objective, enduring "fact" of a person's sex. The sex designation on an uncorrected birth certificate does not account for any sex-related characteristics other than a person's external genitalia at the time of birth. *See Whitaker*, 858 F.3d at 1053 ("[I]t is unclear that the sex marker on a birth certificate can even be used as a true proxy for an individual's biological sex," because it "does not take into account [either] an individual's chromosomal makeup," or whether "an individual is born with the external genitalia of two sexes, or genitalia that is ambiguous in nature."); *see also* Ettner Decl. ¶¶ 16-17; Taylor Decl. ¶ 18. Indeed, it does not account for a person's gender identity, which is the primary determinant of a person's sex. Ettner Decl. ¶¶ 17, 20; Taylor Decl. ¶¶ 30, 65.

In addition, Defendants cannot claim the Policy is somehow rational because a birth certificate is a record of the holder's assigned sex at a particular moment in time, *i.e.*, birth. Tennessee permits all sorts of amendments to birth certificates, including name changes, Tenn. Comp. R. & Regs. 1200-07-01-.10, and changes to the parents listed on a birth certificate after an adoption, Tenn. Comp. R. & Regs. 1200-07-01-.04. Thus, Tennessee law makes birth certificates more than just biology or historical facts. *See Pavan v. Smith*, 137 S. Ct. 2075, 2078 (2017). Indeed,

23

the fact these amendments are allowed in order to correct for information that has changed or has been discovered after the "moment in time" of birth demonstrates there is no rational basis for the Policy with respect to sex. *See Ray*, slip op. at 30; *see also Eisenstadt v. Baird*, 405 U.S. 438, 449 (1972) (no rational basis where law was "riddled with exceptions").

Moreover, 48 states, D.C., and Puerto Rico provide procedures for transgender persons born within their jurisdiction to correct the sex designation on their birth certificates. *See Ray*, slip op. at 30. There is no reason to believe "these states have any less interest in ensuring an accurate record-keeping system." *Love*, 146 F. Supp. 3d at 857; *see also Ray*, slip op. at 30.

The Policy cannot be justified by an interest in preventing fraud. Defendants cannot "articulate how the State's interest in preventing fraud provides for laws that allow amendments to some parts of birth certificates but not others or permits changes to driver's licenses and state identification cards and not birth certificates." *Ray*, slip op. at 30-31. Many transgender persons, including Plaintiffs, manage to obtain other identity documents that do accurately reflect their sex, including U.S. passports and, most notably, driver's licenses issued by Tennessee itself. *See, e.g.*, Gore Decl. ¶ 12; Combs Decl. ¶¶ 11, 17; L.G. Decl. ¶ 16; K.N. Decl. ¶ 11; Ex. B (RFA No. 5); Tenn. Comp. R. & Regs. 1340-01-13-.12(6). There is no rational basis for treating these types of identification documents differently. *See K.L.*, 2012 WL 2685183, at *7 ("the absence of any procedure for changing the sex designation on an individual's license can create discrepancies and inaccuracies between Alaska driver's licenses [and] other forms of government issued identification"); *Love*, 146 F. Supp. 3d at 856-57; *see also Arroyo Gonzalez*, 305 F. Supp. 3d at 333.

Defendants cannot claim an interest in promoting and maintaining nationwide uniformity in the system of vital records, when they admit the Policy is *inconsistent* with the Model Act and Regulations published in 1992. Ex. B (RFA Nos. 7, 9). Indeed, the Model Act provides for corrections to the sex designation on a person's birth certificate following gender affirming medical

24

treatment. Ex. Q at 10. And as previously noted, Tennessee's Policy represents an *extreme outlier* in the nationwide system of vital records.

Defendants cannot claim an interest in collecting and disclosing accurate information for public health and research purposes justifies the Policy. All jurisdictions that permit these corrections share that same interest. Taylor Decl. ¶ 63. Also, to the extent Tennessee needs data regarding the sex assigned at birth to persons born in the state, such data can easily be preserved by maintaining such records under seal and without requiring transgender people born in Tennessee to have birth certificates that are inconsistent with their gender identity. Taylor Decl. ¶ 64. This is something Defendants admittedly can do: "When such an amendment is made, no record of the amendment shall appear upon the face of the certificate; provided, that a record of all evidence submitted relative to the amendment, along with the registrar's analysis of the evidence, shall be maintained by the office of vital records." Tenn. Code Ann. § 68-3-203(f).

Put simply, the Birth Certificate Policy is not rationally related to any of the interests identified by Defendants. The Policy therefore cannot substantially further those interests, let alone be narrowly tailored to achieve them.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, the Court should grant Plaintiffs' Motion for Summary Judgment.

Dated:  March 9, 2020

Respectfully submitted,

*s/John T. Winemiller*

| | |
|---|---|
| Omar Gonzalez-Pagan* | John T. Winemiller |
| LAMBDA LEGAL DEFENSE AND | MERCHANT & GOULD P.C. |
|    EDUCATION FUND, INC. | 800 S. Gay Street, Suite 2150 |
| 120 Wall Street, 19th Floor | Knoxville, TN 37929 |
| New York, NY 10005-3919 | Phone: (865) 380-5960 |
| Telephone: (212) 809-8585 | Facsimile: (612) 332-9081 |
| Facsimile: (212) 809-0055 | JWinemiller@merchantgould.com |
| ogonzalez-pagan@lambdalegal.org | |

25

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
Telephone: (404) 897-1880
Facsimile: (404) 897-1884
tborelli@lambdalegal.org

Gavin R. Villareal*
Maddy Dwertman*
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
Phone: (512) 322-2500
Facsimile: (512) 322-2501
gavin.villareal@bakerbotts.com
maddy.dwertman@bakerbotts.com

Sasha Buchert*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, DC 20006
Telephone: (202) 804-6245
sbuchert@lambdalegal.org

Brandt Thomas Roessler*
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
Phone (212) 408-2500
Facsimile: (212) 408-2501
brandt.roessler@bakerbotts.com

Kathryn S. Christopherson*
BAKER BOTTS L.L.P.
1001 Page Mill Rd., Bldg. One, Suite 200
Palo Alto, CA 94304-1007
Phone: (650) 739-7500
Facsimile: (650) 739-7699
kathryn.christopherson@bakerbotts.com

* Admitted *pro hac vice*.

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, which provides electronic notice of the filing to all counsel of record, including:

Herbert H. Slatery III
Attorney General and Reporter

Dianna Baker Shew
Senior Assistant Attorney General
dianna.shew@ag.tn.gov
Sara E. Sedgwick
Senior Assistant Attorney General
sara.sedgwick@ag.tn.gov
PO Box 20207
Nashville, TN 37202

This 9th day of March, 2020.

*s/John T. Winemiller*
John T. Winemiller

27