## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| KAYLA GORE, JAIME COMBS, L.G., and K.N., | |
| *Plaintiffs*, | |
| v. | No. 3:19-CV-00328 |
| WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health, | DISTRICT JUDGE RICHARDSON MAGISTRATE JUDGE HOLMES |
| *Defendants*. | |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I. Plaintiffs' Complaint Meets the Requisite Pleading Standard................................. 2

II. Tennessee's Birth Certificate Policy Deprives Tennessee-born Transgender Persons of Equal Protection, in Violation of the Fourteenth Amendment. ............................................. 2

    A. Plaintiffs have adequately pled disparate treatment....................................... 3

    B. The Policy facially and intentionally discriminates against transgender people. ......... 3

    C. Tennessee's Birth Certificate Policy requires heightened scrutiny because it discriminates based on sex and transgender status. ................................. 5

    D. Tennessee's Policy cannot survive any level of review................................... 7

III. Tennessee's Birth Certificate Policy Deprives Tennessee-born Transgender Persons of Substantive Due Process Rights Afforded by the Fourteenth Amendment....................... 11

    A. Plaintiffs have adequately pled that Tennessee's Policy violates their fundamental right to informational privacy. ................................................... 11

        1. Tennessee's Policy compels the disclosure of Plaintiffs' transgender status........11

        2. Tennessee's Policy implicates interests of constitutional magnitude................13

    B. Tennessee's Policy infringes upon transgender individuals' fundamental rights to decisional privacy, liberty, dignity, and individual autonomy.................................. 16

IV. Tennessee's Birth Certificate Policy Violates Tennessee-born Transgender Persons' First Amendment Rights to Free Speech. ............................................................ 18

    A. Gender markers on birth certificates do not constitute government speech because they are attributable to the individual person, not to the government.......... 18

    B. Registration as a government record does not convert private expression into government speech. .......................................................... 21

    C. Tennessee's Policy compels transgender persons to endorse the State's view of their gender identity and to disclose their transgender status. ................. 22

    D. The availability of alternative identification documents has no bearing on the constitutionality of Tennessee's Birth Certificate Policy. ................. 24

CONCLUSION............................................................................................................... 25

CERTIFICATE OF SERVICE ...................................................................................... 27

Plaintiffs, by and through their undersigned counsel, respectfully submit the following memorandum of law in opposition to the Motion to Dismiss Plaintiffs' Amended Complaint filed by Defendants, Doc. 65.

## INTRODUCTION

A birth certificate is a critical identification document routinely used to verify an individual's identity. Doc. 59 ¶ 3 (Doc. 59). Access to employment, education, housing, health care, banking, travel, and government services all hinge on having appropriate and accurate personal documentation that reflects a person's true identity. *Id*. For transgender people born in Tennessee, the sex designation (i.e. gender marker) on their original birth certificate is inaccurate because they were assigned the incorrect sex at birth. *Id.* ¶ 4. Correcting the sex designation on their birth certificate is thus critically important for transgender people. Indeed, few things are as essential to one's personhood and position in society as the correct identification of one's gender to the world. *Id.* While the State of Tennessee provides non-transgender people born in Tennessee with accurate birth certificates—birth certificates that reflect their true sex, consistent with their gender identity—the State of Tennessee categorically bars transgender people born in Tennessee from obtaining birth certificates that similarly reflect their true sex, consistent with their gender identity (hereinafter, the "Birth Certificate Policy" or "Policy"). *Id.* ¶ 5.

Compounding this disparate treatment, the State permits cisgender persons born in Tennessee to correct the sex listed on their birth certificates, but specifically prohibits transgender persons born in Tennessee from doing the same. *Id.* Thus, the State recognizes the need to correct inaccurate gender markers but chooses to single out transgender people for denial of that right.

Tennessee's Policy facially discriminates between transgender people and non-transgender people, unconstitutionally depriving only transgender people of documents that accurately communicate who they are, and that they can use without compromising their privacy, dignity,

and safety. Such discriminatory refusal to provide accurate birth certificates to transgender people is an extreme outlier within the United States. Today, 48 states, DC, and Puerto Rico provide procedures for transgender people to obtain accurate birth certificates, leaving Ohio and Tennessee as the only remaining states that refuse to provide accurate birth certificates for transgender people.

The State's Policy violates Plaintiffs' constitutional rights to equal protection, due process, and freedom of expression, and Defendants fail to articulate any adequate justification for it, much less one that can be credited at the pleading stage. Plaintiffs have more than adequately pled these claims, and this Court should allow them to proceed.

## ARGUMENT

### I.      Plaintiffs' Amended Complaint Meets the Requisite Pleading Standard.

To succeed on their Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), Defendants have the burden of establishing that Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 8(a)(2) requires only that Plaintiffs' Amended Complaint provide "a short and plain statement of the claim showing that the [Plaintiffs are] entitled to relief." Under the standard set forth by the U.S. Supreme Court, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When deciding a Motion to Dismiss under Rule 12(b)(6), courts "must construe the complaint in the light most favorable to the plaintiff and must accept all the factual allegations contained in the complaint as true." *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010). Plaintiffs' Amended Complaint easily clears this low bar.

### II.     Tennessee's Birth Certificate Policy Deprives Tennessee-born Transgender Persons of Equal Protection, in Violation of the Fourteenth Amendment.

The Equal Protection Clause "protects against invidious discrimination among similarly situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cty. Bd. of Educ.*,

470 F.3d 250, 260 (6th Cir. 2006). Plaintiffs have stated an equal protection claim.

## A. Plaintiffs have adequately pled disparate treatment.

Defendants first argue that Plaintiffs fail to adequately allege that transgender people are treated differently from cisgender people. Doc. 66 at 7-8. Defendants' argument rests on their claim that Plaintiffs simply have an "erroneous" view that the sex assigned at birth to transgender people is incorrect. Doc. 66 at 7. While Defendants may be entitled to their view of the law, they are not entitled to their own facts, especially at the motion to dismiss stage. Plaintiffs have indeed alleged that their sex assigned at birth is not correct, based on a broad scientific and medical consensus that gender identity is determinative of one's sex, and that the assignment of sex at birth based solely on external genitalia is not accurate for transgender people. Doc. 59 ¶¶ 21-29. Despite Defendants' assertions to the contrary, the Court must accept these well-pleaded allegations as true. *See Paige*, 614 F.3d at 277. Nor are Plaintiffs asking for special treatment to correct the inaccuracy on their birth certificates, as Defendants imply. Doc. 66 at 8. Rather, they seek the same ability afforded to cisgender people to correct errors, based on an assignment of sex that was inaccurate "*at the time of recordation*." Doc. 66 at 8; Doc. 59 ¶¶ 22, 26, 28-29; *see also* Tenn. Comp. R. & Regs. § 1200-07-01-.10. Transgender people are defined by the fact that their sex assigned *at birth* was inaccurate; thus their desire to correct an error at the time of recordation makes them similarly situated to the favored cisgender majority, which is permitted to correct such errors.[1] *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1140-41 (D. Idaho 2018).

