# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

KAYLA GORE; JAIME COMBS; L.G.;  )
and K.N.,                        )
                                 )
     *Plaintiffs*,       )
                                 )
    v.                  )    No. 3:19-cv-00328
                                 )
WILLIAM BYRON LEE, in his official )
capacity as Governor of the State of )  Judge Eli J. Richardson
Tennessee; and LISA PIERCEY, in her )  Magistrate Judge Barbara D. Holmes
official capacity as Commissioner of the )
Tennessee Department of Health,  )
                                 )
    *Defendants*.       )

---

## DEFENDANTS' RESPONSE
## TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

Defendants William Byron Lee and Lisa Piercey, in their official capacities, respectfully file this response to Plaintiffs' Motion for Summary Judgment. As discussed below, Plaintiffs' motion should be denied.

### INTRODUCTION AND FACTS

Plaintiffs are four transgender individuals, born in Tennessee, who wish to change the sex identifier on their respective birth certificates to match their current gender identities. (Amended Complaint, Doc. 59 ¶ 1-2). Plaintiffs do not dispute that sex is typically determined at birth by visual inspection of external genitalia. (Defendants' Response to Plaintiffs' Statement of Material Facts, hereinafter, "Def. Resp. St. F." at 5). Plaintiffs' experts acknowledge that this is an appropriate way to determine sex. (Def. Resp. St. F. at 6) Because it is a medical determination made at the time of birth, the baby's sex designation at birth, as recorded in the medical record or

1

on the birth certificate, cannot and should not later be changed. The baby's sex is a part of the medical record. It must not change so that it will always accurately reflect what happened during the birth procedure. (Defendants' Statement of Additional Facts, hereinafter "DSAF" at 2).

In addition to the integrity of the medical record, recording sex at the time of birth is necessary for several other reasons, including the following:

- Use as a direct indicator in maternal and child health outcomes in public health surveillance and research. Fetal or infant sex is found in research to be a risk factor for the incidence of other information collected on the Certificate of Live Birth, including gestational diabetes, preterm birth, infant birth weight, and cesarean delivery.

- Analysis for logical consistency with other items collected on the Certificate of Live Birth, particularly the congenital anomaly, hypospadias, which is defined as the "incomplete closure of the male urethra resulting in the urethral meatus opening on the ventral surface of the penis."

- Inclusion in set of personal identifiers used in records matching programs from administrative or auditing functions. The linkage of birth certificate records to TennCare (Medicaid) or Newborn Screening data, which receive information from medical records that were generated at the time of birth, are examples of this work. Sex is routinely included as a data element in records matching programs in order to establish more confident matches in the absence of reliable unique identifiers, such as a Social Security Number or Medical Record Number.

(DSAF at 16). While corrections of minor errors are permitted, creating additional ways in which Tennessee's birth records can be modified, particularly without a statutory scheme in place to regulate and track such modifications, heightens the potential for fraud and illegality. (DSAF at 17-18). None of the Plaintiffs alleges that her sex, as determined by external genitalia, was inaccurately recorded on her birth certificate at the time of birth. Plaintiffs have not presented undisputed material facts which would overcome the important interest in preserving the integrity of the birth certificate as a vital record.

## LEGAL ARGUMENT

### I. The Legal Standard for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedures dictates that summary judgment is appropriate "if there is no genuine dispute as to any material fact." A court considering a motion for summary judgment must construe all reasonable inferences in favor of the nonmoving party. *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." *Mosholder v. Barnhardt,* 679 F.3d 443, 448 (6th Cir. 2012*)* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Mosholder*, 679 F.3d at 448-49; *see also,* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Martinez v. Cracker Barrel Old Country Store, Inc*., 703 F.3d 911, 914 (6th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The determinative question is whether "the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided" that one party must prevail as a matter of law. *Id.* (quoting *Liberty Lobby*, 477 U.S. at 251-52).

### II. Tennessee Law Does Not Violate Privacy Rights.

Plaintiffs make two substantive due process claims: first, that Tennessee's Birth Certificate Policy violates their right to informational privacy; and, second, that the policy violates their right to personal autonomy. Both claims fail as a matter of law, and Plaintiffs' motion for summary judgment should be denied.

