IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

KAYLA GORE; L.G.; and K.N.,

Plaintiffs,

vs. Case No. 3:19-CV-00328

WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health,

Defendants.

Videoconference Deposition of:

KAYLA GORE

Taken on behalf of the Defendant
April 13, 2020

Elite Reporting Services
www.elitereportingservices.com
R. MICHELLE SMITH, RMR, LCR, CCR, FPR, CLR
Nashville, Tennessee
(615)595-0073

Case 3:19-cv-00328 Document 88-7 Filed 05/15/20 Page 1 of 16 PageID #: 1342

A. Not any attempts specifically for my gender marker, because it's currently not allowed by law, but I have made attempts to change my name on my birth certificate.

Q. And have you been successful?

A. No, I have not.

Q. Okay. Tell me -- tell me how you've attempted to change the name on your birth certificate, what steps have you taken?

A. The process -- the process here is there is a form that you can get from the local health department, you fill that form out, you accompany that form with a money order for the actual baby birth certificate, you mail that to the Tennessee Department of Records in Nashville, and then they return you your updated birth certificate within 45 days. Or you can physically take it to the department of records if you're in the area of Nashville.

Q. So have you -- have you completed the form and mailed that to the Office of Vital Records?

A. Yes, ma'am, I have.

Q. And when did you do that?

A. October of last year.

Q. Have you -- have you had any communication

with that office since you sent that form?

A. No, I have not.

Q. Have you tried to inquire why you haven't had a response since October?

A. No, I haven't.

Q. Have you made any other attempts to change any other information on your birth certificate?

A. No.

Q. All right. Looking at Paragraph 81 of the amended complaint, it has a list of your different community advocacy efforts, and I wanted to go through those with you. It says presently you are the southern regional organizer with TLC@SONG. What -- how long have you been in that position where you're the southern regional -- a southern regional organizer?

A. A little over a year.

Q. Okay. And what does that actually involve, what do you do as a southern regional organizer for that organization?

A. I work regionally in the south with LGBTQ people around the missions and values of the transgender law center and Southerners on New Ground.

Q. Okay. What might that -- what does that look

presenting identification that conflicted with your gender identity?

A. Can you be more specific? Are you referring to like work or personal life or?

Q. Well, really anything. I mean 93 goes on to say for example you've had -- let's just pick this apart. "Ms. Gore has had to present her birth certificate in the context of securing employment. Because the birth certificate inaccurately states that she is male, providing this document has led directly to Ms. Gore being "outed" as a transgender, and being subjected to awkward, deeply personal, and invasive questions by prospective employers."

So let's just start with employers. What employers have required you to present a birth certificate, or potential employers?

A. One particular -- one particular employer was Silky O'Sullivan's, which is a bar and grill located in Memphis, Tennessee. I was asked to present my birth certificate. This was after the -- after the interview where I was offered the job. And there were people present who worked there that I had previously worked with who knew of my transgender status which I felt -- which I felt caused the hiring manager to ask me for my birth certificate to verify

what people had told him.

They didn't deny me the job, but I felt -- I felt like all of my information had been told to the entire staff without my knowledge because most of them --

THE REPORTER: One moment, this is the court reporter. Can you hear me?

(Off record.)

BY MS. SHEW:

Q. All right. So Ms. Gore, we're going replow a little ground here. So I think you heard the court reporter say where her transcript leaves off.

You, as I understand it, there were, you believe -- you had worked at Silky O'Sullivan's before, there were people who knew of your transgender status, and you believe they told the manager to ask for your birth certificate; is that correct?

A. No, I had worked with people at a different job prior to that, who are currently working there, and I felt like I was outed by that employee. At the previous job I was their supervisor, they didn't really like me, and I wasn't speculating because I got to know some of the people who were in that group the day I got hired, and they divulged that a

conversation that was had that I was transgender.
Q. Okay.
A. And that that employee told people, they talked, but they didn't necessarily say that the manager was told to ask for my birth certificate. But I think that was the result of them outing me. And that was the way for him to confirm.
Q. Okay. Where did you -- where did you work with that person prior?
A. FedExForum.
Q. We'll go through that.
A. Okay.
Q. Go ahead.
A. I was just going to say that it was at the FedExForum, but I worked for a private restaurant, privately owned restaurant, a family-owned restaurant inside of the FedExForum.
Q. Okay. What was that restaurant?
A. Rendezvous.
Q. All right. Any other -- any other employers that have required you, or even asked you to give a birth certificate?
A. Yes. The FedExForum required it for security reasons. I wasn't employed by them, but for security reasons I have to, required that and my Social to be

able to access the event arena.

