UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KAYLA GORE, JAIME COMBS, L.G., and K.N., <br><br> *Plaintiffs*, <br><br> v. <br><br> WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health, <br><br> *Defendants*. | No. 3:19-CV-00328 <br><br> DISTRICT JUDGE RICHARDSON <br> MAGISTRATE JUDGE HOLMES |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## I. There is No Dispute that Birth Certificates are Identity Documents and that Sex is Multi-Factorial.

The undisputed evidence shows that birth certificates are identity documents and that sex is a composite of multiple characteristics, including gender identity. Defendants cannot circumvent the uncontroverted record in this case. Their mere say so is insufficient to create a material dispute.

*First*, it is undisputed that a birth certificate is a primary identity document routinely used to verify a person's identity. For example, Tennessee's "Handbook on Birth Registration and Fetal Death (Stillbirth) Reporting" states, "Throughout life, a person uses his or her birth certificate to prove age, parentage, and citizenship. Birth certificates are needed for entrance to school, voter registration, and for obtaining a driver's license, marriage license, passport, veterans' benefits, public assistance, or social security benefits." Ex. 4 to Bishop Tr.[1] Defendants' witnesses agree a birth certificate is a form of an identification document. Bishop Tr. 26:21-23; Lefler Tr. 39:3-10.

Yet, throughout their response, Defendants engage in legal gymnastics to avoid admitting the obvious: Birth certificates function to identify the persons presenting them. Instead, Defendants contend, without any evidence, that birth certificates are medical records of visual observations made at the time of birth. This view ignores the extensive evidence in this case. Defendants' medical expert agrees birth certificates *are not* medical records. Trabue Tr. 85:1-4. Tennessee's State Registrar could not say whether birth certificates are medical records. Bishop Tr. 36:9-13. Of course, they are not. *See* Tenn. Comp. R. & Regs. 1200-07-01-.11 (indicating circumstances in which vital records may be disclosed).

*Second*, there is no dispute that sex is a multifactorial concept. Pls.' Statement of Material Facts ("SMF") No. 1. On this point Plaintiffs' *and* Defendants' medical and mental health experts agree. Dr. Randi C. Ettner testified, "Sex is a composite of chromosomal pairs, gonads and internal reproductive organs, external genitalia, sexually dimorphic brain structures, and the resultant

---

[1] As an official publication of the Tennessee Office of Vital Records, the Handbook is self-authenticating pursuant to Federal Rule of Evidence 902(5). All documents cited herein are attached to the Declaration of Brandt Thomas Roessler in Support of Plaintiffs' Reply in Support of Their Motion for Summary Judgment, attached hereto as Exhibit 1.

gender identity." Ettner Tr. 23:6-9. Dr. Shayne Sebold Taylor similarly testified, "[S]ex is a complex compilation of multiple factors including one's chromosomal make up …, gonadal sex …, fetal hormonal sex …, pubertal hormonal sex …, hypothalamic sex …, and gender identity." Taylor Decl. ¶ 19. And Defendants' medical expert, Dr. Anthony Trabue, agrees a person has multiple sex characteristics. Trabue 94:19-24.

There is also no dispute that gender identity is a sex-related characteristic, *see* Pls.' SMF No. 1; Ettner Tr. 23:6-9; Taylor Decl. ¶ 19, and that external genitalia ***are not*** an accurate indicator of a person's sex in every instance. Pls.' SMF No. 6; *see also* Ettner Tr. 54:16-20, 55:17-23; Taylor Tr. 23:12-16; Trabue Tr. at 86:13-17; Ex. 8 to Bishop Tr. Therefore, given that sex is multi-factorial and that a birth certificate is an ***identity*** document, the sex designation on a person's birth certificate should be consistent with the sex-related characteristic tied to identity, *i.e.*, the person's gender identity. *See* Ettner Tr. 56:7-15, 57:16-23; Taylor 23:12-16. And though the aforementioned is more than sufficient for the Court to decide this case, it is also uncontroverted that gender identity is the primary determinant of a person's sex. Pls.' SMF No. 2; *see also* Ettner Decl. ¶ 21 ("When there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation."); Ettner Tr. 55:3-4; Taylor Tr. 23:13-16. Defendants present ***no*** contrary evidence to any of this.

