UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |
|---|---|
| KAYLA GORE; JAIME COMBS; L.G.; and K.N., | |
| *Plaintiffs*, | No. 3:19-CV-00328 |
| v. | |
| WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health, | DISTRICT JUDGE RICHARDSON MAGISTRATE JUDGE HOLMES |
| *Defendants*. | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR STATEMENT OF MATERIAL FACTS

Plaintiffs Kayla Gore, Jaime Combs, L.G., and K.N. (collectively, "Plaintiffs"), by and through their attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.01, submit the following Reply in support of the Statement of Material Facts, filed in support of their Motion for Summary Judgment. *See* ECF Nos. 60 and 63.

| No. | Fact | Supporting Record Citation |
|---|---|---|
| **I.** | **SEX AND GENDER IDENTITY** | |
| 1. | A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics may not always be in alignment. | Ettner Decl. ¶¶ 18, 20; Taylor Decl. ¶¶ 19, 20, 30. |
| | Response: Undisputed for purposes of this motion. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of Dr. Randi C. Ettner and Dr. Shayne Sebold Taylor. *See* Ettner Tr. 23:6-9 ("Sex is a composite of chromosomal pairs, gonads and internal reproductive organs, external genitalia, | |

| | | |
|---|---|---|
| | sexually dimorphic brain structures, and the resultant gender identity."); Taylor Tr. 21:4-15. | |
| 2. | Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. Every person has a gender identity. | Ettner Decl. ¶¶ 19, 20, 21, 24, 25, 34; Taylor Decl. ¶¶ 21, 30, 42. |
| | <u>Response:</u> Defendants dispute this statement as the materials cited would not support such a statement. | |

<u>Plaintiffs' Reply:</u> The record evidence supports this statement.

Specifically, Dr. Ettner defines gender identity as "a person's inner sense of belonging to a particular sex, such as male or female," and notes that "[i]t is a deeply felt and core component of human identity." Ettner Decl. ¶ 19; *see also* Ettner Tr. 24:20-25 ("Gender identity is a well established concept in medicine. It refers to an individual deep sense of themselves as belonging to a category, typically male or female. All humans develop an elemental sense which is established early in life and is immutable."); Ettner Tr. 32:15-17 ("it is a deeply felt, internal sense[,] ubiquitous to all human beings and an immutable aspect of identity"); Ettner Tr. 61:19-21 ("Gender identity, as I thought I answered earlier, is an innate brain-based, deeply felt, and universal aspect of identity."). Dr. Ettner further states that "[e]very person has a gender identity." Ettner Decl. ¶ 21. Lastly, Dr. Ettner notes that "[w]hen there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation." Ettner Decl. ¶ 20; *see also* Ettner Tr. 55:1-4.

Similarly, Dr. Taylor states that, "Gender identity is a person's inner sense of belonging to a particular gender. Identifying as male or female is a core component of one's overall identity. Every person has a gender identity." Taylor Decl. ¶ 21. Dr. Taylor further states that, "From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex." Taylor Decl. ¶ 30; *see also* Taylor Tr. 23:13-16 ("[S]omebody's gender identity and how they identify is the determining factor for their sex, not the proxy that we used when they were in the delivery room when they were born.").

| 3. | There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being. | Ettner Decl. ¶¶ 20, 24, 25, 34, 38; Taylor Decl. ¶¶ 21, 28, 29. |
|---|---|---|
| | <u>Response:</u> Disputed. Specifically, Defendants acknowledge that these experts have testified that the "growing assemblage of research" and the "medical community at large" agree that efforts to change a person's gender identity are futile and unethical. Neither expert referred to a "medical consensus." | Ettner Decl. ¶ 24; Taylor Decl. ¶ 29 |
| | Dr. Ettner also stated that past efforts to "cure" transgender persons by such means as psychotherapy, | Ettner Decl ¶ 25. |

| | | |
|---|---|---|
| | aversion treatments or electroshock therapy were ineffective and caused extreme psychological damage. | |
| | Plaintiffs' Reply: The record evidence supports this statement.<br><br>Specifically, Dr. Ettner testifies that, "*All* major associations of medical and mental health providers, such as the American Medical Association, the American Psychiatric Association, the American Psychological Association, and WPATH's Standards of Care, consider such efforts unethical." Ettner Decl. ¶ 25 (emphasis added). Similarly, Dr. Taylor testifies that, "Experts agree that being transgender is a normal variation of human development" and that "the medical community at large" believes that attempts at changing one's gender identity are "a futile and unethical treatment approach." Taylor Decl. ¶¶ 28-29. | |
| 4. | Although there is no one definitive factor that determines gender identity, biological factors—most notably the neurodevelopmental characteristics of a person's brain with respect to sex—play a role in gender identity development and cannot be changed. | Ettner Decl. ¶ 24; Taylor Decl. ¶¶ 21-24. |
| | Response: For purposes of this motion, Defendants do not dispute that no one definitive factor determines gender identity and that it involves biological factors. However, Defendants dispute that either of these experts testified that the "most notabl[e]" biological factor is the neurodevelopmental characteristics of a person's brain with respect to sex. Dr. Taylor stated only that a "leading explanation for the biological basis of gender identity" is the difference in timing between the development of fetal sexual organs and the sexual differentiation of the fetal brain. She goes on to state that "[r]arely, this can result in situations where the sexual organs do not match the brain's sexual differentiation." Dr. Ettner did not address the topic. | |
| | Plaintiffs' Reply: The record evidence supports this statement. *See* Taylor Decl. ¶ 22; Ettner Tr. 30:1-31:15; *see also* Ex. 5 to Ettner Tr. (*Ray* Dep. Tr.), at 97:10-98:14.[1] | |

---

[1]    Notwithstanding having had an opportunity to depose Dr. Ettner, Defendants seek to introduce into evidence a copy of the transcript of Dr. Ettner's deposition testimony in a *different* case, that being *Ray v. Acton*, Case No. 2:18-cv-00272-MHW-CMV (S.D. Ohio). *See* ECF No. 88-3. This deposition testimony is inadmissible hearsay and should be stricken. *See Robertson v. US Bank, N.A.*, No. 14-2677, 2015 WL 12532148, at *7 (W.D. Tenn. Oct. 20, 2015) ("Deposition testimony from a previous case that is offered for the truth of the matter asserted must fall under a hearsay exception to be admissible."), *aff'd sub nom. Robertson v. U.S. Bank, N.A.*, 831 F.3d 757 (6th Cir. 2016). However, should the Court decide to admit this testimony into the record—which it should not—Plaintiffs provide citations to Dr. Ettner's deposition testimony in *Ray* when applicable. For the sake of clarity, Dr. Ettner's deposition testimony in *this* case is

| 5. | The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. Typically, a person is assigned a sex on their birth certificate solely on the basis of the appearance of external genitalia at the time of birth. Other sex-related characteristics (such as a person's chromosomal makeup and gender identity, for example) are typically not assessed or considered at the time of birth. | Ettner Decl. ¶¶ 16, 18; Taylor Decl. ¶¶ 18, 19. |
|---|---|---|
| | <u>Response:</u> This first sentence of this statement is not a fact but is simply terminology preferred by Plaintiffs. Sex is recorded on a birth certificate at the time of birth. Defendants do not dispute the second sentence of this statement. Defendants dispute the third sentence as the materials cites do not support this statement. | |

<u>Plaintiffs' Reply:</u>

The record evidence supports the first sentence of the statement. "Sex assigned at birth" is the phrase utilized by medical and mental health experts to refer to the sex designation recorded for a child at birth.

Plaintiffs' and Defendants' medical and mental health experts agree that a person's sex is *assigned* to them based on the observation of external genitalia. *See* Ettner Decl. ¶ 16 ("At birth, infants are assigned a sex, typically male or female, based solely on the appearance of their external genitalia."); *id.* at ¶¶ 17-18; Taylor Decl. ¶¶ 17-18; Ettner Tr. 34:5-8; Taylor Tr. 19:4-7; Trabue Tr. 96:12-17 (noting "the presence of a penis, or what appears to be a vagina … would be the sex characteristics that would be used in the delivery room *to assign a sex to the infant*.") (emphasis added); *id.* at 87:16-17 (stating that in the case of a baby with ambiguous genitalia, "the pediatricians would decide what -- what the gender would be"); *id.* at 96:8-17.

The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013) ("DSM-5") speaks of "assigned gender," which it defines as "the initial assignment as male or female." The DSM-5 is cited in declarations of Dr. Ettner and Dr. Taylor. *See* Ex. B. to Ettner Decl. (citing DSM-5); Ex. B. to Taylor Decl. (same). The American College of Obstetricians and Gynecologists, of which Defendants' medical expert is a fellow, also speaks of "sex … assigned at birth." *See* Ex. 6 to Trabue Tr.

The record evidence also supports the third sentence in the statement. *See* Ettner Tr. 54:16-55:4; Ettner Tr. 56:7-57:1; Taylor Tr. 21:4-15 ("Sex is a complex multifactorial

<hr>

cited herein as "Ettner Tr.," while Dr. Ettner's deposition testimony in the *Ray* case is cited as "Ex. 5 to Ettner Tr. (*Ray* Dep. Tr.)."

| | | |
|---|---|---|
| | term, and many things go into sex. It's generally determined based on a cursory exam of an infant's external genitals in the delivery room, but after significant amount of research and study, we have realized and understood that it is far more complex than that. It also incorporates an individual's chromosomal makeup, their hormonal makeup, the hormones they were exposed to during fetal development, the hormones they're exposed to during puberty, their internal anatomy, their external anatomy and – in addition to their gender identity."); *see also* Ex. 5 to Ettner Tr. (*Ray* Dep. Tr.), at 156:5-158:12. | |
| 6. | External genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex. | Ettner Decl. ¶ 17; Taylor Decl. ¶ 18; *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1053 (7th Cir. 2017) ("[I]t is unclear that the sex marker on a birth certificate can even be used as a true proxy for an individual's biological sex. The marker does not take into account an individual's chromosomal makeup, which is also a key component of one's biological sex."). |
| | <u>Response:</u> Disputed. Dr. Ettner testified that the appearance of the external genitals at birth is a proxy for sex in the majority of people. She also stated that assigning sex at birth based upon the appearance of external genitalia turns out to be accurate for most people. Dr. Taylor testified that "we should continue to use an infant's genitals as a proxy for their sex, as we are unable to have the capacity to do a further diagnostic workup on every individual that's born."<br><br>Defendants object to the citation to quoted language from a case in support of Plaintiffs' factual assertion, as it is, at best, hearsay and not capable of being admitted as factual evidence. Moreover, it does not support their fact as stated, stating only that it is "unclear" that the sex marker on a birth certificate could be used as a "true proxy for an individual's biological sex."<br><br>Furthermore, sex is not "assigned" at birth, it is recorded. | Ettner Deposition at 54; Ettner Decl. at ¶16; Taylor Deposition at 23.<br><br><br><br><br><br><br><br><br><br><br><br>Ettner Deposition at 55. |
| | <u>Plaintiffs' Reply:</u> The record evidence supports this statement. | |

| | | |
|---|---|---|
| | The statement is a *verbatim* recitation of Dr. Ettner's testimony. *See* Ettner Decl. ¶ 17 ("External genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex."). Additional testimony from Dr. Ettner and Dr. Taylor further support the proposition that external genitalia alone are *not* an accurate proxy for some people's sex, including transgender people. *See* Ettner Tr. 54:17-20 ("[E]xamination of the genitals at birth is a proxy for sex for the majority of people. For some people, however, evidence that emerges later on makes that designation inaccurate."); Ettner Tr. 55:17-23 ("I don't agree that gender identity is formed later. Gender identity exists. Our awareness of it becomes apparent later. A baby cannot talk, and so we use external genitalia as a proxy for sex. For the vast majority of individuals that is not problematic. For individuals who have this rare condition, it is an inaccurate designation."); Taylor Tr. 23:12-16 ("Well, what I'm trying to say is that if – somebody's gender identity and how they identify is the determining factor for their sex, not the proxy that we used when they were in the delivery room when they were born."). Defendants' own medical expert, Dr. Anthony Trabue, also agrees. *See* Trabue Tr. 86:13-17 ("Q: So it's true, then, that a baby's sex cannot be determined by observing the external genitals in one hundred percent of the cases. Is that right? A: Correct."). | |
| 7. | When there is a divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation. | Ettner Decl. ¶ 20; Taylor Decl. ¶¶ 30, 32, 42. |
| | <u>Response:</u> Defendants dispute this statement to the extent "sex" refers to biological sex, as the materials cited would not support such a statement. | |
| | <u>Plaintiffs' Reply:</u> Ample record evidence supports this statement. *See* Taylor Decl. ¶ 30 ("From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex."); Ettner Decl. ¶ 20 ("When there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation."); Ettner Tr. 55:3-4 ("And when there is that departure, gender identity is the determinant of that individual's sex."). Defendants try to equate "sex assigned at birth" (i.e. the sex recorded at the time of birth based on an observation of a child's external genitalia) with so-called "biological sex" without citing to any record evidence for such proposition. However, sex is comprised of multiple components, all of which have a biological basis. Defendants do not—indeed, they cannot—dispute this. *See* Statement of Fact No. 1. Accordingly, as the Endocrine Society Guidelines cited in the Bibliography to Dr. Taylor's declaration state, "the terms biological sex and biological male or female are imprecise and should be avoided." *See* Ex. B to Taylor Decl. (citing Hembree, W. C., et al. (2017). Endocrine treatment of genderdysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *The Journal of Clinical Endocrinology & Metabolism*, 102(11), 3869-3903). | |

| 8. | A transgender person is someone whose gender identity diverges from the sex they were assigned at birth. A transgender man's sex is male (even though he was assigned the sex of female at birth), and a transgender woman's sex is female (even though she was assigned the sex of male at birth). | Ettner Decl. ¶¶ 16, 23; Taylor Decl. ¶¶ 18, 26, 33, 45, 66. |
|---|---|---|
| | Response: Disputed to the extent the statement characterizes a person's biological sex as the "sex they were assigned at birth" and conflates the terms "gender identity" and sex." A transgender man's gender identity is male (even though his biological sex is female), and a transgender woman's gender identity is female (even though her biological sex is male). | |
| | Plaintiffs' Reply: The record evidence amply supports the notion that a person's gender identity is the primary determinant of that person's sex. *See* Taylor Decl. ¶ 30 ("From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex."); Ettner Decl. ¶ 21 ("When there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation."); Ettner Tr. 55:3-4 ("And when there is that departure, gender identity is the determinant of that individual's sex."). Defendants' dispute is not rooted in any record evidence. Defendants try to equate the inaccurate term "biological sex" (*see* Pls.' Reply in support of Statement of Fact No. 7) with the observation of a person's external genitalia, but provide no evidence to support such proposition. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that the primary determinant of a person's sex is the person's gender identity. Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 9. | A cisgender person is someone whose gender identity aligns with the sex they were assigned at birth. A cisgender man's sex is male (and was assigned the sex of male at birth), and a cisgender woman's sex is female (and was assigned the sex of female at birth). | Ettner Decl. ¶¶ 21, 22; Taylor Decl. ¶ 18. |
| | Response: Disputed to the extent the statement characterizes a person's biological sex as the "sex they were assigned at birth" and conflates the terms "gender identity" and sex." A cisgender man's gender identity and biological sex are male, and a cisgender woman's gender identity and biological sex are female. | |
| | Plaintiffs' Reply: Defendants' dispute is not rooted in any record evidence. Defendants try to equate the inaccurate term "biological sex" (*see* Pls.' Reply in support of Statement of Fact No. 7) with the observation of a person's external | |

| | | |
|---|---|---|
| | genitalia, but provide no evidence to support such proposition. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that the primary determinant of a person's sex is the person's gender identity. Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 10. | The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria. Gender dysphoria is a medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013) ("DSM-V"), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association. | Ettner Decl. ¶¶ 26, 31, 32; Taylor Decl. ¶¶ 34, 35, 37, 38. |
| | Response: Disputed to the extent the statement characterizes a person's biological sex as "sex assigned at birth." The statement is otherwise undisputed. | |
| | Plaintiffs' Reply: Defendants' partial dispute is not rooted in any record evidence. Defendants try to equate the inaccurate term "biological sex" (*see* Pls.' Reply in support of Statement of Fact No. 7) with the observation of a person's external genitalia, but provide no evidence to support such proposition. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that the primary determinant of a person's sex is the person's gender identity. Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. Moreover, the DSM-5 published by the American Psychiatric Association (and cited by both Dr. Ettner and Dr. Taylor) defines gender dysphoria as "the distress that may accompany the incongruence between one's experienced or expressed gender and one's *assigned* gender." *See* Ex. B. to Ettner Decl. (citing DSM-5); Ex. B. to Taylor Decl. (same). | |
| 11. | Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, and suicidal ideation or even self-harm. | Ettner Decl. ¶¶ 26, 28, 29; Taylor Decl. ¶¶ 34, 35, 36. |
| | Response: Disputed to the extent the statement characterizes a person's biological sex as "sex assigned at birth." The statement is otherwise undisputed. | |
| | Plaintiffs' Reply: Defendants' partial dispute is not rooted in any record evidence. Defendants try to equate the inaccurate term "biological sex" (*see* Pls.' Reply in support of Statement of Fact No. 7) with the observation of a person's external genitalia, but provide no evidence to support such proposition. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that the | |

