# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| KAYLA GORE; JAIME COMBS; L.G.; and K.N.,<br><br>*Plaintiffs*,<br><br>v.<br><br>WILLIAM BYRON LEE, in his official capacity as Governor of the State of Tennessee; and LISA PIERCEY, in her official capacity as Commissioner of the Tennessee Department of Health,<br><br>*Defendants*. | No. 3:19-CV-00328<br><br>DISTRICT JUDGE RICHARDSON<br>MAGISTRATE JUDGE HOLMES |

## PLAINTIFFS' RESPONSES TO
## DEFENDANTS' STATEMENT OF ADDITIONAL FACTS

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Rules 56.01(c) and (d) of the Local Rules of Court, Plaintiffs respond as follows to Defendants' Statement of Additional Facts.

## PLAINTIFFS' RESPONSES

| No. | Fact | Supporting Record Citation(s) |
|---|---|---|
| 1. | Gender identity cannot be determined at birth, but rather is a person's "inner sense of belonging to a particular sex" and becomes "detectable by self-disclosure in adolescents and adults." | Expert Decl. Dr. Randi C. Ettner, Ph.D., Doc. 61-1, ¶ 19. |
| | Plaintiffs' Response: Disputed in part, Plaintiffs dispute this statement to the extent it implies gender identity does not exist at the time of birth and because it is an incomplete and inaccurate description of gender identity.<br><br>"Gender identity is a person's inner sense of belonging to a particular sex, such as male or female."  Ettner Decl. ¶ 19; *see* | Ettner Decl. ¶¶ 19, 27;<br><br>Taylor Decl. ¶¶ 21, 28;<br><br>Trabue Tr. 51:2-21;<br><br>Ettner Tr. 55:17-23; *id.* at |

1

| | | |
|---|---|---|
| | *also* Taylor Decl. ¶ 21; Trabue Tr. 51:2-21 (agreeing that gender identity is "[a] person's fundamental and innate sense of being male, female, or somewhere in between"). Gender identity is "is an innate brain-based, deeply felt, and universal aspect of identity." Ettner Tr. 61:19-21; *see also* Taylor Tr. 19:12-14 ("every person has a gender identity, and it is biologically based and innate to that individual"); Ettner Decl. ¶¶ 19, 27; Taylor Decl. ¶ 28. As such, gender identity "exists" at the time of birth, and "does not form later." Ettner Tr. 55:17-18. It is just that "[o]ur awareness of it becomes apparent later," because "[a] baby cannot talk." Ettner Tr. 55:19-20. | 61:19-21; Taylor Tr. 19:12-14. |
| 2. | A baby's sex is a part of the medical record that will always accurately reflect what happened during the birth procedure. | Decl. Anthony E.D. Trabue, M.D., Ex.1 ¶ 25, attached as Ex. 4 to Defs' Not. Filing Materials Supp. Resp. Pls.' Mot. Summ. J. |
| | Plaintiffs' Response: Disputed.<br><br>The designation of a baby's sex, based on the observation of external genitalia at the time of birth, that forms part of the medical record is not always accurate. *See*, *e.g.*, Ettner Decl. ¶¶ 16-17, 21, 35, 40-41; Ettner Tr. 34:5-8; *id.* at 54:16-20 ("[E]xamination of the genitals at birth is a proxy for sex for the majority of people. For some people, however, evidence that emerges later on makes that designation inaccurate."); *id.* at 55:17-23 ("I don't agree that gender identity is formed later. Gender identity exists. Our awareness of it becomes apparent later. A baby cannot talk, and so we use external genitalia as a proxy for sex. For the vast majority of individuals that is not problematic. For individuals who have this rare condition, it is an inaccurate designation."); Taylor Decl. ¶¶ 18, 30-31, 47, 63; Taylor Tr. 23:12-16 ("Well, what I'm trying to say is that if – somebody's gender identity and how they identify is the determining factor for their sex, not the proxy that we used when they were in the delivery room when they were born.").<br><br>Defendants' own medical expert, Dr. Anthony Trabue, agrees that the observation of external genitalia at birth is not always an accurate indicator of a person's sex. *See* Trabue Tr. at 86:13-17 ("Q: So it's true, then, that a baby's sex cannot be determined by observing the external genitalia in one hundred percent of the cases. Is that right? A: | (See Response)<br>Ettner Decl. ¶¶ 16-17, 21, 35, 40-41;<br>Ettner Tr. 34:5-8; 54:16-20, 55:17-23<br>Taylor Decl. ¶¶ 18, 30-31, 47, 63;<br>Taylor Tr. 23:12-16<br>Trabue Tr. at 85:1-4, 86:13-17<br>Bishop Tr. 36:9-13, 83:3-6 |