## B. The Policy facially and intentionally discriminates against transgender people.

Tennessee's Policy treats transgender people differently than similarly situated cisgender people because it prohibits transgender people from holding birth certificates that accurately reflect

---

[1] The fact that other states have adopted various procedures to *allow* transgender people to correct their birth certificates does not mean that Tennessee's Policy is somehow immune from constitutional review, as Defendants suggest. *See* Doc. 66 at 8 n.5. To the contrary, this underscores the fact that the Policy is simply an outlier.

3

their sex as determined by their gender identity, while allowing non-transgender people to have accurate birth certificates. This Policy facially discriminates against transgender people.

First, Tennessee's Policy "cannot be stated without referencing sex" and as such it "is inherently based upon a sex-classification and heightened review applies." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017). Second, the statute's explicit statement that not even "sex change surgery" is sufficient to allow correction of a birth certificate for transgender people lays bare the categorical ban aimed at transgender people. Tenn. Code Ann. § 68-3-203(d). Defendants contend that the Policy is "facially neutral" because it supposedly treats all people the same. Doc. 66 at 9. But the Policy inherently discriminates against transgender people whose birth-assigned sex conflicts with who they are: cisgender people may correct gender marker errors made at birth, but transgender people may never correct the marker they were erroneously assigned at birth. By Defendant's logic, no state action discriminating against transgender people would ever be unconstitutional, because the state could always argue that it "neutrally" requires everyone to identify and live in a manner consistent with their birth-assigned sex—a requirement no transgender person could ever meet.

Defendants argue that, at most, the Policy constitutes a ban aimed at individuals who obtain gender-confirming surgery. Doc. 66 at 9. This is not a serious argument. As pled in the Amended Complaint, only transgender people receive this medical care. Doc. 59 ¶¶ 33-37. Defendants also claim this is not discriminatory because not all transgender people undergo gender-confirming surgery. But the Policy clearly prohibits *all* transgender people from obtaining accurate birth certificates; there is no alternative method for transgender people to correct a birth certificate who have not had "sex change surgery."

Furthermore, the State interprets and applies section 68-3-203(d) to apply to *all* transgender people for disparate treatment regardless of what steps they have taken to live in accordance with

their gender identity.  *See*, *e.g.*, Tenn. Op. Att'y Gen. No. 14-70, 2014 WL 3700672 (July 16, 2014) (requiring designation of sex on police booking sheets, warrants and other court records to match birth certificate in accordance with 68-3-203(d), regardless of gender-confirming surgery); Tenn. Op. Att'y Gen. No. 88-43, 1988 WL 410159 (Feb. 29, 1988) (concluding that person's sex is determined at birth for purposes of obtaining Tennessee marriage license pursuant to 68-3-203(d)).

Prohibiting transgender people from obtaining accurate birth certificates consistent with their gender identity forecloses meaningful access to a government document every cisgender person born in Tennessee may obtain and use.  Requiring all people to have documents reflecting their birth-assigned sex does not cure this problem—it *is* the problem.  For one, facial discrimination obviates the need to show intent.  It is "[t]he defender of legislation that differentiates on the basis of gender [who] must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) (quotations omitted).  For another, there can be no question that the Policy intentionally discriminates against transgender people.  Because this classification is enshrined in statute, it is not accidental or inadvertent, but targeted and deliberate.  Not only does Defendants' argument oversimplify the Equal Protection analysis applicable here, such argument has already been rejected by federal courts.  *See Johnson v. California*, 543 U.S. 499, 506 (2005); *Loving v. Virginia*, 388 U.S. 1, 8 (1967); *Latta v. Otter*, 771 F.3d 456, 483-84 (9th Cir. 1994).

### C.    Tennessee's Birth Certificate Policy requires heightened scrutiny because it discriminates based on sex and transgender status.

First, the Policy requires heightened scrutiny because it is a sex-based classification.  "[A]ll gender-based classifications … warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (quotations omitted).  Here, Tennessee's Policy requires heightened scrutiny because a

policy that treats transgender people differently "is inherently based upon a sex-classification." *Whitaker*, 858 F.3d at 1051. At minimum, the Policy warrants heightened scrutiny because "discrimination on the basis of transgender and transitioning status is necessarily discrimination based on sex." *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018), *cert. granted in part sub nom. R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*, 139 S. Ct. 1599 (2019). The weight of circuit authority, including long-standing Sixth Circuit case law, has recognized that discrimination based on transgender status is discrimination based on sex. *See id.* at 571; *Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005); *Smith v. City of Salem*, 378 F.3d 566, 573-75 (6th Cir. 2004); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019); *Whitaker*, 858 F.3d at 1051; *Glenn v. Brumby*, 663 F3d 1312, 1319-20 (11th Cir. 2011); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000); *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213 (1st Cir. 2000).[2]

Additionally, as the Sixth Circuit explained in *Harris Funeral Homes*, refusing to treat a transgender woman like other women is necessarily based on "notions of how sexual organs and gender identity ought to align," which is impermissible sex stereotyping. 884 F.3d at 576. Defendants' suggestion that Plaintiffs do not allege discrimination based on sex stereotyping, Doc. 66 at 10, is incorrect. *See* Doc. 59 ¶ 182. Tennessee's Policy discriminates against transgender people based on the same stereotyped notions. Moreover, *Harris Funeral Homes* also held that existing precedent "preclude[s]" a reading of "'sex' to mean only individuals' chromosomally driven physiology and reproductive function." 884 F.3d at 575. Defendants urge the same "preclude[d]" understanding of "sex" in defense of the Policy. Finally, discrimination based on the fact of transition from one's birth-assigned sex to live in accordance with one's true sex, as

---

[2] *Cf.* Tenn. Op. Att'y Gen. No. 19-01, 2019 WL 845668 (Feb. 8, 2019) (concluding "a crime committed against a person because he or she is transgender [] is [] necessarily committed because of, at least in part, the person's gender").

determined by one's gender identity, also constitutes sex discrimination.  *See Schroer v. Billington*, 577 F. Supp. 2d 293, 306-07 (D.D.C. 2008).