3

**A.     Plaintiffs' informational privacy claim fails as a matter of law.**

Defendants thoroughly outlined the limitations of a claimed constitutional right to informational privacy in their Motion to Dismiss the Amended Complaint, (Doc. 66 at 12-13), and to succinctly repeat, the Sixth Circuit has only extended the right to informational privacy to "interests that implicate a fundamental liberty interest." *Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir. 1998) (citing *J.P. v. Desanti*, 653 F.2d 1080, 1090 (6th Cir. 1981) and *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1061 (6th Cir. 1998)).[1]   The "interest at stake must implicate either a fundamental right or one implicit in the concept of ordered liberty." *Id.*   If such an interest exists, then "the government's interest in disseminating the information must be balanced against the individual's interest in keeping the information private." *Id.*   Identifying a new fundamental right for purposes of substantive due process is "an uphill battle" because the list of fundamental rights "is short." *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007) (quotes and citations omitted).   The asserted right must be crafted as a "careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302, (1993); *Munoz*, 507 F.3d at 964.

When trying to craft a description of their asserted rights, Plaintiffs conflate the expression of "identity" referenced in several Supreme Court cases with their desire to express "gender identity" by changing the sex designation on their birth certificates. *Cf. Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) (concerning expression of identity in same-sex marriage); *Lawrence v. Texas*, 539 U.S. 558 (2003) (concerning expression of identity in same-sex conduct); *Washington v. Glucksberg*, 521 U.S. 702 (1997) (denying right to expression of identity in assisted suicide); and *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) (denying right to expression of identity to male-only

---

[1] As discussed further, *infra.*, the United States District Court for the Southern District of Ohio recently misinterpreted the holdings of both *Bloch* and *Kallstrom* in denying the defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) in a case involving Ohio's "Birth Certificate Policy" with regard to transgender applicants seeking to amend their Ohio birth certificates. *Ray v. Himes*, No. 2:18-cv-272 (S.D. Ohio Sept. 12, 2019).

4

membership corporation).  Despite the illogical comparisons, Plaintiffs claim that Tennessee's policy of recording sex at the time of birth and not allowing amendments to that historical fact facially violates their fundamental right.  Defendants deny that the policy at issue impacts anyone's right to keep their gender identity private.[2]  Nonetheless, even accepting *arguendo* that a right to informational privacy over the expression of gender identity is at issue, that right does not rise to the level of a fundamental right under existing precedent.

The Sixth Circuit has identified only two specific situations in which an asserted right to informational privacy implicates a fundamental right:  (1) "where the release of personal information could lead to bodily harm (*Kallstrom*)," and (2) "where the information released was of a sexual, personal, and humiliating nature (*Bloch*)."  *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008); *see also Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 586 (6th Cir. 2012).

In *Kallstrom*, the Sixth Circuit held that a city violated the informational privacy rights of undercover officers by releasing their personnel files to attorneys for gang members against whom the officers had testified.  136 F.3d at 1063.  The court explained that, "where the release of private information places an individual at substantial risk of serious bodily harm, possibly even death, from a perceived likely threat" it violates the individual's right to informational privacy because it infringes on that individual's fundamental right to bodily integrity.  *Kallstrom,* 136 F.3d at 1064.  That standard was satisfied in *Kallstrom* because the gang at issue was known for its propensity for violence and intimidation.  *Id.*

The Sixth Circuit later clarified that *Kallstrom* "created a narrowly tailored right, limited to circumstances where the information disclosed was particularly sensitive and the persons to

---

[2] Plaintiffs repeatedly cite *K.L. v. State Dept. of Admin. Div. of Motor Vehicles*, 3 AN-11-05431-CI, 2012 WL 2685183, at *6 (Alaska Super. Mar. 12, 2012) in support of their position, but the court in that case declined to find that a "fundamental right to have the gender designation on [plaintiff's] driver's license" existed.

5

whom it was disclosed were particularly dangerous *vis-à-vis the plaintiffs*." *Barber v. Overton*, 496 F.3d 449, 456 (6th Cir. 2007) (emphasis in original). It is not simply a generalized fear of violence from the release of personal information, but the release of particularly sensitive information and a fear of violence from a particularly dangerous source that is directed at the plaintiff, which gives rise to a constitutional claim.

In *Bloch*, the Sixth Circuit held that a sheriff violated a rape victim's right to informational privacy by revealing detailed information about the rape—details that the victim had not even shared with her husband—at a press conference. 156 F.3d at 676. The court explained that "a rape victim has a fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape where no penalogical [sic] purpose is being served." *Id*. at 686.

In *Lambert*, the Sixth Circuit specifically rejected an approach that would balance a person's reasonable expectation of privacy against the government's interest in releasing the information. 517 F.3d at 442. The court held that a county had not violated the plaintiff's right to informational privacy by posting his speeding ticket, which included personal identifying information, on a county website, because that release of information did not implicate the specific rights identified in *Kallstrom* or *Bloch* or any other right that was fundamental or implicit in the concept of ordered liberty. *Id.* at 435-36, 442-43.