Q. Okay. Did that, did that cause any problems for you, the presenting it to the FedExForum?

A. I can't necessarily say that it was related to my birth certificate, so I can't say that the problems that I did have were directly related to me having to submit that document. But most of my problems were around my gender identity.

Q. What problems were those?

A. I was a supervisor for Rendezvous for one of their fans, which meant I would have to handle their money. And the people in the money room would give me problems and they would communicate over a speaker, very loud speaker through thick glass. And on several occasions as I would walk out of the cash room where they didn't think I could audibly hear them, I could hear them misgendering me if maybe one time I left something in the money room and they would say can you get "him, he" left something. And these people -- I think these folks would have access to that information because that was like a part of the security, part of how that was needed for me to have to submit those two documents, security to get into the building, as well as I was handling the money for one of the fans.

Case 3:19-cv-00328 Document 88-7 Filed 05/15/20 Page 7 of 16 PageID #: 1348

Q. So you believe the FedExForum would have given those employees your birth certificate or Social Security information?

A. Those employees were -- were supervisors, they were basically supervisors of that operation.

Q. But you believe the FedExForum would have given them your birth certificate and/or Social Security information?

A. I can't necessarily say yes or no, because I don't know. But I do know that questions I asked about why these things were requirement -- required for a company that I didn't necessarily work for, these are questions I asked my supervisors at Rendezvous, and they explained to me why these documents were required. And one of those was for the security of the arena because they hold -- they hold sporting events at the FedExForum here with very high profile people that they want to protect. And it's just like a security thing ever since -- I guess they would relate it back to 9/11.

And then also because I was a supervisor and I would be responsible for anywhere from five to fifteen thousand dollars an event, I had to have those documents. And that the people in the money room would have copies of my identification with my

photo on it, my birth certificate and my Social on bio to verify I was the person who was supposed to pick up and drop off money.

Q. And you believe those people actually had copies of your birth certificate and your Social Security documents?

A. That's how it was explained to me, that there will be copies for the security people and for the money-handling people. And it was explained to a group of employees, and these were the questions that I had aside from the group.

Q. Okay. Let me -- we may have to go mute here in a minute. So any other employers who either requested or required you to give a copy of your birth certificate?

A. I can't recall.

Q. Okay. No --

A. I can't recall.

Q. Okay. Let's see. At Paragraph 93 it also said that you were subjected to awkward, deeply personal and invasive questions by prospective employers. What types of awkward, deeply personal and/or invasive questions do you recall?

A. Questions about surgery, about the process of transitioning, about my sexuality, and that's it.

Q. You had employers actually ask you these questions?
A. Not necessarily like the higher-up managers, but my immediate supervisors. And these would be things that would like come up in conversations that people felt for some reason were appropriate to ask.
Q. Who -- who would ask you these questions? I'm not clear on who was asking the questions.
A. Like immediate supervisors, in a conversational way.
Q. Did you ever feel like you didn't -- you didn't get a job because you wouldn't participate in those kinds of conversations?
A. It was never during like a hiring process. It would be after I had obtained the job, and these would be general conversations. I have felt uncomfortable in those work environments after, feeling like I was obligated to answer those questions, and that it -- that it was tied to my employment at those places.
Q. Did you ever complain to a supervisor or somebody in human resources department about that?
A. Yes.
Q. When -- when was that, describe that for

me.

A. That was when I was working at Silky O'Sullivan's, I had been there a little over a year and I was having some issues with some of my male coworkers basically jonesing me. And I spoke to my supervisor about it, the same supervisor who asked for my birth certificate when I got the job, and he basically sided with the guys and was like, "I don't see what the problem is, this is what happens, you know, when you work at a bar and grill. You know, this is just the atmosphere." Kind of a if you can't stand the heat, get out of the kitchen type of thing.

Q. Are there any other occasions when you complained to a supervisor or a human resources person, whether at that job or at any other job?

A. No.

Q. Okay. Okay. Any other employers that either -- have we covered every employer that's requested or required that you present a birth certificate?

A. That's it.

Q. Is there any place that you simply decided not to apply because you didn't want to present a birth certificate?

A. Yes. That was really tied to my strategy in obtaining a job was trying to find people who owned their own businesses. Because in addition to them paying more, and more benefits, they were more relaxed on documentation, and they would really only require maybe a Social and identification, or just identification.