Defendants argue "the decision to determine a person's biological sex at the time of birth based on external genitalia" is simply a "matter of policy for the General Assembly and Department of Health," Doc. 85 at 20, n.9, but their say-so is not enough to create a material dispute. And, though insufficient to counter the uncontroverted evidence in this case, Defendants' witnesses cannot identify any law or regulation that states a person's sex must be determined solely by their external genitalia at the time of birth. *See* Trabue Tr. 85:6-12; Bishop Tr. 37:13-18.[2]

---

[2] Defendants accuse Plaintiffs of "conflat[ing] sex with gender identity, thus complicating and confusing what ought to be—and generally is—a simple and straightforward medical determination made and recorded at the time of birth." Doc. 85, at 13. But Defendants ignore the overwhelming and uncontroverted evidence explaining the interplay between sex and gender identity, while offering zero evidence in support for their position. Defendants' characterization of

2

## II. The Birth Certificate Policy Deprives Transgender Persons of Equal Protection.

### A. <u>Tennessee's Policy Treats Transgender Persons Disparately.</u>

Defendants' contention that Plaintiffs fail to show disparate treatment based on sex and transgender status erroneously assumes the sex assigned to transgender persons at birth—based solely on the appearance of external genitalia—is accurate and correct. But the observation of external genitalia at the time of birth is not an accurate proxy of a person's sex in every instance. Pls.' SMF No. 6; *see also* Ettner Tr. 56:7-15; Doc. 61 at 14. Even Defendants' medical expert agrees, "[A] baby's sex cannot be determined by observing the external genitals in one hundred percent of the cases." Trabue Tr. 86:13-17.

The record evidence indisputably establishes that: (1) sex is multifactorial, *see* Pls. SMF No. 1, Ettner Decl. ¶ 18; Taylor Decl. ¶ 19; Ettner Tr. 23:6-9; Taylor Tr. 21:4-15; (2) gender identity is the primary sex-related characteristic in determining a person's sex, *see* Pls. SMF No. 2; Ettner Decl. ¶ 20; Taylor Decl. ¶ 30; Ettner Tr. 55:1-4; Taylor Tr. 23:12-16; and (3) gender identity is innate, immutable, and does not change over time, *see* Pls. SMF Nos. 3, 24; Ettner Tr. 24:20-25, 32:15-17, 61:19-21; Taylor Tr. 19:10-14. *See* Doc. 61 at 15. Defendants ignore this evidence and provide no rebuttal. These uncontroverted facts mean the sex designation (*i.e.*, gender marker) on the birth certificates of Tennessee-born transgender people, including Plaintiffs, is ***inaccurate at the time of recordation***. *See* Taylor Tr. 23:12-16; Ettner Tr. 54:16-20.

Defendants erroneously argue a transgender person's sex assigned at birth cannot be incorrect because gender identity is not ascertainable at the time of birth. But this does not make the sex assignment at birth correct. As Dr. Ettner testified, when expressly asked by Defendants whether gender identity forms after birth,

> I don't agree that gender identity is formed later [than at birth]. Gender identity exists. Our awareness of it becomes apparent later. A baby cannot talk, and so we use external genitalia as a proxy for sex. For the vast majority of individuals that is not problematic. For individuals who have [gender dysphoria], it is an inaccurate designation.

---

their view as "simple and straightforward" exposes their willful refusal to offer any evidence.

Ettner Tr. 55:17-23; *see also* 31:11-15, 54:16-56:15.