8

| | | |
|---|---|---|
| | primary determinant of a person's sex is the person's gender identity. Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 12. | Treatment of gender dysphoria is usually provided pursuant to the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*, published by the World Professional Association of Transgender Health ("WPATH"). | Ettner Decl. ¶¶ 31, 32; Taylor Decl. ¶¶ 37, 38. |
| | Response: Defendants dispute this statement because the materials cited do not support the statement of fact. Both experts stated that the WPATH standards are medically accepted, and reflect best practices, neither stated that treatment of gender dysphoria is "usually provided" pursuant to those standards. | Ettner Decl. ¶¶ 31, 32; Taylor Decl. ¶¶ 37, 38. |
| | Plaintiffs' Reply: The statement is supported by the record evidence. Defendants' dispute appears to be about semantics. As Defendants note, the WPATH Standards of Care are widely accepted within the medical community. As accepted standards of care, treatment is therefore provided in accordance with said standards. Indeed, Dr. Ettner testified that, "The WPATH promulgated *Standards of Care* ("*Standards of Care*") are the internationally recognized guidelines for the treatment of persons with gender dysphoria and serve to inform medical treatment in the United States and throughout the world." Ettner Decl. ¶ 7; *see also* Ettner Decl. ¶¶ 31-32; Taylor Decl. ¶¶ 38-39. | |
| 13. | Medical treatment for gender dysphoria must be individualized and tailored to the medical needs of each patient. | Ettner Decl. ¶ 33; Taylor Decl. ¶ 41. |
| | Response: Undisputed for purposes of this motion. | |
| 14. | These treatments do not change a transgender person's sex, which is already determined by their gender identity. Instead, they affirm the authentic gender than an individual person *is.* Attempts to change a person's gender identity in order to bring it into alignment with the person's sex assigned at birth are not only unsuccessful but also dangerous, risking psychological harm and even suicide. | Ettner Decl. ¶¶ 25, 34, 38, 39; Taylor Decl. ¶¶ 39, 42. |
| | Response: Defendants dispute that a person's "sex" is "determined by their gender identity." Because medical treatment for gender dysphoria is tailored to the medical needs of each patient, Defendants also dispute the general claims that these treatments "do not change a transgender person's sex" and "affirm the authentic gender tha[t] an individual person is." The final sentence is undisputed for purposes of this | Taylor Decl. ¶ 19 |

| | | |
|---|---|---|
| | motion except that the reference to suicide is not supported by the provisions of the declarations cited. | |
| | Plaintiffs' Reply: The record evidence amply supports the notion that a person's gender identity is the primary determinant of that person's sex. *See* Taylor Decl. ¶ 30 ("From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex."); Ettner Decl. ¶ 20 ("When there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation."); Ettner Tr. 55:3-4 ("And when there is that departure, gender identity is the determinant of that individual's sex.").

Similarly, the first and second sentences of the statement are supported by the record evidence. *See* Ettner Decl. ¶ 38 ("A person's gender identity is an innate, immutable characteristic; it is not determined by a particular medical treatment or procedure. The medical treatments provided to transgender people (including social transition), do not 'change a woman into a man' or vice versa. Instead, they affirm the authentic gender that an individual person *is*."); Taylor Decl. ¶ 42 ("Notably, these treatments do not change a transgender person's sex, which is already determined by their gender identity.").

The record evidence also supports the third sentence in this statement, including its reference to suicide. *See* Taylor Decl. ¶ 29 ("Moreover, given that gender identity is permanent and cannot be changed, attempts at changing one's gender identity have severe and often life threatening repercussions including major depression, anxiety, psychotic disorders and *suicide*.") (emphasis added).

Defendants' dispute is not rooted in any record evidence. | |
| 15. | Treatments for gender dysphoria align the transgender person's body and lived experience with the person's sex, as determined by their gender identity. Among the steps that transgender people take to treat their gender dysphoria are: (1) social transition; (2) hormone therapy; and/or (3) gender-affirming surgery. | Ettner Decl. ¶¶ 33, 35-37, 39; Taylor Decl. ¶¶ 41, 43-46. |
| | Response: Defendants dispute that a person's "sex" is "determined by their gender identity." This statement is otherwise undisputed for purposes of this motion. | Taylor Decl. ¶ 19. |
| | Plaintiffs' Reply: The record evidence amply supports the notion that a person's gender identity is the primary determinant of that person's sex. *See* Taylor Decl. ¶ 30 ("From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex."); Ettner Decl. ¶ 20 ("When there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation."); Ettner Tr. 55:3-4 ("And when there is that departure, gender identity is the determinant of that individual's sex."). Defendants' dispute is not rooted in any record evidence. | |

10

| 16. | Social transition entails a transgender person living in accordance with the person's gender identity. For example, for a transgender woman, social transition can include, among other actions, changing her first name to a name typically associated with women, no longer using male pronouns, changing her identity documents to indicate a female gender, wearing clothing and adopting grooming habits stereotypically associated with women, and otherwise living as a woman in all aspects of life. | Ettner Decl. ¶ 35; Taylor Decl. ¶ 43. |
|---|---|---|
| | <u>Response:</u> Undisputed for purposes of this motion. | |
| 17. | Social transition requires that a transgender woman or a transgender man be recognized as a woman or a man, respectively, and treated the same as all other women or men, respectively, by family members, coworkers, and others in the community. | Ettner Decl. ¶¶ 35, 41, 42, 46; Taylor Decl. ¶¶ 43, 44, 49. |
| | <u>Response:</u> Defendants dispute this statement because the references to the experts' declarations do not support the fact asserted. The experts describe the process of social transition, and the desires of the transgender person, but do not state that acceptance by all persons is a requirement of social transition. | |
| | <u>Plaintiffs' Reply:</u> The statement is supported by the record evidence. Both Dr. Ettner and Dr. Taylor speak of social transition as having the goal of having a transgender person's gender identity being legally and socially recognized. *See* Taylor Decl. ¶ 58 ("Transgender people, regardless of how they identify or appear, should enjoy the gender recognition all persons expect and deserve." (quoting WPATH's Identity Recognition Statement (2017))); *see also* Ettner Tr. 40:10-19 ("Q. … In the process of social transitioning where does the effort to change identity documents come within that process? … THE WITNESS: From my experience people want to initiate document change when they want to live in their affirmed gender and be recognized as belonging to their affirmed gender so that their documents reflect their appearance and their lived experience."); Taylor Tr. 33:5-12 ("[W]e have data to suggest that a transgender person's dysphoria can worsen when they don't feel that their community or their legal system or their state recognizes them for who they really are, and, therefore, they may feel limited in their ability to participate in their communities because they do not feel recognized by their communities."); Ex. 5 to Ettner Tr. (*Ray* Depo.), at 134:15-135-5. | |
| 18. | Social transition—which often includes correcting one's identity documents to accurately reflect one's sex—is the most important, and sometimes the only, aspect of transition that transgender people undertake. | Ettner Decl. ¶ 35; Taylor Decl. ¶¶ 43, 44, 58. |
| | <u>Response:</u> Defendants dispute that social transition is the "most important" aspect of transition. Dr. Taylor | Taylor Decl. ¶ 43. |

| | | |
|---|---|---|
| | describes social transition as a "formative aspect" of transition, not the "most important" aspect. This statement is otherwise undisputed for purposes of this motion. | |
| | Plaintiffs' Reply: The statement is supported by the record evidence. The statement is a *verbatim* recitation of Dr. Ettner's testimony. *See* Ettner Decl. ¶ 35 ("Social transition—which often includes correcting one's identity documents to accurately reflect one's sex—is the most important, and sometimes the only, aspect of transition that transgender people undertake."). As to Dr. Taylor's testimony, which describes social transition as a "formative aspect" of transition, Defendants' dispute appears to be about semantics. | |
| 19. | Living in a manner consistent with one's gender identity is critical to the health and well-being of all transgender people." | Ettner Decl. ¶ 36. |
| | Response: Disputed because the material cited does not support this assertion. | |
| | Plaintiffs' Reply: The statement is supported by the record evidence. Dr. Ettner testifies that, "A complete transition is one in which a person attains a sense of lasting personal comfort with their gendered self, thus maximizing overall health, well-being, and personal safety. Social role transition has an enormous impact in the treatment of gender dysphoria." Ettner Decl. ¶ 36; *see also* Taylor Decl. ¶ 43 ("The social transition is a formative aspect of a transgender person's experience."). A complete transition, by definition, requires living in a manner consistent with one's gender identity. *See* Ettner ¶ 41 ("Social transition involves dressing, grooming, and otherwise outwardly presenting oneself through social signifiers of a person's true sex as determined by their affirmed gender identity."). | |
| 20. | Living in a manner consistent with one's gender identity is also a key aspect of treatment for gender dysphoria for those who suffer from it. | Ettner Decl. ¶¶ 36, 39; Taylor Decl. ¶ 58. |
| | Response: Undisputed for purposes of this motion. | |
| 21. | Having identity documents consistent with one's gender identity is a key aspect of social transitioning for transgender persons and can result in significant improvements in the quality of life, health, and wellbeing of transgender persons. | Ettner Decl. ¶¶ 30, 35-36, 41-42, 47; Taylor Decl. ¶¶ 40, 44, 56, 66. |
| | Response: Undisputed for purposes of this motion. | |
| | Plaintiffs' Reply: Additional record evidence supports the proffered statement. *See* Ettner Tr. 40:14-19 ("From my experience people want to initiate document change when they want to live in their affirmed gender and be recognized as belonging to their affirmed gender so that their documents reflect their appearance and their lived experience."); Ettner Tr. 48:2-8 ("Studies from 2015 and 2020 indicate that having congruent gender identity documents reduces psychopathy and suicidal ideation, | |

| | | |
|---|---|---|
| | planning, significantly. And the 2020 study was, I understand, 22,000 individuals, leading the authors to conclude that legal gender affirmation is a determinant of mental health."); Taylor Tr. 33:21-35:15. | |
| 22. | By contrast, not having identity documents, such as a birth certificate, consistent with one's gender identity can have negative effects in the quality of life, health, and welfare of transgender persons. | Ettner Decl. ¶¶ 29, 42-45; Taylor Decl. ¶¶ 50-55, 61. |
| | <u>Response:</u> For purposes of this motion, consistent with the material cited, this is undisputed as to some identity documents, but not all identity documents. | |
| | <u>Plaintiffs' Reply:</u> Additional record evidence supports the proffered statement. *See* Taylor Tr. 34:25-35:9 ("[O]f those patients who had all of their gender identity documents concordant and reflective of their true name and true gender identity, those patients had a significantly lower risk of suicide attempts and suicidal ideation. For the patients who had some documents reflective of their gender identity and the patients who had no documentations -- or documents reflective of their gender identity had much higher risks of suicide and depression and suicide attempts."); Ettner Tr. 48:14-24 ("Revealing incongruent documents does cause those issues. For example, in my own practice I had a patient who had to reveal to a civil servant a document that was not corrected and she was humiliated publicly, harassed, and went home and shot herself in the head; committed suicide. So exposure, violation of privacy, the revelation of information that an individual wants to keep secret if it is noncongruent leads to fear, anxiety, or worse. And that anxiety over time is corrosive to physical and mental health."). | |
| 23. | Not every person suffering from gender dysphoria undergoes the same treatment. From a medical and scientific perspective, there is no basis for refusing to acknowledge a transgender person's sex, as determined by their gender identity, based on whether that person has undergone surgery or any other medical treatment. | Ettner Decl. ¶¶ 33, 37; Taylor Decl. ¶¶ 30, 41, 47, 58, 59, 65. |
| | <u>Response:</u> Defendants dispute that a person's "sex" is "determined by their gender identity." The statement is otherwise undisputed for purposes of this motion. | Taylor Decl. ¶ 19. |
| | <u>Plaintiffs' Reply:</u> The record evidence amply supports the notion that a person's gender identity is the primary determinant of that person's sex. *See* Taylor Decl. ¶ 30 ("From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex."); Ettner Decl. ¶ 20 ("When there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation."); Ettner Tr. 55:3-4 ("And when there is that departure, gender identity is the determinant of that individual's sex."). Defendants' dispute is not rooted in any record evidence. | |

13

| II. | TRANSGENDER PEOPLE AS A CLASS | |
|---|---|---|
| 24. | Transgender people, as a class, exhibit an immutable or distinguishing characteristic that define them as a discrete group. | Ettner Decl. ¶¶ 19, 21-22, 24-25; Taylor Decl. ¶¶ 26, 28-29. |
| | <u>Response:</u> Defendants dispute that transgender people exhibit an immutable or distinguishing characteristic. In her deposition in a previous case, Plaintiffs' expert, Dr. Ettner, testified that she has known transgender persons who "detransitioned" back to living as their sex at birth. In addition, Defendants object to the statement as whole, as the experts cited did not make reference to a "class" of persons, either for purposes of any purported class action status or for purposes of attempting to define transgender persons as a "suspect class." To the extent Plaintiffs or their experts attempt to draw any such legal conclusion, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co*., 650 F. 2d 118, 121 (6th Cir. 1981). | Ettner Deposition at Exhibit 5, pp. 116-18. |
| | <u>Plaintiffs' Reply:</u>  The record evidence is replete with evidence that a person's gender identity is innate, immutable, and cannot be changed.  *See* Ettner Tr. 24:20-25 ("Gender identity is a well established concept in medicine.  It refers to an individual deep sense of themself as belonging to a category, typically male or female.  All humans develop an elemental sense which is established early in life and is immutable."); *id.* 32:15-17 ("As I said previously, it is a deeply felt, internal sense[,] ubiquitous to all human beings and an immutable aspect of identity."); Taylor Tr. 19:12-14 ("[E]very person has a gender identity, and it is biologically based and innate to that individual."); Ettner Decl. ¶ 24 ("A growing assemblage of research documents that gender identity is immutable and biologically based."); *id.* at ¶ 25 ("The evidence demonstrating that gender identity cannot be altered, either for transgender or for non-transgender individuals, further underscores the innate and immutable nature of gender identity."); *id.* at ¶ 38 ("A person's gender identity is an innate, immutable characteristic[.]"); Taylor Decl. ¶ 28 ("Gender identity is innate, and cannot be voluntarily altered."); *id.* at ¶ 29 ("gender identity is permanent and cannot be changed").

Despite having the opportunity to depose Dr. Ettner, Defendants asked her no questions about the concept of "detransition."  Therefore, the testimony they offer from Dr. Ettner's deposition in *Ray v. Acton*, Case No. 2:18-cv-00272-MHW-CMV, currently pending before the U.S. District Court for the Southern District for Ohio, is inadmissible hearsay.  *See Robertson v. US Bank, N.A.*, No. 14-2677, 2015 WL 12532148, at *7 (W.D. Tenn. Oct. 20, 2015) ("Deposition testimony from a previous case that is offered for the truth of the matter asserted must fall under a hearsay | |

exception to be admissible."), *aff'd sub nom. Robertson v. U.S. Bank, N.A.*, 831 F.3d 757 (6th Cir. 2016).

Most concerning, however, is Defendants' mischaracterization of Dr. Ettner's testimony in *Ray*. In her *Ray* deposition, Dr. Ettner similarly testified that gender identity is immutable. *See* Ex. 5 to Ettner Tr. (*Ray* Depo.), at 64:11-20; *id.* at 96:17-23. Moreover, in answering questions about the concept of "detransition," Dr. Ettner repeatedly emphasized that she did not know of anyone whose gender identity had changed, rather that they were living in their sex assigned at birth *for other reasons*. *See* Ex. 5 to Ettner Tr. (*Ray* Depo.), at 116:19-22 ("[T]hey did not state that their gender identity had changed, just that they needed to live as a man *for a variety of other reasons*.") (emphasis added); *id.* at 117:6-9 ("Detransition … doesn't necessarily mean that their gender identity has changed[.]"); *id.* at 118:8-11 ("*I cannot state that their gender identity has changed, only that the circumstances under which they live have changed*.") (emphasis added); *id.* at 120:8-14 ("A. … no one has ever told me that their general gender identity has changed. Q. And you've never read any literature about that occurring? A. Not literature that I'm aware of or that is well known to me.").