2

| | | |
|---|---|---|
| | Correct."); *see also* Bishop Tr. at 83:3-6 (Q. So is it possible for a person to correct the sex on their birth certificate even after their first year of birth?" A. "If a mistake was made.").<br><br>Moreover, while the recording of the assignment of a baby's sex at the time of birth, based on the observation of the baby's genitalia, may form part of the baby's medical record, it is not true that a birth certificate is a medical record. *See* Trabue Tr. 85:1-4 ("Q. Okay. And, as a general proposition, birth certificates are not medical records, are they? A. No."); *cf.* Bishop Tr. 36:9-13 ("Q. Okay. Is a birth certificate a medical record? … A. I don't know."). In other words, a baby's medical record is distinct from a baby's birth certificate. | |
| 3. | Dr. Ettner opines that gender is "immutable." | Ettner Decl. ¶ 25. |
| | <u>Plaintiffs' Response</u>: Plaintiffs dispute this statement to the extent it refers to "gender"—not "gender identity"—as the materials cited would not support such a statement.<br><br>Dr. Ettner's testimony is that a person's *gender identity* is immutable. Ettner Decl. ¶ 25; *see also* Ettner Decl. ¶ 24 ("A growing assemblage of research documents that *gender identity* is immutable and biologically based."); Ettner Tr. 24:20-25 ("*Gender identity* … is immutable."). | |
| 4. | Dr. Shane Taylor opines that gender is biologically based and cannot be changed. | Expert Decl. Dr. Shane Sebold Taylor, Doc. 61-2, ¶ 21. |
| | <u>Plaintiffs' Response</u>: Plaintiffs dispute this statement to the extent it refers to "gender"—not "gender identity"—as the materials cited would not support such a statement.<br><br>Dr. Taylor's testimony is that *gender identity* "has a strong biological basis and cannot be changed." Taylor Decl. ¶ 21; *see also* Taylor Decl. ¶ 22; Taylor Tr. 19:13-14; Ettner Decl. ¶ 25 ("gender identity cannot be altered, either for transgender or for non-transgender individuals"). | Taylor Decl. ¶¶ 21, 22<br>Taylor Tr. 19:13-14<br>Ettner Decl. ¶ 25 |
| 5. | Dr. Ettner testified in her deposition as follows:<br><br>    Q. Have you ever evaluated someone who is transgender whose gender identity later reverts back to their birth sex? | Dep. Randi C. Ettner at 116118, excerpts attached as Ex. 3 to Defs' Not. Filing Materials Supp. Resp. Pls.' Mot. Summ. J. |