Second, the Policy discriminates based on transgender status, and transgender status meets all the hallmarks of a suspect classification.  Defendants concede the level of scrutiny for classifications based on transgender status remains an open question, Doc. 66 at 10, but any faithful application of the required analysis shows that such classifications must be carefully scrutinized. Heightened scrutiny is required where the government targets a class that (1) has been "historically subjected to discrimination," (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," (3) has "obvious, immutable, or distinguishing characteristics," and (4) is "a minority or politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (internal quotations omitted), *aff'd*, 133 S. Ct. 2675 (2013).  While not all considerations need point toward heightened scrutiny and the first two alone may be dispositive, *Plyler v. Doe*, 457 U.S. 202, 216 n.14, (1982), all indicia are present for transgender people.

Put simply, "transgender people as a class have historically been subject to discrimination or differentiation; [] they have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society; [] as a class they exhibit immutable or distinguishing characteristics that define them as a discrete group; and [] as a class, they are a minority with relatively little political power." *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *see also* Doc. 59 ¶ 186.  Multiple courts have come to the same conclusion.  *See*, *e.g.*, *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018); *F.V.*, 286 F. Supp. 3d at 1145; *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016).

**D.  Tennessee's Policy cannot survive any level of review.**

Defendants have not and cannot identify any legitimate government interest that supports

7

Tennessee's discriminatory Policy, let alone an important or compelling one. Several courts have held that policies barring transgender people from obtaining identity documents matching their gender identity lack any adequate governmental justification. *See*, *e.g.*, *Arroyo Gonzalez v. Rosello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *F.V.*, 286 F. Supp. 3d at 1142; *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015); *K.L. v. State Dept. of Admin., Div. of Motor Vehicles*, 3 AN-11-05431-CI, 2012 WL 2685183, at *7 (Alaska Super. Mar. 12, 2012); *see also* Consent Judgment, *Foster v. Andersen*, No. 18-2552-DDC-KGG, ECF No. 33 (D. Kan. June 21, 2019). And, recently, a federal court denied a motion to dismiss claims challenging Ohio's policy of refusing to correct the sex designation on birth certificates for transgender people, holding that defendants had failed to assert any interest "compelling enough to counteract the alleged infringement on Plaintiffs' right to privacy." *See Ray v. Himes*, No. 2:18-CV-272, slip op. at 30 (S.D. Ohio Sept. 12, 2019) (ECF No. 47).[3]

Defendants assert an interest in the accuracy of birth certificates, and preparing related reports, Doc. 66 at 11, but fail to explain how that is adequately tailored to a Policy requiring transgender people to maintain and use birth certificates that conflict with their gender identity.[4] Defendants ignore the fact that the Policy forces transgender people to have inaccurate documents, actually undermining the State's supposed goal.

Nor can the Policy be justified as necessary to capture some purportedly objective, enduring "fact" of a person's sex. The gender marker on an uncorrected birth certificate does not account for any sex-related characteristics other than a person's external reproductive organs at the time of birth. Doc. 59 ¶ 22. Defendants have not offered any reason why the government has

---

[3] A copy of the decision in *Ray* has been filed with the Court as ECF Docket No. 62-1, while a copy of the consent judgment in *Foster* has been filed with the Court as ECF Docket No. 62-5.

[4] Even assuming Defendants require information about a person's sex assigned at birth for reports, such information may be kept under seal without requiring transgender people to possess and use birth certificates that inaccurately represent their identity.

any legitimate interest in disclosing the appearance of transgender people's external genitalia at the time of birth.[5]  Further, a designation of sex on a birth certificate determined from external genitalia alone is not an accurate "proxy" for an individual's so-called biological sex, given the complexity of each person's many sex-related characteristics—let alone an individual's true sex, which the medical consensus recognizes is determined by gender identity.  *Whitaker*, 858 F.3d at 1053; Doc. 59 ¶¶ 21-24.[6]  Numerous courts have rejected purported government interests like those asserted here by Defendants.  *See, e.g.*, *Love*, 146 F. Supp. 3d at 856 (state's refusal to correct the gender markers on transgender plaintiffs' drivers licenses "[bore] little, if any, connection to [the state's] purported interests" in maintaining accurate identity documents); *K.L.*, 2012 WL 2685183 (state's refusal to correct transgender woman's driver's license not only failed to "further…the state's interest in accurate documents[s] and identification" but, in fact, created a risk of "inaccurate and inconsistent identification documents"); *see also Ray*, slip op. at 29-32; *Arroyo Gonzalez*, 305 F. Supp. 3d at 333; *F.V.*, 286 F. Supp. 3d at 1142.

The Eastern District of Michigan recognized that the state's refusal to correct the gender markers on transgender plaintiffs' drivers licenses "[bore] little, if any, connection to [the state's] purported interests" in maintaining accurate identity documents.  *Love*, 146 F. Supp. 3d at 856. Alaska's Superior Court held that the state's refusal to correct a transgender woman's driver's

---

[5] Tennessee's own laws undermine Defendants' purported interest in maintaining accurate identification documents.  The State allows transgender people to change the sex designation on their driver's licenses and identification cards to match their gender identity, effectively contradicting its purported interest with respect to birth certificates.  *See* Tenn. Comp. R. & Regs. § 1340-01-13-.12(6); Amend. Compl. ¶ 74.  The Policy also creates inconsistencies between people's birth certificates and their federal identification documents, such as passports.  Amend. Compl. ¶ 73.

[6] These well-pleaded facts about the medical consensus surrounding the understanding of gender and transgender people must be taken as true at this stage, *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1548 (6th Cir. 1997), and Defendants cannot circumvent that standard by simply asserting that such facts are a "matter of policy" to be determined by Tennessee government.  Doc. 66 at 12 n.6.