Plaintiffs' claim to a fundamental right falls far short of the standards set by *Kallstrom* and *Bloch* because Defendants have not disclosed Plaintiffs' transgender status (and certainly not to anyone who poses a threat of harm to Plaintiffs) and because there should be no fundamental right to change correct information on a birth certificate.

6

Plaintiffs' informational privacy claim fails for the simple reason that Defendants have not disseminated information about Plaintiffs' transgender status. Even assuming that disclosure of the sex identifier on Plaintiffs' birth certificates would constitute disclosure of Plaintiffs' transgender status, Plaintiffs do not allege any instance in which Defendants have released copies of Plaintiffs' birth certificates to third parties. To the extent that Plaintiffs' birth certificates are being provided to third parties, it is Plaintiffs themselves who have released that information. Further, the standard set by *Kallstrom* requires that the disclosure of information be to a third party who poses a threat of harm. At most, Plaintiffs have alleged generalized fears over the release of information regarding their transgender identity, but again, Defendants do not control and have not released that information, much less to any third party who poses an actual risk of harm to Plaintiffs.

Plaintiffs' substantive due process claim based on informational privacy fails as a matter of law because it implicates neither of the specific rights identified by the Sixth Circuit in *Kallstrom* or *Bloch*, nor any other fundamental right. Plaintiffs attempt to shoehorn their informational privacy claim into *Kallstrom* by alleging that "[t]he involuntary disclosure of one's transgender status can . . . cause significant harm, including placing one's personal safety and bodily integrity at risk." (Doc. 59 ¶ 201). But these vague references to harm, personal safety, and bodily integrity are easily distinguishable from the concrete threat that existed in *Kallstrom*. Plaintiffs fail to allege that information about their transgender status is being released to any specific individual who is "particularly dangerous *vis-à-vis the plaintiffs*." *Barber*, 496 F.3d at 456. [3]

---

[3] In *Ray*, the District Court erroneously relied upon a generalized fear of violence in the transgender community to support its conclusion that "Plaintiffs' transgender status upon presentation of their birth certificates place their 'personal safety and bodily integrity in jeopardy.'" *Ray*, No. 2:18-cv-00272, Doc. 47 at 19. Although plaintiffs claimed "hostility" at government offices, the only allegation of an actual threat of violence came from a "co-worker,"

Plaintiffs also attempt to fit within the right identified in *Bloch* by alleging that a person's transgender status is "highly personal and intimate information," the disclosure of which would be "deeply intrusive." (Doc. 59 ¶ 200). But the specific informational privacy right recognized in *Bloch* concerned "information . . . of a sexual, personal, and humiliating nature" that implicated the fundamental right of privacy in one's sexual and family life. *Lambert*, 517 F.3d at 440-41. Plaintiffs do not allege their transgender status is of a sexual or humiliating nature, only that it is intimate and personal. (Doc. 59 ¶ 200).[4] In any event, a birth certificate does not itself disclose one's transgender status. It simply reports as a historical fact one's biological sex at birth.

Because the Sixth Circuit has narrowed the right to informational privacy to the specific situations identified in *Kallstrom* and *Bloch*, and Plaintiffs' allegations do not satisfy those standards, their substantive due process claim fails as a matter of law.

## III. Tennessee Law Does Not Violate the Equal Protection Clause.

Plaintiffs contend that Tennessee's Birth Certificate Policy violates the Equal Protection Clause because it deprives transgender people, and *only* transgender people, of the right to a birth certificate that accurately reflects their sex, "as determined by their gender identity." (Doc. 59 ¶ 5; Doc. 61 at 13). Plaintiffs' equal protection claim, however, fails as a matter of law because Tennessee's Birth Certificate Policy does not treat transgender persons differently from cisgender persons. Indeed, in Tennessee, no person may correct the sex designation on a birth certificate

---

not the human resources employee to whom the plaintiff had disclosed her transgender identity. *Id.* at 20. In any event, Plaintiffs in this case fail to allege any concrete threat of physical violence.

[4] The District Court in *Ray* erroneously analogized the "private and intimate nature of being transgender" to the sexual information that was disclosed in *Bloch*. No. 2:18-cv-00272, Doc. 47 at 24 (alterations omitted). In doing so, the District Court improperly extended the narrow "right to informational privacy" to interests that do not "implicate a fundamental liberty interest." *Lambert*, 517 F.3d at 440 (internal quotation marks omitted).

unless it was factually inaccurate *at the time of birth*.  In other words, Plaintiffs fail to show disparate treatment, and their equal protection claim thus fails as a matter of law.