Q. Okay. So you -- you had a strategy of applying at smaller companies or family owned companies I think you told us that; right?

A. Yes, ma'am.

Q. Okay. Was there any -- any place that you can recall that you just thought that would be a good place to work, I would like to work there but I'm just not even going to apply because they're going to ask for my birth certificate or they'll make me give them my birth certificate?

A. Yes, there were places like that.

Q. Okay. What places?

A. Walgreens, Kroger, there were some different warehouses that I didn't apply to, like UPS. LeBonheur was a job that I didn't apply to.

Q. What job were you applying for at -- or you didn't apply for but you wanted to apply for but didn't at LeBonheur?

A. There was a -- they named it like an internship, it was a type of internship with one of their community advocacy programs.

Q. Okay. Any other employers? We have Walgreens, Kroger, UPS, LeBonheur, any others?

A. The FedExForum, there were some jobs that just in conversation of working there and talking with some of the actual FedExForum employees, that I just didn't want to apply for because I felt like the whole building would have my information at that point.

Q. Okay. Any others that you just didn't apply?

A. No.

Q. Okay. At Paragraph 94 of the amended complaint it says "Ms. Gore is personally aware of the high incidence of violence and harassment directed at transgender persons as well as the high rates of employment and housing discrimination faced by transgender people, particularly transgender women of color like herself, in Tennessee."

You've described several -- several or maybe all of these items. My question is, is any other, it says you are personally aware, violence, harassment, employment and housing discrimination. Anything else that is within your personal knowledge,

didn't want to apply for, services you didn't want to apply for, money that you didn't want to apply for, specific ones that you have not applied for because you did not want to show a birth certificate.

A. School, I did want to go back to school because Tennessee had a, I believe it's called the Tennessee reconnect program, where they pay for two years of college for individuals who dropped out of school or did not complete their program. I wanted to enter back into school through that program and I had to submit my birth certificate and I just didn't feel -- I didn't feel whole submitting that, so I didn't enter into that program.

And I'm not 100 percent that's the name of it, but it's a program that's funded by the State to help people who were in college, didn't complete it, get back in college and be able to have it fully paid for.

Q. Okay. Did you have any reason to believe you would be denied because of your transgender status?

A. I don't -- the college that -- the college I was interested in, I don't think they would have denied me. They were very interested in me being a student at that college. However, I felt as though I wasn't -- I wasn't prepared mentally to go through

that process because I didn't know what the outcome would be, or what their process would look like as far as how much discrimination am I going to have to face throughout this, or how many hurdles are going to be put in front of me because I am transgender.

Q. Okay. But -- but going back to my original question, I understand the answer you've given, but you didn't have a reason to believe that the State of Tennessee was just going to say we're just not giving, we're just not going to give Kayla Gore that money because Kayla Gore is a transgender woman?

A. I don't know the answer to that, because I don't want to speculate what other people would do. But just by being a resident of the Tennessee -- of the State of Tennessee for 31 -- 33 years of my life, yeah, I didn't think that I had a great chance.

Q. Because you are a transgender woman, or for another reason?

A. Because I'm transgender.

Q. Okay. So and I know the program you're talking about, and I think it may be called -- I think you may be right, it's called something like Tennessee reconnect, or but you, you believe that the persons considering the Tennessee reconnect program would have discriminated against you and denied you

03:14:53 03:14:57 03:15:01 03:15:05 03:15:09 03:15:13 03:15:22 03:15:24 03:15:27 03:15:30 03:15:32 03:15:35 03:15:41 03:15:45 03:15:49 03:15:58 03:16:01 03:16:05 03:16:06 03:16:08 03:16:14 03:16:17 03:16:18 03:16:21 03:16:23

that funding because you are a transgender woman?

A. I don't want to say never, because -- okay. Thank you. I don't want to say that they would have denied me. What I will say that I felt like it was going to be a harder process for me than it would have been for someone who didn't identify the way I do.

Q. All right. Let's look, let's see, I think we're done with the amended complaint.

MS. KADIVAR: Kayla, do you want to take a break?

THE WITNESS: Yeah, we can take a five-minute break.

MS. SHEW: Okay. Let's do this. Because I'm afraid if we all sign off, I think we -- just anyone that wants to close their screen can, and mute your mic. And it's 3:17, so let's come back about 3:25 or so, just take a quick break.

(Short break.)

BY MS. SHEW:

Q. All right. We're back on the record. Ms. Gore, when we left for the break, we were talking about college. And I had asked you just as a general proposition, about things that you didn't want to even try to apply to do, because you were concerned