Moreover, illustrating Defendants' disparate treatment of transgender persons, the record evidence demonstrates Defendants permit other individuals, such as those born with ambiguous genitalia, to correct the sex designation of "unknown" on their birth certificates *after the time of recordation*, based on sex-related characteristics *other than* external genitalia. *See* Lefler Tr. 50:18-53:21; Bishop Tr. 45:16-49:21; Trabue Tr. 87:14-90-8, 93:2-15; Ex. 13 to Bishop Tr.

In light of the overwhelming evidence supporting Plaintiffs and the complete absence of contrary evidence by Defendants, it is undisputed that Tennessee's Birth Certificate Policy results in Plaintiffs' being issued birth certificates bearing sex designations that are inaccurate at the time of birth. Because the Policy allows cisgender persons to correct inaccurate sex designations on their birth certificates while categorically denying transgender persons the same ability, the Policy indisputably deprives transgender persons of equal protection. *See* Doc. 61, at 12-14.

### B. Heightened Scrutiny Applies to Tennessee's Birth Certificate Policy.

Heightened scrutiny applies in this case because (1) Tennessee's Policy facially discriminates based on sex and (2) transgender persons are a suspect class.

Defendants admit Tennessee Code § 68-3-203(d) cannot be read without reference to sex. Doc. 85 at 11; Doc. 62-2, at 7-8. Defendants try to recant this admission by straining to distinguish between the statute's textual reference to "sex" and discrimination based on sex. Defendants' argument that the statute is not facially discriminatory has no basis in law or fact, however. Defendants cannot escape the fact the statute upon which they base the Policy speaks in terms of sex, nor that a sex designation on a birth certificate is by its very nature a sex classification. In addition, as the Sixth Circuit has held, "discrimination on the basis of transgender and transitioning status is necessarily discrimination on the basis of sex." *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018), *cert. granted in part*, 139 S. Ct. 1599 (2019).

As to whether transgender persons are a suspect or quasi-suspect class, Defendants' argument misses the mark. Defendants argue that because there is no precedent holding that

transgender persons are a suspect class for Equal Protection purposes, the Court is unable to find in favor of Plaintiffs in this case. Defendants' bold request that the Court abdicate its function in resolving novel disputes is not supported by any authority. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015); *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 375 (2010).

The Supreme Court and various circuit courts have provided extensive guidance for determining whether a classification is suspect or quasi-suspect, which Plaintiffs have analyzed in their Motion and to which Defendants failed to respond. *Compare* Doc. 61, at 15-17; *with* Doc. 85, at 10-12. And the record establishes that transgender persons have historically been subjected to discrimination, Ettner Decl. ¶¶ 44-45; Taylor Decl. ¶¶ 50-51, 53-56; Ettner Tr. 47:10-14, exhibit immutable or distinguishing characteristics that define them as a discrete group, Ettner Decl. ¶¶ 19, 21-22, 24-25; Taylor Decl. ¶¶ 26, 28-29; Ettner Tr. 24:20-25, 32:15-17, which bear no relation to their ability to perform or contribute to society, Ettner Decl. ¶¶ 22, 29; Taylor Decl. ¶¶ 29, 40, and are a minority with relatively little political power, Taylor Decl. ¶ 27. *See* Doc. 61 at 16.

In attempting to rebut the fact gender identity is immutable, though not that it is a distinguishing characteristic, Defendants grossly mischaracterize Dr. Ettner's testimony in a *different* case. First, Defendants fail to make clear to the Court that Dr. Ettner's deposition transcript from which they quote at length is from a *different* lawsuit. *See* Doc. 85, at 13-14.[3] Second, Defendants selectively quote from this prior deposition to suggest Dr. Ettner testified that a person's gender identity is subject to evolution over time. Nothing could be further from the truth: Dr. Ettner repeatedly testified then, as she did now, that gender identity is immutable. Ex. 5 to Ettner Tr. (*Ray* Dep. Tr.), at 64:11-20, 96:17-23, 116:7-117:10, 140:1-142:15; *see also* Ettner Decl. ¶ 24; Ettner Tr. 24:23-25. Moreover, in answering questions about the concept of "detransition," Dr. Ettner repeatedly emphasized that she did not know of anyone whose gender identity had changed, rather that they were living in their sex assigned at birth *for other reasons*.