Defendants' dispute is not rooted in any record evidence.

| | | |
|---|---|---|
| 25. | Transgender people, as a class, represent a small minority. | Taylor Decl. ¶ 27; Gonzalez-Pagan Decl., Ex. J. |
| | <u>Response:</u> For purposes of this motion, Defendants do not dispute that transgender persons represent a minority of persons in the State of Tennessee and in the United States. However, Defendants dispute the statement as whole, as the experts cited did not make reference to a "class" of persons, either for purposes of any purported class action status or for purposes of attempting to define transgender persons as a "suspect class." To the extent Plaintiffs or their experts attempt to draw any such legal conclusion, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981). | |
| | <u>Plaintiffs' Reply:</u> The statement is supported by the record evidence. *See* Taylor Decl. ¶ 27 ("According to a Williams Institute study in 2016, there are approximately 1.6 million people in the United States that identify as transgender. In this same study, it was revealed that an estimated 31,000 transgender people (or 0.6% of the state's population) live in the state of Tennessee."); Taylor Tr. 40:10-11 ("this is still a relatively small group of people"). | |
| 26. | Transgender people, as a class, have historically been and continue to be subject to discrimination, violence, and harassment. | Ettner Decl. ¶¶ 44-45; Taylor Decl. ¶¶ 50-51, 53-56; |

15

| | | Gonzalez-Pagan Decl., Ex. D; Ex. F; Ex. G; Ex. H. |
|---|---|---|
| | Response: Disputed because the citations to the expert declarations do not support the statement. In addition, Dr. Taylor, when questioned about the cited statements during her deposition, was unable to support these statements.<br><br>Defendants also dispute the statement as whole, as the experts cited did not make reference to a "class" of persons, either for purposes of any purported class action status or for purposes of attempting to define transgender persons as a "suspect class." To the extent Plaintiffs or their experts attempt to draw any such legal conclusion, the statement is improper and should be stricken. *F.R.C. Int'l v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981).<br><br>Finally, Defendants object to the Plaintiffs' use of Exhibits D, F, G, and H to the Gonzalez-Pagan Declaration to support the statement, as these documents are hearsay and not capable of being presented in a form admissible in evidence. | Taylor Deposition at 29-33, 47-48. |
| | Plaintiffs' Reply: The statement is supported by the record evidence. *See* Ettner Decl. ¶ 44 ("An abundance of research establishes that transgender people suffer from stigma and discrimination."); Taylor Decl. ¶ 51 ("For example, according to a 2015 study, approximately one-third of individuals who have shown identification documents with a name or gender that did not match their gender presentation reported negative experiences, such as being harassed, denied services, and/or attacked. More specifically, as a result of showing an identification document with a name or gender that did not match their gender presentation, 25% of people were verbally harassed, 16% were denied services or benefits, 9% were asked to leave a location or establishment, and 2% were assaulted or attacked.").<br><br>Moreover, Exhibits D and F to the Declaration of Omar Gonzalez-Pagan are reputable studies cited in the bibliography to Dr. Taylor's declaration. *See* Ex. B. to Taylor Decl. (citations 32 and 41). Indeed, Dr. Taylor testifies about the results of Exhibit F in paragraph 51 of her declaration. Multiple federal district courts have cited to Exhibit F for the proposition that transgender people have experienced a history of discrimination, harassment, and violence. *See, e.g.*, *Crowder v. Diaz*, No. 2:17-CV-1657-TLN-DMC, 2019 WL 3892300, at *13 (E.D. Cal. Aug. 19, 2019), *report and recommendation adopted*, No. 217CV01657TLNDMC, 2019 WL 5566433 (E.D. Cal. Oct. 29, 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1137 (D. Idaho 2018); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 720 (D. Md. 2018). | |

16

Furthermore, the proffered statement is not necessarily governed by the standards of admissibility under the Federal Rules of Evidence because it can be considered a legislative fact, rather than an adjudicative fact. "Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have *relevance to legal reasoning* and the lawmaking process, whether *in the formulation of a legal principle or ruling by a judge* or court or in the enactment of a legislative body." *In re Madeline Marie Nursing Homes*, 694 F.2d 433, 446 (6th Cir. 1982) (emphasis added); *see also Dayco Corp. v. F.T.C.*, 362 F.2d 180, 186 (6th Cir. 1966). Thus, the court may consider the reliability of Exhibits D, E, F, and G to the Declaration of Omar Gonzalez-Pagan in its consideration of this matter. *Cf. Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (citing social science research); *Atkins v. Virginia*, 536 U.S. 304, 316 n.21 (2002) (citing survey research); *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 494 n.11 (1954) (citing psychological studies).

| 27. | Transgender people, as a class, have a defining characteristic that bears no relation to their ability to perform or contribute to society. | Ettner Decl. ¶¶ 22, 29; Taylor Decl. ¶¶ 29, 40; Gonzalez-Pagan Decl., Ex. I at 4. |
|---|---|---|

Response: Disputed because the material cited does not support this statement. Defendants also dispute the statement as whole, as the experts cited did not make reference to a "class" of persons, either for purposes of any purported class action status or for purposes of attempting to define transgender persons as a "suspect class." To the extent Plaintiffs or their experts attempt to draw any such legal conclusion, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981).

Finally, Defendants object to Plaintiffs' use of Exhibit I to the Gonzalez-Pagan Declaration to support the statement, as the document is hearsay and not capable of being presented in a form that would be admissible in evidence. Defendants also object because the document cited does not support the statement.

Plaintiffs' Reply: The statement is supported by the record evidence. *See* Ettner Decl. ¶ 22 ("The only difference between transgender people and cisgender people is that the latter have gender identities that are consistent with their birth-assigned sex whereas the former do not."); Taylor Decl. ¶ 40 ("Transgender people undergoing treatment for their gender dysphoria can live long, happy, productive and meaningful lives.").

Moreover, the proffered statement is not necessarily governed by the standards of admissibility under the Federal Rules of Evidence because it can be considered a

legislative fact, rather than an adjudicative fact. "Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have *relevance to legal reasoning* and the lawmaking process, whether *in the formulation of a legal principle or ruling by a judge* or court or in the enactment of a legislative body." *In re Madeline Marie Nursing Homes*, 694 F.2d 433, 446 (6th Cir. 1982) (emphasis added); *see also Dayco Corp. v. F.T.C.*, 362 F.2d 180, 186 (6th Cir. 1966). Thus, the court may consider the reliability of Exhibit I to the Declaration of Omar Gonzalez-Pagan in its consideration of this matter.

| 28. | Transgender people, as a class, have relatively little political power. | *See, e.g.*, Gonzalez-Pagan Decl., Ex. K. |
|---|---|---|
| | Response: Defendants object to Plaintiffs' use of Exhibit K to the Gonzalez-Pagan Declaration to support the statement, as the document is hearsay and not capable of being presented in a form admissible in evidence. Defendants also object because the document cited does not support the statement. It discusses proposed legislation from 2017, some of which did not pass or was predicted to fail.<br><br>Defendants also dispute the statement as whole, as the experts cited did not make reference to a "class" of persons, either for purposes of any purported class action status or for purposes of attempting to define transgender persons as a "suspect class." To the extent Plaintiffs or their experts attempt to draw any such legal conclusion, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981). | |
| | Plaintiffs' Reply: The proffered statement is not necessarily governed by the standards of admissibility under the Federal Rules of Evidence because it can be considered a legislative fact, rather than an adjudicative fact. "Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have *relevance to legal reasoning* and the lawmaking process, whether *in the formulation of a legal principle or ruling by a judge* or court or in the enactment of a legislative body." *In re Madeline Marie Nursing Homes*, 694 F.2d 433, 446 (6th Cir. 1982) (emphasis added); *see also Dayco Corp. v. F.T.C.*, 362 F.2d 180, 186 (6th Cir. 1966). Thus, the court may consider the reliability of Exhibit K to the Declaration of Omar Gonzalez-Pagan in its consideration of this matter. | |
| **III.** | **PLAINTIFFS** | |
| 29. | Plaintiffs are four transgender persons who wish to amend their Tennessee birth certificates to accurately reflect their gender identity. Declaration of Kayla | Declaration of Kayla Gore ("Gore Decl.") ¶¶ 5, 23; Declaration of Jaime Combs |

| | | |
|---|---|---|
| | Gore ("Gore Decl.") ¶¶ 5, 23; Declaration of Jaime Combs ("Combs Decl.") ¶¶ 6, 22; Declaration of L.G. ("L.G. Decl.") ¶¶ 7, 25; Declaration of K.N. ("K.N. Decl.") ¶¶ 5, 22. | ("Combs Decl.") ¶¶ 6, 22; Declaration of L.G. ¶¶ 7, 25; Declaration of K.N. ¶¶ 5, 22. |
| | Response: Undisputed for purposes of this motion. | |
| **Plaintiff Kayla Gore** | | |
| 30. | Plaintiff Kayla Gore is a 34-year-old woman who was born and currently resides in Memphis, Tennessee. | Gore Decl. ¶¶ 2, 4. |
| | Response: Undisputed. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of Kayla Gore. *See* Gore Tr. 9:18-24 (identifying place of birth and current address); *see also id.* at 72:14-16. | |
| 31. | At birth, Ms. Gore was incorrectly designated "male" on her birth certificate, even though she is, in fact, a woman. | Gore Decl. ¶¶ 4, 5. |
| | Response: Disputed. The materials cited do not support the statement that Plaintiff was incorrectly identified as "male" at the time her birth certificate was completed. | |
| | Plaintiffs' Reply: The statement is supported by the record evidence. *See* Gore Decl. ¶ 4 ("I am a woman."); *id.* ¶ 5 ("I am also transgender. I was designated 'male' on my birth certificate, even though I am, in fact, a woman"); *see also* Gore Tr. 29:20-31:7 (describing the gender marker (i.e. sex designation) on her birth certificate as a "mistake" and attributing the incorrect designation to the fact that, at the time of birth, "[t]hey didn't look at my gender identity, they only looked at the physical appearance of my body at the time of my birth"). Defendants' contention that Ms. Gore was correctly identified as "male" at the time of her birth assumes that the observation of a person's external genitalia is an accurate proxy for a person's sex. It is not. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex—as determined by her gender identity—is female (even though she was assigned the sex of male at birth). *See* Pls.' Reply in support of Statements of Fact 2, 6 through 8. Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 32. | Ms. Gore is transgender. | Gore Decl. ¶ 5. |
| | Response: Undisputed. | |

| | | |
|---|---|---|
| | _Plaintiffs' Reply_: Additional evidence is found in the deposition testimony of Kayla Gore. _See_ Gore Tr. 15:1-5. | |
| 33. | Ms. Gore has undergone medical treatment for gender dysphoria. | Gore Decl. ¶ 10. |
| | _Response_: Undisputed. | |
| | _Plaintiffs' Reply_: Additional evidence is found in the deposition testimony of Kayla Gore. _See_ Gore Tr. 26:18-23 ("…the beginning stages was the social transition, which was my gender expression outwardly. And then from there on, I went through the hormone replacement therapy and then I've had gender … confirming surgery."). | |
| 34. | Ms. Gore's gender identity and expression is female (she looks, dresses, and expresses herself as a woman). | Gore Decl. ¶¶ 6, 8, 9, 10. |
| | _Response_: Undisputed for purposes of this motion. | |
| | _Plaintiffs' Reply_: Additional evidence is found in the deposition testimony of Kayla Gore. _See_ Gore Tr. 25:5-9 ("I started experimenting with the more feminine expressions in the clothes that I wore, the shoes that I wore, the jewelry that I wore, just my outward appearance became to be more feminine presenting…."); _see also id._ at 26:17-23. | |
| 35. | Ms. Gore has aligned her body characteristics, appearance, and lived experience with her female gender identity. | Gore Decl. ¶¶ 10, 11, 12. |
| | _Response_: Undisputed for purposes of this motion. | |
| | _Plaintiffs' Reply_: Additional evidence is found in the deposition testimony of Kayla Gore. _See_ Plaintiffs' Reply in support of Statements of Fact 33 and 34. | |
| 36. | Ms. Gore has changed her name and corrected the gender marker on her state identification card and Social Security records. | Gore Decl. ¶¶ 11, 12. |
| | _Response_: Undisputed. | |
| | _Plaintiffs' Reply_: Additional evidence is found in the deposition testimony of Kayla Gore. _See_ Gore Tr. 26:24-27:7 (testifying that she has corrected her name and gender marker on her Tennessee state identification, Tennessee voter registration card, and Social Security records). | |
| 37. | Because Tennessee's Birth Certificate Policy makes it impossible for Ms. Gore to correct the gender marker on her birth certificate, she considers it futile to correct her name on her birth certificate, as the document would still be incongruent with her other identification documents. | Gore Decl. ¶ 15. |

| | | |
|---|---|---|
| | <u>Response</u>: Disputed. Ms. Gore testified that she has applied to have her name changed on her birth certificate but has not received a response to that application. | |

<u>Plaintiffs' Reply</u>: Ms. Gore filed an amended declaration on April 13, 2020 clarifying that she *had* considered it futile to correct her name on her birth certification. *See* Am. Gore Decl. ¶ 15 (ECF No. 82-1). Additionally, Ms. Gore testified that she has submitted an application to change her name on her birth certificate but has not yet received a response to that request. *See* Gore Tr. 19:1-20:5.

Plaintiffs therefore amend this statement as follows: "Because Tennessee's Birth Certificate Policy makes it impossible for Ms. Gore to correct the gender marker on her birth certificate, she *had thus considered* it futile to correct her name on her birth certificate, as the document would still be incongruent with her other identification documents."

Because the statement, as amended, is supported by the record evidence, Defendants' partial dispute is moot.

Additional evidence is found in the deposition testimony of Kayla Gore. *See* Gore Tr. 29:20-23 ("[The Tennessee birth certificate policy] doesn't allow for me to change my gender marker or anyone for that matter if there was a mistake when it was -- when the document was created at the time of my birth."). The statement that Tennessee's Birth Certificate Policy makes it impossible for Ms. Gore to correct the gender marker on her birth certificate is also supported by the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See* Bishop Tr. 67:16-25 ("Q: If a person who was designated 'male' at birth, but identifies as female, were to come to the Office of Vital Records to request that their birth certificate be corrected to reflect their female gender identity, would they be able to do that? . . . A: Per the statute, no. Q: And to which statute do you refer? A. Sixty-eight [of the Vital Records Act].").

| 38. | Ms. Gore wishes to correct the gender marker on her birth certificate to accurately reflect her identity as a woman, as determined by her gender identity. | Gore Decl. ¶ 23. |
|---|---|---|
| | <u>Response</u>: Defendants dispute that Ms. Gore could "correct" her birth certificate since it was not incorrect as created. For purposes of this motion, it is not disputed that Ms. Gore wishes to change the sex field on her birth certificate. | |

<u>Plaintiffs' Reply</u>: Additional evidence is found in the deposition testimony of Kayla Gore. *See, e.g.*, Gore Tr. 18:19-22 (testifying that she wishes to correct her Tennessee birth certificate to refer to her sex as female); *id.* at 29:20-23 (describing gender marker on her birth certificate as a "mistake").

Defendants' partial dispute is not rooted in any record evidence. Defendants' contention that Ms. Gore's sex was correctly identified as "male" at the time of her birth assumes that the observation of a person's external genitalia is an accurate proxy

| | | |
|---|---|---|
| | for a person's sex. It is not. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex—as determined by her gender identity—is female (even though she was assigned the sex of male at birth). *See* Plaintiffs' Reply in support of Statements of Facts 2, 6 through 8.<br><br>Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 39. | Ms. Gore's birth certificate does not reflect her true identity, is incongruent with her female identity and expression, and conflicts with her other identification documents. | Gore Decl. ¶¶ 14, 15. |
| | <u>Response:</u> Disputed to the extent that "true identity" is used to mean "gender identity." The statement is otherwise undisputed for purposes of this motion. | |
| | <u>Plaintiffs' Reply:</u> Additional evidence is found in the deposition testimony of Kayla Gore. *See* Gore Tr. 26:24-27:7 (testifying that she has corrected her name and gender marker to be consistent with her female gender identity on all identity documents except her birth certificate); *id.* at 29:20-23 (explaining that she cannot change her gender marker on her birth certificate). *Cf.* Ettner Tr. 23:21-22 ("'True sex,' I have used to refer to a person's affirmed gender identity.").<br><br>Defendants' partial dispute is not rooted in any record evidence. Defendants admit that Ms. Gore's gender identity is female. *See* Defs.' Response to Statement of Fact No. 34. Moreover, Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that gender identity is a person's core internal sense of their own gender and the primary factor in determining a person's sex. *See* Pls.' Reply in support of Statement of Fact No. 2. | |
| | ***Plaintiff Jaime Combs*** | |
| 40. | Plaintiff Jaime Combs is a 51-year old woman who was born in Elizabethton, Tennessee and currently resides in Nashville, Tennessee. | Combs Decl. ¶¶ 3, 5. |
| | <u>Response:</u> Undisputed. | |
| | <u>Plaintiffs' Reply</u>: Additional evidence is found in the deposition testimony of Jaime Combs. *See* Combs Tr. 8:20-22, 9:7-10 (identifying Ms. Comb's place of birth, date of birth, and current address). | |
| 41. | At birth, Ms. Combs was incorrectly designated "male" on her birth certificate, even though she is, in fact, a woman. | Combs Decl. ¶¶ 5, 6. |