3

Case 3:19-cv-00328   Document 95   Filed 05/29/20   Page 3 of 16 PageID #: 2510

| | |
|---|---|
| MS. INGELHART: Objection to the term at issue, birth sex, as well as these others that we have discussed.<br><br>But answer to the best of your ability.<br><br>BY THE WITNESS:<br><br>A. I have evaluated I think on two occasions people who have attempted to reverse their surgery or have regretted having the surgery, and one I think attempted to revert to living in their birth sex but they didn't -- they did not state that their gender identity had changed, just that they needed to live as a man for a variety of other reasons.<br><br>Q. All right. Are you aware, just in the profession, of transgender folks who have - whose gender identity has reverted to their birth sex?<br><br>A. I am aware of people who have detransitioned.<br><br>Q. Is that the terminology, detransitioned?<br><br>A. Detransition means they have reverted to living in the sex they were assigned to. It doesn't necessarily mean that their gender identity has changed, and I wouldn't know without actually interviewing or assessing those people.<br><br>[ ]<br><br>A. I'm aware that some people who have transitioned from the sex they were assigned at birth have reverted to living in the gender, the sex they were assigned at birth. I cannot state that their gender identity has changed, only that the circumstances under which they live have changed. | |
| Plaintiffs' Response: Plaintiffs dispute this statement, as the cited excerpts are not from Dr. Ettner's deposition in this case.<br><br>Dr. Ettner did not testify in her deposition *in this case* as Defendants' proposed additional fact states. In fact, despite having had the opportunity to depose Dr. Ettner, Defendants asked Dr. Ettner no questions about the concept of "detransition." *See generally* Ettner Tr. | Ex. 5 to Ettner Tr. (*Ray* Tr.), at 64:11-20, 96:17-23, 116:19-22, 117:6-9, 118:8-11, 120:5-14 |

| | | |
|---|---|---|
| | Defendants have introduced into evidence a copy of the transcript of Dr. Ettner's deposition testimony in a *different* case, that being *Ray v. Acton*, Case No. 2:18-cv-00272-MHW-CMV (S.D. Ohio). *See* ECF No. 88-3. This deposition testimony is inadmissible hearsay and should be stricken. *See Robertson v. US Bank, N.A.*, No. 14-2677, 2015 WL 12532148, at *7 (W.D. Tenn. Oct. 20, 2015) ("Deposition testimony from a previous case that is offered for the truth of the matter asserted must fall under a hearsay exception to be admissible."), *aff'd sub nom. Robertson v. U.S. Bank, N.A.*, 831 F.3d 757 (6th Cir. 2016). <br><br> Most concerning, however, is Defendants' mischaracterization of Dr. Ettner's testimony in *Ray*. In her *Ray* deposition, Dr. Ettner similarly testified that gender identity is immutable. *See* Ex. 5 to Ettner Tr. (*Ray* Tr.), at 64:11-20; *id.* at 96:17-23. Moreover, in answering questions about the concept of "detransition," Dr. Ettner repeatedly emphasized that she did not know of anyone whose gender identity had changed, rather that they were living in their sex assigned at birth *for other reasons*. *See* Ex. 5 to Ettner Tr. (*Ray* Tr.), at 116:19-22 ("[T]hey did not state that their gender identity had changed, just that they needed to live as a man *for a variety of other reasons*.") (emphasis added); *id.* at 117:6-9 ("Detransition … doesn't necessarily mean that their gender identity has changed[.]"); *id.* at 118:8-11 ("*I cannot state that their gender identity has changed, only that the circumstances under which they live have changed*.") (emphasis added); *id.* at 120:5-14 ("A. … no one has ever told me that their general gender identity has changed. Q. And you've never read any literature about that occurring? A. Not literature that I'm aware of or that is well known to me."). <br><br> Defendants' proposed additional fact is not rooted in any record evidence *in this case*. | |
| 6. | Plaintiff Jaime Combs testified that she did not believe she had used her birth certificate as a form of identification in the past seven (7) years. | Dep. Jaime Combs at 40-41, excerpts attached as Ex. 2 to Defs' Not. Filing Materials Supp. Resp. Pls.' Mot. Summ. J. |
| | <u>Plaintiffs' Response</u>: Disputed in part. <br><br> While Ms. Combs has not had to present her birth certificate as a form of identification during the past seven years, Ms. | Combs Tr. 38:11-14 |