9

license not only failed to "further … the state's interest in accurate documents[s] and identification" but, in fact, created a risk of "inaccurate and inconsistent identification documents." *K.L.*, 2012 WL 2685183, at *7. Identity documents bearing a transgender person's birth-assigned sex "inaccurately describe the discernable appearance of the [document] holder by not reflecting the holder's lived gender expression of identity," creating problems for the document's owner and all those who need to see it. *Id.*

Defendants also attempt to cast birth certificates as mere relics of "past events," and not "current identification documents." Doc. 66 at 11. But that is belied by the existence of a mechanism allowing cisgender people to correct errors on their birth certificates, or to update the name or the parentage of a person. *See Ray*, slip op. at 31 ("The Court assumes that Ohio has a compelling interest in maintaining the historical accuracy of all information in its birth records. Yet, Ohio law does provide procedures to amend a birth certificate to change one's name and the names of one's parents in the case of an adoption."). Like cisgender people, transgender people need accurate birth certificates as trusted and current identification documents, used for a wide array of purposes in contemporary life. Doc. 59 ¶¶ 48-51. Merely asserting that there is "no evidence" that Plaintiffs' sex was inaccurately identified at birth, Doc. 66 at 11-12, ignores Plaintiffs' well-pleaded allegations that the sex designation on their birth certificates are indeed inaccurate. Doc. 59 ¶¶ 22, 26, 28-29. The classification Defendants must justify in this case is the one permitting cisgender people to have accurate birth certificates, and to correct inaccuracies, but not transgender people.

Because the Policy makes accurate and consistent identification more difficult, it undermines, rather than supports, Defendants' alleged interests. To the extent Defendants seek to prove any interest in maintaining the Policy, they cannot do so at this stage. Plaintiffs have adequately pled facts for their Equal Protection claim to survive any level of scrutiny. Because

Plaintiffs have adequately pled that Tennessee's Birth Certificate Policy violates Plaintiffs' constitutional right to equal protection, this Court should deny Defendants' Motion.

### III. Tennessee's Birth Certificate Policy Deprives Tennessee-born Transgender Persons of Substantive Due Process Rights Afforded by the Fourteenth Amendment.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. "Challenges to legislation implicating a fundamental right are reviewed with strict scrutiny." *Ohio Ass'n of Indep. Sch. v. Goff*, 92 F.3d 419, 422 (6th Cir. 1996). Plaintiffs have stated a plausible due process claim.

### A. Plaintiffs have adequately pled that Tennessee's Policy violates their fundamental right to informational privacy.

Plaintiffs' Amended Complaint adequately alleges that Tennessee's Birth Certificate Policy impinges on Plaintiffs' fundamental right to informational privacy. Defendants argue that Plaintiffs' due process privacy claim should be dismissed because (1) Defendants have supposedly "not disseminated information about Plaintiffs' transgender status," and (2) because Plaintiffs' Amended Complaint does not implicate "the specific rights identified by the Sixth Circuit in *Kallstrom* or *Bloch*, nor any other fundamental right." Doc. 66 at 15. Defendants are mistaken on both counts.

#### 1. Tennessee's Policy compels the disclosure of Plaintiffs' transgender status.

Defendants assert that they "have not disseminated information about Plaintiffs' transgender status" and that "Plaintiffs do not allege any instance in which Defendants have released copies of Plaintiffs' birth certificates to third parties." Doc. 66 at 15. By making this statement, Defendants impliedly disclaim any responsibility for the disclosure of Plaintiffs' transgender status. Defendants are wrong.

Courts have rejected Defendants' proposed approach. In *Kallstrom*, the city did not make an unconstitutional disclosure directly to the gang members who might have inflicted violence, but to defense attorneys. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065 (6th Cir. 1998). It

was enough for the Sixth Circuit the information disclosed "may fall into the hands" of those likely to inflict violence. *Id.* at 1063; *see also K.L.*, 2012 WL 2685183, at *6.

Moreover, Defendants give transgender people no choice but to produce a birth certificate that discloses their transgender status in circumstances where that information would never otherwise have come to light. Doc. 59 ¶¶ 50-51. A person may not be forced to choose between a valuable government benefit and a constitutionally protected right. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994). Yet, under Tennessee's Policy, disclosure is not a "choice" for transgender people in any meaningful sense. Put simply, people must produce birth certificates to participate in public life. For example, people must produce birth certificates as form of identification in order to obtain certain governmental benefits. *See*, *e.g.*, Tenn. Code Ann. § 4-58-103(c)(2) (food stamps); Tenn. Comp. R. & Regs. § 0770-01-05-.13(2)(a) (housing assistance). Likewise, Tennessee requires employers to keep some proof of citizenship on file for their employees, which for most people is their birth certificate. *See* Tenn. Code Ann. § 50-1-703(a)(1)(B). And in Tennessee, individuals seeking licensure in a number of professional fields are required to provide a copy of their birth certificate, per state licensure regulations. *See*, *e.g.*, Tenn. Comp. R. & Regs. § 0450-01-.05 (clinical counselors). Defendants have chosen to record a person's sex on birth certificates based on the appearance of their external genitalia at birth as opposed to the primary determinant of a person's sex, Doc. 59 ¶¶ 23, 65, and to never permit transgender people to correct that designation, with full knowledge that the Policy forces unwanted disclosure of a person's transgender status. *See Ray*, slip op. at 28. Those facts are enough to support Plaintiffs' privacy claim. *See Love*, 146 F. Supp. 3d at 856.

Furthermore, Defendants cannot have it both ways. Defendants cannot claim they are not responsible for the disclosure of a person's transgender status through their birth certificate, but

then claim that "the sex designation on a birth certificate is government speech." Doc. 66 at 18.

### 2. *Tennessee's Policy implicates interests of constitutional magnitude.*

There is a personal privacy right recognized by the Fourteenth Amendment that protects "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457, 465 (1977); *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 146 (2011). Accordingly, the Sixth Circuit has recognized a right to "informational privacy." *Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir. 1998). And while the Sixth Circuit has construed the right to informational privacy to extend "only to the interests that implicate a fundamental liberty interest," *id.*, or where such "interest[s] at stake [] implicate either a fundamental right or one implicit in the concept of ordered liberty," *Kallstrom*, 136 F.3d at 1061, it has recognized that an informational-privacy interest of constitutional dimension exists: "(1) where the release of personal information could lead to bodily harm (*Kallstrom*), and (2) where the information released was of a sexual, personal, and humiliating nature (*Bloch*)." *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008); *see also Love*, 146 F. Supp. 3d at 853. Tennessee's Policy violates Plaintiffs' constitutionally-protected right to informational privacy on both counts. *See Arroyo Gonzalez*, 305 F. Supp. 3d at 333.