### A.    Plaintiffs fail to show disparate treatment.

The Equal Protection Clause "embodies the principle that all persons similarly situated should be treated alike."  *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).  "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers."  *Id.*  The Equal Protection Clause prohibits only intentional discrimination.  *Washington v. Davis*, 426 U.S. 229, 239 (1976).  Indeed, if the challenged law is facially neutral, the plaintiff must show that the law was "promulgated or reaffirmed *because of*, not merely in spite of, its adverse impact on persons in the plaintiff's class."  *Horner v. Ky. High Sch. Athletic Ass'n.*, 43 F.3d 265, 276 (6th Cir. 1994) (emphasis in original) (citing *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1999)).

Here, Plaintiffs assert that transgender persons born in Tennessee are treated differently from their cisgender counterparts based on sex and transgender status.   (Doc. 61 at 13).  Specifically, Plaintiffs contend that only cisgender persons can amend their birth certificates if their sex designation is incorrect, while transgender persons are categorically deprived of this remedy.   Plaintiff's argument, however, improperly assumes that the sex designation on a transgender person's birth certificate is "incorrect" if it reflects that person's sex at the time of birth rather than his or her current gender identity.  Indeed, in Tennessee, both transgender and cisgender persons may amend their birth certificates in the manner sought by Plaintiffs—without strikethrough or other evidence showing the document has been amended—only by presenting "evidence that a reasonable person would conclude proves beyond a reasonable doubt that [the]

9

original entry on [the] certificate was factually inaccurate *at the time of recordation*." Tenn. Code Ann. § 68-3-203(f) (emphasis added).[5]

The sex designation on a Tennessee birth certificate is recorded based on an individual's external genitalia at the time of birth. Plaintiffs maintain that external genitalia alone is not an accurate proxy for a person's sex and contend that a person's gender identity should be the dispositive factor in determining his or her sex. In doing so, Plaintiffs totally ignore the core function of a birth certificate—it captures various factual information at the time of a person's birth. Indeed, that an individual might later identify as a gender that is not congruent with the sex recorded at birth does not invalidate the sex designation made at the time of birth. Even Plaintiffs' expert, Dr. Randi C. Ettner, agrees that gender identity cannot be determined at birth, but rather becomes "detectable by self-disclosure in adolescents and adults." (DSAF 1). In other words, Plaintiffs fail to show that Tennessee's Birth Certificate Policy treats transgender persons differently from cisgender persons with respect to their ability to amend the sex designation on their birth certificates. Plaintiffs' equal protection claim thus fails, and their motion for summary judgment must be denied.

B. **Tennessee's Birth Certificate Policy is not subject to heightened scrutiny because transgender persons are not a suspect class.**

Plaintiffs also argue that Tennessee's Birth Certificate Policy is subject to heightened scrutiny because it discriminates against transgender persons based on sex and their transgender status. Specifically, Plaintiffs contend that heightened scrutiny applies because Tennessee's Birth Certificate Policy is "on its face . . . a classification based on sex." (Doc. 62 at 14) and cite the

_____

[5] Plaintiffs argue that the "strike-out line" as required by Tenn. Comp. R. & Regs. 1200-07-01-.10(11)(a) violates the Equal Protection Clause because it results in the disclosure of the transgender person's transgender status. (Doc. 61 at 13, n3). Plaintiffs' characterization of this requirement is not only misguided but also misleading. The requirement applies whenever the State Registrar amends certificates of birth, death, marriage, and divorce or annulment. In other words, this requirement does not treat transgender persons differently from cisgender persons.

10

State's responses to their requests for admission in support. Defendants, however, dispute that its Birth Certificate Policy is discriminatory on the basis of sex. In fact, Defendants simply admitted that Tenn. Code Ann. § 68-3-203(d) cannot be read or interpreted without reference to sex and that it uses the word "sex." (Doc. 62-2, at 7-8). Tennessee Code Annotated § 68-3-203(d) prohibits a change in the sex listed on a birth certificate "as a result of sex change surgery." The mere fact that this provision mentions "sex change surgery" does not mean that it discriminates, on its face, against transgender persons based on sex or their transgender status. As discussed above, neither transgender persons nor cisgender persons may amend the sex designation on their birth certificates unless it was incorrectly recorded at the time of birth. Indeed, Section 68-3-203(d) does not subject transgender persons to a different standard; it simply clarifies that the sex that is recorded on a person's birth certificate remains an accurate designation of sex at the time of birth even if that person later has a "sex change surgery."