---

[3] The testimony from Dr. Ettner's deposition in *Ray v. Acton*, Case No. 2:18-cv-00272-MHW-CMV (S.D. Ohio), is inadmissible hearsay. *See Robertson v. US Bank, N.A.*, No. 14-2677, 2015 WL 12532148, at *7 (W.D. Tenn. Oct. 20, 2015), *aff'd*, 831 F.3d 757 (6th Cir. 2016).

Ex. 5 to Ettner Tr. (*Ray* Dep. Tr.), at 116:19-22, 117:6-9, 118:8-11, 120:5-14.

Heightened scrutiny applies to this case: The Policy treats transgender persons disparately.

### III. Tennessee's Policy Violates Transgender Persons' Fundamental Right to Privacy.

Defendants focus on Plaintiffs' claim that the Policy impinges on Plaintiffs' fundamental right to informational privacy. Plaintiffs have shown the Policy violates their informational privacy rights. *See* Doc. 61, at 5-8; Doc. 71 at 13-16. Defendants argue this informational privacy claim fails as a matter of law because (1) Plaintiffs "asserted right to informational privacy over the expression of gender identity … does not rise to the level of a fundamental right under existing precedent," and (2) Defendants have allegedly "not disseminated information about Plaintiffs' transgender status." *See* Doc. 85, at 4-8. Defendants are wrong on both counts.

Defendants ignore that both *Kallstrom* and *Bloch* recognize an informational privacy claim when the disclosure of information relates to the exercise of a fundamental right. *See Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir. 1998); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1061 (1998). The right to live and express one's identity, without interference from the state, is safeguarded as part of the fundamental right to decisional privacy and the constitutionally-protected liberty interests to individual dignity and autonomy. *See* Doc. 61 at 6-8. Defendants do not appear to contest Plaintiffs' separate and distinct argument that Tennessee's Policy infringes on Plaintiffs' fundamental rights and liberty interests to decisional privacy, individual dignity, and autonomy. This alone is sufficient to find Defendants violated Plaintiffs' informational privacy.

In addition, Defendants misconstrue *Bloch*'s and *Kallstrom*'s guidance of when the disclosure of information violates the informational right to privacy, separate and apart from circumstances related to the exercise of a fundamental right.

In the first instance, Defendants misguidedly accuse Plaintiffs of "shoehorning" their informational privacy claim to fit *Kallstrom*'s guidance that informational privacy extends to cases "where the release of private information places an individual at substantial risk of serious bodily harm, possibly even death, from a perceived likely threat." *Kallstrom*, 136 F.3d at 1064.

6

Defendants only objection to Plaintiffs' case, however, is their assertion that Plaintiffs have not suffered any physical harm specifically connected with presenting their birth certificates to someone. *See* Doc. 85, at 7. To be clear: This is not the test established by *Kallstrom*. The Sixth Circuit did not require that plaintiffs actually be harmed before giving effect to their informational privacy rights. To the contrary, the Sixth Circuit held that a "substantial ***risk*** of serious bodily harm" from a "***perceived*** likely threat" is sufficient to give rise to a fundamental right protected by the Fourteenth Amendment. *Kallstrom*, 136 F.3d at 1061 (emphasis added).

Defendants also argue *Kallstrom* is distinguishable from the present case because Plaintiffs have allegedly not shown how the recipients of birth certificates are "particularly dangerous vis-à-vis the plaintiffs." *See* Doc. 85, at 7 (quoting *Barber v. Overton,* 496 F.3d 449, 456 (6th Cir. 2007)). Defendants suggest all cases wishing to invoke *Kallstrom* must present opposing groups as easily identifiable as police officers and violent gang members. *See* Doc. 85, at 7. This interpretation has no basis in the Sixth Circuit's *Kallstrom* decision and ignores strong precedents since, such as *Ray*, *Love*, *Arroyo*, and *K.L*. *See* Doc. 61, at 11-12.[4] To be sure, as the *Barber* court noted, *Kallstrom* protects the release of private information "when the plaintiffs ha[ve] a ***reason to fear*** retaliation from persons to whom it [is] disclosed." 496 F.3d at 456 (emphasis added).