22

22

Case 3:19-cv-00328 Document 94 Filed 05/29/20 Page 22 of 60 PageID #: 2469

| | | |
|---|---|---|
| | <u>Response:</u> Disputed. The materials cited do not support the statement that Plaintiff was incorrectly identified as "male" at the time her birth certificate was completed. | |
| | <u>Plaintiffs' Reply</u>: The statement is supported by the record evidence. *See* Combs Decl. ¶ 5 ("I am a woman.")"; *id.* ¶ 6 ("I was designated 'male' on my birth certificate, even though I am, in fact, a woman."); *see also* Combs Tr. 45:18-46:2 ("Q: Can you think of any reasons why you were assigned at birth as male? . . . A: …You know, this was 51 years ago, so I wasn't able to be asked or contribute information. I will say, when I did have gender-affirming surgery, one of the first words that my surgeon told me was that 'you did not form correctly.'").<br><br>Defendants' contention that Ms. Combs was correctly identified as "male" at the time birth assumes that the observation of a person's external genitalia is an accurate proxy for a person's sex. It is not. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex—as determined by her gender identity—is female (even though she was assigned the sex of male at birth). *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8.<br><br>Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 42. | Ms. Combs is transgender. | Combs Decl. ¶ 6. |
| | <u>Response:</u> Undisputed. | |
| | <u>Plaintiffs' Reply</u>: Additional evidence is found in the deposition testimony of Jaime Combs. *See* Combs Tr. 26:1-11 (explaining that she met her wife at a support group for women who are transgender); *id.* at 30:15-19 ("There are people who know I am a woman who is transgender."). | |
| 43. | Ms. Combs's gender identity is female (she looks, dresses, and expresses herself as a woman). | Combs Decl. ¶¶ 5, 6, 7, 8, 10. |
| | <u>Response:</u> Undisputed for purposes of this motion. | |
| | <u>Plaintiffs' Reply</u>: Additional evidence is found in the deposition testimony of Jaime Combs. *See* Combs Tr. 30:15-19. | |
| 44. | Ms. Combs has aligned her body characteristics, appearance, and lived experience with her female gender identity. | Combs Decl. ¶¶ 9-11. |
| | <u>Response:</u> Undisputed for purposes of this motion. | |
| | <u>Plaintiffs' Reply</u>: Additional evidence is found in the deposition testimony of Jaime Combs. *See* Combs Tr. 30:23-25, 31:2-19, 45:21-26:2 (discussing having undergone gender-affirming surgery). | |

| 45. | Ms. Combs has changed her name and corrected the gender marker on her driver's license, Social Security records, and passport. | Combs Decl. ¶¶ 9, 11. |
|---|---|---|
| | Response: Undisputed. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of Jaime Combs. *See* Combs Tr. 31:21-36:15 (describing process by which she changed her name and corrected the gender marker on her drivers' license, Social Security records, and passport). | |
| 46. | Because Tennessee's Birth Certificate Policy makes it impossible for Ms. Combs to correct the gender marker on her birth certificate, Ms. Combs' birth certificate is incongruent with her other identification documents. | Combs Decl. ¶ 13. |
| | Response: For purposes of this motion, it is undisputed that Tennessee law does not permit Ms. Combs to change the sex which was recorded on her birth certificate at the time of her birth. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of Jaime Combs. *See* Combs Tr. 42:18-43:6 (describing her birth certificate as "not reflective of me" and "being inaccurate to whom I am"); *id.* at 31:21-36:15 (describing process by which she changed her name and corrected the gender marker on her driver's license, passport, and Social Security so that they are "congruent" with her gender). The statement that Tennessee's Birth Certificate Policy makes it impossible for Ms. Combs to correct the gender marker on her birth certificate is also supported by the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See* Bishop Tr. 67:16-25 ("Q: If a person who was designated 'male' at birth, but identifies as female, were to come to the Office of Vital Records to request that their birth certificate be corrected to reflect their female gender identity, would they be able to do that? . . . A: Per the statute, no. Q: And to which statute do you refer? A. Sixty-eight [of the Vital Records Act].").

Defendants' partial implied dispute that Tennessee law does not make it impossible for Ms. Combs to *correct* the gender marker on her birth certificate is not rooted in any record evidence. *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8, 41. Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 47. | Ms. Combs wishes to correct the gender marker on her birth certificate to accurately reflect her identity as a woman, as determined by her gender identity. | Combs Decl. ¶ 22. |
| | Response: Defendants dispute that Ms. Combs could "correct" her birth certificate since it was not incorrect as created. For purposes of this motion, it is not | |

| | | |
|---|---|---|
| | disputed that Ms. Combs wishes to change the sex field on her birth certificate. | |

Plaintiffs' Reply: Additional evidence is found in the deposition testimony of Jaime Combs. *See* Combs Tr. 34:12-36:5 (discussing the importance of protecting her "identity information" by obtaining identity documents congruent with her gender); *id.* at 47:1-5 (testifying that the "reality of discrimination to people that have inconsistent documentation on who they are . . . is a very real possibility for me").

Defendants' partial dispute is not rooted in any record evidence. Defendants' contention that Ms. Combs was correctly identified as "male" at the time of her birth assumes that the observation of a person's external genitalia is an accurate proxy for a person's sex. It is not. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex—as determined by her gender identity—is female (even though she was assigned the sex of male at birth). *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8.

Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement.

| 48. | Ms. Combs's birth certificate does not reflect her true identity, is incongruent with her female identity and expression, and conflicts with her other identification documents. | Combs Decl. ¶¶ 13, 14, 20, 21. |
|---|---|---|

Response: Disputed to the extent that "true identity" is used to mean "gender identity." The statement is otherwise undisputed for purposes of this motion.

Plaintiffs' Reply: Additional evidence is found in the deposition testimony of Jaime Combs. *See* Combs Tr. 18:22-25 ("[M]y birth certificate says that I am male."); *id.* at 30:18-19 ("I am a woman who is transgender."); *id.* at 42:18-43:6 ("I do feel that way because it is painful and difficult for me to have *documentation that is not reflective of me*. Because of my past history and experiences with birth certificate -- and *the birth certificate being inaccurate to who I am*, it has been a source that could be used against me. I have seen -- I feel like because of this paper, in the past, I've had to tell my story in situations I did not want to. An example would be when I was in a bank and they required this *documentation that was no longer congruent with who I was* or other information that I had, and I felt it necessary to explain why it didn't match.") (emphasis added); *see also* Pls.' Reply in support of Statement of Fact No. 46 (citing record evidence concerning conflict between Ms. Combs birth certificate and other identification documents).

Defendants' partial dispute is not rooted in any record evidence. Defendants admit that Ms. Comb's gender identity is female. *See* Defs.' Response to Statement of Fact No. 43. Moreover, Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that gender identity is a person's core internal sense of their

| | | |
|---|---|---|
| | own gender and the primary factor in determining a person's sex. *See* Pls.' Reply in support of Statement of Fact No. 2. | |
| | ***Plaintiff L.G.*** | |
| 49. | Plaintiff L.G. is a 31-year-old woman who was born in Tennessee and currently resides in Kentucky. | L.G. Decl. ¶¶ 2, 6. |
| | <u>Response:</u> Undisputed. | |
| | <u>Plaintiffs' Reply:</u> Additional evidence is found in the deposition testimony of L.G. *See* L.G. Tr. 9:21-22 (identifying current address); *id.* at 10:22-25 (identifying place of birth and current residence). | |
| 50. | At birth, L.G. was incorrectly designated "male" on her birth certificate, even though she is, in fact, a woman. | L.G. Decl. ¶ 7. |
| | <u>Response:</u> Disputed. The materials cited do not support the statement that Plaintiff was incorrectly identified as "male" at the time her birth certificate was completed. | |
| | <u>Plaintiffs' Reply:</u> The statement is supported by the record evidence. *See* L.G. Decl. ¶ 7 ("I was designated 'male' on my birth certificate, even though I am, in fact, a woman"); L.G. Tr. 23:21-22 ("I identify as a woman in all aspects of my life."); *id.* at 30:16-22 ("I had been grappling with my identity and was coming to the realization that I was a trans woman. I had never identified with being a male. And I had always thought that I was female. And I did not have the language or terminology to fully understand or articulate my identity until high school, when I understood that I was a trans woman."); *id.* at 38:2-6 (Q: Why do you think that the gender marker is incorrect? . . . A: "It says male, and I'm not male. I'm female"); *id.* at 49:10-13 ("I sent m[y] birth certificate and a letter explaining that it was *incorrect* and that I couldn't get it changed; that I tried, and it hadn't been changed.") (emphasis added). Defendants' contention that L.G. was correctly identified as "male" at birth assumes that the observation of a person's external genitalia is an accurate proxy for a person's sex. It is not. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex is female (even though she was assigned the sex of male at birth). *See* Pls.' Reply in support of Statements of Fact 2, 6 through 8. Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 51. | L.G. is transgender. | L.G. Decl. ¶ 7. |
| | <u>Response:</u> Undisputed. | |
| | <u>Plaintiffs' Reply:</u> Additional evidence is found in the deposition testimony of L.G. *See, e.g.*, L.G. Tr. 26:8 ("My mother knows that I'm a trans woman."); *id.* at 29:3-10 (testifying to having come out as a trans woman to her mother in 2004). | |

| 52. | L.G.'s gender identity is female (she looks, dresses, and expresses herself as a woman). | L.G. Decl. ¶¶ 6, 10-12. |
|---|---|---|
| | Response: Undisputed for purposes of this motion. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of L.G. *See* L.G. Tr. 23:21-22 ("I identify as a woman in all aspects of my life."). | |
| 53. | L.G. has been diagnosed with and undergone medical treatment for gender dysphoria. | L.G. Decl. ¶ 11. |
| | Response: Undisputed. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of L.G. *See* L.G. Tr. 33:4-7 ("When I finally decided to be who I was and to be -- to live into that fully and to be okay and accept that, I also began seeking and found medical treatment in my area."); *id.* at 34:10-14 ("And I told [my mother] . . . that I had received proper medical care and that my dysphoria was manageable."); *id.* at 51:2-25 (testifying to having undergone gender-confirming surgery). | |
| 54. | L.G. has aligned her body characteristics, appearance, and lived experience with her female gender identity. | L.G. Decl. ¶¶ 10, 11, 12, 14, 16. |
| | Response: Undisputed for purposes of this motion. | |
| | Plaintiffs' Reply: Additional evidence is cited in Plaintiffs' Reply in Support of Statement of Fact 53. | |
| 55. | L.G. has changed her name and corrected her gender marker on her driver's license and Social Security records. | L.G. Decl. ¶¶ 14, 16. |
| | Response: Undisputed. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of L.G. *See* L.G. Tr. 39:18-52:11 (describing process of changing her name and correcting her gender marker on her driver's license and Society Security records). | |
| 56. | L.G. has changed the name on her birth certificate but has been prevented from correcting the gender marker on her birth certificate by Tennessee's Birth Certificate Policy. | L.G. Decl. ¶¶ 16, 17. |
| | Response: It is undisputed for purposed of this motion that L.G. has changed the name on her birth certificate, and that Tennessee law does not permit her to change the sex recorded at the time of birth on her birth certificate. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of L.G. *See* L.G. Tr. 49:10-13 ("I sent my birth certificate and a letter explaining that it was *incorrect* and that I couldn't get it changed; that I tried, and it hadn't been changed.") (emphasis added); *id.* at 54:3-55:20 (testifying that her name on her birth certificate has been corrected and describing unsuccessful attempts to correct gender marker on | |

her birth certificate).  The statement that Tennessee's Birth Certificate Policy makes it impossible for L.G. to correct the  gender marker on her birth certificate is also supported by the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar.  *See* Bishop Tr. 67:16-25 ("Q: If a person who was designated 'male' at birth, but identifies as female, were to come to the Office of Vital Records to request that their birth certificate be corrected to reflect their female gender identity, would they be able to do that? . . . A: Per the statute, no.  Q: And to which statute do you refer?  A. Sixty-eight [of the Vital Records Act].").

Defendants' partial implied dispute that Tennessee law does not make it impossible for L.G. to *correct* the sex designation on her birth certificate is not rooted in any record evidence.  *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8, 41.

Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement.

| 57. | L.G. wishes to change the gender marker on her birth certificate to accurately reflect her identity as a woman, as determined by her gender identity. | L.G. Decl. ¶ 25. |
| --- | --- | --- |
|  | Response:  Defendants  dispute  that  L.G.  could "correct" her birth certificate since it was not incorrect as created.   For purposes of this motion, it is not disputed that L.G. wishes to change the sex field on her birth certificate. |  |
|  | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of L.G. *See* L.G. Tr. 37:21-24 ("[T]he gender marker on my birth certificate is incorrect.  And I've tried to correct that several times, and the State of Tennessee has not corrected it."); *id.* at 38:5-6 (testifying that the gender marker on her birth certificate is incorrect because "[i]t says male, and I'm not male.  I'm female"); *id.* at 54:3-55:20 (describing unsuccessful efforts to change her gender marker on her Tennessee birth certificate).<br><br>Defendants' partial dispute is not rooted in any record evidence.  Defendants' contention that L.G. was correctly identified as "male" at the time of her birth assumes that the observation of a person's external genitalia is an accurate proxy for a person's sex.  It is not.  Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex—as determined by her gender identity—is female (even though she was assigned the sex of male at birth).  *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8.<br><br>Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. |  |
| 58. | L.G.'s birth certificate does not reflect her true identity, is incongruent with her female identity and | L.G. Decl. ¶¶ 17, 18, 23, 24. |

| | | |
|---|---|---|
| | expression, and conflicts with her other identification documents. | |
| | <u>Response:</u> Disputed to the extent that "true identity" is used to mean "gender identity." The statement is otherwise undisputed for purposes of this motion. | |
| | <u>Plaintiffs' Reply:</u> Additional evidence is found in the deposition testimony of L.G. *See* L.G. Tr. 52:3-6 ("And she finally gave me my driver's license, and it was finally right. It finally said female. And everything has been corrected, except for my birth certificate."); *see also* Pls.' Reply in Support of Statement of Fact No. 57.<br><br>Defendants' partial dispute is not rooted in any record evidence. Defendants admit that L.G.'s gender identity is female. *See* Defs.' Response to Statement of Fact No. 52. Moreover, Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that gender identity is a person's core internal sense of their own gender and the primary factor in determining a person's sex. *See* Pls.' Reply in support of Statement of Fact No. 2. | |
| 59. | L.G.'s transgender status is not publicly known, including not being known by any of her current co-workers. | L.G. Decl. ¶ 13. |
| | <u>Response:</u> Disputed. L.G. testified that her mother, her siblings, and at least one former work colleague know that she is a transgender woman, as well as "some of my classmates and immediate cohorts, the professors and director of admissions" at the institution she currently attends. | |
| | <u>Plaintiffs' Reply:</u> The statement is supported by the record evidence.<br><br>L.G. testified that she is presently "not 'out' as transgender at work" and that "[n]one of my co-workers know that I am transgender." L.G. Decl. ¶ 13. Only a limited number of people in her family and immediate cohort know that she is transgender. *See* L.G. Tr. 26:14-27:7 (testifying that she came out to *one former* co-worker and declining to speculate on whether any other of her former co-workers know she is transgender); *id.* at 27:14-21 (testifying that she has disclosed her transgender identity to some classmates, immediate cohorts, professors, and the director of admissions).<br><br>Defendants' dispute is not rooted in any record evidence. L.G.'s testimony that she has disclosed her transgender status to certain people she knows does not controvert that her transgender status is "not publicly known." | |
| | ***Plaintiff K.N.*** | |
| 60. | Plaintiff K.N. is a 31-year-old woman who was born in Tennessee and currently resides in California. | K.N. Decl. ¶¶ 2, 4. |
| | <u>Response:</u> Undisputed. | |

| | | |
|---|---|---|
| | **Plaintiffs' Reply:** Additional evidence is found in the deposition testimony of K.N. *See* K.N. Tr. 9:24-10:1 (identifying current residence); *id.* at 13:7-10 (identifying place of birth). | |
| 61. | At birth. K.N. was incorrectly designated "male" on her birth certificate, even though she is, in fact, a woman. | K.N. Decl. ¶ 5. |
| | **Response:** Disputed. The materials cited do not support the statement that Plaintiff was incorrectly identified as "male" at the time her birth certificate was completed. | |
| | **Plaintiffs' Reply:** The statement is supported by the record evidence. *See* K.N. Decl. ¶ 5 ("I was designated 'male' on my birth certificate, even though I am, in fact, a woman"); *see also* K.N. Tr. 31:4-5 ("I had to present my birth certificate with my incorrect name and incorrect gender[.]")<br><br>Defendants' contention that K.N. was correctly identified as "male" at birth assumes that the observation of a person's external genitalia is an accurate proxy for a person's sex. It is not. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex is female (even though she was assigned the sex of male at birth). *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8.<br><br>Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 62. | K.N. is transgender. | K.N. Decl. ¶ 5. |
| | **Response:** Undisputed. | |
| | **Plaintiffs' Reply:** Additional evidence is found in the deposition testimony of K.N. *See* K.N. Tr. 16:23-25 ("I would say I never really felt any connection to the gender identity that I was assigned at birth."); *id.* at 24:15-18 ("I eventually was coming to a point of accepting the difficulties of transition and to accepting myself as transgender[.]"). | |
| 63. | K.N. has been diagnosed with gender dysphoria. | K.N. Decl. ¶ 7. |
| | **Response:** Undisputed for purposes of this motion. | |
| | **Plaintiffs' Reply:** Additional evidence is found in the deposition testimony of K.N. *See* K.N. Tr. 27:22-24 (identifying mental health provider who diagnosed K.N. with gender dysphoria); *id.* at 24:19-25:15 (discussing gender dysphoria diagnosis). | |
| 64. | K.N.'s gender identity is female (she looks, dresses, and expresses herself as a woman). | K.N. Decl. ¶¶ 4-8. |
| | **Response:** Undisputed for purposes of this motion. | |
| | **Plaintiffs' Reply:** Additional evidence is found in the deposition testimony of K.N. *See* K.N. Tr. 17:1-2 ("I began expressing in more effeminate ways…"); *id.* at 23:15- | |

| | | |
|---|---|---|
| | 24:18 (discussing process of accepting her gender identity and transition; "I began personally expressing myself more at home in feminine ways."). | |
| 65. | K.N. has aligned her body characteristics, appearance, and lived experience with her female gender identity. | K.N. Decl. ¶¶ 7-11. |
| | Response: Undisputed for purposes of this motion. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of K.N. *See* K.N. Tr. 27:13-15 ("I personally felt the greatest relief of symptoms in my life when I started HRT [hormone replacement therapy]. . . ."); *id.* at 24:10-11 ("I began personally expressing myself more at home in feminine ways."); *id.* at 24:15-18 ("I eventually was coming to a point of accepting the difficulties of transition and to accepting myself as transgender…."). | |
| 66. | K.N. has changed her name and corrected the gender marker on her driver's license, Social Security records, and passport. | K.N. Decl. ¶¶ 10, 11. |
| | Response: Undisputed. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of K.N. *See* K.N. Tr. 29:23-30:20 (discussing process of updating identity documents, including driver's license, Social Security Records, and passport); *see also id.* at 45:25-46:4 ("I've taken great efforts to change my -- any identifying information using my pre -- my full name, or what I sometimes refer to as dead name, everywhere I could find online or elsewhere."). | |
| 67. | Because Tennessee's Birth Certificate Policy makes it impossible for K.N. to correct the gender marker on her birth certificate, K.N.'s birth certificate is incongruent with her other identification documents. | K.N. Decl. ¶ 16. |
| | Response: For purposes of this motion, it is undisputed that Tennessee law does not permit K.N to change the sex which was recorded on her birth certificate at the time of her birth. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of K.N. *See* K.N. Tr. 31:4-7 ("I had to present my birth certificate with my incorrect name and incorrect gender, and I had to explain myself and I had to explain Tennessee's policy around this."); *id.* at 35:5-6 (explaining that her Tennessee birth certificate "was unable to be updated"). The statement that Tennessee's Birth Certificate Policy makes it impossible for Ms. Combs to correct the gender marker on her birth certificate is also supported by the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See* Bishop Tr. 67:16-25 ("Q: If a person who was designated 'male' at birth, but identifies as female, were to come to the Office of Vital Records to request that their birth certificate be corrected to reflect their female gender identity, would they be able to do that? . . . A: Per the statute, no. Q: And to which statute do you refer? A. Sixty-eight [of the Vital Records Act].") | |