5

|   |   |   |
|---|---|---|
|   | Combs traveled abroad with her birth certificate, as proof of her identity and citizenship, as recently as a couple of months ago. Combs Tr. 38:11-14 ("Q. When was the last time you traveled with your birth certificate? … THE WITNESS: Probably two months ago."). |   |
| 7. | In her deposition, Plaintiff Combs could only refer to a situation, remote in time, in which she was required to present her birth certificate. | Combs Tr. at 42-43. |
|   | Plaintiffs' Response: Plaintiffs dispute this statement because the materials cited do not support the statement of fact.<br><br>Ms. Combs testified to multiple instances in which she was required to present her birth certificate, including having to present her birth certificate to: change her social security records (Combs Tr. at 33:2-9), obtain her passport (Combs Tr. 40:5-9), for banking purposes/business transactions (Combs Tr. 42:8-44:8), and for starting education at the Tennessee School of Beauty (Combs Tr. 44:18-45:6, 48:12-22).  In fact, at pages 42-43 of Ms. Comb's deposition cited by defendants, Ms. Combs simply testified to "[a]n example" of having to present her birth certificate: "Because of my past history and experiences with birth certificate – and the birth certificate being inaccurate to who I am, it has been a source that could be used against me.  I have seen – I feel like because of this paper, in the past, I've had to tell my story in situations I did not want to.  An example would be when I was in a bank and they required this documentation that was no longer congruent with who I was or other information that I had, and I felt it necessary to explain why it didn't match." | Combs Tr. at 33:2-9, 40:5-9, 42:8-44:8, 44:18-45:6, 48:12-22 |
| 8. | L.G. testified that she keeps her birth certificate locked in a safety deposit box, and could only respond concerning her fears associated with actually presenting her birth certificate. | Dep. L.G. at 45, excerpts attached as Ex. 1 to Defs' Not. Filing Materials Supp. Resp. Pls.' Mot. Summ. J. |
|   | Plaintiffs' Response: Plaintiffs dispute that LG "could only respond concerning her fears associated with actually presenting her birth certificate."  Plaintiffs dispute this statement because the materials cited do not support the statement of fact.  L.G. testified to the harms she | L.G. Tr. at 39:9-44:12; 45:3-20; 46:3-52:11. |

6

| | | |
|---|---|---|
| | experienced by actually presenting her birth certificate. *See, e.g.,* L.G. Tr. at 39:9-44:12; 45:3-20; 46:3-52:11.<br><br>For example, L.G. testified that she has "experienced discrimination and hostility and violence. And there have been instances where the discrimination has -- has been directly related to the incongruent documents." L.G. Tr. 39:10-14. | |
| 9. | The Tennessee Vital Statistics Birth Data Element Layout used by the Tennessee Department of Health to record information contains over 416 data elements. | Decl. Edward Gray Bishop ¶ a, attached as Ex. 6 to Defs' Not. Filing Materials Supp. Resp. Pls.' Mot. Summ. J. |
| | <u>Plaintiffs' Response</u>: Undisputed for purposes of this motion. | |
| 10. | The information recorded is extensive and ranges from the date of birth to the parents' educational level to the congenital anomalies of the infant. | Bishop Decl. ¶ a. |
| | <u>Plaintiffs' Response</u>: Plaintiffs object to this statement. It is not factual; it is an opinion and/or is conclusory.<br><br>The Tennessee Vital Statistics Birth Data Element Layout is not the same as birth certificate. Indeed, a person's birth certificate only contains 14 items of information. *See, e.g.,* Exs. 5, 7, 8 to Bishop Tr. As Tennessee's Director of Vital Statistics testified, "[i]t is possible for differences to exist between the vital records and [Tennessee's] statistical file." Lefler Tr. 57:24-58:1. Indeed, a person's birth certificate can be changed without changing the statistical file. Bishop Tr. 53:4-7.<br><br>Plaintiffs also object to Defendants' use of the phrase "congenital anomalies." | Exs. 5, 7, 8 to Bishop Tr.;<br><br>Lefler Tr. 57:24-58:1;<br><br>Bishop Tr. 53:4-7 |
| 11. | The information contained in the Tennessee Vital Statistics Birth Data Element Layout forms the basis of the historical birth record of the child, as well as the Tennessee Department of Health Certificate of Live Birth. | Bishop Decl. ¶ b. |