Informational privacy includes "interests of an intimate nature which define significant portions of our personhood." *Bloch*, 156 F.3d at 685; *cf. Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992). And every federal court to consider the question has agreed that information about a person's transgender status and gender identity could hardly be more intimate or involve more core aspects of personhood. *See Ray*, slip op. at 23; *Arroyo Gonzalez,* 305 F. Supp. 3d. at 334; *Love*, 146 F. Supp. 3d at 855; *K.L.*, 2012 WL 2685183, at *6; *Doe v. Blue Cross & Blue Shield of Rhode Island*, 794 F. Supp. 72, 74 (D.R.I. 1992); *Darnell v. Lloyd*, 395 F. Supp. 1210, 1214 (D. Conn. 1975). Indeed, the Sixth Circuit has found that a person's "sexuality

and choices about sex … are interests of an intimate nature which define significant portions of our personhood … that we regard as highly personal and private." *Bloch*, 156 F.3d at 685; *cf. Sterling v. Borough of Minersville*, 232 F.3d 190, 196 n.4 (3d Cir. 2000) ("disclosure of one's sexual orientation" is "protected by the right to privacy," as "such information is intrinsically private"); *Eastwood v. Dept. of Corrections*, 846 F.2d 627, 631 (10th Cir. 1988) ("This constitutionally protected right is implicated when an individual is forced to disclose information regarding personal sexual matters."). In sum, a person's transgender status is particularly private, intimate personal information. *See, e.g., Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999); *Foster*, 2019 WL 329548, at *2; *Arroyo Gonzalez,* 305 F. Supp. 3d at 333; *Ray*, slip op. at 23.[7]

"Disclosing that one is transgender involves a deep personal choice which the government cannot compel, unless disclosure furthers a valid public interest." *Arroyo Gonzalez,* 305 F. Supp. 3d at 333. In other words, the *forced* disclosure of a person's transgender status through the government's refusal to issue accurate identity documents violates the constitutionally-protected right to informational privacy. *See id.* at 333; *Love*, 146 F. Supp. at 856; *K.L.*, 2012 WL 2685183, at *8. By prohibiting correction of the inaccurate sex designation on the birth certificates of transgender persons born in Tennessee, the Policy infringes upon Plaintiffs' fundamental right to privacy with regards to intimately personal and sensitive information.

Furthermore, forced disclosure of a person's transgender status places their personal safety and bodily integrity in jeopardy. *See Whitaker*, 858 F.3d at 1051; *In re E.P.L.*, 891 N.Y.S.2d 619, 621 (Sup. Ct. 2009). Just being transgender "is likely to provoke … hostility and intolerance from

---

[7] The forcible disclosure of a person's transgender status can also result in disclosure of private medical information. Many transgender people, including Plaintiffs, suffer gender dysphoria. Therefore, disclosure of a person's transgender status may also lead to the disclosure of private medical information, as gender dysphoria is associated solely with transgender persons. *Cf. Bloch*, 156 F.3d at 685 (citing *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 (3d Cir. 1980)); *Doe*, 825 F. Supp. at 1107.

others." *Powell*, 175 F.3d at 111-12. "The forced disclosure of the transgender status of plaintiffs and other transgender persons by way of inaccurate birth certificates exposes them to prejudice, discrimination, distress, harassment, and violence," as well as "to a substantial risk of stigma, [] intimidation, [] and danger." *Arroyo Gonzalez*, 305 F. Supp. 3d at 332, 333; *see also Ray*, slip op. at 19; *Foster*, 2019 WL 329548, at *2; *F.V.*, 286 F. Supp. 3d at 1137. These fears are borne out by transgender people's experiences. According to a 2015 study, nearly a third of transgender people who show an identification document with a name or gender that does not match their gender presentation are verbally harassed, denied benefits or service, asked to leave, or assaulted. Doc. 59 ¶ 58.

This case involves the same type of risk—serious bodily harm—present in *Kallstrom*. *See Love*, 146 F. Supp. 3d at 856 ("Similar to *Kallstrom*, the Court finds no reason to doubt that where disclosure of this highly intimate information may fall into the hands of persons harboring such negative feelings, the Policy creates a very real threat to Plaintiffs' personal security and bodily integrity."). "[T]he *Kallstrom* court unambiguously identified the right to personal security and bodily integrity '*from a perceived likely threat*.'" *Id.* at 854 (quoting *Kallstrom*, 136 F.3d at 1064) (emphasis in original). And contrary to Defendants' contention, Doc. 66 at 16, "'hypothetical risk' plays an important role in determining whether Plaintiffs' privacy claim implicates a fundamental liberty interest." *Id*. Though Defendants argue that the threats to Plaintiffs' personal security and bodily integrity are too generalized to support a Fourteenth Amendment claim, "*Kallstrom* does not require courts to wait until plaintiffs are actually assaulted, or worse." *Ray*, slip op. at 19. As with the plaintiffs in *Love*, "[h]ere, Plaintiffs have offered a plethora of evidence which, accepted as true, suggests that the Policy poses a real threat to their 'personal security and bodily integrity.'" *Id.* at 855 (quoting *Kallstrom*, 136 F.3d at 1062).

In addition to studies documenting the discrimination, harassment, and violence

transgender people experience when they must present inaccurate identification documents, Plaintiffs point to their own first-hand experience and knowledge of the discrimination, harassment, and hostility people suffer on account of their transgender status. As explained in the Amended Complaint, Tennessee's Policy has already instigated hostility and threats of violence against Plaintiffs. Doc. 59 ¶¶ 93, 113, 138-39, 163. Each of the Plaintiffs fear future violence if they cannot control whether and when to disclose their transgender identity. Doc. 59 ¶¶ 92, 112, 137, 162.

**B.    Tennessee's Policy infringes upon transgender individuals' fundamental rights to decisional privacy, liberty, dignity, and individual autonomy.**

Defendants argue that Plaintiffs' due process claim relating to personal autonomy must fail because "neither the Supreme Court nor the Sixth Circuit has recognized a fundamental right to choose one's own gender identity, much less to dictate which sex is listed on one's birth certificate." Doc. 66 at 18. However, few decisions are as deeply personal as the decisions by transgender persons to live consistent with their gender identity—which is rooted in their constitutionally-protected rights to liberty and autonomy—and to disclose their transgender status to others. Because the forcible disclosure of a person's transgender status interferes with such deeply personal decisions, Tennessee's Birth Certificate Policy infringes upon transgender persons' fundamental rights to decisional privacy, liberty, dignity, and individual autonomy.