Nevertheless, Plaintiffs maintain that transgender persons are a suspect class and contend that heightened scrutiny thus applies to their equal protection claim (Doc. 59, ¶ 186). Neither the Supreme Court nor the Sixth Circuit has ever applied heightened scrutiny to an equal protection claim brought by transgender persons. The Sixth Circuit has held that discrimination based on transgender status is prohibited under Title VII of the Civil Rights Act of 1964, *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) *cert granted*, 2019 WL 1756679 (U.S. April 22, 2019) (No. 18-107); *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004). But it has never held that transgender persons are a suspect class for purposes of equal protection analysis. *See Davis*, 426 U.S. at 239 (distinguishing between Title VII claims and equal protection claims). Moreover, both *R.G. & G.R. Harris Funeral Homes* and *Smith* concerned discrimination based on sex stereotyping, which is not alleged here. *EEOC*, 884 F.3d at 571; *Smith*, 378 F.3d at

11

571.  Indeed, there is no controlling authority that supports Plaintiffs' bare assertion that transgender persons are part of a protected class for Equal Protection purposes.

Therefore, because Plaintiffs are not members of a suspect class, Tennessee's Birth Certificate Policy must be reviewed under the rational basis test.  *Scarbrough*, 470 F.3d at 261. "Under this test, government action is considered irrational only if it is 'unrelated to the achievement of any combination of legitimate purposes'" *Id.* (citing *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005.  If there is any "reasonably conceivable state of facts that could provide a rational basis for the classification" then the law must be upheld.  *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). The means chosen by the State does not have to be the best means for achieving the desired result. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976).  As explained below, Tennessee's policy of allowing amendments to the sex designation on a birth certificate only if it was inaccurate at the time it was recorded furthers legitimate governmental interests.

## IV.  Tennessee Law Does Not Violate the First Amendment.

Plaintiffs assert that the Birth Certificate Policy violates their First Amendment right "to refrain from speaking by forcing them to identify with a sex that was incorrectly assigned to them at birth," "to disclose their transgender status," and to "endorse the government's position as to their own gender, as well as . . . the meaning of sex generally."  (Doc. 59 ¶¶ 214-16).  Plaintiffs also allege that the Birth Certificate Policy violates the First Amendment by "prevent[ing] [them] from accurately expressing their gender identity."  (Doc. 59 ¶ 214.)  All of these claims fail as a

12

matter of law because the sex designation on a birth certificate is government speech, not the private speech of Plaintiffs.[6]

Plaintiffs further conflate sex with gender identity, thus complicating and confusing what ought to be—and generally is—a simple and straightforward medical determination made and recorded at the time of birth. Plaintiffs' conflation of sex with gender identity confounds any discussion of Plaintiffs' First Amendment rights regarding accurate recordation of a child's sex at the time of birth because a newborn infant cannot yet have formed any subjective sense of gender identity. Indeed, the determination of a person's sex is an objective medical determination, and the baby's sex designation at birth, as recorded in the medical record or on the birth certificate, cannot and should not later be changed. The baby's sex is a part of the medical record that will always accurately reflect what happened during the birth procedure. (DSAF 2). Even Plaintiffs' expert witness Dr. Ettner has described gender identity as a person's "inner sense of belonging to a particular sex," which is "detectable by self-disclosure in adolescents and adults." (DSAF 1). While Plaintiffs' experts opined that gender identity is "immutable" and "biologically based," (DSAF 3, 4), Dr. Ettner also effectively contradicted this claim that gender identity is "immutable" by admitting, in her earlier deposition, that she has known transgender persons who "detransitioned" back to their sex at birth:

Q. Have you ever evaluated someone who is
transgender whose gender identity later reverts
back to their birth sex?

MS. INGELHART: Objection to the term at issue, birth sex,

---

[6] Plaintiffs' claim that Defendants have interfered with their ability to "define and express" their gender identity (Doc. 59 ¶ 205) is also belied by Plaintiffs' acknowledgement that Tennessee has allowed them to obtain other identity documents, such as driver's licenses, listing their preferred sex identifier. (Doc. 59 ¶ 6).

as well as these others that we have discussed. But answer to the best of your ability.

BY THE WITNESS:
A. I have evaluated I think on two occasions people who have attempted to reverse their surgery or have regretted having the surgery, and one I think attempted to revert to living in their birth sex but they didn't -- they did not state that their gender identity had changed, just that they needed to live as a man for a variety of other reasons.

Q. All right. Are you aware, just in the profession, of transgender folks who have -- whose gender identity has reverted to their birth sex?