In the second instance, Defendants' response to Plaintiffs' *Bloch* analysis is similarly underwhelming. Defendants' hang their hat on a quote from *Lambert* that summarizes *Bloch* as extending informational privacy rights to interests of a "sexual, personal, and humiliating nature." *Lambert*, 517 F.3d at 440-41. Defendants fixate on *Lambert*'s use of "and" in this summary and interpret *Lambert* as requiring all three factors be met. *See* Doc. 85 at 8. Neither *Bloch* nor *Lambert* suggest such a strained interpretation. And while Plaintiffs are not ashamed of their transgender status, it ***is*** humiliating to have their status forcibly disclosed by the State of Tennessee. This is clearly evidenced by the fear of disclosure felt by Plaintiffs, *see* Pls.' SMF No. 91; Gore Tr. 31:17-

---

[4] Defendants claim *Ray v. Himes*, No. 2:18-cv-272, slip op. at 13 (S.D. Ohio Sept. 12, 2019), was "erroneously" decided, while offering no case law in support of this argument, Doc. 85, at 7 n.3, and ignoring other cases cited by Plaintiffs, such as *Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015), and *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327 (D.P.R. 2018).

32:2; Combs Tr. 47:1-5; L.G. Tr. 55:18-20; K.N. Tr. 45:14-46:4, and stems from their treatment by Tennessee as second-class citizens unworthy of the same protections as cisgender persons. Ettner Tr. 47:10-49:7. Defendants' assertion that Plaintiffs do not experience shame or humiliation by others when disclosing their transgender status would be laughable if it were not so tragic.

Defendants have also misrepresented case law regarding the application of *Bloch* as it relates to transgender persons. In their Reply in Support of their Motion to Dismiss, Defendants selectively quoted *Pullum v. Elola* to purportedly show, "gender identity disorder [was] not . . . the type of personal sexual information identified in *Bloch*." No. 3:14-cv-1233, 2016 WL 749204, at *13 (M.D. Tenn. Feb. 25, 2016); *see* Doc. 74, at 4. This observation by the *Pullum* court, however, was made in relation to the question of whether the defendant was entitled to qualified immunity, **not** whether the Plaintiffs' gender identity was the sort of information protected by the right to informational privacy.  *See Pullum*, 2016 WL 749204, at *12-13. The *Pullum* court **held** that gender identity was protected by the fundamental right to informational privacy and that the plaintiff had "state[d] a cognizable informational privacy violation" after correctional officers disclosed the plaintiffs' gender identity to other inmates. 2016 WL 749204, at *12.

Lastly, Defendants' allege the Birth Certificate Policy does not result in the forcible disclosure of Plaintiffs' transgender status. *See* Doc. 85, at 7. Defendants argue that by presenting their birth certificates to others, Plaintiffs voluntarily disclose their transgender status. *See* Doc. 85, at 7. This argument ignores the crux of Plaintiffs' claim: Because birth certificates are widely utilized identification documents and because the Policy bans transgender persons from correcting the sex designation on their birth certificates, Plaintiffs are forced to disclose their transgender status whenever they present their birth certificates to others.[5] Yet Defendants admit Plaintiffs often must provide birth certificates as proof of identity. *See* Pls.' SMF No. 88.

---

[5] Defendants misleadingly claim the *K.L.* court "declined to find" a right to correct gender markers on drivers' licenses. *See* Doc. 85 at 5 n.2. But the court did not **need** to address this issue because it held that prohibiting transgender persons from correcting the gender marker on their drivers' licenses was unconstitutional under even less exacting standards and despite the state arguing, similar to Defendants here, that the use of drivers' licenses for identification is often voluntary.