31

| | | |
|---|---|---|
| | Defendants' partial implied dispute that Tennessee law makes it impossible for K.N. to *correct* the gender marker on her birth certificate is not supported by any record evidence. *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8, 61. | |
| 68. | K.N. wishes to correct the gender marker on her birth certificate to accurately reflect her identity as a woman, as determined by her gender identity. | K.N. Decl. ¶ 22. |
| | <u>Response:</u> Defendants dispute that K.N. could "correct" her birth certificate since it was not incorrect as created. For purposes of this motion, it is not disputed that K.N. wishes to change the sex field on her birth certificate. | |
| | <u>Plaintiffs' Reply</u>: Additional evidence is found in the deposition testimony of K.N. *See, e.g.*, K.N. Tr. 46:24-25 (…"I want to update my own birth certificate…"). Defendants' partial dispute is not rooted in any record evidence. Defendants' contention that K.N.'s sex was correctly identified as "male" at the time of her birth assumes that the observation of a person's external genitalia is an accurate proxy for a person's sex. It is not. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex is female (even though she was assigned the sex of male at birth). *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8. Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement. | |
| 69. | K.N.'s birth certificate does not reflect her true identity, is incongruent with her female identity and expression, and conflicts with her other identification documents. | K.N. Decl. ¶¶ 16, 18, 21. |
| | <u>Response:</u> Disputed to the extent that "true identity" is used to mean "gender identity." The statement is otherwise undisputed for purposes of this motion. | |
| | <u>Plaintiffs' Reply</u>: Additional evidence is found in the deposition testimony of K.N. *See* K.N. Tr. 31:4-7 ("I had to present my birth certificate with my incorrect name and incorrect gender, and I had to explain myself and I had to explain Tennessee's policy around this."); *id.* at 33:6-12 ("I remember in the passport office, the agent questioned my birth certificate. He pointed out that [. . .] the gender did not match my identification documents, and he was asking why this document I needed to prove my identity did not match my name. And at that point, I had to explain Tennessee's policy."). Defendants' partial dispute is not rooted in any record evidence. Defendants admit that K.N.'s gender identity is female. *See* Defs.' Response to Statement of Fact No. 64. Moreover, Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that gender identity is a person's core internal sense of their own | |

32

| | | |
|---|---|---|
| | gender and the primary factor in determining a person's sex. *See* Pls.' Reply in support of Statement of Fact No. 2. | |

| **IV.** | **TENNESSEE'S BIRTH CERTIFICATE POLICY** | |
|---|---|---|
| 70. | Tennessee birth certificates include, *inter alia*, the given name and surnames of the newborn child, the date of birth, the names of the child's parents, and the sex of the child. | *See, e.g.*, Tenn. Code Ann. § 68-3-311(b)(2); *see also* Gonzalez-Pagan Decl., Ex. B (RFA No. 21). |
| | Response: Defendants object as the cited materials do not support the statement. In addition, Defendants object because the requirements for Tennessee birth certificates are a function of state law. To the extent Plaintiffs attempt to state a legal conclusion, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981). | |
| | Plaintiffs' Reply:  The statement is supported by the cited materials and record evidence.  *See, e.g.*, Tenn. Code Ann. § 68-3-311(b)(2) (noting that Tennessee certificate of birth shows date of birth, place of birth, sex, date of filing, and name); Gonzalez-Pagan Dec. Ex. B (RFA No. 21) ("Tennessee statutes and regulations require an institution to obtain data on sex and to include that date in its filing of the birth certificate." (citing Tenn. Code Ann. § 68-3-302(a)).  Furthermore, Tennessee's Handbook on Birth Registration and Fetal Death (Stillbirth) Reporting outlines the various items included on a Tennessee birth certificate.  *See generally* Ex. 4 to Bishop Tr.  As an official publication of the Tennessee Office of Vital Records, the Handbook is self-authenticating pursuant to Federal Rule of Evidence 902(5). Additional record evidence also supports the proffered statement.  *See, e.g.*, Exs. 5, 7, and 8 to Bishop Tr. (copies of Tennessee Department of Public Health Certificates of Live Birth); Lefler Tr. 48:24-49:8 (testifying that "sex recorded at birth" is one of the data elements collected in the Tennessee statistical birth system and that such information is extracted from a person's certificate of live birth). Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded.  Plaintiffs' statement identifies the fields that appear on a standard Certificate of Live Birth issued by the Tennessee Department of Public Health and, as such, constitutes a factual statement.  Defendants do not cite any evidence contradicting the statement. | |
| 71. | It is the practice of the State of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on the observations by third parties about the external genitalia of newborns. | *See* Defs.' Mem. Mot. to Dismiss (ECF No. 29) at 11-12 & n.6; *cf.* Gonzalez-Pagan Decl., Ex. B (RFA No. 21). |

| | | |
|---|---|---|
| | <u>Response:</u> Defendants object because the materials cited do not support this statement. | |
| | <u>Plaintiffs' Reply:</u> The statement is supported by the cited materials. *See* Defs.' Mem. Mot. to Dismiss (ECF No. 29) at 11-12 ("Requiring the state to allow Plaintiffs to amend their birth certificates to reflect their current gender identities—when there is no evidence that their biological sex, *as determined by the appearance of external genitalia*, was incorrectly recorded at the time of birth—would undermine the State's legitimate interests in maintaining accurate records."); *id.* at 12, n.6 ("Plaintiffs suggest that an accurate determination of sex must consider not only external genitalia but also '[o]ther sex related characteristics' such as 'a person's chromosomal makeup or gender identity,' but the criteria to be used to accurately determine a person's biological sex for purposes of recording that information on a birth certificate is a matter of policy for the General Assembly and Department of Health."); Gonzalez-Pagan Decl., Ex. B (RFA No. 21) (admitting that "the Tennessee Department of Health and Office of Vital Records do not undertake any independent assessment to determine an individual's gender for purposes of creating and maintaining birth certificates."). <br><br> Additional record evidence also supports the proffered statement. For example, Defendants' medical expert, Dr. Anthony Trabue, testified that "the sex characteristics that would be used in the delivery room *to assign a sex to the infant*" would be "the presence of a penis, or what appears to be a vagina." Trabue Tr. 96:12-17 (emphasis added). Dr. Trabue has "delivered approximately 12,000 babies" over the course of his career in Tennessee. Trabue Decl. ¶ 18. Of course, as Dr. Trabue agreed, "a baby's sex cannot be determined by observing the external genitals in one hundred percent of the cases." Trabue Tr. 86:13-18; *see also* Statement of Fact No. 6 and Pls.' Reply in support thereof. | |
| 72. | In his official capacity as Governor of Tennessee, Defendant William Byron Lee executes the laws of the State, including The Vital Records Act of Tennessee (the "Vital Records Act"), and supervises the implementation and enforcement of the Vital Records Act. Governor Lee has the power to appoint the Commissioner of the Department of Health for the State of Tennessee, who serves at the pleasure of the governor. | *See* Tenn. Code Ann. § 68-1-102. |
| | <u>Response:</u> Defendants object because the material cited does not support the statement in the first sentence above. In addition, the statement is not one of fact, but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981). | |

| | |
|---|---|
| | <u>Plaintiffs' Reply:</u>  The statement is supported by the cited material.  *See* Tenn. Code Ann. § 68-1-102(a) ("The department of health shall be under the charge and general supervision of the commissioner of health, who shall be appointed by the governor. . . .").  With respect to the first sentence, it cannot be reasonably disputed that the executive power of the state is vested in the Governor, who is charged with ensuring that the law is faithfully executed.  Moreover, and in any event, a court may take judicial notice of federal and state constitutions and statutes. *See, e.g.*, Tenn. R. Evid. 202(a).  The Tennessee Constitution provides that "[t]he supreme executive power of [the State of Tennessee is] vested in a governor" who "shall take care that the laws be faithfully executed." Tenn. Const. Art. III, §§ 1, 10.<br><br>Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded.  Plaintiffs' statement describes the content found in provisions of the Tennessee Annotated Code and the Tennessee Constitution and, as such, constitutes a factual statement.  Defendants do not cite any evidence contradicting the statement.  Therefore, the court should find that the statement is a material fact uncontroverted by Defendants. |

| 73. | In her official capacity as Commissioner of the Tennessee Department of Health, Defendant Lisa Piercey supervises the activities of the Department and enforces Tennessee's vital records laws, including the Vital Records Act. | *See* Tenn. Code Ann. §§ 68-3-104. |
|---|---|---|
| | <u>Response:</u> Defendants object because the material cited does not support the statement except by reference to general supervisory authority. In addition, the statement is not one of fact, but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981). | |

<u>Plaintiffs' Reply:</u>  The statement is supported by the cited material.  *See, e.g.*, Tenn. Code Ann. § 68-3-104 ("The commissioner shall: (1) Appoint a state registrar of vital records. . . . (b) The state registrar: (1) Under the supervision of the commissioner, shall act as agent of the commissioner and: (A) shall have charge of the office of vital records and act as the custodian of all the certificates and records received by the state registrar and perform such other duties as the commissioner may prescribe; and (B) Shall be charged with the execution of this chapter [Vital Records Act of 1977] and of the regulations of the department throughout the state. . . .").

Additional evidence is found in the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See, e.g.*, Bishop Tr. 17:19-22 (stating that the "Commissioner of the Department of Health" appointed him as State Registrar); *id.* at 16:2-9 (explaining that his responsibilities as State Registrar are "[t]o put on file any vital event in the state of Tennessee.  To maintain those records for the time stated in the statute; and we also issue copies of these vital records"); *id.* at 37:1-6 (agreeing

that, as "State Registrar and Director of the Office of Vital Records," he is "tasked with enforcing laws and regulations pertaining to vital records in Tennessee"); *id.* at 80:15-22 (testifying that Department of Health has the authority to issue and change "rules with regards to the completion and maintenance of vital records").

Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded. Plaintiffs' statement is based upon a provision of the Tennessee Annotated Code and facts testified to by Mr. Bishop and, as such, constitutes a factual statement. Defendants do not cite any evidence contradicting the statement. Therefore, the court should find that the statement is a material fact uncontroverted by Defendants.

| 74. | The Tennessee Department of Health, which includes the Office of Vital Records, exercises responsibility for the registration, issuance, correction, and changes to Tennessee birth certificates. | *See* Tenn. Code Ann. § 68-3-103. |
|---|---|---|

**Response:** Defendants object because the material cited does not support the statement except by reference to general authority. In addition, the statement is not one of fact, but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981).

Plaintiffs' Reply: The statement is supported by the citation. *See, e.g.*, Tenn. Code Ann. § 68-3-103 ("The department shall: (1) Establish an office of vital records . . . (2) Make and amend, with the approval of the public health council, regulations necessary for the creation and efficient performance of an adequate system of vital records, and give instructions and prescribe forms for collecting, transcribing, compiling and preserving vital records[.]"); *see also* Plaintiffs' Statements of Fact 75 through 78 and record citations therein.

Additional evidence is found in the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See, e.g.*, Bishop Tr. 16:2-9 (explaining that his responsibilities as State Registrar are "[t]o put on file any vital event in the state of Tennessee. To maintain those records for the time stated in the statute; and we also issue copies of these vital records"); *id.* at 81:13-83:6 and Ex. 13 thereto (Tennessee Office of Vital Records Website FAQs regarding amendments to birth, death, marriage, and divorce certificates).

Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded. Plaintiffs' statement is based upon a provision of the Tennessee Annotated Code and facts testified to by Mr. Bishop and, as such, constitutes a factual statement. Defendants do not cite any evidence contradicting the statement. Therefore, the court should find that the statement is a material fact uncontroverted by Defendants.

| 75. | Recognizing that the information in a birth certificate may sometimes be inaccurate or need updating, the Vital Records Act and the regulations promulgated and enforced by Defendants permit the correction of errors on and updating of birth certificate records. | *See* Tenn. Code Ann. § 68-3-203; Tenn. Comp. R. & Regs. 1200-07-01-.10 |
|---|---|---|
|  | Response: Defendants object because the statement is not one of fact but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co*., 650 F. 2d 118, 121 (6th Cir. 1981). |  |
|  | Plaintiffs' Reply: Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded. Plaintiffs' statement is based on a provision of the Tennessee Annotated Code and related regulations and, as such, constitutes a factual statement. Defendants do not cite any evidence contradicting the statement. Therefore, the court should find that the statement is a material fact uncontroverted by Defendants. |  |
| 76. | For example, in cases which a person has lawfully changed their name, such person may present a duly authenticated copy of the court order changing their name and request an amended certificate of birth. | Tenn. Comp. R. & Regs. 1200-07-01-.10 |
|  | Response: Defendants object because this statement does not accurately describe the law. Defendants also object because the statement is not one of fact but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co*., 650 F. 2d 118, 121 (6th Cir. 1981). |  |
|  | Plaintiffs' Reply: The statement accurately describes the law. *See* Tenn. Comp. R. & Regs. 1200-07-01-.10(2)(a)(5) ("Any item on a certificate may be corrected by an order of a court of record with the exception of the date of filing, the signature of the certifier, and changing the date of birth to a date which is after the date of filing. A certified copy of the order must be submitted to the State Registrar."); *id.* at 1200-07-01-.10(2)(a)(7) ("A legal change of name order from a court of competent jurisdiction is required to change the name as shown on the certificate, unless the registrant presents documentary evidence that the name was incorrectly recorded that time of registration of birth."). <br><br> Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded. Plaintiffs' statement describes certain content contained in the official compilation of Rules and Regulations of the State of Tennessee and, as such, constitutes a factual statement. Defendants do not cite any |  |

37

| | | |
|---|---|---|
| | evidence contradicting the statement. Therefore, the court should find that the statement is a material fact uncontroverted by Defendants. | |
| 77. | Similarly, following the adoption of a child, a new birth certificate reflecting only the names of the adoptive parents and the new name of the adopted child must be substituted for the original registered birth certificate. The original registration certificate of the birth of the adoptee, decree of adoption, and other documents are kept under seal and can only be opened upon a court order or upon a directive from the Tennessee Department of Children's Services. | Tenn. Comp. R. & Regs. 1200-07-01-.04 |
| | Response: Defendants object because this statement does not accurately describe the law. Defendants also object because the statement is not one of fact but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981). | |
| | Plaintiffs' Reply: The statement accurately describes the law. *See* Tenn. Comp. R. & Regs. 1200-07-01-.04(10) (providing that a new certificate of birth following an adoption "shall be on a form prescribed by the State Registrar and shall include the following items necessary to complete the certificate: (a) the full name of the child . . . (c) the names and personal information of the parent(s)"); *id.* at Tenn. Comp. R. & Regs. 1200-07-01-.04(12) ("After preparation of a new certificate of birth . . . the certificate in the name at birth and/or the legal documents upon which the new certificate or report was prepared are to be placed in an envelope and sealed. Such sealed report may be opened by the State Registrar for the issuance of a copy of the certificate in the name at birth only upon order of a competent jurisdiction or upon receipt of a directive from the Tennessee Department of Children's Services."). 