7

| | | |
|---|---|---|
| | Plaintiffs' Response: Disputed.<br><br>Tennessee's Director of Vital Statistics testified that the information is extracted from the certificate of live birth to be included in the Tennessee statistical birth system, not the other way around. *See* Lefler Tr. at 49:5-21.<br><br>Plaintiffs also dispute this statement to the extent defendants are suggesting that the information contained in the Tennessee Vital Statistics Birth Data Element Layout forms always matches the information contained in a birth certificate. Indeed, a person's birth certificate only contains 14 items of information. *See*, *e.g.,* Exs. 5, 7, 8 to Bishop Tr. And, as Tennessee's Director of Vital Statistics testified, "[i]t is possible for differences to exist between the vital records and [Tennessee's] statistical file." Lefler Tr. 57:24-58:1; *see also, e.g.*, Bishop Tr. at 51:23-52:7 (testifying that the Tennessee Vital Statistics Birth Data Element Layout form may "indicate their sex as 'unknown'" even though the birth certificate "record was corrected by affidavit to change the child's sex to 'male.'"). Indeed, a person's birth certificate can be changed without changing the statistical file. Bishop Dep Tr. 53:4-7. | Lefler Tr. at 49:5-21, 57:24-58:1;<br><br>Exs. 5, 7, 8 to Bishop Tr.;<br><br>Bishop Tr. at 51:23-52:7, 53:4-7 |
| 12. | Tennessee birth certificates merely record the sex of the child as reported at birth. | Bishop Decl. ¶ c. |
| | Plaintiffs' Response: Disputed. Defendants' additional fact, as asserted, is not supported by the record.<br><br>A person's birth certificate reflects the sex the person was *assigned at birth* based on the observation of the person's genitalia at birth, which is only one of multiple sex-related characteristics a person possesses. It is not "merely record[ing] the sex of the child."<br><br>Plaintiffs' and Defendants' medical and mental health experts agree that a person's sex is *assigned* to them based on the observation of external genitalia. *See* Ettner Decl. ¶ 16 ("At birth, infants are assigned a sex, typically male or female, based solely on the appearance of their external genitalia."); *id.* at ¶17; Taylor Decl. ¶¶ 18; Ettner Tr. 34:5-8; Taylor Tr. 19:4-7; Trabue Tr. 96:14-17 (noting "the presence of a penis, or what appears to be a vagina … would be the sex characteristics that would be used in the delivery room *to assign a sex to the infant*."); *id.* at 87:16-17 (stating that in the | Ettner Decl. ¶¶ 16-18, 20-21, 35, 40-41;<br><br>Ex. B. to Ettner Decl.;<br><br>Taylor Decl. ¶¶ 18-19, 30-31, 47, 63;<br><br>Ex. B. to Taylor Decl.;<br><br>Ettner Tr. 34:5-8, 54:16-20, 55:17-23<br><br>Taylor Tr. 19:4-7, 21:4-15, 23:12-16<br><br>Trabue Tr., 86:13-17, 87:16-17, 94:19-24, 96:8-17; |