"[T]here are certain areas of life so fundamentally important and private" that the government may not infringe upon them without burdening "an individual's autonomy or freedom to make those decisions." Scott Skinner-Thompson, *Outing Privacy*, 110 Nw. U.L. Rev. 159, 171-72 (2015); *see also Bloch*, 156 F.3d at 685 ("Our sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood."); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333.

As we know, "[t]he Constitution promises liberty to all within its reach, a liberty that

includes certain specific rights that allow persons … to define and express their identity." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015); *see also Lawrence v. Texas*, 539 U.S. 558, 574 (2003); *Casey*, 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence"). Constitutionally protected liberty interests are those that implicate "individual dignity and autonomy"—i.e., decisions or actions that "shape an individual's destiny." *Obergefell*, 135 S. Ct. at 2597, 2599; *see also Lawrence*, 539 U.S. at 578. As crystallized in *Obergefell*, substantive Due Process protects the right and choice of every person to possess and control their own person and to define and express their own personal identity. *See* 135 S. Ct. at 2597. As such, Plaintiffs have adequately pled that their ability to live in accord with, express, and have legally recognized one's true sex, as determined by one's gender identity, is entitled to protection under the Due Process Clause as a fundamental right. Doc. 59 ¶¶ 205-08.

A person's liberty interest in their core personal identity, and living in accordance with that identity, is severely infringed if the government denies recognition of and acts to thwart that identity. Just as requiring a cisgender woman to mis-identify herself as a man on government-issued documents would be an inconceivable intrusion on individual liberty, so too does the Policy impermissibly intrude on the liberty of Tennessee-born transgender persons to identify themselves in a manner consistent with their gender identity. The ability to live in accord with and express one's true sex, as determined by one's gender identity, is "so fundamentally important … that the government may not, absent satisfying a heightened level of scrutiny, infringe or burden an individual's autonomy or freedom to make [such a] decision[]." Skinner-Thompson, *Outing Privacy*, 110 Nw. U.L. Rev. at 171–72; *see also Arroyo Gonzalez*, 305 F. Supp. 3d at 333-34.[8]

---

[8] Courts and legal commentators alike have similarly recognized the liberty interests inherent in personal decisions about expression of one's identity. *See Zalewska v. Cty. of Sullivan, N.Y.*, 316 F.3d 314, 321 (2d Cir. 2003); *Richards v. Thurston*, 424 F.2d 1281, 1284 (1st Cir. 1970); *Doe ex rel. Doe v. Yunits*, No. 001060A, 2000 WL 33162199, *3 (Mass. Super. Oct. 11, 2000); Chai R. Feldblum, *The Right to Define One's Own Concept of Existence: What Lawrence Can Mean for Intersex and Transgender People*, 7 Geo. J. Gender & L. 115, 116 (2006); Jed Rubenfeld, *The*

**IV.    Tennessee's Birth Certificate Policy Violates Tennessee-born Transgender Persons' First Amendment Rights to Free Speech.**

Defendants ask this Court to dismiss Plaintiffs' First Amendment claim because the speech at issue, they allege, belongs to the government, not to Plaintiffs. But the gender marker displayed on an individual's birth certificate expresses intimately private information relating to that particular individual. By forcing transgender Tennesseans to maintain and produce birth certificates containing the state's ideological message about their gender, rather than their own truthful message, Tennessee unconstitutionally compels their speech. Defendants' labored attempts to cast this as "government speech" are wholly without merit. Furthermore, Defendants unabashedly attempt to distract the Court from the constitutionality of Tennessee's Policy by alluding to the permissive use of alternative identification documents, such as U.S. passports. This argument is a red herring: The possibility of avoiding a statute's discriminatory effect does not render the statute constitutional.

**A.    Gender markers on birth certificates do not constitute government speech because they are attributable to the individual person, not to the government.**

Defendants fundamentally mischaracterize the purpose and utility of birth certificates, inaccurately asserting that birth certificates are merely historical records of "factual information" at the time of a person's birth. Doc. 66 at 19. Tennessee's own laws demonstrate that birth certificates are not immutable records of circumstances at a single point in time. *See* Doc. 59 ¶¶ 66-69. Rather, birth certificates are contemporaneous identification documents that persons are routinely expected to present to others, including to the State itself. *See* Part III.A.1, *supra*.

Based on their inaccurate view of birth certificates as historical records, Defendants allege that birth certificates constitute government speech. Defendants' analysis, however, is flawed. "The First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Walker v. Texas Div., Sons of Confederate Veterans,*

_____

*Right of Privacy*, 102 HARV. L. REV. 737, 782 (1989).

*Inc.*, 135 S. Ct. 2239, 2253 (2015). Although the State is generally entitled to its own viewpoints, it may not "forc[e] a private party to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *New Doe Child #1 v. Congress of United States*, 891 F.3d 578, 593 (6th Cir. 2018) (internal quotations omitted). Moreover, the State's interest in expressing a viewpoint "cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1977). The Sixth Circuit has elaborated on this principle, holding that individuals become "couriers" of the State's viewpoint when they are so "closely linked with the expression [such] that it makes them appear to endorse" it. *New Doe Child #1*, 891 F.3d at 593. Government speech becomes impermissible, unconstitutional compelled speech when "persons who observe" the message "routinely—and reasonably—interpret them as conveying some message on the [courier's] behalf." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 471 (2009).