A. I am aware of people who have detransitioned.

Q. Is that the terminology, detransitioned?

A. Detransition means they have reverted to living in the sex they were assigned to. It doesn't necessarily mean that their gender identity has changed, and I wouldn't know without actually interviewing or assessing those people.

[ ]

A. I'm aware that some people who have transitioned from the sex they were assigned at birth have reverted to living in the gender, the sex they were assigned at birth. I cannot state that their gender identity has changed, only that the circumstances under which they live have changed.

(DSAF 5). Despite Dr. Ettner's equivocation that "detransitioning" somehow does not necessarily equate to reversion back to the sex assigned at birth, Dr. Ettner's testimony nevertheless demonstrates that a person's gender identity (or expression of gender identity) can be flexible and therefore cannot be considered "immutable." Instead, what is immutable is the sex designation recorded on the birth certificate at the time of birth, which clearly constitutes government speech.

14

The right of "freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citations omitted). But when "the government speaks, it is not barred . . . from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245 (2015) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009)). As long as observers would attribute the speech at issue to the government, and not the plaintiff, a plaintiff's compelled-speech claim must be rejected. *See New Doe Child # 1 v. Congress of the United States*, 891 F.3d 578, 593 (6th Cir. 2018). Nothing in the Amended Complaint suggests that observers would attribute information contained on a Tennessee birth certificate to the respective plaintiffs, since no infant can influence what information is recorded on a birth certificate at the time of birth.

In *Walker*, the Supreme Court concluded that specialty license plates issued by Texas constituted government speech, not private speech, and on that basis rejected a First Amendment claim that Texas had engaged in viewpoint discrimination in selecting which designs to display on the plates. 135 S. Ct. at 472. The Court reasoned that Texas "select[ed] each design" and then presented them on "government-mandated, government-controlled, and government-issued" plates that had "traditionally been used as a medium for government speech." *Id.* Because the designs were "meant to convey and ha[d] the effect of conveying a government message," they "constitute[d] government speech." *Id.* (internal quotation marks omitted).

The factual information contained on birth certificates likewise constitutes government speech. All records created by the Office of Vital Records are the "property of the office of vital records," and "the uses that may be made of the records or other information" are controlled by the state registrar. Tenn. Code Ann. § 68-3-104(6); *see also* Tenn. Comp. R. & Regs. 1200-07-

15

01.01 ("All forms, certificates, and reports used in the system of vital records are the property of the Department" and "shall be used only for official purposes."). The Department requires that birth certificates be issued, carefully controls the information that is included on them, and issues the certificates. Thus, when a person presents a copy of his or her birth certificate, it is generally understood that the factual information contained on that document—including the sex designation—is attributable to the government. *See Walker*, 135 S. Ct. at 2250.

Because the sex designation on Plaintiffs' birth certificates is government speech, not private speech, requiring Plaintiffs to keep the sex designation that was recorded at birth does not infringe on Plaintiffs' right to refrain from speaking. To the extent the sex designation on the birth certificate conveys a message, it is the message of the government, not of Plaintiffs. Plaintiffs' compelled speech claim thus fails as a matter of law.

Even if the sex designation on Plaintiffs' birth certificates could be considered private speech, the compelled speech claims would still fail because Plaintiffs have not demonstrated, with the exception of the requirements to apply for licensure as a licensed clinical counselor (Def. Resp. St. F. at 88), not plausibly alleged that Defendants have forced them to present their birth certificates to anyone. Although some Plaintiffs allege that they have had to present their birth certificates to employers or in order to obtain a U.S. passport (Doc. 59 ¶¶ 93, 113), other Plaintiffs avoided presenting their birth certificates to employers by instead presenting a U.S. passport, which may be amended to reflect the passport holder's current gender identity. (Doc. 59 ¶¶ 73, 163). Indeed, the Amended Complaint readily admits that Plaintiffs can change the gender designation on numerous federal and state identification documents—for example, U.S. Passports, social security documents, driver's licenses, and voter registration cards. (Doc. 59 ¶¶ 73, 74). Many of the situations in which Plaintiffs allege they were required to present their birth

certificates could easily have been avoided by obtaining and presenting one of these other identification documents with an amended gender designation. (Doc. 59 ¶¶ 138, 139). Plaintiff Jaime Combs admitted that, when she was required to present her birth certificate to her bank in 2010, it was before she had her passport corrected. (DSAF 19). Equally unavailing are Plaintiffs' assertions that merely *possessing* a birth certificate that does not reflect their subjective gender identity "increases the likelihood that she will be subject to invasions of privacy, prejudice, discrimination, distress, harassment, or violence," (Doc. 59 ¶¶ 92, 112, 137, 162), since possession alone of such a document cannot violate Plaintiffs' First Amendment right to express their gender identity.[7]

Even the implementing regulations for the REAL ID Act, which established national minimum standards for state identification cards such as driver's licenses, allow an applicant to establish identity by presenting *either* a U.S. passport or a birth certificate. 6 C.F.R. § 37.11(c). Given the widespread acceptance of other documents as proof of identity, Plaintiffs have failed to plausibly allege that they are compelled to share their birth certificates with third parties.