8

**IV. Plaintiffs have Established that Tennessee's Birth Certificate Policy Violates Tennessee-born Transgender Persons' First Amendment Right to Free Speech.**

Defendants' attempts to cast the sex designation on birth certificates as "government speech" lack merit. While Defendants cite to *Walker* in arguing that the sex designation on birth certificates constitutes government speech, they ignore all other precedent informing the Court's decision on Plaintiffs' First Amendment claim. For example, the Supreme Court has instructed lower courts to "exercise great caution before extending … government-speech precedents" because the doctrine "is susceptible to dangerous misuse." *Matal v. Tam*, 137 S. Ct. 1744, 1760 (2017). The recordation of information on a government document does ***not*** convert that information into government speech, leading one circuit court to exclude birth certificates from the realm of government speech. *See In re Tam,* 808 F.3d 1321, 1348 (Fed. Cir. 2015); *see also* Doc. 71, at 18-24. Defendants attempt to distract the Court from the constitutionality of Tennessee's Policy by alluding to the permissive use of alternative identification documents, such as passports, fails as a matter of logic. The possibility of avoiding a statute's discriminatory effect does not render the statute constitutional. *See* Doc. 71, at 24-25. Further, not everyone has the means, need, or capacity to obtain a U.S. Passport, as is the case with Ms. Gore.

**V. Tennessee's Birth Certificate Policy Serves No Legitimate Interest.**

Defendants do not meet their burden under the heightened scrutiny applicable to Plaintiffs' constitutional claims. They only argue the Policy furthers legitimate governmental interests under rational basis. But the Policy bears no rational relationship to the articulated interests.

Tennessee's prohibition on permitting transgender people to correct the sex designation on birth certificates has no relationship to Tennessee's interest in promoting public health surveillance and research. The information used for the public health surveillance and research comes from Tennessee's "statistical file," also known as the Tennessee Birth Statistical System. Lefler Tr. 49:22-25; 50:23-51:4; 51:16-21; 54:7-18. The information shared for this purpose ***is not*** a person's birth certificate. Lefler Tr. 52:12-21. Moreover, the statistical file is closed within four to fifteen months of a child's birth. Lefler Tr. 49:9-21; *see also* Bishop Tr. 52:12-17. Any "analysis for

9

Case 3:19-cv-00328   Document 93   Filed 05/29/20   Page 10 of 13 PageID #: 1398

logical consistency" occurs ***before*** the statistical file is closed. Lefler 58:25-59:14. And a person's birth certificate can be changed without changing the statistical file. Bishop Tr. 53:4-7. Indeed, Tennessee permits other people to correct the sex designation on their birth certificates (through an affidavit) ***without*** changing the statistical file. Lefler Tr. 57:9-15; *see also* Lefler Tr. 50:18-53:21; Bishop Tr. 45:16-49:21; Exs. 7 and 13 to Bishop Tr. And, as Tennessee's Director of Vital Statistics admits, other states have the same interests in promoting this public health research and surveillance, share the same information, and do so while permitting transgender people to correct the sex designation on their birth certificates. Lefler Tr. 51:22-52:5, 83:25-84:21; *see also* Taylor Tr. 42:15-23. Put simply, there is no rational relationship between prohibiting Tennessee-born transgender people from correcting the sex designation on their birth certificates, consistent with their gender identity, and an interest in promoting public health research and surveillance.

Tennessee's Policy also does not prevent fraud. Tennessee's State Registrar could not cite a single study or report in support of his allegation that "[c]reating additional ways in which Tennessee's birth records can be modified … heightens the potential for fraud and illegality." Bishop Tr. 77:16-78:7. He could only identify the need for regulations as a basis for this concern, *id.* at 78:12-17, but acknowledged the Department of Health has the authority to issue such regulations, *id.* at 80:15-22. In any event, it is Tennessee's Policy that creates discrepancies and inaccuracies with other form of government issued identification. *See K.L.*, 2012 WL 2685183, at *7. Defendants cannot "articulate how the State's interest in preventing fraud provides for laws that allow amendments to some parts of birth certificates but not others or permits changes to driver's licenses and state identification cards and not birth certificates." *Ray*, slip op. at 30-31.