Additional evidence is found in the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See* Bishop Tr. 57:19-58:2 (agreeing that "[w]hen a child is adopted" "a new birth certificate [is] issued with the adoptive parents' names on the birth certificate" and that "the original birth certificate" will be "kept under seal by the Office of Vital Records"); *id.* at 58:7-8 ("There are records that have been amended that have been put under seal."). 

Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded. Plaintiffs' statement describes certain content contained in the official compilation of Rules and Regulations of the State of Tennessee and, as such, constitutes a factual statement. Defendants do not cite any evidence contradicting the statement. Therefore, the court should find that the statement is a material fact uncontroverted by Defendants. | |

38

| 78. | Pursuant to Tenn. Comp. R. & Regs. 1200-07-01-.10, and as documented on the public website for the Office of Vital Records, the sex listed on a person's birth certificate may be corrected if the change is substantiated by (1) a signed and notarized affidavit showing the full name, date of birth, the sex as it is shown on the certificate and the sex as it should be correctly listed, and (2) documentary evidence showing the correct sex of the individual. | *See* Tenn. Comp. R. & Regs. 1200-07-01-.10; Gonzalez-Pagan Decl., Ex. C at 3. |
|---|---|---|
| | Response: For purposes of this motion, Defendants do not dispute that Exhibit C from the Gonzalez-Pagan Declaration is part of the public website for the Office of Vital Records. The remainder of this statement is not one of fact but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co*., 650 F. 2d 118, 121 (6th Cir. 1981). | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See* Bishop Tr. 83:3-6 ("Q: So it is possible for a person to correct the sex on their birth certificate even after their first year of birth? A: If a mistake was made."); *see also* Ex. 13 to Bishop Tr.<br><br>Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded.  Plaintiffs' statement describes certain content contained in the official compilation of Rules and Regulations of the State of Tennessee and the public website for the Office of Vital Records.  Defendants do not object that the statement is inaccurate and they do no cite any evidence contradicting the statement.  Therefore, the court should find that the statement is a material fact uncontroverted by Defendants. | |
| 79. | The original bills for the Vital Records Act of 1977 (House Bill 425 and Senate Bill 162) expressly authorized the amendment of the sex designation on Tennessee-issued birth certificates following "sex change surgery." | Gonzalez-Pagan Decl., Ex. L, Ex. M. |
| | Response: Undisputed for purposes of this motion. | |
| 80. | The bills for the Vital Records Act of 1977 (House Bill 425 and Senate Bill 162) were amended on the floor of the legislature to expressly prohibit amendments to the sex designation on Tennessee-issued birth certificates in response to "controversy" at the time. | Gonzalez-Pagan Decl., Ex. N at 6-7, Ex. O at 5, Ex. M. |
| | Response: Undisputed for purposes of this motion. | |

39

| 81. | As a result, the Vital Records Act provides, in part, that "[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." | Tenn. Code Ann. § 68-3-203(d). |
|---|---|---|
| | Response: Defendants object because the statement is not one of fact but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co*., 650 F. 2d 118, 121 (6th Cir. 1981). | |
| | Plaintiffs' Reply: Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded. Plaintiffs' statement, which simply quotes a provision of the Vital Records Act, is factual in nature. Defendants do not object that the statement is inaccurate and they do no cite any evidence contradicting the statement. Therefore, the court should find that the statement is a material fact uncontroverted by Defendants.<br><br>Moreover, and in any event, a court may take judicial notice of federal and state constitutions and statutes. *See, e.g.*, Tenn. R. Evid. 202(a). | |
| 82. | Based on this provision, Defendants enforce a policy, custom, or practice that categorically prohibits transgender persons born in Tennessee from correcting the sex listed on their birth certificates so that it matches their sex, consistent with their gender identity, regardless of what steps such persons have taken to live in a manner consistent with their gender identity. | *See* Defs.' Mem. Mot. to Dismiss (ECF No. 29) at 7-8 & n.5; *see also*, *e.g.*, Tenn. Op. Att'y Gen. No. 14-70, 2014 WL 3700672 (July 16, 2014) (designation of sex on police booking sheets, warrants and other court records must match birth certificate, regardless of gender-confirming surgery); Tenn. Op. Att'y Gen. No. 88-43, 1988 WL 410159 (Feb. 29, 1988) (person's sex determined at birth for purposes of obtaining Tennessee marriage license). |
| | Response: Disputed. The provision cited by Plaintiffs pertains to persons who have had sex change surgery. This provision is not limited to transgender persons and does not describe all transgender persons.<br><br>In addition, Defendants dispute that "sex" and "gender identity" are the same thing. | Taylor Decl. ¶ 19. |

| | | |
|---|---|---|
| | <u>Plaintiffs' Reply</u>: Additional evidence is found in the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See* Bishop Tr. 67:16-21, 23-25 ("Q: If a person who was designated 'male' at birth, but identifies as female, were to come to the Office of Vital Records to request that their birth certificate be corrected to reflect their female gender identity, would they be able to do that? . . . A: Per the statute, no. Q: And to which statute do you refer? A: Sixty-eight [of the Vital Records Act].") | |
| | Defendants' dispute mischaracterizes Plaintiffs' statement and is not supported by the record evidence. Defendants do not dispute that the Vital Records Act provides, in part, that "[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." *See* Defs.' Response to Statement of Fact No. 81. And, although the provision refers specifically to persons who have had sex change surgery, Defendants do not dispute that, based on this provision, they enforce a policy, custom, or practice that categorically prohibits transgender persons from correcting the sex listed on their birth certificates so that it matches their sex, consistent with their gender identity. Indeed, Defendants have stated that "it is undisputed that Tennessee law does not permit [Ms. Combs, L.G., or K.N.] to change the sex which was recorded on her birth certificate at the time of her birth." *See* Defs.' Responses to Statements of Fact Nos. 46, 56, and 67. | |
| | As Mr. Bishop testified, based on Tenn. Code Ann. § 68-3-203(d), a person who was designated "male" at birth but identifies as female cannot correct their birth certificate to reflect their female gender identity. | |
| | Defendants' dispute regarding "sex" and "gender identity" is similarly misplaced, as Plaintiffs do not assert that "sex" and "gender identity" are the same thing. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that gender identity is a person's core internal sense of their own gender and the primary factor in determining a person's sex. *See* Pls.' Reply in support of Statement of Fact No. 2. | |
| 83. | Furthermore, Tennessee typically requires birth certificates to show a strike-out line through any information corrected, such as when instituting name changes on birth certificates. | Tenn. Comp. R. & Regs. 1200-07-01-.10(a)(2). |
| | <u>Response:</u> This statement appears to cite Tenn. Comp. R. & Regs. 1200-07-01-.10 (11)(a)(2). Defendants object because the statement does not accurately describe the regulation which provides that the original corrected entry may be blocked if ordered by a court or required by statute. Defendants also object because the statement is not one of fact but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. Unitsed States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981). | |

| | | |
|---|---|---|
| | Plaintiffs' Reply: Plaintiffs' citation contains a typographical error. Plaintiffs therefore amend their record citation as follows: Tenn. Comp. R. & Regs. 1200-07-01-.10(11)(a)(2). | |
| | The statement accurately describes the regulation. *See* Tenn. Comp. R. & Regs. 1200-07-01-.10(11)(a)(2) ("Certificates of birth . . . may be amended by the State Registrar in the following manner upon receipt of the required documentation . . . (2) drawing a single line through the item to be amended and inserting the correct data immediately above or to the side thereof. The line drawn through the original entry must not obliterate such entry."). That the original entry may be blocked out pursuant to a court order or statute does not render inaccurate Plaintiffs' statement that Tennessee *typically* requires birth certificates to show a strike-out line through any information that is corrected. | |
| | Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded. Plaintiffs' statement describes certain content found in the official compilation of Rules and Regulations of the State of Tennessee and, as such, constitutes a factual statement. Although Defendants identify an exception to Tennessee's typical practice of requiring birth certificates to show a strike-out line through any information that is corrected, Defendants fail to contradict Plaintiffs' proffered statement. Therefore, the court should find that the statement is a material fact uncontroverted by Defendants. | |
| 84. | Taken in conjunction, these applications of the Vital Records Act by Defendants constitute the Birth Certificate Policy challenged by Plaintiffs. | Gore Decl. ¶ 13; Combs Decl. ¶ 12; K.N. Decl. ¶ 14; L.G. Decl. ¶ 25. |
| | Response: Defendants object because the materials cited do not support this statement. In addition, the statement is simply a definition used by Plaintiffs, in various ways, in various filings. | |
| | Plaintiffs' Reply: The statement is supported by the cited materials. Each of Plaintiffs' declarations defines the Birth Certificate Policy as the State of Tennessee's "policy and practice that categorically prohibits transgender persons . . . from correcting the gender marker on their birth certificates so that the birth certificates may accurately reflect their sex, as determined by their gender identity." *See* Gore Decl. ¶ 13; Combs Decl. ¶ 12; K.N. Decl. ¶ 14; L.G. Decl. ¶ 15. Moreover, Defendants' objection that Plaintiffs have defined which applications of the Vital Records Act constitute the Birth Certificate Policy they are challenging in this litigation is not a sufficient counter to Plaintiffs' statement. | |
| 85. | The Model State Vital Statistics Act, published by the National Center for Health Statistics, expressly authorizes the amendment of the sex designation on birth certificates in a manner consistent with a transgender person's gender identity. | Gonzalez-Pagan Decl., Ex. Q at 10; *see also* Gonzalez-Pagan Decl., Ex. B (RFA No. 7). |
| | Response: Disputed. The Model State Vital Statistics Act, as cited by Plaintiffs, allows the amendment of | |

| | | |
|---|---|---|
| | sex only [u]pon receipt of a certified copy of an order of (a court of competent jurisdiction) indicating the sex of an individual born in the State has been changed by a surgical procedure...." Defendants' responses to Plaintiffs' requests for admissions, also cited by Plaintiffs, note this. | |
| | Plaintiffs' Reply: Although Defendants dispute this factual statement, their dispute is not responsive to the statement and therefore may not create a genuine issue of material fact. The language of the Model Act quoted by Defendants merely identifies the evidentiary materials that a transgender person must submit in order to obtain an amendment to the sex designation on a birth certificate. Plaintiffs' statement that the Model Act expressly authorizes the amendment of the sex designation on the birth certificates of transgender persons is therefore not adequately controverted. Moreover, additional evidence supports the statement. *See, e.g.*, Lefler Tr. 83:11-24. | |
| 86. | Tennessee's Birth Certificate Policy is inconsistent with the Model State Vital Statistics Act. | Gonzalez-Pagan Decl., Ex. B (RFA Nos. 7, 9). |
| | Response: Disputed. As noted in the cited materials, the Model State Vital Statistics Act is, by its own account, "guidance" only. Tennessee statutory and regulatory law, in many respects, contains the same or similar language to the Model Act. | |
| | Plaintiffs' Reply: Additional evidence is found in the deposition testimony of Edward Gray Bishop, Tennessee's State Registrar. *See* Bishop Tr. 73:9-23 ("Q: Would you agree that Tennessee's laws and regulations are inconsistent with the guidance of the CDC [in the Model State Vital Statistics Act]? . . . A: They do not match. Correct."). Although Defendants purport to dispute this statement, they do not actually deny the facts contained therein. Defendants' characterization of the Model Act as "guidance" is immaterial and not responsive to the statement. Indeed, Tennessee's Director of Vital Statistics testified that it is "important for the Tennessee Office of Vital Records to follow guidance from NCHS [National Center for Health Statistics]." Lefler Tr. 79:1-6. Moreover, Defendants' dispute that some other unidentified provisions of Tennessee statutory and regulatory law contain language that is the same or similar to language found in the Model Act is unresponsive and fails to controvert Plaintiffs' statement that the *Birth Certificate Policy* is inconsistent with the Model Act. | |
| **V.** | **OTHER TENNESSEE POLICIES REGARDING IDENTITY DOCUMENTS** | |
| 87. | Tennessee permits transgender persons to correct the sex designation on their drivers' licenses in a manner consistent with their gender identity. | Gore Decl. ¶ 12; Combs Decl. ¶¶ 11, 17; Gonzalez-Pagan Decl., Ex. B (RFA No. 5); Tenn. Comp. R. & Regs. 1340-01-13-.12(6). |

43

| | | |
|---|---|---|
| | **Response:** Undisputed for purposes of this motion. | |
| 88. | The State of Tennessee requires persons, in a variety of contexts, to produce their birth certificates to access and enjoy a host of government benefits and to participate in public and private life. | *See, e.g.*, Tenn. Code Ann. § 4-58-103(c)(2) (food stamps); Tenn. Code Ann. § 50-1-703(a)(1)(B) (employers to keep some proof of citizenship on file for their employees); Tenn. Comp. R. & Regs. § 0770-01-05-.13(2)(a) (housing assistance); Tenn. Comp. R. & Regs. § 0450-01-.05 (requiring presentation of birth certificate for application as licensed clinical counselor); *see also* Gonzalez-Pagan Decl., Ex. B (RFA No. 11) ("Defendants admit that some Tennessee statutes and regulations may contemplate the use of birth certificates as personal identification documents."). |
| | **Response:** Disputed. Except for the requirements for licensure as a licensed clinical counselor, all of the other authorities cited permit a variety of documents to be used. A birth certificate is only one of the list of acceptable documents. Defendants object because the citation to Exhibit B to the Gonzalez-Pagan Declaration does not support this statement. Finally, Defendants object because this statement is not factual, but states a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F.3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981). | |
| | **Plaintiffs' Reply:** The proffered statement is supported by the record evidence, including Exhibit B to the Gonzalez-Pagan Declaration in which Defendants "admit that some Tennessee Statutes and regulations may contemplate the use of birth certificates as personal identification documents." *See* Gonzalez-Pagan Decl., Ex. B (RFA No. 11); *cf.* Bishop Tr. 26:21-23 (agreeing that a birth certificate is used as an "identification document"); *id.* at 32:16-19 (agreeing that "a birth certificate is a form of identification used for numerous purposes"); Lefler Tr. 42:25-43:3 ("I believe [a birth certificate] can be used as an identification document. I also understand that it can be used as a document to establish citizenship[.]"). | |

As Plaintiffs' cited record evidence demonstrates, access to certain public benefits and participation in public and private life requires verification of a person's identity and/or citizenship, which may be established with a birth certificate. Indeed, the statement of fact is entirely consistent with Tennessee's *own* "Handbook on Birth Registration and Fetal Death (Stillbirth) Reporting," which states that, "Throughout life, a person uses his or her birth certificate to prove age, parentage, and citizenship. *Birth certificates are needed for entrance to school, voter registration, and for obtaining a driver's license, marriage license, passport, veterans' benefits, public assistance, or social security benefits*." Ex. 4 to Bishop Tr. (emphasis added). As an official publication of the Tennessee Office of Vital Records, the Handbook is self-authenticating pursuant to Federal Rule of Evidence 902(5).

Lastly, whether persons are also permitted to produce a document other than a birth certificate is irrelevant and does not controvert the proffered statement. Indeed, it ignores the reality that not every person has the means, need, or capacity to obtain alternative forms of identification, such as a U.S. Passport.

Defendants' objection that the statement is a legal conclusion rather than a fact is without merit and should be disregarded. Plaintiffs' statement merely describes requirements set forth in certain Tennessee statutes and regulations and, as such, constitutes a factual statement.

| | VI. | THE HARMS INFLICTED UPON TRANSGENDER PERSONS, INCLUDING PLAINTIFFS, BY THE BIRTH CERTIFICATE POLICY | |
|---|---|---|---|
| 89. | | Being unable to correct the gender marker on one's identity documents, including one's birth certificate, means that transgender people are forced to display documents that indicate their birth-assigned sex (typically assumed based only upon the appearance of genitalia at birth), rather than their actual sex as determined by their gender identity and their lived experience. This discordance creates a myriad of deleterious social and psychological consequences. | Ettner Decl. ¶ 40; Taylor Decl. ¶¶ 50, 52. |
| | | Response: Disputed. As discussed in response to #88, above, transgender persons would often have the option to present other documentation such as a driver's license or passport. Defendants also dispute this statement because Dr. Taylor's Declaration, cited above, does not support this statement.<br><br>In addition, Defendants dispute that a person's "sex" is "determined by their gender identity and their lived experience." "Sex" and "gender identity" are distinct terms. | |
| | | Plaintiffs' Reply: The statement is supported by the record evidence. In fact, it is a *verbatim* recitation of Dr. Ettner's testimony. *See* Ettner Decl. ¶ 40 ("Being unable to | |

45

correct the gender marker on one's identity documents, including one's birth certificate, means that transgender people are forced to display documents that indicate their birth-assigned sex (typically assumed based only the appearance of genitalia at birth), rather than their actual sex as determined by their gender identity and their lived experience. This discordance creates a myriad of deleterious social and psychological consequences."); *see also* Taylor Decl. ¶ 50 ("When a transgender person's legal documentation does not accurately reflect their identity, that transgender person is at risk for workplace discrimination, housing discrimination, voting discrimination, health care discrimination and even violence."); *id.* at ¶ 52 ("Gender dysphoria can worsen if a transgender person has discordant documentation, where some documents accurately reflect their gender identity and others do not."). Defendants' contention that Dr. Taylor's Declaration, which identifies several deleterious social and psychological consequences of discordant identity documents, does not support this statement is plainly erroneous.