8

| | |
|---|---|
| case of a baby with ambiguous genitalia, "the pediatricians would decide what -- what the gender would be"); *id.* at 96:8-17.<br><br>The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013) ("DSM-5") speaks of "assigned gender," which it defines as "the initial assignment as male or female." The DSM-5 is cited in declarations of Dr. Ettner and Dr. Taylor. *See* Ex. B. to Ettner Decl. (citing DSM-5); Ex. B. to Taylor Decl. (same). The American College of Obstetricians and Gynecologists, of which Defendants' medical expert is a fellow, also speaks of "sex … assigned at birth." *See* Ex. 6 to Trabue Tr.<br><br>Genitalia is just one of multiple sex-related characteristics. *See* Ettner Tr. 23:6-9 ("Sex is a composite of chromosomal pairs, gonads and internal reproductive organs, external genitalia, sexually dimorphic brain structures, and the result of gender identity."); Taylor Tr. 21:4-15; Trabue Tr. 94:19-24; Ettner Decl. ¶ 20; Taylor Decl. ¶ 19.<br><br>Moreover, the "sex of the child as reported at birth," based on the observation of external genitalia, is not always accurate. *See, e.g.*, Ettner Decl. ¶¶ 16-17, 21, 35, 40-41; Ettner Tr. 34:5-8; *id.* at 54:16-20 ("[E]xamination of the genitals at birth is a proxy for sex for the majority of people. For some people, however, evidence that emerges later on makes that designation inaccurate."); *id.* at 55:17-23 ("I don't agree that gender identity is formed later. Gender identity exists. Our awareness of it becomes apparent later. A baby cannot talk, and so we use external genitalia as a proxy for sex. For the vast majority of individuals that is not problematic. For individuals who have this rare condition, it is an inaccurate designation."); Taylor Decl. ¶¶ 18, 30-31, 47, 63; Taylor Tr. 23:12-16 ("Well, what I'm trying to say is that if – somebody's gender identity and how they identify is the determining factor for their sex, not the proxy that we used when they were in the delivery room when they were born.").<br><br>Defendants' own medical expert, Dr. Anthony Trabue, agrees that the observation of external genitalia at birth is not always an accurate indicator of a person's sex. *See* Trabue Tr. at 86:13-17 ("Q: So it's true, then, that a baby's sex cannot be determined by observing the external genitalia in one hundred percent of the cases. Is that right? A: Correct."); *see also* Bishop Tr. at 83:3-6 (Q. So is it possible | Ex. 6 to Trabue Tr.<br><br>Bishop Tr. at 83:3-6 |

9

| | | |
|---|---|---|
| | for a person to correct the sex on their birth certificate even after their first year of birth?" A. "If a mistake was made."). | |
| 13. | Following NCHS guidance, the Tennessee Birth Statistical System is limited to three valid values for the sex of the infant: Male, Female, and, if the sex of the infant is ambiguous, Not Yet Determined or Unknown. | Decl. Vanessa Lefler ¶ 2, attached as Ex. 5 to Defs' Not. Filing Materials Supp. Resp. Pls.' Mot. Summ. J. |
| | Plaintiffs' Response: Plaintiffs object because the material cited do not support this statement. The CDC guide on which Lefler's declaration relies does not provide guidance on what values are "valid" for the purposes of developing Tennessee's Birth Statistical System. Furthermore, Lefler testified during her deposition that "those guidelines are then open for each state to adopt." Lefler Tr. 76:19-20. | Lefler Tr. 76:19-20. |
| 14. | Plaintiffs' expert Dr. Ettner testified as follows:<br><br>Q. How many categories of gender identity are there?<br><br>A. There are many ways that people can express their gender identity. | Ettner Dep. at 25. |
| | Plaintiffs' Response: Undisputed for purposes of this motion that Dr. Ettner testified that "there are many ways people can express their gender identity." | |
| 15. | Dr. Ettner testified as follows:<br><br>Q. In your experience of having treated over 3,000 individuals, have you experienced individuals who call themselves, for example, agender?<br><br>A. It's not a term that is commonly used, although there are terms that are similar that are used and that I have, indeed, seen in my clinical practice.<br><br>Q. What similar terms?<br><br>A. Non-binary, genderqueer would be examples of the – what I believe is the example you are offering?<br><br>Q. And those terms, what do they denote? | Ettner Dep. at 27. |