Defendants' assertion that gender markers on birth certificates are "generally understood" to be "attributable to the government" is flagrantly disingenuous. Doc. 66 at 19. These gender markers are "routinely" and "reasonably" understood to reflect personal information relating to the particular individual.[9] *Summum*, 555 U.S. at 471. For example, a Tennessee clerk reviewing a clinical counselor license application, for which Tennessee regulations require birth certificates as proof of identification, would not reasonably interpret the designation "male" to reflect the State's viewpoint of the applicant's gender at birth. *See* Tenn. Comp. R. & Regs. § 0450-01-.05. Rather, the clerk is certain to attribute the designation of "male" to the individual presenting the

---

[9] Defendants have conceded that when birth certificates are presented for identification purposes, the gender marker thereon is routinely and reasonably attributed to the person to whom the birth certificate relates. *See* Doc. 66 at 15. Defendants cannot have it both ways, alleging Plaintiffs' due process claim fails because disclosure is not attributable to the State, and then simultaneously alleging birth certificates are government speech that cannot be attributed to the Plaintiffs.

birth certificate and presume that the individual outwardly expresses "male" characteristics.[10]  At the very least, whether a recipient of a birth certificate would attribute the gender marker contained thereon to its presenter or to the government is a question of fact that precludes dismissal of Plaintiffs' First Amendment Claim.  *See Iqbal*, 556 U.S. at 678.

The primary case on which Defendants rely to argue that the speech at issue belongs to the government is readily distinguishable.  In *Walker*, a private organization sought authorization from the State of Texas for a vehicle specialty license plate that depicted a Confederate flag.  *See Walker*, 135 S. Ct. 2239.  The State of Texas denied this request on the basis that it did not want to be perceived as endorsing or promoting Confederate ideology.  *See id*.  When challenged, the U.S. Supreme Court held that Texas's specialty license plates constituted government speech because license plates: (1) had long been used by states to broadcast messages and mottos; (2) were essentially "IDs" issued by the state; and (3) "are often closely identified in the public mind" with the state.  *Id*. at 2248-50.  Birth certificates, on the other hand, have not historically or typically been used by state governments to broadcast messages.  Birth certificates contain personal identification information, are typically kept confidential, and therefore do not serve the purpose of broadcasting government viewpoints.

Moreover, the Supreme Court has regarded the *Walker* decision as "the outer bounds of the government speech doctrine" and has instructed lower courts to "exercise great caution before extending … government-speech precedents" because the doctrine "is susceptible to dangerous misuse."  *Matal v. Tam*, 137 S. Ct. 1744, 1760 (2017).  Defendants' Motion to Dismiss is such a "dangerous" attempt to "misuse" the government-speech doctrine.  *Id*.

Gender markers on birth certificates represent inherently personal information.  Persons to

---

[10]  Indeed, it is this precise attribution to the individual that unconstitutionally compels the disclosure of a person's transgender status when the birth certificate does not match other identification documents, an issue discussed further below.

whom a birth certificate is presented routinely and reasonably view Plaintiffs, as "couriers" of the birth certificate, to be proponents of the gender marker shown on the birth certificate. As such, these gender markers do not constitute government speech, and Tennessee's Birth Certificate Policy unconstitutionally compels Plaintiffs to espouse an ideology to which they do not ascribe.

### B. Registration as a government record does not convert private expression into government speech.

Without expressly stating such, Defendants assume that because birth certificates are government records, they are *per se* government speech. For example, Defendants assert that records created by the Office of Vital Records are the "property of the office of vital records" and "the uses that may be made of the records or other information" are controlled by the state registrar. Doc. 66 at 19 (citing Tenn. Code Ann. § 68-3-104(6)).

This implied presumption that registration as a government record converts private expression into government speech has been flatly rejected by the Supreme Court. *See Matal*, 137 S. Ct. 1744. In *Matal*, the Supreme Court held that the registration of trademarks with the U.S. Patent and Trademark Office did not per se "convert the mark[s] into government speech." *Id*. at 1748. To hold otherwise, the Supreme Court wrote, "would constitute a huge and dangerous extension of the government-speech doctrine, *for other systems of government registration could easily be characterized in the same way*." *Id.* (emphasis added). Moreover, the Court affirmed the lower court's ruling, which expressly characterized birth certificates as private speech. *See In re Tam*, 808 F.3d 1321, 1348 (Fed. Cir. 2015) ("The PTO's processing of trademark registrations no more transforms private speech into government speech than when the government … records … *birth certificates*[.] To conclude otherwise would transform every act of government registration into one of government speech and thus allow rampant viewpoint discrimination.").

Defendants maintain that birth certificates, like specialty license plates, are "government-mandated, government-controlled, and government-issued" and therefore constitute government

speech.  *Walker*, 135 S. Ct. at 472.  However, the Supreme Court has made clear that application of the government speech doctrine turns on the extent to which the government controls the *content*—not just the *medium*—of the speech at issue.  *See Matal*, 137 S. Ct. at 1760.

When contrasted against the specialty license plates in *Walker*, birth certificates are more akin to the trademark registrations in *Matal* because they are independently developed by private persons and then registered with the government for recordkeeping, identification, and regulation. Unlike Texas, which had direct control over which messages would be allowed on its specialty license plates, Tennessee has no control over the content of birth certificates, though the State may control their creation, retention, and dissemination.  The State, for example, does not decide a person's name, nor does the State have authority to unilaterally determine a person's parentage or sex.[11]  A birth certificate is a medium created and *regulated* by the State, but the State does not have sole control over the *content* that appears on a birth certificate.

Because registration as a government record does not convert otherwise private speech into government speech and because the State does not control the content of birth certificates registered with the State, the gender markers contained on Tennessee's birth certificates constitute private, not government, speech.

### C.  Tennessee's Policy compels transgender persons to endorse the State's view of their gender identity and to disclose their transgender status.

Already made clear by the pleadings, Defendants and Plaintiffs espouse very different understandings of sex and gender.  Defendants understand gender to be inextricably connected with external genitalia, as observed and recorded at birth.  Doc. 66 at 6-8.  Plaintiffs, along with a

---

[11] Tennessee law allows persons to change their name as displayed on birth certificates.  Tenn. Comp. R. & Regs. § 1200-07-01-.10.  Following a name change, an individual's birth certificate no longer accurately reflects his or her name given at birth.  Thus, Tennessee law itself does not treat birth certificates as merely government speech expressing a historical record, contrary to Defendants' assertions.  The same holds true with regards to a person's parentage.  Tenn. Comp. R. & Regs. § 1200-07-01-.04.

majority of medical professionals, understand gender identity to reflect a person's core internal sense of their own gender, wholly separate from their external genitalia. Doc. 59 ¶¶ 21-24. Of course, at the motion to dismiss stage, Plaintiffs' understanding of these facts controls.