Plaintiffs' claim that the Birth Certificate Policy violates their First Amendment right to express their gender identity also fails as a matter of law. The First Amendment does not guarantee individuals the right to express their views "whenever and however and wherever they please."

---

[7] In fact, while Plaintiff Jaime Combs testified that she did not believe she had used her birth certificate as a form of identification in the past seven (7) years (DSAF 6), when she was then asked to explain her assertion that *possessing* a birth certificate that does not reflect her gender identity subjects her to harm, Plaintiff Combs could only refer to a situation, remote in time, in which she was required to present her birth certificate. (DSAF 7) In turn, Plaintiff L.G. testified, when asked about her assertion that harm would accrue to her from possessing a birth certificate she considers inaccurate, L.G. testified that she keeps her birth certificate locked in a safety deposit box, and could only respond concerning her fears associated with actually presenting her birth certificate. (DSAF 8).

17

*Greer v. Spock*, 424 U.S. 828, 836 (1976) (internal quotation marks omitted). Because birth certificates constitute government speech, Plaintiffs have no First Amendment right to use that medium to express their own views. *See Summum*, 555 U.S. at 467-68 (explaining that the government "has the right to speak for itself" and to "select the views that it wants to express" (internal quotation marks omitted)). Since Plaintiffs lack any First Amendment right to express their gender identities on their respective birth certificates in the first place, denying them the opportunity to amend their birth certificates plainly does not infringe on that right.

## V. Tennessee Has Legitimate Government Interests in Maintaining Accurate Birth Records

Tennessee's statutes and regulations requiring that the sex designation be recorded at the time of birth and prescribing the circumstances under which the birth certificate may be amended further numerous legitimate government interests.

First, as a general matter, the information collected on birth certificates and other vital records "shall be such as will aid the public health of the state." Tenn. Code Ann. § 68-3-201. To that end, the state registrar of vital records is tasked with "preparing and publishing reports of vital statistics of this state and other reports required by the department." *Id*. § 68-3-104(b)(3). The Tennessee Vital Statistics Birth Data Element Layout used by the Tennessee Department of Health to record information contains over 416 data elements. (DSAF 9). The information recorded is extensive and ranges from the date of birth to the parents' educational level to the congenital anomalies of the infant. (DSAF 10). The information contained in the Tennessee Vital Statistics Birth Data Element Layout forms the basis of the historical birth record of the child, as well as the Tennessee Department of Health Certificate of Live Birth. (DSAF 11). This information is provided to approved agencies for purposes including local health planning and programming,

18

Tenn. Code Ann. § 68-3-104(b)(6), and is used for research purposes, including legislatively mandated studies of maternal deaths and of suicides. *Id.* §§ 68-3-205(b); 68-3-607; 68-3-703.

Tennessee birth certificates merely record the sex of the child as reported at birth. (DSAF 12). Following NCHS guidance, the Tennessee Birth Statistical System is limited to three valid values for the sex of the infant: Male, Female, and, if the sex of the infant is ambiguous, Not Yet Determined or Unknown. (DSAF 13).[8] Recording sex at the time of birth is necessary for several reasons, including the following:

- Use as a direct indicator in maternal and child health outcomes in public health surveillance and research. Fetal or infant sex is found in research to be a risk factor for the incidence of other information collected on the Certificate of Live Birth, including gestational diabetes, preterm birth, infant birth weight, and cesarean delivery.

- Analysis for logical consistency with other items collected on the Certificate of Live Birth, particularly the congenital anomaly, hypospadias, which is defined as the "incomplete closure of the male urethra resulting in the urethral meatus opening on the ventral surface of the penis."

- Inclusion in set of personal identifiers used in records matching programs from administrative or auditing functions. The linkage of birth certificate records to TennCare (Medicaid) or Newborn Screening data, which receive information from medical records that were generated at the time of birth, are examples of this work. Sex is routinely included as a data element in records matching programs in order to establish more confident matches in the absence of reliable unique identifiers, such as a Social Security Number or Medical Record Number.