Finally, the sex designation on the birth certificates of Tennessee-born transgender people, such as Plaintiffs, is inaccurate, Pls.' MF Nos. 6, 7; Taylor Tr. 23:12-16; Ettner Tr. 54:16-20, 55:17-23, such that the Policy cannot further any interest in accuracy.

## CONCLUSION

Plaintiffs respectfully request the Court grant Plaintiffs' Motion for Summary Judgment.

Dated: May 29, 2020

Respectfully submitted,

*s/ John T. Winemiller*

| | |
|---|---|
| Omar Gonzalez-Pagan* <br> LAMBDA LEGAL DEFENSE AND <br>     EDUCATION FUND, INC. <br> 120 Wall Street, 19th Floor <br> New York, NY 10005-3919 <br> Telephone: (212) 809-8585 <br> Facsimile: (212) 809-0055 <br> ogonzalez-pagan@lambdalegal.org <br><br> Tara L. Borelli* <br> LAMBDA LEGAL DEFENSE AND <br>     EDUCATION FUND, INC. <br> 730 Peachtree Street NE, Suite 640 <br> Atlanta, GA 30318-1210 <br> Telephone: (404) 897-1880 <br> Facsimile: (404) 897-1884 <br> tborelli@lambdalegal.org <br><br> Sasha Buchert* <br> LAMBDA LEGAL DEFENSE AND <br>     EDUCATION FUND, INC. <br> 1776 K Street NW, Suite 722 <br> Washington, DC 20006 <br> Telephone: (202) 804-6245 <br> sbuchert@lambdalegal.org <br><br> * *Admitted pro hac vice* | John T. Winemiller <br> MERCHANT & GOULD <br> 800 S. Gay Street, Suite 2150 <br> Knoxville, TN 37929 <br> Phone: (865) 380-5960 <br> Facsimile: (612) 332-9081 <br> JWinemiller@merchantgould.com <br><br> Gavin R. Villareal* <br> Maddy Dwertman* <br> Puneet Kohli* <br> Samoneh Kadivar* <br> BAKER BOTTS L.L.P. <br> 98 San Jacinto Boulevard, Suite 1500 <br> Austin, TX 78701-4078 <br> Phone: (512) 322-2500 <br> Facsimile: (512) 322-2501 <br> gavin.villareal@bakerbotts.com <br> maddy.dwertman@bakerbotts.com <br> puneet.kohli@bakerbotts.com <br> samoneh.kadivar@bakerbotts.com <br><br> Brandt Thomas Roessler* <br> BAKER BOTTS L.L.P. <br> 30 Rockefeller Plaza <br> New York, NY 10112-4498 <br> Phone (212) 408-2500 <br> Facsimile: (212) 408-2501 <br> brandt.roessler@bakerbotts.com <br><br> Kathryn S. Christopherson* <br> BAKER BOTTS L.L.P. <br> 1001 Page Mill Rd., Bldg. One, Suite 200 <br> Palo Alto, CA 94304-1007 <br> Phone: (650) 739-7500 <br> Facsimile: (650) 739-7699 <br> kathryn.christopherson@bakerbotts.com |

*Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, which provides electronic notice of the filing to all counsel of record, including:

Herbert H. Slatery III
Attorney General and Reporter

Dianna Baker Shew
Senior Assistant Attorney General
dianna.shew@ag.tn.gov
Sara E. Sedgwick
Senior Assistant Attorney General
sara.sedgwick@ag.tn.gov
PO Box 20207
Nashville, TN 37202

This 29th day of May, 2020.

                                               *s/John T. Winemiller*
                                               John T. Winemiller