The record evidence also amply supports the notion that a person's gender identity is the primary determinant of that person's sex. *See* Taylor Decl. ¶ 30 ("From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex."); Ettner Decl. ¶ 20 ("When there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation."); Ettner Tr. 55:3-4 ("And when there is that departure, gender identity is the determinant of that individual's sex.").

Defendants' dispute is not rooted in any record evidence.

Additionally, Defendants' dispute relating to the presentation of other documentation is non-responsive and not supported by the record. Whether transgender persons may, in some circumstances, be permitted to present documentation other than a birth certificate does not controvert that, in circumstances where a birth certificate must be presented, transgender persons are forced to display documents that indicate their birth-assigned sex rather than their actual sex. It also ignores the reality that not every person has the means, need, or capacity to obtain alternative forms of identification, such as a U.S. Passport.

| 90. | The inability access identity documents, such as birth certificates, that accurately reflect one's sex is harmful and exacerbates gender dysphoria, kindling shame and amplifying fear of exposure, as the *sine qua non* of the gender dysphoria diagnosis is the desire to be regarded in accordance with one's true sex as determined by one's gender identity. | Ettner Decl. ¶¶ 39, 42, 43, 46; Taylor Decl. ¶ 44, 52. |
|---|---|---|
| | Response: Defendants dispute that a person's "true sex" is "determined by one's gender identity." This statement is otherwise undisputed for purposes of this motion. | |
| | Plaintiffs' Reply: Additional record evidence supports the proffered statement. *See* Taylor Tr. 26:23-25 ("I would say that I have many patients who [sic] gender | |

dysphoria has worsened because of discordant documentation."); *id.* at 27:15-23, 28:1-17 (testifying that the gender dysphoria of "many patients" has worsened because they some or all of their identity documents do not accurately reflect their gender identity); Ettner Tr. 48:2-8 ("Studies from 2015 and 2020 indicate that having congruent gender identity documents reduces psychopathy and suicidal ideation, planning, significantly. And the 2020 study was, I understand, 22,000 individuals leading the logics to conclude that legal gender affirmation is a determinant of mental health."); Combs Tr. 42:18-20 ("[I]t is painful and difficult for me to have documentation that is not reflective of me."); L.G. Tr. 55:9-20 ("Whenever I received the denial, whenever I got my birth certificate back and it was still incorrect . . . I felt so hopeless, like it would never be fixed. . . And I'm just so scared that I'm going to have to show it to somebody; that they are going to ask to see it. I just want it to be fixed."); *see also id.* at 45:23-46:2.

The record evidence amply supports the notion that a person's gender identity is the primary determinant of that person's sex. *See* Taylor Decl. ¶ 30 ("From a medical perspective, in the event that one's gender identity does not match their sex assigned at birth, i.e. in transgender people, one's gender identity should be the determining factor of their sex."); Ettner Decl. ¶ 20 ("When there is divergence between anatomy and identity, one's gender identity is paramount and the primary determinant of an individual's sex designation."); Ettner Tr. 55:3-4 ("And when there is that departure, gender identity is the determinant of that individual's sex.").

Defendants' dispute is not rooted in any record evidence.

| 91. | The forced disclosure of the transgender status of Plaintiffs and other transgender persons by way of an inaccurate birth certificate exposes them to prejudice, discrimination, distress harassment, and violence. | Ettner Decl. ¶¶ 42, 43; Taylor Decl. ¶ 51, 53-55; Gore Decl. ¶ 20; Combs Decl. ¶¶ 15, 17; L.G. Decl. ¶¶ 16, 20; K.N. Decl. ¶ 20 . |
| --- | --- | --- |
| | <u>Response</u>: This statement is undisputed for purposes of this motion only as it pertains to ¶ 20 of Plaintiff L.G.'s Declaration. Defendants otherwise object to this statement because it is not supported by the materials cited. In addition, Dr. Taylor, when questioned about the cited statements during her deposition, was unable to support these statements. | |
| | <u>Plaintiffs' Reply</u>: The statement is supported by the materials cited, as well as additional record evidence. *See* Ettner Decl. ¶ 43 ("An inability to access identity documents that accurately reflect one's true sex is harmful and exacerbates gender dysphoria, kindling shame and amplifying fear exposure. Inaccurate documents can cause an individual to isolate, in order to avoid situations that might evoke discrimination, ridicule, accusations of fraud, harassment, or even violence— experiences that are all too common among transgender people."); Taylor Dec. ¶ 51 ("For example, according to a 2015 study, approximately one-third of individuals who have shown identification documents with a name or gender that did not match their gender presentation reported negative experiences, such as being harassed, | |

47

denied services, and/or attacked."); *id.* at ¶¶ 53-55 (identifying "several negative downstream ramifications" of "incorrect documentation"); Gore Decl. ¶ 20 ("For example, I have been outed as a transgender woman to several employers to whom I have had to present my birth certificate with the incorrect gender marker and asked invasive personal questions."); Combs Decl. ¶ 15 ("[B]ecause my birth certificate incorrectly identifies me as male, my first marriage to a man was not recognized as legal and our divorce was, therefore complicated. . . In order to prevent public disclosure of my gender identity and resulting harm to my business, I was forced to agree to an uncontested divorce in which my former husband retained control of our joint assets); *id.* at ¶ 17 ("I also had a difficult time obtaining a passport because of inconsistent identity documents."); L.G. Decl. ¶ 16 ("Following multiple instances of invasive questioning and humiliation at the Tennessee Department of Motor Vehicles (DMV), the DMV denied my requests to correct the gender marker on my driver's license. . . . The process of correcting the gender marker on my driver's license was painful, humiliating, and traumatizing. I believe that were I permitted to have an accurate birth certificate, the process of correcting my driver's license would have been straightforward, and would not have subjected me to this kind of humiliation and harassment."); K.N. Decl. ¶ 20 ("I have, for example, faced invasive questioning when updating my driver's license and passport because I had to present my Tennessee birth certificate, which incorrectly identifies my sex as male."); *see also* Ettner Tr. 48:14-24 ("Revealing incongruent documents does cause those issues [e.g., psychopathy and suicidal ideation]. For example, in my own practice I had a patient who had to reveal to a civil servant a document that was not corrected and she was humiliated publicly, harassed, and went home and shot herself in the head; committed suicide. So exposure, violation of privacy, the revelation of information that an individual wants to keep secret, if it is noncongruent leads to fear, anxiety, or worse. And that anxiety over time is corrosive to physical and mental health."); Combs Tr. 18:22-25:21 (discussing complications with divorce relating to inaccurate birth certificate); *id.* at 34:12-36:1 (explaining challenges of obtaining passport; "So in order to receive the passport, I was required to have my genitals examined by a physician for no other purpose."); *id.* at 42:18-25-43:24 (explaining that "it is painful and difficult" to have an "inaccurate" birth certificate that does not reflect her identity); *id.* at 44:25-45:6 (submitting birth certificate to Tennessee School of Beauty "left me feeling very vulnerable"); *id.* at 47:1-5 ("[T]he reality of discrimination to people that have inconsistent documentation on who they are . . . is a very real possibility for me."); K.N. Tr. 33:6-18 (describing questioning of her birth certificate by agent at passport office as "invasive"); *id.* at 44:6-10 ("I described the incidence [sic] already where I showed my birth certificate. I was not physically assaulted in those instances, but I did feel a certain violence just in the violation that I did need to justify the documents. I would also say I have seen harassment for showing identity documents that do ultimately stem from my birth certificate."); Gore Tr. 31:21-32:2 ("And I believe that not having a birth certificate prevents me from obtaining a job or going to school without the fear of discrimination because someone who otherwise wouldn't know that I'm transgender knows that I'm transgender because my birth certificate says so."); *id.* at 46:19-25 (testifying that, after her transgender status was disclosed, she has been subjected to awkward, deeply personal and/or invasive

questions "about surgery, about the process of transitioning, about my sexuality"); L.G. Tr. 39:18-52:11 (recounting several "instances of hostility and discrimination and violence" arising from presentation of inconsistent identity documents); *id.* at 55:9-20 ("Whenever I received the denial, whenever I got my birth certificate back and it was still incorrect. . . I felt so hopeless, like it would never be fixed. And I - - I remember seeing that - - something in the news about the State not changing it for anybody - - for trans women like me. And I'm just so scared that I'm going to have to show it to somebody; that they are going to ask to see it. I just want it to be fixed.").

Defendants' assertion that Dr. Taylor was unable to support this statement when questioned about it during her deposition inaccurately characterizes Dr. Taylor's testimony, which identifies several examples of transgender persons being exposed to prejudice discrimination, distress, harassment and/or violence as a consequence of presenting inaccurate identity documents. *See, e.g.*, Taylor Tr. 29:15-18 (college students not assigned to appropriate housing); *id.* at 30:22-31:4 (challenges at pharmacy); *id.* at 31:6-13 (challenges at DMV); *id.* at 31:21-32:21 (challenges relating to health insurance).

| 92. | Having a birth certificate incorrectly identifying the sex of a transgender person is also a significant barrier to their ability to function successfully as their true self in seeking employment and volunteer opportunities, and gaining access to other private and public services, entitlements, and benefits. | *See, e.g.*, Taylor Decl. ¶¶ 50, 51, 53-55, 61; Gore Decl. ¶ 20; Combs Decl. ¶ 18; L.G. Decl. ¶ 20; K.N. Decl. ¶ 20. |
|---|---|---|
| | Response: This statement is undisputed for purposes of this motion only as it pertains to ¶ 20 of Plaintiff L.G.'s Declaration. Defendants otherwise dispute this statement as the materials cited do not support this broad conclusion. In addition, the cited material from Dr. Taylor's Declaration does not support the statement and when questioned about the cited statements during her deposition, Dr. Taylor was unable to support these statements. | |

| | | |
|---|---|---|
| | <u>Plaintiffs' Reply</u>: The statement is supported by the materials cited, as well as additional record evidence. *See* Taylor Decl. ¶ 50 ("When a transgender person's legal documentation does not accurately reflect their identity, that transgender person is at risk for workplace discrimination, housing discrimination, voting discrimination, health care discrimination and even violence."); *id.* at ¶ 51 ("For example, according to a 2015 study, approximately one-third of individuals who have shown identification documents with a name or gender that did not match their gender presentation reported negative experiences, such as being harassed, denied services, and/or attacked."); *id.* at ¶¶ 53-55 (identifying "several negative downstream ramifications" of "incorrect documentation"); Gore Decl. ¶ 20 ("For example, I have been outed as a transgender woman to several employers to whom I have had to present my birth certificate with the incorrect gender marker and asked invasive personal questions."); Combs Decl. ¶ 18 ("The inconsistency among my identity documents continues to function as a barrier. I recently completed training to participate in the Trans Buddy Program at Vanderbilt University Medical Center. All program participants are required to submit immunization records. I experienced difficulty correcting my immunization records, many of which are recorded under an incorrect name and gender marker."); K.N. Decl. ¶ 20 ("I have, for example, faced invasive questioning when updating my driver's license and passport because I had to present my Tennessee birth certificate, which incorrectly identifies my sex as male."); Gore Tr. 74:10-75:20 (discussing difficulties applying for SNAP or food stamp benefits); *id.* at 64:5-21 (discussing difficulties with obtaining housing). This statement is also supported by additional record evidence cited in Pls.' Reply in support of Statement of Fact No. 91.<br><br>Defendants' assertion that Dr. Taylor was unable to support the statement when questioned about it during her deposition inaccurately characterizes Dr. Taylor's testimony, which identifies several examples of the challenges transgender persons encounter because of incorrect and/or inconsistent identity documents. *See, e.g.*, Taylor Tr. 29:15-18 (college students not assigned to appropriate housing); *id.* at 30:22-31:4 (challenges at pharmacy); *id.* at 31:6-13 (challenges at DMV); *id.* at 31:21-32:21 (challenges relating to health insurance). | |
| 93. | For example, Ms. Gore has been outed as a transgender woman to several employers and subjected to invasive personal questions when she has had to present her birth certificate with the incorrect gender marker. Knowing that she would have to present an inaccurate birth certificate has dissuaded Ms. Gore from applying for jobs and resuming her education, because doing so would force her to disclose her transgender status. | Gore Decl. ¶ 20. |
| | <u>Response</u>: Disputed. During her deposition, Ms. Gore listed only two employers to whom she was outed, neither of which declined to hire her. She stated that conversations about surgery occurred after she was hired and were "conversational" although | |

| | | |
|---|---|---|
| | uncomfortable. In terms of her reluctance to apply for jobs, she testified that she preferred obtaining a job with someone who owned their own business because, "in addition to them paying more and more benefits, they were more relaxed on documentation, and they would really only require maybe a Social and identification, or just identification." She acknowledged that any concerns she had about resuming her education were speculative. | |
| | Plaintiffs' Reply: The statement is supported by the record evidence. Defendants' characterization of Ms. Gore's testimony is inaccurate, incomplete, and not supported by the record evidence. In addition to identifying two employers to whom she was outed, Ms. Gore testified that she was subjected to awkward, deeply personal, and invasive questions by employers. *See* Gore Tr. 46:19-47:21 (recalling that she was subjected to "[q]uestions about surgery, about the process of transitioning, about [her] sexuality…" by "immediate supervisors"). Ms. Gore's assertion that certain conversations took place after she was hired and were "conversational" does not controvert the proffered statement that she has been outed to employers and subjected to invasive personal questions as a result of having had to present her birth certificate. Similarly, Ms. Gore identified several jobs she did not apply to because she did not want to present a birth certificate, including Walgreens, Kroger, UPS, LeBonheur, and FedEx Forum. *See id.* at 48:23-50:11. Finally, Defendants' assertion that Ms. Gore acknowledged that any concerns she has about resuming her education were speculative misconstrues her testimony. Ms. Gore testified that she didn't want to speculate as to whether she would have been denied state funding to resume her college education. *See id.* at 72:6-16. However, she *also* testified that knowing that she would have to present an inaccurate birth certificate that discloses her transgender status dissuaded from resuming her education. *See id.* at 71:5-13 ("I did not want to go back to school because Tennessee had a, I believe it's called the Tennessee reconnect program, where they pay for two years of college for individuals who dropped out of school or did not complete their program. I wanted to enter back into school through that program and I had to submit my birth certificate and I just didn't feel - - I didn't feel whole submitting that, so I didn't enter into that program."); *id.* at 71:24-72:5 ("…I felt as though I wasn't -- I wasn't prepared mentally to go through that process because I didn't know what the outcome would be, or what their process would look like as far as how much discrimination am I going to have to face throughout this, or how many hurdles are going to be put in front of me because I am transgender."). | |
| 94. | The forced disclosure of a person's transgender status through inaccurate identification documents, such as a birth certificate, violates a transgender person's privacy—the right to maintain stewardship of personal and medical information—and their ability to control whether, when, how, and to whom to disclose one's transgender status. | Ettner Decl. ¶ 46; Taylor Decl. ¶¶ 57-60. |

51

| | | |
|---|---|---|
| | <u>Response:</u> Defendants dispute that a birth certificate that accurately recorded a person's biological sex at the time of birth is "inaccurate." Defendants also dispute this statement as it is not supported by the materials cited, with the exception of the statement in ¶ 60 of Dr. Taylor's Declaration. Defendants object to that statement to the extent it is an attempt to define a "right of privacy" as a legal concept. To the extent that it is such an attempt, it states a legal conclusion and is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co*., 650 F. 2d 118, 121 (6th Cir. 1981). | |

<u>Plaintiffs' Reply:</u> The record evidence supports this statement. Specifically, Dr. Ettner testifies that "[p]rivacy, and the ability to control whether, when, how, and to whom to disclose one's transgender status, is essential to accomplishing [therapeutic aims]." Ettner Decl. ¶ 46; *see also id.* ¶ 47 ("Thus, when an individual implements a social role transition, legal recognition of the transition is vital and an accurate birth certificate is a crucial aspect of that recognition, in large part because congruent identity documentation confers privacy—the right to maintain stewardship of personal and medical information—allowing an individual to live a safe and healthy life."). Dr. Taylor expresses agreement with the World Professional Association for Transgender Health (WPATH) Identity Recognition Statement, noting that "[a] patient's right to privacy includes what they choose to do with their own documentation." *See* Taylor Decl. ¶¶ 57-60; *see also* Taylor Tr. 38:15-20 ("I – knowing the fact that 48 other states in the country allow this and also have a responsibility to uphold vital statistics, I feel that Tennessee's response is, as mentioned in my testimony, an act of discrimination infringing on their rights to privacy."). Dr. Taylor's testimony regarding a "patient's right to privacy" is not an attempt to define "right of privacy" as a legal concept and, as such, does not state a legal conclusion.