10

|   |   |   |
|---|---|---|
|   | A. Individuals who characterize themselves in that manner don't necessarily have a gender identity that they believe is entirely male or entirely female. And they see themselves as having a more nuanced or unique identity which they oftentimes attempt to express. |   |
|   | Plaintiffs' Response: Plaintiffs object because the language quoted above does not accurately reflect the transcript of Dr. Ettner's deposition.<br><br>Defendants' proposed additional fact leaves out important context for said statements. For example, Dr. Ettner also testified that in her experience treating over 3,000 individuals who are transgender or gender nonconforming, she has "seen few non-binary individuals," that she has "not had requests from those individuals to change identity documents," and that "there's very little research that [she] can point to or scholarly articles that [she] can refer to" on that question. Ettner Tr. 41:15-21. | Ettner Tr. 41:15-21. |
| 16. | Recording sex at the time of birth is necessary for several reasons, including the following:<br><br>• Use as a direct indicator in maternal and child health outcomes in public health surveillance and research. Fetal or infant sex is found in research to be a risk factor for the incidence of other information collected on the Certificate of Live Birth, including gestational diabetes, preterm birth, infant birth weight, and cesarean delivery.<br><br>• Analysis for logical consistency with other items collected on the Certificate of Live Birth, particularly the congenital anomaly, hypospadias, which is defined as the "incomplete closure of the male urethra resulting in the urethral meatus opening on the ventral surface of the penis."<br><br>• Inclusion in set of personal identifiers used in records matching programs from administrative or auditing functions. The linkage of birth certificate records to TennCare (Medicaid) or Newborn Screening data, which receive information from medical records that were generated at the time of birth, are examples of this work. Sex is routinely included as a data element in records matching programs in order to establish | Lefler Decl. ¶ 1. |

| | | |
|---|---|---|
| | more confident matches in the absence of reliable unique identifiers, such as a Social Security Number or Medical Record Number. | |
| | Plaintiffs' Response: Disputed in part.<br><br>The asserted interests are not related to the maintenance and issuance of *birth certificates*, and therefore are unrelated to the ability of transgender persons to correct the sex designation on their birth certificates.<br><br>The information used for public health surveillance and research comes from Tennessee's "statistical file," also known as the Tennessee Birth Statistical System. Lefler Tr. 49:22-25; 50:23-51:4; 51:16-21; 54:7-18. The information shared for these purposes *is not* a person's birth certificate. Lefler Tr. 52:12-21. Moreover, the statistical file is closed within four to fifteen months of a child's birth. Lefler Tr. 49:9-21; *see also* Bishop Tr. 52:12-17. Any "analysis for logical consistency" occurs *before* the statistical file is closed. Lefler 58:25-59:14. And a person's birth certificate can be changed without changing the statistical file. Bishop Tr. 53:4-7.<br><br>Moreover, seeing as how transgender persons are allowed to correct the sex designation on a variety of other identification documents, such as those maintained by TennCare (Medicaid) and the Social Security Administration, the interest in ensuring linkage between birth certificates and other agencies' records supports Plaintiffs' position. Indeed, the Director of Vital Statistics testified: "Ideally, it would be great, from our research, or data analysis perspective, to have data that are internally valid and consistent across data systems." Lefler Tr. 74: 25-75:3.<br><br>Lastly, when asked about the discrepancy between a Plaintiffs' TennCare (Medicaid) records, which accurately reflect her sex as female, and her birth certificate, which incorrectly reflects her sex as male, the Director of Vital Statistics testified as follows:<br><br>   Q. Using the example of that plaintiff, if TennCare records designate her as "female," how would a birth certificate designating her as "male" serve the records matching purpose that you describe in section 1C? | Lefler Tr. 49:9-25; 50:23-51:4; 51:16-21; 52:12-21; 54:7-18; 58:25-59:14; 74: 25-75:3.<br><br>Bishop Tr. 52:12-17; 53:4-7 |