Tennessee's Policy compels Plaintiffs to involuntarily ascribe to the State's outdated viewpoint on gender identity. The gender markers listed on Plaintiffs' birth certificates convey the State's viewpoint that sex is determined solely by the appearance of external genitalia at the time of birth—a viewpoint inconsistent with the medical and scientific understanding of sex and to which each Plaintiffs strongly objects. Doc. 59 ¶¶ 98, 119, 145, 168, 216. Gender markers on birth certificates are "routinely" and "reasonably" attributed to the person presenting the birth certificate for identification purposes,[12] which the States requires in certain circumstances. *Summum*, 555 U.S. at 471; *see* Part III.A.1, *supra*. The Policy thus impermissibly "forc[es] a private party to 'be an instrument for fostering public adherence to an ideological point of view he [or she] finds unacceptable.'" *New Doe Child #1*, 891 F.3d at 593 (quoting *Wooley*, 430 U.S. at 715).

Tennessee's Birth Certificate Policy also prohibits Plaintiffs from expressing their own constitutionally protected viewpoints regarding identity and gender. By forcing Plaintiffs to present birth certificates with incongruous gender markers, the Policy precludes Plaintiffs from expressing their sex, as determined by their gender identity.

Finally, Tennessee's Policy impermissibly compels Plaintiffs to involuntarily disclose their transgender status. The First Amendment endows persons not only with the right to speech, but also the right to silence: "the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed. of the Blind*

---

[12] Whether the recipient of a birth certificate would attribute the gender marker thereon to its presenter or to the government is, at the very least, an issue of fact that must at this stage be presumed in favor of Plaintiffs. *See* Part IV.A, *supra*.

*of North Carolina, Inc.*, 487 U.S. 781, 796-97 (1988).  Defendants may not force Plaintiffs to disclose unwanted facts any more than unwanted viewpoints, especially when the fact at issue puts Plaintiffs at risk of harm upon disclosure.  *See id.*  The harm caused by compelled speech "takes on an added dimension" where the privacy of intimate information is at stake, as here.  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also* Part III.A, *supra*.

Tennessee's Policy refusing to provide transgender individuals with birth certificates matching their gender identity forces them to disclose the most private information about them-selves—their transgender status—to absolute strangers in order to access a host of necessary public and private resources.  Such disclosure has put each Plaintiff at risk of discrimination and physical harm.  *See* Doc. 59 ¶¶ 93, 113, 138-39, 163.  This compelled disclosure of Plaintiffs' identity is exactly what the Supreme Court's enduring First Amendment precedent proscribes.

**D.    The availability of alternative identification documents has no bearing on the constitutionality of Tennessee's Birth Certificate Policy.**

Whether Plaintiffs may avoid presenting a birth certificate with an incongruous gender marker by utilizing an alternative identity document, such as a U.S. Passport, is wholly immaterial to the constitutionality of Tennessee's Policy.  *See* Doc. 66 at 19-20.  An unconstitutional law is no less unconstitutional because the persons against whom the law discriminates could *possibly* avoid being affected by the law.  *See*, *e.g.*, *Engel v. Vitale*, 370 U.S. 421, 130 (1962); *West Virginia St. Bd. of Edu. v. Barnette*, 319 U.S. 624, 633 (1943).  With respect to compelled speech, whether a person has "any alternative means" to "disclaim" the government's viewpoint is "not significant" to its constitutionality.  *Frudden v. Philling*, 742 F.3d 1199, 1205 (9th Cir. 2014).

By way of example, in *Wooley*, plaintiffs strongly disagreed with the "Live Free or Die" motto that appeared on New Hampshire's state-issued license plates.  430 U.S. at 713.  The Supreme Court held that New Hampshire violated the First Amendment by compelling plaintiffs to "participate in the dissemination of an ideological message by displaying it on [their] private

property," regardless of whether plaintiffs could have avoided such participation by either covering up the motto, *id.*, or "plac[ing] on their bumper a conspicuous bumper sticker explaining in no uncertain terms that they do not profess the motto 'Live Free or Die' and that they violently disagree with the connotations of that motto." *Id.* at 722 (J., Rehnquist, dissenting).

Defendants' contention that Plaintiffs' First Amendment claim fails because Plaintiffs can simply present U.S. passports showing accurate gender markers, instead of presenting their Tennessee birth certificates, has no foundation in legal jurisprudence and ignores the lived reality of many Tennesseans, many of whom may not possess a U.S. passport. Indeed, Defendants cite no legal authority to support their position. Tennessee's Policy unconstitutionally compels Plaintiffs to become "couriers" of the State's outdated viewpoint on gender identity and to involuntary disclose Plaintiffs' transgender status, regardless of whether Plaintiffs may utilize identification documents other than their birth certificates.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court deny Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

Dated: March 25, 2020

Respectfully submitted,

*s/ John T. Winemiller*

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
Telephone: (212) 809-8585
Facsimile: (212) 809-0055
ogonzalez-pagan@lambdalegal.org

John T. Winemiller
MERCHANT & GOULD
9717 Cogdill Road, Suite 101
Knoxville, TN 37932
Phone: (865) 380-5960
Facsimile: (612) 332-9081
JWinemiller@merchantgould.com

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
Telephone: (404) 897-1880
Facsimile: (404) 897-1884
tborelli@lambdalegal.org

Gavin R. Villareal*
Maddy Dwertman*
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
Phone: (512) 322-2500
Facsimile: (512) 322-2501
gavin.villareal@bakerbotts.com
maddy.dwertman@bakerbotts.com

Sasha Buchert*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, DC 20006
Telephone: (202) 804-6245
sbuchert@lambdalegal.org

Brandt Thomas Roessler*
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
Phone (212) 408-2500
Facsimile: (212) 408-2501
brandt.roessler@bakerbotts.com

* *Admitted pro hac vice*

Kathryn S. Christopherson*
BAKER BOTTS L.L.P.
1001 Page Mill Rd., Bldg. One, Suite 200
Palo Alto, CA 94304-1007
Phone: (650) 739-7500
Facsimile: (650) 739-7699
kathryn.christopherson@bakerbotts.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, which provides electronic notice of the filing to all counsel of record, including:

Herbert H. Slatery III
Attorney General and Reporter

Dianna Baker Shew
Senior Assistant Attorney General
dianna.shew@ag.tn.gov
Sara E. Sedgwick
Senior Assistant Attorney General
sara.sedgwick@ag.tn.gov
PO Box 20207
Nashville, TN 37202

This 25th day of March, 2020.

*s/John T. Winemiller*
John T. Winemiller