(DSAF 16). In other words, Tennessee's Birth Certificate Policy of recording sex at the time of birth promotes the State's legitimate governmental interests.

Limiting amendments of the sex designation on birth certificates also promotes legitimate governmental interests. The statute governing amendments of vital records explicitly provides that the amendment process is designed "to protect the integrity and accuracy of vital records."

---

[8] Comparing this method of recording "sex" at birth to an individual's "gender identity," Plaintiffs' expert Dr. Ettner testified that "there are many ways that people can express their gender identity." (DSAF 14). Of those many ways, Dr. Ettner described one way as "non-binary" meaning individuals who "don't necessarily have a gender identity that they believe is entirely male or entirely female." (DSAF 15).

Tenn. Code Ann. § 68-3-203(a). Amendments of minor errors on birth certificates during the first year are permitted in accordance with Tenn. Comp. R. & Regs. 1200-07-01-.10(1). (DSAF 17). In the opinion of the state registrar, who has a statutory duty to investigate cases of irregularities or violations of law, creating additional ways in which Tennessee's birth records can be modified, particularly without a statutory scheme in place to regulate and track such modifications, heightens the potential for fraud and illegality. (DSAF 18).

Tennessee's Birth Certificate Policy is rationally related to these legitimate interests. Because one of the purposes of the Vital Records Act is to collect accurate information for public health and research purposes, it is rational for the State to allow an amendment to the sex designation on a birth certificate only when that designation was inaccurately recorded at the time of birth. As the name suggests, vital records are primarily "records" of past events—not current identification documents. Requiring the State to allow Plaintiffs to amend their birth certificates to reflect their current gender identities—when there is no evidence that their biological sex, as determined by the appearance of external genitalia, was incorrectly recorded at the time of birth— would undermine the State's legitimate interests in maintaining accurate records.[9]

In sum, the interests described above are important and the State's carefully circumscribed amendment process for birth certificates is substantially related to achieving those interests. *Communities for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 693 (6th Cir. 2006) (internal quotation marks omitted).

---

[9] Plaintiffs suggest that an accurate determination of sex must consider not only external genitalia but also "[o]ther sex-related characteristics" such as "a person's chromosomal makeup or gender identity," but the criteria to be used to accurately determine a person's biological sex for purposes of recording that information on a birth certificate is a matter of policy for the General Assembly and Department of Health. And the decision to determine a person's biological sex at the time of birth based on external genitalia is hardly irrational or arbitrary.

## CONCLUSION

For all of the reasons discussed above, Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully Submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

*/s/ Dianna Baker Shew*
DIANNA BAKER SHEW      BPR 012793
Senior Assistant Attorney General
(615) 532-1969
dianna.shew@ag.tn.gov

SARA E. SEDGWICK   BPR 004336
Senior Assistant Attorney General
(615) 532-2589
sara.sedgwick@ag.tn.gov
P.O. Box 20207
Nashville, TN  37202
*Counsel for the Defendants*

21

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May 2020 I filed the foregoing via the Court's ECF system and thereby served the following counsel:

Gavin R. Villareal
Maddy Dwertman
Puneet Kohli
Samoneh Kadivar
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
Phone: (512) 322-2500
Facsimile: (512) 322-2501
gavin.villareal@bakerbotts.com
maddy.dwertman@bakerbotts.com
puneet.kohli@bakerbotts.com
samoneh.kadivar@bakerbotts.com

Brandt Thomas Roessler
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
Phone (212) 408-2500
Facsimile: (212) 408-2501
brandt.roessler@bakerbotts.com

Kathryn S. Christopherson
BAKER BOTTS L.L.P.
1001 Page Mill Rd., Bldg. One, Suite 200
Palo Alto, CA 94304-1007
Phone: (650) 739-7500
Facsimile: (650) 739-7699
kathryn.christopherson@bakerbotts.com

John T. Winemiller (TN 021084)
MERCHANT & GOULD
9717 Cogdill Road, Suite 101
Knoxville, TN 37932
Phone: (865) 380-5960
Facsimile: (612) 332-9081
JWinemiller@merchantgould.com

Sasha Buchert
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, DC 20006
Telephone: (202) 804-6245
sbuchert@lambdalegal.org

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
Telephone: (212) 809-8585
Facsimile: (212) 809-0055
ogonzalez-pagan@lambdalegal.org

Tara L. Borelli
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
Telephone: (404) 897-1880
Facsimile: (404) 897-1884
tborelli@lambdalegal.org

/s/ *Dianna Baker Shew*
Dianna Baker Shew