Defendants' dispute regarding the accuracy of transgender persons' birth certificates is not rooted in any record evidence. Defendants try to equate the inaccurate term "biological sex" (*see* Pls.' Reply in support of Statement of Fact No. 7) with the sex recorded on a person's birth certificate, which is based on the observation of a person's external genitalia, but provide no evidence to support such proposition. Defendants have proffered no evidence to dispute Dr. Ettner's and Dr. Taylor's testimony that external genitalia alone—the critical criterion for assigning sex at birth—is not an accurate proxy for a person's sex, that the primary determinant of a person's sex is the person's gender identity, and that a transgender woman's sex is female (even though she was assigned the sex of male at birth). *See* Plaintiffs' Reply in support of Statements of Fact 2, 6 through 8.

Defendants' *ipse dixit* is not sufficient to dispute Plaintiffs' proffered statement.

| 95. | Being denied birth certificates that accurately reflect their sex, as determined by their gender identity, is | Ettner Report ¶¶ 45-47; Taylor Report ¶¶ 52, 61; |

| | |
|---|---|
| psychologically and emotionally harmful to transgender persons born in Tennessee, including Plaintiffs. | Gore Decl. ¶ 22; Combs Decl. ¶ 21; L.G. Decl. ¶ 24; K.N. Decl. ¶ 21. |
| Response: Defendants dispute this statement as it is not supported by the materials cited. The cited provisions of the Plaintiffs' Declarations contain only conclusory statements, nearly identical in each declaration. The specific fact requirement of Rule 56(c)(4) of the Fed. R. Civ. P. is not satisfied by such conclusory statements. *LaPine v. Savoie,* 2017 WL 6764085, *3 (6th Cir. 2017) (citing *Stine v. State Farm Fire & Casualty Co.*, 428 Fed. Appx. 549, 550 (6th Cir. 2011). Finally, the Ettner Report and Taylor Report cited are not in the record. | |

Plaintiffs' Reply: The record evidence supports this statement. Defendants' assertion that the Ettner Report and Taylor Report are not in the record is incorrect and disingenuous. The Ettner Report refers to the Expert Declaration of Dr. Randi C. Ettner, Ph.D., which is appended to Plaintiffs' Motion for Summary Judgment as Exhibit 1 (ECF Doc. 69-1). The Taylor Report refers to the Expert Declaration of Dr. Shayne Sebold Taylor, M.D., which is appended to Plaintiffs' Motion for Summary Judgment as Exhibit 2 (ECF Doc. 69-2).

Dr. Taylor states that "[g]ender dysphoria can worsen if a transgender person has discordant documentation, where some documents accurately reflect their gender identity and others do not." Taylor Decl. ¶ 52. Dr. Taylor further states that "[h]aving inconsistent or incongruent documentation can worsen the severity of gender dysphoria by limiting an individual's ability to enjoy the rights and opportunities equal to those around them." *Id.* ¶ 61. Dr. Ettner states that "[f]or the transgender individual, an inaccurate birth certificate can transform a mundane interaction into a traumatic experience. Repeated negative experiences inevitable erode resilience, creating an ingravescent course of gender dysphoria and attendant psychiatric disorders." Ettner Decl. ¶ 45; *see also id.* at ¶ 46 ("Understandably, the desire to make an authentic appearance is of great concern for transgender individuals, as the *sine qua non* of the gender dysphoria diagnosis is the desire to be regarded in accordance with one's true sex as determined by one's gender identity."); *id.* at ¶ 47 (describing an "accurate birth certificate" as a "crucial aspect" of a transgender person's transition).

The cited statements in Plaintiffs' Declarations are statements of material fact. *See, e.g.*, Gore Decl. ¶ 22 ("Being denied a birth certificate that accurately reflects my sex, as determined by my gender identity, is psychologically and emotionally harmful to me."); *see also* Combs Decl. ¶ 21; L.G. Decl. ¶ 24; K.N. Decl. ¶ 21. That all Plaintiffs have been similarly harmed by being denied a birth certificate that does not accurately reflect their sex, as determined by their gender identity, does not render their statements "conclusory."

Moreover, the record contains ample additional evidence detailing the psychological and emotional harm experienced by transgender persons, including Plaintiffs, as a consequence of being denied accurate birth certificates.

For example, Dr. Ettner recounted the following:

> A. Revealing incongruent documents does cause [anxiety, depression, suicidality, and other attendant mental health issues]. For example, in my own practice I had a patient who had to reveal to a civil servant a document that was not corrected and she was humiliated publicly, harassed, and went home and shot herself in the head; committed suicide. So exposure, violation of privacy, the revelation of information that an individual wants to keep secret if it is noncongruent leads to fear, anxiety, or worse. And that anxiety over time is corrosive to physical and mental health.

> Q. Do you recall what that identity document was?

> A. I don't recall but I believe it was a birth certificate. She had left the state and was moving to a new state and had to produce identity documents. And that's when her, what should have been a mundane transaction actually became a traumatic one with a lethal outcome.

Ettner Tr. 48:14-49:7. *See also, e.g.*, Ettner Tr. 60:21-61:3 (Q: "Does having incongruent gender ID documents, without ever having to reveal them, by itself cause any harm for transgender individuals? A: "Yes. Yes, indeed. And there have been studies that document that. And we know that the fear of exposing that can actually increase an individual's acquiring hypertension due to the intersectionality of cardiac reactivity and stress."); Combs Tr. 42:18-20 ("[I]t is painful and difficult for me to have documentation that is not reflective of me."); *id.* at 43:22-24 ("It was a little dehumanizing to me to present this information to someone that was inaccurate about me."); Gore Tr. 68:4-10 ("And then also just cause me harm when I'm having to present a birth certificate for whatever it is, whether it is for resources or services, higher education, employment, buying a house, renting an apartment, wherever I would need to submit my birth certificate, I don't have one that reflects everything on all of the other identifying documents."); L.G. Tr. 44:5-12 (describing unsuccessful attempt to correct gender marker on her driver's license; "And I was so ashamed. I didn't want to show anybody my license [containing the wrong gender marker]."); *id.* at 46:15-48:11 (describing unsuccessful attempt to correct gender marker on her driver's license; "It was so shameful to pull that out and have people ask me questions about my driver's license being wrong."); *id.* at 52:1-6 (describing efforts to obtain driver's license with a correct gender marker; "And I felt so defeated. I just felt broken. . . "); *id.* at 55:6-20 ("Whenever I received the denial, whenever I got my birth certificate back and it was still incorrect. . . I felt so hopeless, like it would never be fixed. And I -- I remember seeing that -- something in the news about the State not changing it for anybody -- for trans women like me. And I'm just so scared that I'm going to have to show it to somebody; that they are going to ask to see it. I just want it to be fixed."); *see also* Plaintiffs' Reply in support of Statements of Fact Nos. 90 through 94.

54

| | | |
|---|---|---|
| | Merely calling Plaintiffs' statements "conclusory" is not a sufficient counter to the alleged fact, which should be deemed admitted as not adequately controverted. | |
| 96. | Finally, by forcing Plaintiffs to have birth certificates incongruent with their gender identity—despite their social and medical transitions, and in defiance of their legal name changes and corrections to their other Tennessee and Federal identity documents—Defendants interfere with Plaintiffs' ability to communicate to others who they are. | Gore Decl. ¶¶ 14, 18; Combs Decl. ¶¶ 14, 20; L.G. Decl. ¶¶ 16, 20, 27; K.N.'s Decl.¶¶ 18, 20, 24; *see also* Ettner Decl. ¶ 46. |
| | Response: Defendants dispute this statement, as the materials cited do not support this conclusory statement that "Defendants interfere with Plaintiffs' ability to communicate to others who they are." In addition, the Declaration of Plaintiff K.N. does not have a ¶ 24. | |
| | Plaintiffs' Reply: The cited materials support the statement regarding Defendants' interference with Plaintiffs' ability to communicate to others who they are. The cited provisions of Plaintiffs' declarations assert that, because of Tennessee's Birth Certificate Policy, each of their respective birth certificates incorrectly identifies their sex as male, despite their being women. Having admitted that Plaintiffs are female and that their birth certificates identify them as male, Defendants cannot reasonably dispute—and cite no record evidence to controvert—that Plaintiffs' birth certificates interfere with their ability to communicate to others that they are women. Merely calling the statement "conclusory" is not a sufficient counter to the alleged fact, which should be deemed admitted as not adequately controverted.

Additional record evidence further supports the proffered statement of fact.

For example, Ms. Gore refrained from entering back to school through the Tennessee Reconnect program because, as she testified, "I had to submit my birth certificate and I just didn't feel -- I didn't feel whole submitting that, so I didn't enter into that program." Gore Tr. 71:9-13.

Ms. Combs testified how "it is painful and difficult for [her] to have documentation that is not reflective of [her]," and how "the birth certificate being inaccurate to who" she is has forced her "to tell [her] story in situations [she] did not want to[,]" including "when [she] was in a bank and they required this documentation that was no longer congruent with who [she] was or other information that [she] had, and [she] felt it necessary to explain why it didn't match." Combs Tr. 42:18-43:6.

Similarly, L.G. testified that she is "just so scared that [she's] going to have to show [her birth certificate] to somebody; that they are going to ask to see it," because it is "still incorrect." L.G. Tr. 55:9-20. Indeed, L.G. has testified that the "inability to openly identify and present as a woman and *to be recognized as a woman*," is "crushing." *Id.* at 32:19-21.

Lastly, K.N. testified, "I had to present my birth certificate with my incorrect name and incorrect gender, and I had to explain myself and I had to explain Tennessee's policy around this." K.N. Tr. 31:4-7; *see also id.* at 33:6-12. K.N. has thus "avoided | |

| | | |
|---|---|---|
| | using [her] birth certificate, given that it does not correctly identify [her]." *Id.* at 42:3-4. | |
| | Plaintiffs' amend their citation to the Declaration of Plaintiff K.N. to remove paragraph 24. | |
| 97. | As a result of the Birth Certificate Policy, Plaintiffs are faced with a consistent reminder that the State of Tennessee does not respect them for who they are and does not recognize their personhood. | Ettner Decl. ¶¶ 43, 44; Gore Decl. ¶ 22; Combs Decl. ¶ 21; L.G. Decl. ¶ 24; K.N. Decl. ¶ 21. |
| | Response: Defendants object to this statement. It is not factual; it is an opinion and/or is conclusory. The Ettner Declaration and Gore Declaration do not support the statement. The Declarations of the remaining Plaintiffs contain nearly identical conclusory opinions. | |

Plaintiffs' Reply: The cited record evidence supports the statement. *See, e.g.*, Ettner Decl. ¶ 43 (describing an "inability to access identity documents that accurately reflect one's true sex" as resulting in transgender persons "[b]eing stripped of one's dignity, privacy, and the ability to move freely in society…."); Gore Decl. ¶ 22 ("Being denied a birth certificate that accurately reflects my sex, as determined by my gender identity, is psychologically and emotionally harmful to me. My birth certificate is a persistent reminder that the State of Tennessee does not respect me for whom I am …"); *see also* Pls. Reply in support of Statement of Fact No. 96.

Defendants' objection is not supported by the record. Defendants admit that Plaintiffs are female and that their birth certificates nonetheless identify them as male. That the State of Tennessee does not respect them and recognize their personhood as women is a factual statement, not a conclusory opinion.

| 98. | The Birth Certificate Policy stigmatizes transgender persons born in Tennessee, such as Plaintiffs, as illegitimate or unworthy of recognition. | Ettner Decl. ¶¶ 43, 44; Gore Decl. ¶ 22; Combs Decl. ¶ 21; L.G. Decl. ¶¶ 18, 24; K.N. Decl. ¶ 21. |
|---|---|---|
| | Response: Defendants dispute this statement. The materials cited do not support the statement, except for the conclusory language at ¶ 18 of the Declaration of L.G. that she is stigmatized. | |

Plaintiffs' Reply: The statement is supported by the record evidence. Specifically, Dr. Ettner explains how the inability to access identity documents that accurately reflect one's true sex results in transgender people suffering both enacted and felt stigma. *See* Ettner Decl. ¶¶ 43, 44. Additionally, Plaintiffs' declarations, each of which states that they are subjected to psychological harm, emotional harm, and potential physical harm as a result of being denied a birth certificate that accurately reflects their sex, as determined by their gender identity, support the assertion that they are stigmatized by the Birth Certificate Policy.

| | | |
|---|---|---|
| | In addition, Dr. Ettner testified that transgender people "[e]xperience distress because they violate social norms and are subject to *humiliation*, *stigmatization*, discrimination, harassment, violence." Ettner Tr. 47:10-12 (emphasis added). And that, "[r]evealing incongruent documents does cause those issues." *Id.* at 48:14-15. Indeed, Dr. Ettner cited a 2020 study that revealed "that legal gender affirmation is a determinant of mental health." *Id.* at 48:2-8. | |
| | Defendants' suggestion that the materials cited do not support the statement because they do not use the word "stigmatized" appears to be about semantics. The record is replete with evidence that the Birth Certificate Policy stigmatizes transgender people, such as Plaintiffs. *See* Pls.' Reply in support of Statements of Fact Nos. 89 through 97. | |
| 99. | The Birth Certificate Policy inhibits the ability of transgender persons born in Tennessee, including Plaintiffs, to fully participate in our society. | *See, e.g.,* Gore Decl. ¶ 20; Combs Decl. ¶¶ 15, 17, 18; L.G. Decl. ¶ 20; K.N. Decl. ¶ 20; Taylor Decl. ¶¶ 48, 55. |
| | Response: Defendants dispute this statement as the materials cited do not support the statement. In general, the cited material discusses the need for accurate "identity documents." In addition, Plaintiff Gore's statement in ¶ 20 of her Declaration is disputed. During her deposition, Ms. Gore listed only two employers to whom she was outed, neither of which declined to hire her. She stated that conversations about surgery occurred after she was hired and were "conversational" although uncomfortable. In terms of her reluctance to apply for jobs, she testified that she preferred obtaining a job with someone who owned their own business because, "in addition to them paying more and more benefits, they were more relaxed on documentation, and they would really only require maybe a Social and identification, or just identification." She acknowledged that any concerns she had about resuming her education were speculative. | |
| | Plaintiffs' Reply: The cited record evidence supports the notion that the inability to obtain an accurate birth certificate inhibits one's ability to fully participate in society. Dr. Taylor expressly states that "[t]ransgender people may feel that they are unable to participate in their communities, neighborhoods, schools or jobs without having documentation that reflects their gender identity." Taylor Decl. ¶ 55; *see also id.* at ¶ 48 ("Identity documentation is required in all aspects of our lives. From applying for health insurance, to enrolling our children in school, to getting on an airplane, to applying for a credit card or a marriage license."); Combs Decl. ¶¶ 15, 17, 18 (describing complications with her divorce and obtaining a passport because of incorrect birth certificate); K.N. Decl. ¶ 20 (describing having been harassed, inappropriately touched, and discriminated against in the workplace because of | |

incorrect birth certificate); L.G. Decl. ¶ 20 (describing having faced invasive questioning because of incorrect birth certificate).

The record also abounds with additional evidence regarding the ways in which the Birth Certificate Policy inhibits transgender persons born in Tennessee from participating fully in society. *See* Pls.' Reply in support of Statements of Fact Nos. 89 through 98. For example, Ms. Gore testified she may not apply for "County services or State services or Federal services that -- that I qualify for, … whether that's access to food stamps or rental assistance … because I don't have a birth certificate with my correct gender on it." Gore Tr. 70:7-21.

Defendants' dispute regarding paragraph 20 of Ms. Gore's declaration is based on a mischaracterization of her deposition testimony. *See* Pls.' Reply in support of Statement of Fact No. 93.

58

Dated:  May 29, 2020

Respectfully submitted,

s/ John T. Winemiller
John T. Winemiller
MERCHANT & GOULD P.C.
800 S. Gay Street, Suite 2150
Knoxville, TN 37929
Phone: (865) 380-5960
Facsimile: (612) 332-9081
JWinemiller@merchantgould.com

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
Telephone: (212) 809-8585
Facsimile: (212) 809-0055
ogonzalez-pagan@lambdalegal.org

Gavin R. Villareal*
Maddy Dwertman*
Puneet Kohli*
Samoneh Kadivar*
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
Phone: (512) 322-2500
Facsimile: (512) 322-2501
gavin.villareal@bakerbotts.com
maddy.dwertman@bakerbotts.com
puneet.kohli@bakerbotts.com
samoneh.kadivar@bakerbotts.com

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
Telephone: (404) 897-1880
Facsimile: (404) 897-1884
tborelli@lambdalegal.org

Sasha Buchert*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, DC 20006
Telephone: (202) 804-6245
sbuchert@lambdalegal.org

Brandt Thomas Roessler*
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
Phone (212) 408-2500
Facsimile: (212) 408-2501
brandt.roessler@bakerbotts.com

* Admitted pro hac vice.

Kathryn S. Christopherson*
BAKER BOTTS L.L.P.
1001 Page Mill Rd., Bldg. One, Suite 200
Palo Alto, CA 94304-1007
Phone: (650) 739-7500
Facsimile: (650) 739-7699
kathryn.christopherson@bakerbotts.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, which provides electronic notice of the filing to all counsel of record, including:

Herbert H. Slatery III
Attorney General and Reporter

Dianna Baker Shew
Senior Assistant Attorney General
dianna.shew@ag.tn.gov
Sara E. Sedgwick
Senior Assistant Attorney General
sara.sedgwick@ag.tn.gov
PO Box 20207
Nashville, TN 37202

This 29th day of May, 2020.

*s/John T. Winemiller*
John T. Winemiller