12

| | | |
|---|---|---|
| | MS. SHEW: Object to the form.<br><br>A. There are, as I understand from my conversations with TennCare, a variety of ways in which they use the birth certificate data. Our primary agreement with them is to establish the initial claim for the mother, and for potential enrollment of the child in additional services.<br><br>*But, after that initial fact of birth, I'm not sure how TennCare, as an agency, is using birth data to link with their own records.*<br><br>Lefler Tr. 73:1-17 (emphasis added). Thus, the example of the use of sex in the linkage of birth certificate records to TennCare (Medicaid) is not supported by the record evidence.<br><br>Similarly, the Director of Vital Statistics testified that she is "not aware of how the Social Security Administration maintains its identity roles." Lefler Tr. 68:19-25. Thus, the example of the use of sex in the linkage of birth certificate records to Social Security records is not supported by the record evidence. | |
| 17. | Amendments of minor errors on birth certificates during the first year are permitted in accordance with Tenn. Comp. R. & Regs. 1200-07-01-.10(1). | Bishop Decl. ¶ d. |
| | Plaintiffs' Response: Plaintiffs object because the statement is not one of fact, but is a legal conclusion. Therefore, the statement is improper and should be stricken. *F.R.C. Int'l. v. United States*, 278 F. 3d 641,643-44 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F. 2d 118, 121 (6th Cir. 1981)). | |
| 18. | Creating additional ways in which Tennessee's birth records can be modified, particularly without a statutory scheme in place to regulate and track such modifications, heightens the potential for fraud and illegality. | Bishop Decl. ¶ e. |
| | Plaintiffs' Response: Plaintiffs dispute this statement as entirely conclusory with no support offered to substantiate it. When asked during his deposition to provide support for this statement, Bishop testified as follows:<br><br>Q. Can you cite to a study to back up the statement you make in paragraph (e) of your declaration? | Bishop Tr. 77:25-78:17, 80:15-22. |

13

| | | |
|---|---|---|
| | A. I cannot.

Q. Can you cite to a report to back up the statement you make in paragraph (e) of your declaration?

A. I cannot.

And when asked on what basis he made this statement in his declaration, Bishop simply repeated the same unacceptable conclusory statement:

Q. What is the basis for your statement in paragraph (e)?

A. The basis is, without statutory regulations being in place, modifications would heighten the potential for fraud and illegality.

Bishop Tr. 77:25-78:17.

And Tennessee's State Registrar testified that Tennessee's Department of Health has the authority to issue new or change existing rules. Bishop Tr. 80:15-22. | |
| 19. | Plaintiff Jaime Combs admitted that, when she was required to present her birth certificate to her bank in 2010, it was before she had her passport corrected. | Combs Tr. at 44. |
| | Response: Undisputed for purposes of this motion. | |

Dated:  May 29, 2020

Respectfully submitted,

*s/ John T. Winemiller*
John T. Winemiller
MERCHANT & GOULD P.C.
800 S. Gay Street, Suite 2150
Knoxville, TN 37929
Phone: (865) 380-5960
Facsimile: (612) 332-9081
JWinemiller@merchantgould.com

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
Telephone: (212) 809-8585
Facsimile: (212) 809-0055
ogonzalez-pagan@lambdalegal.org

Gavin R. Villareal*
Maddy Dwertman*
Puneet Kohli*
Samoneh Kadivar*
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
Phone: (512) 322-2500
Facsimile: (512) 322-2501
gavin.villareal@bakerbotts.com
maddy.dwertman@bakerbotts.com
puneet.kohli@bakerbotts.com
samoneh.kadivar@bakerbotts.com

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
Telephone: (404) 897-1880
Facsimile: (404) 897-1884
tborelli@lambdalegal.org

Sasha Buchert*
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
1776 K Street NW, Suite 722
Washington, DC 20006
Telephone: (202) 804-6245
sbuchert@lambdalegal.org

Brandt Thomas Roessler*
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112-4498
Phone (212) 408-2500
Facsimile: (212) 408-2501
brandt.roessler@bakerbotts.com

* Admitted *pro hac vice*.

Kathryn S. Christopherson*
BAKER BOTTS L.L.P.
1001 Page Mill Rd., Bldg. One, Suite 200
Palo Alto, CA 94304-1007
Phone: (650) 739-7500
Facsimile: (650) 739-7699
kathryn.christopherson@bakerbotts.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, which provides electronic notice of the filing to all counsel of record, including:

Herbert H. Slatery III
Attorney General and Reporter

Dianna Baker Shew
Senior Assistant Attorney General
dianna.shew@ag.tn.gov
Sara E. Sedgwick
Senior Assistant Attorney General
sara.sedgwick@ag.tn.gov
PO Box 20207
Nashville, TN 37202

This 29th day of May, 2020.

<u>s/John T. Winemiller</u><br>
John T. Winemiller