IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KAYLA GORE, et al.,                )
                                   )
        Plaintiffs,                )
                                   )
    v.                             )          No. 3:19-cv-0328
                                   )
WILLIAM BYRON LEE, et al.,         )          JUDGE RICHARDSON
                                   )
        Defendants.                )

**<u>MEMORANDUM OPINION</u>**

Pending before the Court is Defendants' Motion to Dismiss Amended Complaint (Doc. No. 65, "Motion"), supported by a memorandum of law. (Doc. No. 66). Plaintiffs have filed a brief in opposition to the Motion (Doc. No. 71, "Plaintiffs' Opposition"), to which Defendants have filed a reply. (Doc. No. 74). Plaintiffs also have filed a Notice of Supplemental Authority (Doc. No. 102), and Defendants have filed a response thereto. (Doc. No. 103).

As set forth in the Amended Complaint for Declaratory and Injunctive Relief (Doc. No. 59, "Amended Complaint"), this case concerns a particular alleged policy of the State of Tennessee concerning Tennessee birth certificates. The policy (which Plaintiffs call the "Birth Certificate Policy," the term the Court will use herein) is to refuse to change—or, as Plaintiffs sometimes characterize it only slightly differently, to refuse to allow a transgender person to change—the sex designation on a transgender person's birth certificate. As further described below, Plaintiffs allege that the Birth Certificate Policy "categorically prohibits transgender persons born in Tennessee from correcting the sex listed on their birth certificates so that it matches their true sex,

consistent with their gender identity, regardless of what steps such persons have taken to live in a manner consistent with their gender identity." (*Id.* at ¶ 70). [1]

Plaintiffs have sued each of the two Defendants in their respective official capacities, alleging that they have applicable enforcement authority with respect to the Birth Certificate Policy and have "knowingly encouraged, condoned, and acquiesced" in the enforcement of the Birth Certificate Policy. (*Id.* at ¶ 70).

FACTS[2]

Transgender persons are persons "whose gender identity diverges from the sex they were assigned at birth." (*Id.* at ¶ 26).[3] Transgender persons constitute a minority of persons; the majority

---

[1] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page ___ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. Citations to the Amended Complaint, by contrast, use the name rather than the docket number of the document and are made to paragraph numbers rather than page numbers.

[2] The facts in this section are alleged in the Amended Complaint and, where stated without qualification, are accepted as true for purposes of resolving the instant Motion. Where facts are stated with some kind of qualification (such as "Plaintiffs allege that"), the facts are not taken as true. In deciding what allegations from the Amended Complaint to accept as true, the Court has applied the below-stated *Iqbal*/*Twombly* standards. To the extent that the Court herein relies on facts not set forth in the Amended Complaint, it has done so under the firm conviction that such facts are not reasonably disputable (and instead are disputable at most only in some metaphysical or epistemological sense) and are subject to judicial notice as being both generally known in this district and elsewhere and/or accurately and readily determinable from sources whose accuracy cannot reasonably be questioned. Relatedly, as to certain observations of the Court that are not quite of the "factual" type potentially subject to judicial notice, the Court believes that they are valid as of a matter of common sense, which as noted below the Court should bring to bear in assessing the Amended Complaint. The Court does not believe that it must or should evaluate the Amended Complaint devoid of the context provided by the manifest truths conveyed by such facts and observations, and the Court declines to do so.

[3] It seems that there are various reasonable ways to describe what it means to be transgender, and the Court herein uses Plaintiffs' description (definition), both because it makes sense and because it is, after all, Plaintiffs' own conception of being transgender that underlies their Amended Complaint. As indicated above, that conception entails a "diverg[ence]" between a person's gender identity and "the sex they were assigned at birth [on their birth certificate, Plaintiffs apparently mean]." (Amended Complaint, ¶ 26, 169 ). Plaintiffs suggest also a slightly different verbal formulation of what being transgender entails: an "[in]congruen[ce]" between a person's gender identity and the sex the person was assigned on the person's birth certificate. (*Id.* at ¶ 169).

of persons are cisgender persons, meaning persons "whose gender identity aligns with the sex they were assigned at birth." (*Id.* at ¶ 27). Each of the Plaintiffs is a transgender person. More specifically, each of the four Plaintiffs is a person with a gender identity of female but a Tennessee birth certificate indicating such Plaintiff's sex as male. (*Id.* at ¶¶ 15-19). All Plaintiffs wish to change[4] their respective birth certificates to reflect their sex as female. (*Id.*) Plaintiffs allege that such a change would constitute a "correct[ion]" necessary to "accurately reflect [each Plaintiff's respective] sex." (*Id.*)

Standing in the way of this wish is the Birth Certificate Policy. (*Id.*, *passim*). The Tennessee Department of Health is the agency within the state government responsible for public health, and it exercises (through its Office of Vital Records) responsibility for the registration, issuance, correction, and changes to Tennessee birth certificates. (*Id.* at ¶ 62). Tennessee birth certificates include, inter alia, the given name and surnames of the newborn child, the date of birth, the names of the child's parents, and the sex of the child. (*Id.* at ¶ 64).[5] It is the practice of the State of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on observations about the external genitalia of newborns. (*Id.* at ¶ 65).

Recognizing that the information in a birth certificate may sometimes be inaccurate or need updating, Tennessee's Vital Records Act (Tenn. Code Ann. §§ 68-3-101 *et seq.*) and state

---

[4] The Amended Complaint uses the word "correct" rather than "change," but as discussed below, the Court cannot accept as true the allegation that such a change would be a "correct[ion]." "Correction" suggests that the original action (meaning, here, the designation of sex) was incorrect at the time it was made (meaning, here, at the time the birth certificate is completed). As set forth herein, however, given the limited nature of what the sex designation on a Tennessee birth certificate actually designates, Plaintiffs have not plausibly alleged that their sex designation was incorrect at the time the birth certificate was completed. Therefore, in describing herein what it is that Plaintiffs are alleging or requesting, the Court at times paraphrases using the term "change" where Plaintiffs have used the word "correct."

[5] Neither the Amended Complaint nor the parties' briefing indicates the source of these requirements for the content of a birth certificate, but the Court's research indicates that the source is Tenn. Comp. R. & Regs. 1200-07-01-.04(10).

regulations promulgated thereunder (Tenn. Comp. R. & Regs. 1200-07-01 *et seq.*) permit the correction of errors and updating of birth certificate records. (*Id.* at ¶ 66). For example, pursuant to Tenn. Comp. R. & Regs. 1200-07-01-.10, if a person has lawfully changed his or her name, the person may present a duly authenticated copy of the court order changing the person's name and request an amended certificate of birth for himself or herself. (*Id.* at ¶ 67). Similarly, pursuant to Tenn. Comp. R. & Regs. 1200-07-01-.04, following the adoption of a child, a new birth certificate reflecting only the names of the adoptive parents and the new name of the adopted child must be substituted for the original registered birth certificate. (*Id.* at ¶ 68). Likewise, pursuant to Tenn. Comp. R. & Regs. 1200-07-01-.10, and as documented on the public website for the Office of Vital Records, the sex listed on a person's birth certificate may be corrected if the change is substantiated by (1) a signed and notarized affidavit showing the full name, date of birth, the sex as it is shown on the certificate and the sex as it should be correctly listed, and (2) documentary evidence showing the correct sex of the individual. (*Id.* at ¶ 69).[6]

However, Tennessee's Vital Records Act provides, in part, that "[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." (*Id.* at ¶ 70) (quoting Tenn. Code Ann. § 68-3-203(d)). "Based on this provision," Defendants enforce the Birth Certificate Policy, *i.e.*, "a policy, custom or practice that categorically prohibits transgender persons born in Tennessee from [changing] the sex listed on their birth certificates so that it matches their true sex, consistent with their gender identity," irrespective of what steps such persons have taken to live in a manner consistent with their gender identity. (*Id.*). It is this policy

---

[6] From this, the Court draws the reasonable inference that the original sex designation on a birth certificate can be changed if (but only if) documentary evidence establishes that the original sex designation for some reason (perhaps a clerical error) does not actually reflect the person's external genitalia at the time of birth.

(the Birth Certificate Policy as just defined)[7] that Plaintiffs challenge via the instant lawsuit. (*Id.* at ¶ 70).[8] The Court herein treats, and often speaks in terms of, Plaintiffs' challenge being not just

---

[7] Beyond saying that the Birth Certificate Policy is "based on" Tenn. Code Ann. § 68-3-203(d), Plaintiffs do not delineate the relationship between the Birth Certificate Policy and Tenn. Code Ann. § 68-3-203(d), or for that matter any other Tennessee statute or any Tennessee administrative regulation. As far as the Court can tell, Plaintiffs assert that the Birth Certificate Policy represents an application (one that Plaintiffs contend is unconstitutional) of Tenn. Code Ann. § 68-3-203(d) (which Plaintiffs contend is itself unconstitutional). It is noteworthy that Plaintiffs do not assert that the Birth Certificate Policy somehow is unauthorized by, or runs counter to, any Tennessee statutes (including Tenn. Code Ann. § 68-3-203(d)). So although Plaintiffs challenge not only (or even primarily) Tenn. Code Ann. § 68-3-203(d) itself, but rather a "policy, custom, or practice" (the Birth Certificate Policy) that is "based on" Tenn. Code Ann. § 68-3-203(d), the Court deems it appropriate to consider Tenn. Code Ann. § 68-3-203(d) as being encompassed within the Birth Certificate Policy. Also notably, as is appropriate on a Rule 12(b)(6) motion, Defendants do not dispute either the alleged existence and substance of the Birth Certificate Policy or its foundation in Tenn. Code Ann. § 68-3-203(d).

[8] Plaintiffs do challenge something besides the Birth Certificate Policy. Specifically, they challenge "Tennessee's existing practice of showing a 'strikeout' line for permissible corrections to birth certificates, as delineated by Tenn. Comp. R. & Regs. 1200-07-01-.10," claiming that it violates substantive due process to the "extent it applies to transgender individuals," because to that extent "this practice would disclose a person's transgender status on the face of the birth certificate." (Amended Complaint, ¶ 202). Notably, the "strikeout line" practice to which Plaintiffs refer is apparently delineated in the following specific regulatory provision:

> (11) Methods of Amending Certificates.
>> (a) Certificates of birth, death, marriage, and divorce or annulment may be amended by the State Registrar in the following manner upon receipt of the required documentation:
>>> 1. completing the item in any case where the item was left blank on the existing certificate or
>>> 2. drawing a single line through the item to be amended and inserting the correct data immediately above or to the side thereof. The line drawn through the original entry must not obliterate such entry. The original entry will be blocked out only if the court so orders or blocking is required by statute.

Tenn. Comp. R. & Regs. 1200-07-01-.10(11). As one might expect, the apparent upshot of this "strikeout line" practice is that generally (*i.e.*, subject to Tenn. Code Ann. § 68-3-203(f), discussed below), a person viewing a changed birth certificate will be able to see not only the information thereon as changed, but also such information as it was stated prior to any change; this means, most pertinently in the instant case, that even if Tennessee permitted a change to a birth certificate's "sex" field, the original entry for such field would also be discernible. This in turn means, in a point of concern to Plaintiffs as discussed below, that a person's sex designation at birth would be discernible from the face of any amended birth certificate if Tennessee (a) actually did (as Plaintiffs request) begin allowing a change to the "sex" field, but (b) did not change its "strikeout line" practice. Due to their concern about the consequences of allowing a change to the "sex" field to be discernible, Plaintiffs challenge not just the Birth Certificate Policy, but also the

to a "policy" per se, but also to something arguably slightly different—the Tennessee birth certificates themselves that contain a sex designation that remains unchanged (and unchangeable) pursuant to the Birth Certificate Policy.

Plaintiffs claim that because of the (unfavorable) differential treatment it imposes on transgender persons, the Birth Certificate Policy is subject to at least so-called intermediate scrutiny. (*Id.* at ¶ 185). And Plaintiffs further claim that the Birth Certificate Policy fails such scrutiny because (according to Plaintiffs) it is not supported by any compelling, important, or even legitimate government interest and lacks necessary, narrowly-tailored, substantial, or even rational relationship to any valid government interest. (*Id.* at ¶¶ 76-77).

<u>PLAINTIFFS' CLAIMS</u>

Plaintiffs plead three causes of action. In Count I, they assert that the Birth Certificate Policy deprives them of equal protection of the law, in violation of the Equal Protection Clause of the Fourteenth Amendment. According to Plaintiffs, the Birth Certificate Policy facially and intentionally discriminates against transgender people (on the basis of sex and transgender status) by classifying them as members of a sex that is not "their true sex, as determined by gender identity[.]" (*Id.* at ¶ 183).

In Count II, Plaintiffs assert that the Birth Certificate Policy deprives them of substantive due process, in violation of the Due Process Clause of the Fourteenth Amendment. According to Plaintiffs, the Birth Certificate Policy results in the forced disclosure of a person's transgender status whenever the person's birth certificate is presented, because the person's (unchanged) birth certificate assigns a sex that does not align with the person's gender identity—thus allegedly

---

"strikeout line" practice. But if Tennessee's refusal to allow changes to the "sex" field is not constitutionally infirm, then the constitutionality of the "strikeout line" practice need not be addressed.

revealing that the person is transgender. This alleged forced disclosure, according to Plaintiffs, violates various alleged rights of Plaintiffs purportedly encompassed within the Due Process Clause: the alleged rights to "privacy," "to possession and control of their own person," "to define and express one's gender identity," to "not be treated in a manner contrary to one's sex," "to live in accordance with one's gender identity," and "to autonomy in one's body and identity." (*Id.* at ¶ 199, 200, 202, 204, 205, 206 and 208).

In Count III, Plaintiffs assert that the Birth Certificate Policy violates the Free Speech Clause of the First Amendment (made applicable to the states via the Fourteenth Amendment). According to Plaintiffs, the Birth Certificate Policy: (i) "forc[es]" transgender persons "to identify with a sex that was incorrectly assigned to them at birth and conflicts with who they are"; (ii) "forces" people to disclose their transgender status, a private and sensitive matter and one which may expose them to discrimination, harassment, and violence; (iii) "prevents transgender people from accurately expressing their gender identity"; (iv) compels transgender persons "to endorse the government's position as to their own gender, as well as on the meaning of sex generally," because the "gender marker listed on Plaintiffs' birth certificates conveys the state's message that sex is determined solely by the appearance of external genitals at the time of birth and never deviates from that"; and (v) prevents [transgender persons] "from accurately expressing their gender." (*Id.* at ¶¶ 214-217).

Unsurprisingly, Plaintiffs assert that they have been injured as a result of Defendants' alleged constitutional violations. (*Id.* at ¶¶ 177). They assert that each Plaintiff has been harmed in various ways. (*Id.* at ¶¶ 96, 99, 100, 116, 120, 121, 142, 146, 147, 165, 169, 170).

Plaintiffs do not request damages. Instead, they request only declaratory and injunctive relief. Specifically, they request a declaratory judgment to the effect that Defendants' actions in

enforcing the Birth Certificate Policy are in violation of the Equal Protection Clause, the Due Process Clause, and the Free Speech Clause. They also request that Defendants (and those acting in concert with them) be: (i) permanently enjoined from enforcing the Birth Certificate Policy, including from refusing to provide birth certificates to transgender persons that reflect their gender identity; (ii) ordered (via essentially an affirmative injunction) "to permit transgender persons born in Tennessee to change their birth certificates to reflect their gender identity, without adhering to the practice delineated in Rules of the Tenn. Comp. R. & Regs. 1200-07-01-.10 of using a strikeout line to change one's name, and with no record of the correction appearing upon the face of the certificate as provided by Tenn. Code Ann. § 68-3-203(f)";[9] and (iii) likewise ordered to immediately issue changed birth certificates to Plaintiffs to reflect their gender identity, without

---

[9] Tenn. Code Ann. § 68-3-203(f) prescribes what is essentially an exception to the "strikeout line" practice, *i.e.*, the above-discussed requirement of Tenn. Comp. R. & Regs. 1200-07-01-.10(11) to use a strikeout line to make a change and thus leave discernible the substance of the original entry before it was changed. That subsection provides:

> In addition to other methods of amending certificates that may be provided by statute or by duly authorized department rule, the state registrar, if presented by an applicant with evidence that a reasonable person would conclude proves beyond a reasonable doubt that an original entry on a certificate was factually inaccurate at the time of recordation, shall block out the misinformation and make the necessary correction. When such an amendment is made, no record of the amendment shall appear upon the face of the certificate; provided, that a record of all evidence submitted relative to the amendment, along with the registrar's analysis of the evidence, shall be maintained by the office of vital records.

Tenn. Code Ann. § 68-3-203(f). So under this subsection, where a correction is made *because the original entry on a certificate was factually inaccurate at the time of recordation*, then no record of the original entry shall be discernible, necessarily meaning that the strikeout line practice is inapplicable. But this subsection would be inapplicable if the original information *was correct at the time of recordation*. In the case of, for example, a name change years after birth, it could not be said that the original information was incorrect at the time of recordation; in that case, as Plaintiffs correctly note, the strikeout line practice would be applicable. Plaintiffs contend (but the Court does not assume to be true, as discussed herein) that their sex designation was indeed factually inaccurate; if that contention were valid, then the exception to the strikeout line practice would indeed apply, and thus no record of the original sex designation would be discernible. But if the State is not constitutionally required to start allowing changes to the sex designation, such that the Court need not reach whether the strikeout line practice is constitutionally infirm with respect to sex designation, the Court certainly does not need to reach whether this exception is applicable.

adhering to the "strikeout line," and with no record of the correction appearing upon the face of the birth certificate.

As might be expected, Plaintiffs also request an award of costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and any other applicable laws.

<u>BACKGROUND PRINCIPLES</u>

The instant case is largely about categorization. Specifically, it is primarily about what is and is not the basis for categorizing persons—how persons are and are not categorized—via their birth certificates under Tennessee law and policy, what those categories actually mean, and whether it is unconstitutional for Tennessee to refuse to allow changes to the categorization based on subsequent circumstances that have nothing to do with the basis for the original classification.[10]

Plaintiffs allege that in Tennessee "a person is assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth" and that "[o]ther sex-related characteristics (such as a person's chromosomal makeup or gender identity, for example) are typically not assessed or considered at the time of birth." (Amended Complaint at ¶ 22). Defendants do not disagree that designation of sex on a Tennessee birth certificate is based solely on external genitalia at the time of birth. (Hereinafter, choosing relatively brief and non-graphic terminology, the Court refers to this particular notion of sex as "sex (based on birth appearance)").[11]

---

[10] What this case is *not* about is transitioning or transgenderism writ large, or transgender persons as group, or cisgender persons as a group, or how the undersigned or any other judge feels about any of these topics. Likewise, except to the limited extent indicated herein, it is not about any other Tennessee laws and policies affecting transgender persons— including any that are currently under constitutional challenge in cases before the undersigned or other federal judges; those challenges present different issues and are subject to different analyses.

[11] Of course, there are other conceptions of sex, but sex (based on birth appearance) is the one that is relevant herein because it is the one that governs sex designation on a Tennessee birth certificate. Consistent with

The undersigned believes that he must begin his analysis at a very fundamental level, by enumerating various relevant realities regarding the categorization here at issue. Despite not claiming to be anything close to an expert in any relevant discipline, the undersigned perceives that the following propositions are relevant and cannot reasonably be disputed: (a) the vast majority of persons can be, and historically have been, placed by other persons and their societies in one of two categories based on their biological characteristics, namely their genitalia (reproductive organs);[12] (b) one such biological category is comprised of persons with penile genitalia (and associated reproductive organs); (c) this category traditionally has been called the

---

the footnote below, the Court notes that it is aware of no reason to believe that a particular sex designation would, except in very rare cases, be different if the designation was made based on chromosomal composition rather than on external genitalia at the time of birth.

[12] More recently, in the aftermath of the discovery of sex chromosomes in the early part of the 20th century, a second biological characteristic became prominent in categorizing persons based on biological sex: chromosomal makeup. In particular, the vast majority of persons have either (i) what are known as one "X" chromosome and one "Y" chromosome, or (ii) what are known as two "X" chromosomes. So a person categorized as "male" can be so categorized based not only on having a penile organ, but also based on having an X chromosome and a Y chromosome, and a person categorized as "female" can be so categorized based not only on having a vulva, but also based on having two X chromosomes. Such categorization leads (with very rare exceptions) to results consistent with categorization based on reproductive organs. *See Doe v. Ladapo*, No. 4:23CV114-RH-MAF, 2023 WL 3833848, at *1 (N.D. Fla. June 6, 2023) ("With extraordinarily rare exceptions not at issue here, every person is born with external sex characteristics, male or female, and chromosomes that match."). That is, historically, if a person would be categorized as a male based on external genitalia (penile genitalia), then with at most only very rare exceptions (which neither side has contended would be of any relevance to the resolution of the instant Motion), the person would have a particular (that is, X-Y) chromosomal makeup that would also result in the categorization of the person as male. And, historically, if a person would be categorized as a female based on external genitalia (vulvic genitalia), then with at most only very rare exceptions (which, again, neither side has contended would be of any relevance to the resolution of the instant Motion), the person would have a particular (that is, X-X) chromosomal makeup that would also result in the categorization of the person as female.

In the instant case, however, the Court disregards any role of chromosomes in placing persons in one or the other category of biological sex, because Plaintiffs allege that persons are categorized on (and for purposes of) Tennessee birth certificates based solely on external genitalia—with persons having penile genitalia being categorized as "male," and persons with vulvic genitalia being categorized as "female." However, the Court does note that it is aware of no reason to believe that a particular sex designation would, except in very rare cases, be different if the designation was made based on chromosomal composition rather than on external genitalia at the time of birth.

"male" category, with persons falling into such category being called "males"; (d) the other such category is comprised of persons with vulvic genitalia (and associated reproductive organs); (e) this category traditionally has been called the "female" category, with persons falling into such category being called "females"; (f) these two categories historically have been considered the "sex" categories,[13] with "male" (as thus defined, based on biology) being one category of "sex," and "female" (as thus defined, based on biology) being the other category of "sex"; (g) the notion of "gender identity" (which is described in a footnote below) as that term has long been used, transcends mere reproductive-biology characteristics;[14] and, relatedly (h) a person's "gender identity," as that notion is generally perceived, ultimately is not necessarily associated with (let alone determined by) one's reproductive biological characteristics (including external genitalia at the time of birth), but rather is determined based on the person's self-perception based on a wide variety of factors.[15]

---

[13] It appears that a very small percentage of persons do not fit neatly into either one of these categories. For example, Defendants correctly note that a small number of babies are born with ambiguous genitalia. (The Court assumes that a certain percentage of babies likewise are born with ambiguities related to the so-called sex chromosomes. (Doc. No. 74 at 2 n.1)  But as Defendants note, the fact that a small number of babies are born with ambiguous genitalia is not material to the Court's resolution of the instant Motion, (*Id.*) and indeed neither side relies on it to support its argument in connection with this Motion. Plaintiffs do rely on this fact, however, in their reply in support of their motion for summary judgment. (Doc. No. 93 at 3).

[14] "Gender" can be conceptualized as something distinct from "gender identity." Plaintiffs define "gender identity" as "a person's core internal sense of their own gender." (Amended Complaint at ¶ 3, 23). That is, "gender identity" by definition refers to a person's own internal sense of the person's gender; by contrast, "gender" is a designation that may be asserted essentially externally; that is, a speaker or writer may speak of terms "gender" generally without regard to any person's internal sense of the person's own gender, or may speak of  the "gender" of a particular person without regard to that person's internal sense of the person's own gender. When this occurs, the notion of "gender" is distinguishable from the notion of "gender identity." This case primarily concerns the latter—namely, Plaintiffs' and other transgender person's internal sense of their respective genders, and thus the Court—like Plaintiffs themselves—usually will use the term "gender identity" herein.

[15] It also is readily apparent that in the view of some, "gender" is not binary, meaning that a person's "gender" is not necessarily either male or female. But the existence and merit of this view is not implicated in this case. That is, for purposes of this case, it does not matter that some persons may self-identify as

The reader will note that the Court has *not* listed as an indisputable fact the notion that a person's gender identity ultimately is not necessarily associated with (let alone determined by) one's *sex*. In other words, for *Plaintiffs'* benefit, the Court does *not* assume that gender identity is in some cases inconsistent with a person's sex. This is because, as may surprise some readers (who may be familiar with the concept of gender identity being distinguishable and diverging from sex), Plaintiffs do not rely on a distinction between sex and gender identity; to the contrary, Plaintiffs go nearly so far as to say that *gender identity determines sex*—and then clearly rely on the notion that gender identity determines sex. For this reason, the Court does not reject at the outset the notion that gender identity and sex (depending on what one means by sex) will always be in alignment; instead, realizing that Plaintiffs rely on this notion, the Court begins with an open mind as to this notion and fully addresses its validity and relevance below.

The Court does not see how any of propositions (a)-(h) above reasonably can be disputed, and on at least propositions (g) and (h) above, Plaintiffs patently are in agreement. That is, Plaintiffs agree that a person's gender identity is not determined by biological characteristics, including his or her external genitalia at the time of birth.[16] This should come as no surprise. By contrast, Plaintiffs actually take no position on *whether gender identity is determined by sex*— which is a question different from whether gender identity is determined by external genitalia at the time of birth, if (as Plaintiffs contend) sex is not properly based on external genitalia at the

---

having a gender identity that is neither male not female; what matters is that some persons (*i.e.*, transgender persons, including Plaintiffs) perceive that they have a gender identity that is inconsistent with the biological sex indicated on their birth certificate.

[16] For example, in one manifestation of this agreement, Plaintiffs allege that "[e]xternal reproductive organs are not determinative of a person's sex" and immediately thereafter link "gender identity" and "sex." (Amended Complaint at ¶¶ 28-30). It follows that Plaintiffs' view is that external reproductive organs are not determinative of a person's gender identity.

time of birth. This may surprise any readers who were under the impression that transgenderism is based on the recognition of a distinction between gender identity and sex. Any such impression would be sharply inconsistent with Plaintiffs' view on this topic, which (as noted herein) is that gender identity determines sex (or, in other words, that sex is determined by gender identity).

What the Amended Complaint (and Plaintiffs' Opposition) focus on, instead of whether gender identity is determined by sex, is *whether sex is determined by gender identity*. And on this issue, as indicated above, Plaintiffs' allegation is clear: as properly understood, sex *is*—not just *may be*, but *is*—determined by gender identity. (Amended Complaint at ¶¶ 15-18, 173, 183). Plaintiffs make this same substantive allegation in slightly different terms elsewhere. Specifically, Plaintiffs do so when they unequivocally allege that the *sex*—and not just the gender identity—of a transgender man (meaning, by Plaintiffs' definition, a person whose gender identity is male even though the person's birth certificate assigned them the sex of female) "is male," and likewise that that the *sex* of a transgender female (meaning, by Plaintiffs' definition, a person whose gender identity is female, even though the person's birth certificate assigned them the sex of male) "is female." (Amended Complaint at ¶ 26).

In two places in the Amended Complaint, Plaintiffs equivocate somewhat, calling gender identity "the *primary* factor in determining a person's sex" and "the *critical* determinant of a person's sex." (Amended Complaint at ¶¶ 23, 29) (emphasis added). In a third place, the Amended Complaint speaks in terms of gender identity being merely "inextricably linked to"—rather than being solely and entirely *determinative of*—a person's sex and being merely a "sex-related characteristic." (Amended Complaint at ¶ 30). But despite these three implications that sex is properly determined based on a consideration of (secondary and non-critical) factors that go beyond just gender identity, the Amended Complaint does not suggest what these other factors

could be. The Amended Complaint likewise does not explain how any conceivable other (less significant) factors might support a determination that a particular person's sex is different from the person's gender identity. Indeed, the Amended Complaint relies firmly on the notion that sex *invariably* is properly determined by gender identity, *i.e.* that invariably the way to ascertain a person's "true sex" is to determine what the person's gender identity is and then pronounce it to be also the person's "true sex." Thus, the Court construes the Amended Complaint as a whole to allege that sex is determined exclusively by gender identity.

This notion is vital to Plaintiffs' claim that the State is constitutionally required to allow a transgender person to change the sex designation on the person's birth certificate to match the person's gender identity. Although some readers might be surprised or even concerned[17] that Plaintiffs refute the distinction between gender identity and sex, it is readily apparent how taking this position conceivably could help Plaintiffs. Part of Defendants' argument in support of the Motion is that the birth certificate, in designating sex (based on birth appearance), makes no assertion about (let alone designation of) gender identity; this argument supports the notion that the Birth Certificate Policy's disallowance of changes to the *sex* designation on a birth certificate does nothing to undermine, refute, or be inconsistent with a transgender person's *gender identity*. This argument would be neutralized to the extent the Court accepts Plaintiffs' position that sex is determined (exclusively) by gender identity.

Whether and to what extent the Court accepts this position is a topic that the Court addresses below. But before doing so, the Court must return to an observation that as noted above

---

[17] Specifically, for observers who believe that the notion of "gender" carries "useful connotations" that transcend and are distinct from the connotations of the notion of "sex," *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 157 n.1 (1994) (Scalia, J., dissenting), concern might exist that such "useful[ness]" is eviscerated to the extent that the distinction between "gender" and "sex" is eliminated by defining a person's "sex" not in terms of one's physical characteristics, but rather in terms of one's gender identity.

the Court believes is undisputed and indeed indisputable: the notion of "gender identity" is separate

from the notion of "sex" as determined by biological characteristics.[18] And it is entirely feasible

that a particular statute, in referring to "sex," is referring only to biological sex and not to a broader

concept that would include gender identity. The Supreme Court itself referred to this possibility

not long ago, in a landmark case promoting transgender rights, *Bostock v. Clayton Cnty., Georgia*,

140 S. Ct. 1731 (2020), in which it assumed arguendo that the term "sex" as used in Title VII of

the Civil Rights Act of 1964 referred only to biological sex.

> The only statutorily protected characteristic at issue in today's cases is
> "sex"—and that is also the primary term in Title VII whose meaning the parties
> dispute. Appealing to roughly contemporaneous dictionaries, the employers say
> that, as used here, the term "sex" in 1964 referred to "status as either male or female
> [as] determined by reproductive biology." The employees counter by submitting
> that, even in 1964, the term bore a broader scope, capturing more than anatomy and
> reaching at least some norms concerning gender identity and sexual orientation. But
> because nothing in our approach to these cases turns on the outcome of the parties'
> debate, and because the employees concede the point for argument's sake, we
> proceed on the assumption that "sex" signified what the employers suggest,
> referring only to biological distinctions between male and female.

*Id.* at 1739. So without actually deciding that "sex," as used in Title VII, referred specifically and

exclusively to a classification based on reproductive biology (genitalia), the Supreme Court

recognized that this was at least possible. And the clear reason this was at least possible is that

when a given statute refers to "sex," the term as properly construed may refer to solely to biological

sex, not to broader notions of gender identity. The same is true for a policy or for a fillable

information field on a birth certificate; in such contexts, as in the context of a specific statute such

as Title VII, the notion of "sex" may refer *only* to biological sex, irrespective of broader notions

---

[18] Below, the Court at times will refer to this latter notion as "biological sex."

of gender identity.[19] And more specifically, in a particular context, "sex" may mean more precisely sex as determined based on external genitalia at the time of birth (and not any other biological considerations).

With all of this as background, the Court turns next to what the Birth Certificate Policy does and does not do.

THE BACKGROUND FOR AND CONTENT OF THE
BIRTH CERTIFICATE POLICY, PROPERLY UNDERSTOOD[20]

For purposes of Tennessee birth certificates, "sex" has a very narrow and specific meaning. *All* that the term "sex" refers to, *for purposes of a Tennessee birth certificate in particular*, is external genitalia at the time of birth. (Amended Complaint at ¶ 14) ("[I]t is the practice of the State of Tennessee, for purposes of determining the sex designation on birth certificates, to rely solely on observations about the external genitalia of newborns"). That is, Tennessee birth certificates classify every person at the time of birth into one of two categories based on—and only on—external genitalia at the time of birth. A person's ultimate gender identity, or external genitalia later in life (as potentially changed by surgery), do not have anything to do with that classification. Nor do the person's ultimate personality, personal or professional interests and activities, values, "masculinity" or "femininity," style of dress, or appearance. In fact, nothing else at all about who a person is (including the person's gender identity) or what the person does—at any point in their life—has anything to do with the sex classification.

---

[19] None of this is to deny that in some if not at all contexts, discrimination based on transgender status is discrimination based on "sex," even if "sex" means only biological sex. But the issue the Court is discussing here has nothing to do with whether discrimination based on transgender status is discrimination based on sex. The issue is whether, in assigning "sex" to a person, a birth certificate is assigning a "true sex" (which Plaintiffs equate with "gender identity") to the person.

[20] The characterizations herein regarding the Birth Certificate Policy and Tennessee birth certificates are drawn from the Amended Complaint.

It bears emphasis that, as indicated above, a Tennessee birth certificate refers to the classification of the newborn made therein—into one of two categories based on external genitalia—as a classification based on "sex." And of course Tennessee birth certificates call the categories of sex "male" and "female."

So the background upon which the Birth Certificate Policy operates, as alleged in the Amended Complaint and undisputed by Defendants, can be summarized succinctly. Under Tennessee law and practice, birth certificates: (i) classify people into one of two categories based on external genitalia at the time of birth; (ii) refer to this categorization as a classification based on "sex"; and (iii) refer to the two categories as "male" and "female." Plaintiffs do not allege any constitutional infirmity in any of these three aspects of Tennessee law and practice.[21] And as Defendants note in essence, it is hard to see how any of this would be problematic. (Doc. No. 74 at 2) (noting "the longstanding and broadly accepted definition of 'sex' to mean the classification as male or female based on reproductive function." (citing New Oxford American Dictionary 1600 (3d ed. 2010))). That is, Plaintiffs do not challenge the State's practice of assigning a newborn a "sex" of "male" or "female" at the time of birth.

Instead, Plaintiffs challenge the Birth Certificate Policy, *i.e.*, the State's *refusal to change* the birth certificate's sex categorization for a transgender person based on the person's gender identity not aligning with the sex designation on the person's birth certificate.[22]

---

[21] To be clear, Plaintiffs certainly dispute the appropriateness of the practice of assigning a sex based solely on external genitalia at the time of birth. (Doc. 59 at ¶ 53). But they do not challenge this practice per se; they do not contend that it is unconstitutional. The Court declines to speculate as to why Plaintiffs do not so contend, although the Court can think of multiple rational reasons.

[22] The Court is referring here to a person at some point (obviously post-birth) perceiving that that his or her gender identity is divergent from the sex designation on his or her birth certificate.

## STANDARDS FOR A RULE 12(b)(6) MOTION TO DISMISS

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual

allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018). And "[a]t this preliminary stage in litigation, courts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies." *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999)). Ultimately, this inquiry into the plausibility of claims challenged under Rule 12(b)(6) is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. *See also Crawford v. Tilley*, 15 F. 4th 752, 762 (4th Cir. 2021) (noting that a court can draw upon judicial experience and common sense to decide whether claims are plausible); *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (noting that plausibility "depends on a host of considerations, including common sense").

<u>ANALYSIS</u>

I.    <u>Equal Protection Claim</u>

In Count I, Plaintiffs assert that the Equal Protection Clause is violated by the State's refusal to change the sex designation on a transgender person's birth certificate based on

subsequent (post-birth) events or circumstances,[23] namely, the transgender person's gender identity not aligning with the sex designated on the birth certificate. Plaintiffs do not allege (plausibly or indeed at all) that there is a constitutional infirmity with initially including a sex designation on a birth certificate that is based solely on external genitalia at the time of birth. So Plaintiffs must show why it is plausible that the Equal Protection Clause requires that such designation be changed upon request by a transgender person even though such designation has not been plausibly alleged to have been constitutionally infirm when made. This is not an easy task; if there is not a constitutional problem with *creating a document* with particular content, there well may not be any constitutional problem with *maintaining it in its original form* despite the affected person's requests to change it.[24]

Seeking to make this showing as to their equal protection claim, Plaintiffs rely on a particular proposition: "that their sex assigned at birth is not correct, based on a broad scientific and medical consensus that gender identity is determinative of one's sex, and that the assignment of sex at birth based solely on external genitalia is not accurate for transgender people." (Doc. No. 71 at 5).[25] In the Court's view, if this proposition is either (i) not plausible or (ii) not relevant in

---

[23] As indicated in the discussion below, the circumstances that allegedly require the State to allow a change to the sex designation have nothing to do with the basis upon which the designation was made in the first place.

[24] Nevertheless, the Court recognizes that the issue here is the constitutionality (or lack thereof) of the State's refusal to change the sex designation, not the constitutionality (or lack thereof) of making the sex designation in the first place. The Court also recognizes that the two issues are distinct, and that the resolution of latter issue is far from dispositive of the resolution of the former issue.

[25] Defendants aptly point out that "[i]t is unclear how, under Plaintiffs' view that gender identity is determinative of one's sex, a State could ever accurately determine sex at the time of birth." (Doc. No. 74 at 2 n.2). In fact, it is clear that under Plaintiffs' view, sex could *never* be accurately determined at the time of birth. So one would think that, for their entire theory to hold together, Plaintiffs would take the position that is non-sensical (or worse) to seek to determine sex at the time of birth, since the key determinant (gender identity, not biology) either does not yet exist (if a newborn baby does not yet have a gender identity) or unknown (since no one could possibly tell what gender identity a newborn baby has even if it

the instant context, then Plaintiffs' entire equal protection claim (of transgender-status-based disparate treatment) fails because that claim depends fully on the plausibility and relevance of the proposition.

Plaintiffs allege that "Tennessee's Policy treats transgender people differently than similarly situated cisgender people because it prohibits transgender people from holding birth certificates that accurately reflect their sex as determined by their gender identity, while allowing non-transgender people to have accurate birth certificates. This Policy facially discriminates against transgender people." (Doc. No. 71 at 5-6). In other words, transgender persons allegedly are treated differently than cisgender persons because they, and not cisgender persons, are prevented from having birth certificates that accurately (correctly) reflect their sex as determined by gender identity.[26] As Defendants correctly note, that is the crux of Plaintiffs' theory of disparate treatment. (Doc. No. 66 at 7).

As just indicated, Plaintiffs frame their equal protection theory primarily in terms of disparate treatment rather than disparate impact. This was prudent because the former is required, and the latter is insufficient, to establish an equal protection claim. "The 'threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-

---

indeed it already has a gender identity). But Plaintiffs do not take this position, perhaps because they realize that it is untenable to claim that no determination should ever be made of a newborn's sex at birth—a determination that could hardly be based on anything other than biology, most likely external genitalia but alternatively chromosomal composition. What this all suggests is that Plaintiffs' view—that a determination of sex at the time of birth was simply incorrect from the get-go unless it proves ultimately to match the person's gender identity—is also untenable because under Plaintiffs' view, the correctness of such determination would always be unknown or unknowable when made.

[26] The Court notes that transgender persons and cisgender persons are treated exactly the same as to the basis for the sex designation on a birth certificate; for both groups, the designation is made based entirely on external genitalia at the time of birth. So the claim of disparate treatment has nothing to do with the *basis* for the sex designation, and everything to do with the purported *inaccuracy* of the sex designation.

makers.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.,* 470 F.3d 250, 260 (6th Cir.2006)). Moreover, "disparate impact and foreseeable consequences, without more, do not establish [an equal protection] violation." *Spurlock v. Fox*, 716 F.3d 383, 398 (6th Cir. 2013) (quoting *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 464 (1979)).[27]

So Plaintiffs' above-referenced theory of disparate treatment must be plausible for the equal protection claim to survive the instant Motion. And to find that this is the case, the Court must find plausible Plaintiffs' contention that the birth certificate's sex designation for a transgender person is "incorrect." In the Court's view, Plaintiffs do not suggest (plausibly or otherwise) in any way that the Equal Protection Clause would require the State to change the sex designation of a transgender person's birth certificate if it were not "incorrect." And Plaintiffs certainly do no explain why the Equal Protection Clause requires the changing of a record—of sex (based on birth appearance)—that Plaintiffs do not dispute the State was allowed to create in the first place. So, to repeat, Plaintiffs' entire theory of disparate treatment, and resulting equal protection claim, depends on the validity of the notion that the sex designation on a transgender person's birth certificate is *incorrect*.[28]

---

[27] However, "evidence of a policy's disparate impact may be *probative* in determining whether the policymaker harbored a discriminatory intent," although it rarely is *dispositive* of discriminatory intent. *Spurlock*, 716 F.3d at 400 (emphasis added).

[28] The Court declines to muse herein on how else Plaintiffs might have sought to allege disparate treatment. Without taking a position as to any disparate-treatment theory that was not presented, the Court notes that a significant challenge to alleging disparate treatment is the fact (indicated by the Amended Complaint in conjunction with Tenn. Code Ann. § 68-3-203(f)) that Tennessee refuses to allow *anyone* to change the information on his or her birth certificate for any reason other than the original entry being factually inaccurate at the time of recordation—meaning, with respect to sex designation, that the recorded sex designation did not accurately correspond to the external genitalia of the person at the time of birth. And while transgender persons surely are far more likely than cisgender persons to wish to change the sex designation for some other reason, as discussed below there are multiple conceivable scenarios in which a cisgender person might have a motive (perhaps a nefarious one) to desire to change the sex designation

According to Plaintiffs, this proposition must be accepted as true at this stage of the litigation. (Doc. No. 71 at 5). The Court disagrees. Based on what "sex" actually means *for purposes of a Tennessee birth certificate*, it is not plausible to suggest that the "sex" listed on a Tennessee birth certificate for a transgender person becomes "incorrect" or "inaccurate" when it is eventually understood to diverge from the transgender person's gender identity.

Plaintiffs claim that "based on a broad scientific and medical consensus gender identity is determinative of one's sex, and that the assignment of sex at birth based solely on external genitalia is not accurate for transgender people." (Doc. No. 71 at 5). In other words, Plaintiffs claim that gender identity equals "sex." But the veracity of that claim depends on what one means by "sex." In the sense that *Plaintiffs* are using the term "sex" when making that claim, the claim may be true. But as noted above, sex can mean different things to different people and/or mean different things in different contexts, and the notion that there is only one definition of "sex"—or only one sense in which the word "sex" properly can be used—is patently wrongheaded. Not even Plaintiffs dispute that the State is generally allowed to use the term "sex" on a birth certificate to refer to external genitalia at the time of birth.[29] And it is *this* notion of sex, and not whatever notion of "sex" that Plaintiffs (and the referenced medical and scientific community) have in mind, that is relevant here.

_____

even though it was accurately recorded at the time of birth (and aligns with the cisgender person's gender identity). And yet, just like a transgender person, a cisgender person may not change the sex designation on his or her birth certificate for any other reason. For this reason, Defendants argue that Plaintiffs are seeking not equal treatment under the law, but rather more favorable treatment under the law than cisgender persons receive. The Court sees no need to weigh in on the validity of Defendants' characterization; the Court's point here instead is that, as Defendants argue, Tenn. Code Ann. § 68-3-203(f) applies to transgender persons and cisgender persons alike, thus limiting Plaintiffs' options for alleging disparate treatment.

[29] Plaintiffs' claim is, instead, that for a *minority* of persons (transgender persons), the original designation of sex (based on birth appearance) *ultimately* proves inappropriate because (according to Plaintiffs) it results in a designation that is eventually revealed to be inaccurate.

Relatedly, Plaintiffs allege that "[t]here is no medical or scientific basis for refusing to acknowledge a transgender person's true sex, as determined by their gender identity . . . ." (Amended Complaint, ¶ 46). But the proposition that a person's "true sex [is] determined by their gender identity" is neither *factually* true nor *factually* false; the validity of the proposition depends on what is meant by "true sex"—a subjective, value-laden, and ambiguous term. Depending on the meaning of the term, "true sex" may or may not be determined by gender identity, and persons can hold different views about what "true sex" means and how one's "true sex" should be determined in light of what "true sex" means. Plaintiffs' proposition is not a factual assertion,[30] but rather a sheer value judgment (or perhaps a semantical opinion)—one that is by no means necessarily shared by all other persons (or consistent with all dictionary definitions, for that matter); therefore, the Court declines to accept it as true.

But even accepting arguendo that "true sex" is determined (defined) by gender identity, that proposition is irrelevant here because the Birth Certificate Policy does not reflect any refusal to acknowledge a person's "true sex" as thus defined. What it does reflect is something very different: a refusal to change the historical information on a birth certificate reflecting the person's sex (based on birth appearance). In other words, if "true sex" is indeed based on gender identity, then the Birth Certificate Policy (and, for that matter, Tennessee's laws and practices underlying that policy, as well as Tennessee birth certificates) have nothing to say about "true sex," because they have nothing to say about gender identity. And in any event, they do not purport to speak to "true sex"; they purport to speak only to sex (based on birth appearance). As Defendants correctly

---

[30] Defendants correctly assert that "Plaintiffs' allegation that a person's 'sex' at the time of birth means his or her gender identity is a legal conclusion, not a factual allegation." (Doc. No. 74 at 1). The Court agrees with Defendants' vital observation that Plaintiffs' allegation here is not a factual allegation. But the Court perceives of it as more of a value judgment or opinion on semantics and less of a legal conclusion. But either way, it is not entitled to the assumption of truth and is in any event irrelevant, as discussed herein.

put it: "The narrow purpose of the sex field on a birth certificate is to record a person's sex at the time of birth, not to predict that person's eventual gender identity. A person's current gender identity is simply irrelevant to the sex designation that appears on a birth certificate." (Doc. No. 74 at 2). Defendants might have added that the sex field on a birth certificate is also not intended to predict a person's external genitalia later in life (which of course could be changed by surgery), to suggest that "male" or "female" cannot have meanings transcending mere external genitalia at birth, or to suggest that a person cannot switch between the two based on gender identity or changes in external genitalia.

Defendants state that Plaintiffs are "conflat[ing] sex with gender identity, thus complicating and confusing what ought to be—and generally is—a simple and straightforward medical determination made and recorded at the time of birth." (Doc. 85 at 13). In other words, Defendants here argue (among other things)[31] that the sex designation on a birth certificate reflects nothing more than a medical determination about the baby's external genitalia at the time of birth. For reasons discussed herein throughout, the Court agrees. And because this is all that the sex designation on a Tennessee birth certificate reflects, the Court also agrees with Defendants in finding erroneous "Plaintiffs'. . . view that the sex designation on a transgender person's birth certificate is 'incorrect' if it reflects that person's sex at the time of birth rather than his or her current gender identity." (Doc. No. 66 at 7-8).

---

[31] Defendants' other argument here is that Plaintiffs are conflating sex (based on birth appearance) with gender identity. As discussed elsewhere herein, Plaintiffs respond in effect that this conflation is entirely appropriate because (as alleged in the Amended Complaint) *a person's gender identity is their sex*. As noted elsewhere herein, the Court declines to accept the italicized proposition as true and believes it to be irrelevant in any event because in this context Plaintiffs are using the word "sex" to refer to something very different from the "sex" here at issue, *i.e.*, sex (based on birth appearance).

To the extent that Plaintiffs in their briefing insinuate that something different (and nefarious) is going on with (or underlying) the Birth Certificate Policy, the Court finds that the Amended Complaint does not contain factual matter to support the insinuation. Nothing in the Policy, or the statute upon which it allegedly is based, says anything about gender identity or "true sex" as Plaintiffs conceive of the term. Nor does the Court see in the Amended Complaint any factual matter indicating that the State somehow is otherwise (*i.e.*, outside the *direct* purview of the Policy or the statute) using Tennessee birth certificates in particular to take a position regarding "true sex" or gender identity, either in general or with respect to the respective persons named in birth certificates. Nor does the Court see any factual matter indicating that the Birth Certificate Policy is somehow a stalking horse for imposing other views that may be adverse to transgender persons—for example, the view that a person must live his or her life in a manner consistent with traditional familial or societal roles for individuals who had that person's sex (based on birth appearance). This is America, and subject to any applicable and constitutional laws, persons may live their lives, and think about and present themselves, as they see fit.[32] But the Court does not see any alleged factual matter suggesting that the State is insisting, asserting, or even implying otherwise via the Birth Certificate Policy or anything else related to birth certificates.

Plaintiffs suggest that an animus against transgender persons is reflected in the statutory provision that "[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery." Tenn. Code Ann. § 68-3-203(d). In particular, they claim that this

---

[32] It seems widely accepted in this country that it is presumptively not anyone else's business, in general, how other persons perceive of themselves and live their lives. Likewise, it seems widely accepted, and in many respects is the law, that persons should be able to live their lives without abuse or harassment, no matter how they perceive of themselves or live their lives. (On the flip side of that coin, however, is the notion that it is presumptively not anyone else's business, in general, what another individual thinks about how other persons perceive of themselves and live their lives).

provision "lays bare the categorical ban aimed at transgender people." (Doc. No. 71 at 6). But any such animus is irrelevant if (as the Court finds herein) Plaintiffs do not have a plausible theory of disparate treatment. [33]

And the accusation of such animus is not cognizable on the instant Motion in any event, for four reasons. To begin with, the Amended Complaint (unlike Plaintiffs' Opposition) alleges no anti-transgender animus in this law; it does not, for example, assert that the law is the result of an anti-transgender bias on the part of those who are and recently have been controlling the legislative and executive branches of the Tennessee state government. Still less does the Amended Complaint set forth factual matter supporting an allegation of such animus.

Second, Tenn. Code Ann. § 68-3-203(d) patently does not even apply to transgender persons who (like Plaintiffs, as far as the Amended Complaint indicates) have not had sex-change

---

[33] Tenn. Code Ann. § 68-3-203(d) does not itself reflect disparate treatment. True, presumably the vast majority of persons to whom it applies would be transgender—but, as noted herein, not all of them would be transgender. Moreover, the statute states that the persons to whom it applies will *not* be treated differently from other persons for purposes of the rules regarding changes to a birth certificate's sex designation. In short, the statute applies equally to transgender and cisgender persons alike, and its purpose is to ensure that the general ban against changing a birth certificate's sex designation applies to transgender and cisgender persons alike. As Defendants note:

> [N]either transgender persons nor cisgender persons may amend the sex designation on their birth certificates unless it was incorrectly recorded at the time of birth. Tennessee Code Annotated § 68-3-203(d) does not subject transgender persons to a different standard; it simply clarifies that the sex that is recorded on a person's birth certificate remains an accurate designation of sex at the time of birth even if that person later has a "sex change surgery."

(Doc. No. 66 at 9).

Plaintiffs' argument here is really one of disparate impact—that the statute impacts transgender persons far more than cisgender persons. As noted herein, evidence of disparate impact can be evidence of discriminatory intent, although as also noted herein, neither the Amended Complaint nor anything else suggests that the disparate impact in this circumstance is reflective of discriminatory intent. And in any event, the issue of discriminatory intent is not even reached unless there is disparate treatment—something Plaintiffs have not plausibly alleged, in the Court's view.

surgery,[34] So, to the extent that Plaintiffs here insinuate that the statute applies categorically to all transgender persons, that insinuation is incorrect. Of course, a law aimed at only a subgroup can reflect an animus against the entire group of which the subgroup is a part. But the Court currently perceives no reason to believe that Tenn. Code Ann. § 68-3-203(d) was aimed at transgender persons as a whole *because they are transgender* or even at a subset of transgender persons (i.e., those who have had sex-change surgery) *because they are transgender*, rather than aimed at persons whose external genitalia was surgically changed *irrespective of whether they are transgender*.

Relatedly, there is no reason to believe that the statute's concern with such persons was *solely* that their external genitalia had changed, and *not* that they were transgender (*i.e.*, had a gender identity divergent from the designation of sex (based on birth appearance) in their birth certificate). This is especially true given when, and by whom, this statute was enacted—a topic completely ignored by Plaintiffs. The statute at issue, Tenn. Code § 68-3-203 was enacted as 1977 Pub. Acts, c. 128 § 21 on May 3, 1977. It included subsection (d), the particular subsection here at issue, and that subsection has remained in its current form until this day. The majority of both of the houses of the Tennessee legislature that passed the bill, and the Tennessee governor who signed the bill, were all of the same party—and it was *not* the party that has controlled the Tennessee legislature and the Tennessee governor's office for the past dozen years or so. So the statute undeniably was not the result of some current movement to discriminate against transgender persons, or of some political agenda, associated with the current powers that be in the Tennessee

---

[34] As indicated above, however, Plaintiffs theorize essentially that this statutory language has been extended by state actors to apply to all transgender persons, whether or not they have had a sex-change operation—thus serving as the basis of a policy/practice/custom (the Birth Certificate Policy) that applies to all transgender persons. The Court is aware that this is Plaintiffs' theory. Here, the Court is dealing solely with the more limited and discrete claim that Tenn. Code Ann. § 68-3-203(d) reflects an anti-transgender bias.

state government. Nor does the time of the statute's passage suggest an anti-transgender bias. The Court does not deny that in 1977, there was widespread animus against persons having what the statute calls "sex change surgery" (the term the Court uses herein, albeit with a hyphen). But the Court is aware of, and Plaintiffs have provided, no basis to believe that the political moment in Tennessee in 1977 was such that the governing political party would have (i) gone out of its way to pass this kind of provision based on an animus against persons having sex-change surgery, or (ii) even conceptualized at all a group of "transgender" persons broader than the referenced group, *i.e.*, those having sex-change surgery, that could or should be targeted based on animus against the broader group.[35]

Third, Tenn. Code Ann. § 68-3-203(d) does *not* apply only to transgender persons. It applies to any person who has a sex-change surgery. Persons certainly can have sex-change surgery for reasons unrelated to being transgender. Indeed, reportedly[36] some persons have. *See, e.g.*, *Mexican fugitive undergoes sex change surgery to avoid arrest*, https://sg.news.yahoo.com/mexican-fugitive-undergoes-sex-change-surgery-avoid-arrest-111417370.html; *Escaped Colombian convict gets sex change to avoid going back to jail*,

_____

[35] Available information shows that the term "transgender" was barely even in use in 1977. https://books.google.com/ngrams/graph?year_start=1800&year_end=2019&corpus=26&smoothing=7&case_insensitive=on&content=transgender, although reportedly the term was coined earlier, in 1965. https://en.wikipedia.org/wiki/Transsexual. Available information shows that, by contrast, the term "transexual" was widely in use in 1977. https://books.google.com/ngrams/graph?content=transexual&year_start=1800&year_end=2019&case_insensitive=on&corpus=en-2019&smoothing=7. It seems uncontroversial to say that the term the term "transsexual" has been used to refer to divergence from one's sex designation at birth specifically associated with medical interventions, especially surgery.

[36] To be clear, the Court is not accepting as true any assertions made in these articles. The Court cites these articles not to assert the reported incidents necessarily occurred, but rather to bolster its point that there are conceivable scenarios whereby persons undergo sex-change surgery for reasons unrelated to being transgender. Whether the events reported in these articles actually occurred, they were certainly *conceived* by someone (at the very least, the reporter writing the story and, if the story is accurate, the person receiving the sex-change surgery).

https://nypost.com/2013/05/09/escaped-colombian-convict-gets-sex-change-to-avoid-going-back-to-jail; *The man who's had TWO sex changes: Incredible story of Walt, who became Laura, then REVERSED the operation because he believes surgeons in US and Europe are too quick to operate*, https://www.dailymail.co.uk/news/article-2921528/The-man-s-TWO-sex-changes-Incredible-story-Walt-Laura-REVERSED-operation-believes-surgeons-quick-operate.html (reporting on a man's second sex-change surgery that brought him back into alignment with his original sex designation (male) after he realized that he was not transgender after all). Such persons would be subject to Tenn. Code Ann. § 68-3-203(d) even if they are not transgender.

Fourth, as noted elsewhere herein the enactment of Tenn. Code Ann. § 68-3-203(d) is patently explainable by reasons having nothing to do with anti-transgender animus, namely a desire to make and maintain a record of sex (based on birth appearance) .[37] A simple search of the Internet reveals what in the Court's view seems intuitive: the relative rate of births of one biological sex vis-a-vis the rate of birth for the other biological sex is a matter of significant social, scientific, and medical (and perhaps also economic and political) interest and consequence. In short, the relative birth rates of males and females in (and across) our world matters, and it cannot be assessed without raw data categorizing persons as male or female *at the time of birth*.[38] As noted above,

---

[37] The Court pauses to note that it is *not* here addressing the extent to which the Birth Certificate Policy is supported by reasons adequate to survive whatever level of equal-protection scrutiny would be applicable to the Birth Certificate Policy if Plaintiffs had adequately alleged disparate treatment. Instead, the Court here is continuing its discussion of what the Court cannot accept as true for present purposes, *i.e.*, the insinuation that Tenn. Code Ann. § 68-3-203(d) reflects an animus against transgender persons. This discussion is part of a very consequential explanation of why the Court finds that the Birth Certificate Policy simply does not do—either explicitly, or furtively under the guise of some other rationale—anything more than what the Court says it does, which is certainly something less than what Plaintiffs claim it does.

[38] The undersigned understands that there could be varying criteria across the world for making such categorization, most likely by external genitalia (as with Tennessee birth certificates) or by chromosomal composition. But as noted elsewhere herein, the undersigned does not perceive that, or any reason why, the results would vary materially depending on which criteria was used. And he further perceives neither much concern in the relevant scientific disciplines that the criteria used are faulty nor much dispute as to who is

Tennessee has chosen to make the designation of sex (based on birth appearance) a matter of historical, factual record to be preserved. Tenn. Code Ann. § 68-3-203(d) simply serves to make clear—in a clarification that easily could be seen as prudent for a state legislature to make, especially in 1977 as the total number of sex-change surgeries continued to mount —that this record must be preserved even if a sex-change operation serves to change the person's external genitalia from what the genitalia was at the time of designation of sex (based on birth appearance).

In short, as far as the Amended Complaint shows, Tenn. Code Ann. § 68-3-203(d) is not reflective of disparate treatment (as opposed to disparate impact) or of anti-transgender bias. And the issue of such bias is not even reached if (as here, in the Court's view) disparate treatment has not been plausibly alleged.

Plaintiffs make several additional arguments.[39] They state the following:

> Tennessee's Birth Certificate Policy . . . stands in stark contrast to Tennessee's own policy permitting transgender people to correct the gender marker on their driver licenses and state identification cards to accurately reflect their sex, consistent with their gender identity. The Tennessee Department of Safety and Homeland Security ("Department of Safety") permits transgender people to correct the sex designation on their driver licenses so that the licenses accurately reflect their sex, as determined by their gender identity, even absent a changed birth certificate. Like the federal government, the Department of Safety does not require transgender persons to have any particular medical procedure, such as surgery, to do so. The Department of Safety only requires that the person requesting the gender marker correction provide either (1) a statement from a physician that "necessary medical procedures to accomplish the change in gender are complete," or (2) a court order recognizing a gender change.

---

appropriately deemed male and who is appropriately deemed female for purposes of categorization of sex at birth (as contrasted, of course, with gender identity).

[39] Plaintiffs do not necessarily make these arguments in support only of their equal protection claim. But the arguments are flawed for the reasons discussed here, and thus they fail to support any of Plaintiffs' claims.

(Amended Complaint, ¶ 74). Plaintiffs then assert that the Department of Safety's policy "undermine[s] Defendants' purported interest in maintaining accurate identification documents." (Doc. No. 71 at 11 n.5). But Plaintiffs do not explain the grounds for this assertion

The Court rejects this unsupported assertion. Defendants state in reply, "[T]he fact that Tennessee allows individuals to change their sex designation on current identification documents such as driver's licenses makes clear that the State is not engaging in any impermissible stereotyping." (Doc. No. 74 at 2). The Court would put it somewhat differently: what it makes clear is two points vital to this Court's analysis, *i.e.*, that (a) the State does not have or seek to impose a *general* view that sex is immutable, and therefore, (b) the Birth Certificate Policy does not suggest or serve to impose the view that sex is immutable for any purposes other than for the limited purpose of a Tennessee birth certificate (which defines sex in terms of an immutable historical fact). The Court does not accept Defendants' statement in full cart blanche, but it does find apt the statement's suggestion that the very State practices to which Plaintiffs point here are consistent with the notion that the Birth Certificate Policy serves merely to accurately document sex (based on birth appearance) for each newborn baby, and not to make broader statements about "sex" or gender identity or to suggest the immutability of sex or gender identity. The statement likewise aptly suggests that the sex designation on a birth certificate is intended to record a past historical observation, and thus it should not be compared to the sex designation on the *current identification documents* to which Plaintiffs refer. In other words, changing the designation of sex (based on birth appearance) on a birth certificate due to someone's transgender status *defeats* the very purpose of that part of the document. But changing someone's sex designation to reflect (current) gender identity on a current identification document *promotes* the purpose of that document.

Ultimately, Plaintiffs' assertion here is based on a far-too-general characterization of a birth certificate as an "identification document," *i.e.*, on an unwarranted analogization of a birth certificate (and in particular its historical designation of sex (based on birth appearance)) with current identification documents such as a driver's license. As just discussed, the kinds identification documents being compared by Plaintiff are different from one another, and it is not analytically helpful to lump them together here. Defendants' relevant interest here is not an interest in the accuracy of "identification documents" generally; it is an interest in making and maintaining an accurate designation of sex (based on birth appearance). This interest in positively promoted, rather than inhibited, by declining to change that designation based on post-birth events or circumstances.[40]

Plaintiffs additionally make much of the fact that Tennessee stands virtually alone in not allowing transgender persons to change the sex designation on their birth certificate. (*E.g.,* Amended Complaint, ¶72-73). The Court does not begrudge Plaintiffs making this observation and seeking somehow to make hay out of it.[41] But ultimately this fact by itself counts for little. Tennessee is allowed to have its own policy—no matter how unique or "out of the mainstream" it may be—so long as the policy is not unconstitutional; this strikes the undersigned as one of the defining features of our constitutional system of federalism. The question is not whether Tennessee's policy is an outlier, but rather whether Tennessee's policy violates the Equal

---

[40] The Court pauses to note that, again, it is *not* here addressing the extent to which the Birth Certificate Policy is supported by interests adequate to survive whatever level of equal-protection scrutiny would be applicable to the Birth Certificate Policy if Plaintiffs had plausibly alleged disparate treatment. Instead, the Court here is discussing why, contrary to Plaintiffs' suggestion, the sex-designation field of a birth certificate is not comparable to a current identification document.

[41] After all, a state's law or policy conceivably could be an outlier precisely because it is unconstitutional. Other times, however, a state's law or policy is an outlier despite not being unconstitutional. An outlier may or may not be unconstitutional, and "outlier" status is not a litmus test for unconstitutionality.

Protection Clause, substantive due process, or the First Amendment. The Court declines to rely on the notion that it is more likely that Tennessee is constitutionally required to do something different from what it does just because other states and the federal government do it. The undersigned is not alone in believing that federal-court suppression of outliers *on the grounds that they are outliers* is inconsistent with federalism as many (including the undersigned) conceive of federalism. As one scholar explained this line of belief:

> Some scholars have suggested that the relationship between outlier suppression and federalism is almost inherently a hostile one. When judicial opinions interpret the Constitution to suppress outliers, scholars note, those opinions impose national uniformity and undercut state autonomy, thus impinging on what they regard as the very hallmark of federalism. . . .

> To be sure, the notion that outlier-suppressing opinions clash with federalism contains some explanatory power--at least as applied to certain notions of federalism. If one values federalism primarily because it permits different states to arrive at different solutions, outlier-suppressing opinions typically should be viewed as clashing with federalism.[155] New York and Florida are extremely different states, this state-autonomy version of federalism runs, and courts should not force them to follow precisely the same rules. Under a related theory, to the extent that one values federalism primarily because it permits people to relocate from one state to a different state whose policies better reflect their values, outlier-suppressing opinions also should generally be seen as disrespecting federalism. Under this competitive-federalism theory, for instance, New Yorkers who object to state income taxes may decide to express that policy preference by relocating to Florida, a state that eschews income taxation. Both of these federalism theories stand in considerable tension with judicial opinions that suppress all outlier variants because the theories are predicated on maintaining and permitting the existence of diverse measures that satisfy people with diverse preferences. Such state diversity seems plainly incompatible with outlier-suppressing opinions.

*See Justin Driver, Constitutional Outliers*, 81 U. Chi. L. Rev. 929, 961-62 (2014). The Court's point here is not that the Birth Certificate Policy represents some deep-seated, value-laden judgment by the Tennessee government; as reflected herein, the Court finds that the policy is easily explainable by much more mundane concerns. The Court's point, instead, is that there is nothing

inherently constitutionally suspect about a state doing something differently from how the federal government and other states (even *all* other states) do it.

The Court perceives an additional problem with what Plaintiffs are asking for here. As noted, Plaintiffs do not challenge the notion that the State can include in a birth certificate a designation of a person's sex. But the upshot of Plaintiffs' argument is that for *all* persons *initially*, and *cisgender* persons *perpetually*, the designation would refer to *sex (based on birth appearance)*—but that for *transgender persons* who later choose to change their birth certificates, the designation would *eventually* refer to *gender identity*. Plaintiffs are proposing that a birth certificate present one kind of information for one group of persons, but another kind of information for the other group of persons. And under Plaintiffs' demand, whereby there would be no strike-through line as to sex, no one viewing a person's birth certificate would ever be able to determine which of the two groups a person belongs to, and thus no one would ever be able to determine which of the two kinds of information is reflected on the birth certificate. The Court does not see where Plaintiffs have explained how this kind of unequal treatment—requiring different information for different groups of people on the same kind of official state document— is required by the Equal Protection Clause. Still less do Plaintiffs do anything to alleviate the reasonable concern that it seems non-sensical for no one to be able to determine which kind of information is included in any particular iteration of the document.

The Court does not begrudge Plaintiffs' view that the Birth Certificate Policy is demeaning to them and other transgender persons. They are allowed to think, feel and talk about the Birth Certificate Policy as they see fit. "But whether a law is dignifying or demeaning is a question for legislators, not judges." *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 487 (6th Cir. 2021), *abrogated on other grounds* by *Dobbs v. Jackson Women's Health Org.*, 213 L. Ed. 2d 545,

142 S. Ct. 2228 (2022). And the Court cannot start with how Plaintiffs feel or think about the Birth Certificate Policy; instead, it must start with what the Birth Certificate Policy, as described by Plaintiffs own allegations and facts judicially noticeable, *actually does*. And it simply does not do the crucial thing that Plaintiffs allege it does, namely, propagate incorrect representations on birth certificates of a transgender persons' true sex; the Court finds that the Birth Certificate Policy does no such thing, not least (or exclusively) because birth certificates express no position as to a transgender person's "true sex." This reality cripples Plaintiffs' equal protection claim from the outset and prevents Plaintiffs from establishing a plausible entitlement to relief on that claim.

Plaintiffs write that the Sixth Circuit has "held that existing precedent 'preclude[s]' a reading of '"sex" to mean only individuals' chromosomally driven physiology and reproductive function.'" (Doc. No. 71 at 8 (quoting *EEOC v. R.G. & G.R. Harris Funeral* Homes, Inc., 884 F.3d 560, 575 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020)). But *Harris Funeral Homes* (and *Bostock*) were construing the meaning of "sex" within the scope of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000 et seq.). These cases simply were not concerned with a "reading" of "sex" for purposes of Tennessee birth certificates, and as noted above *Bostick* itself indicated that "sex" can have different meanings in different contexts. What's more, Plaintiffs' claims actually raise no issue of the proper "reading" of "sex" for purposes of Tennessee birth certificates. There is no question what "sex" means for purposes of Tennessee birth certificates; it means sex (based on birth appearance). The question is not *how to read* that term, but whether a Tennessee birth certificate's use of the term (as it undisputedly is to be read under Tennessee practice), together with the State's refusal to change the sex designation for a transgender person to match the person's gender identity, effects a violation of the constitutional rights of transgender persons in the manner Plaintiffs allege it does. *Harris Funeral Homes* and

*Bostock* are inapplicable because there is nothing in them to suggest that there is something constitutionally infirm about the alleged Birth Certificate Policy, including the policy's insistence that a birth certificate's reference to "sex" remain as it originally was, *i.e.* a reference solely to sex (based on birth appearance), irrespective of what a person's gender identity turns out to be.

Perhaps Plaintiffs would now contend that these cases are applicable by analogy because they suggest that a state cannot (via any state statute, regulation or policy whatsoever) define "sex" to mean (or define sex in terms of) only individuals' physiology and reproductive function (including, as specifically relevant here, external genitalia at birth). But as noted above, the Amended Complaint does not allege that the state cannot, at the time of birth, make a "sex" designation based solely on external genitalia at the time of birth.

And such an argument would miss the mark in any event. The State does not, via the Birth Certificate Policy, *define* sex to mean (or *define* sex in terms of) only external genitalia at birth. That is not how the Birth Certificate Policy actually operates. Plaintiffs do not allege that the State (via the Birth Certificate Policy or otherwise) defines "sex" to mean only—defines sex in terms only of—external genital at birth. Instead, when scrutinized, Plaintiffs' allegation is that babies are categorized based on external genitalia, and such categorization is referred to on the birth certificate as a categorization based on "sex." But these circumstances do not suggest that "sex" is being *defined* by the State. Instead, they suggest that the State has directed that observable information—as to which of two categories a newborn baby falls into—be recorded on the birth certificate under the heading "sex"; depending on the baby's external genitalia, the baby is to be placed into one of two categories, and a Tennessee birth certificate dubs this categorization a categorization by "sex." There is nothing in this process that entails the State somehow "defining" the term "sex" only in terms of external genitalia. To place someone in a category of persons—a

category that happens to be given a particular name (for example, male)—based solely on a limited and specific criterion is not to say that the named category is for all purposes is definable only by that criterion. Likewise, to characterize such categorization as a categorization based on X (for example, sex) is not to pronounce that the term X, as used in any other context, properly is and must be determined based solely on that criterion.

Put differently, the Amended Complaint plausibly suggests only that a determination of "sex" on a Tennessee birth certificate is actually a determination as to external genitalia to which the category "male" or "female," as the case may be, is applied under the "sex" classification on the birth certificate. The Amended Complaint does not seem to allege that it is a determination of "sex" in any other, more transcendent sense—and to the extent that the Amended Complaint does so allege, the allegation is wholly conclusory, unsupported by Plaintiffs' own description of the Birth Certificate Policy and any other factual matter. A baby's external genitalia are observed, and based on that observation, the label "male" or "female" is used to describe the baby's "sex" for purposes of the birth certificate—and only for purposes of the birth certificate.[42] True, this procedure results in a biology-based designation of a person *at the time of the person's birth*. But there is no insinuation on the birth certificate itself that this designation is immutable over a person's life, or applies to every context, or is the only possible way to think of the person's "sex,"

---

[42] Consistent with the fact that the Court is resolving a motion to dismiss, the Court's statement here is based solely on what the Amended Complaint itself alleges about the Birth Certificate Policy. The Court notes, however, that its statement here is also consistent with at least two sealed documents in the record, which show the "sex" block of a particular Tennessee birth certificate to be completed with "undetermined" and "unknown," respectively. There can be little doubt what happened in each instance here. The physician completing the birth certificate was unable, based on observation of the newborn baby's external genitalia, to place the newborn into either of the two categories available to the physician. It is not as if the physician was trying to make a determination of sex in some other sense but was unable to do so. This actually highlights the fact that a determination of "sex" on a Tennessee birth certificate is a determination of external genitalia—nothing more, nothing less—and that for purposes of a Tennessee birth certificate, external genitalia results in the label of either "male" or "female."

or is the person's "*true* sex." Still less is the determination in any way a purported determination of *gender*; the birth certificate has nothing to say about gender specifically. And Plaintiffs themselves state (albeit in connection with their motion for summary judgment) that "Defendants' witnesses cannot identify any law or regulation that states a person's sex must be determined solely by their external genitalia at the time of birth." (Doc. No. 93 at 3). Plaintiffs' point is clear: there is no such state law or policy. Indeed, as discussed above, the approach of the Department of Safety helps confirm Plaintiffs' point. Plaintiffs' point here actually serves to bolster not Plaintiffs' position, but rather the Court's construction of Plaintiffs' own allegation: the Birth Certificate Policy, as described by Plaintiffs themselves, is about *what is on the birth certificate and only what is on the birth certificate*. It is not about, or in support of, some (non-existent, as far as the record reveals and Plaintiffs assert) State policy to insist that a person's sex is (for *all* purposes, or even *any* purpose beyond the contents of the birth certificate) determined by the person's external genitalia at the time of the person's birth.[43]

    Plaintiffs have not alleged any facts plausibly suggesting that the State, via the process of designating on a birth certificate a person's sex (based on birth appearance), purports or seeks to announce that the *only way* to describe the person is as a "male" or a "female" (as the case may be). Relatedly, Plaintiffs have not alleged any facts plausibly suggesting that there is something

---

[43] Of course, it is always possible that persons in the community could misapprehend the specific basis for, and the limited nature and purpose of, the sex designation on a birth certificate, and perhaps take it to make some overarching statement about a person's sex or gender identity. But Plaintiffs have not explained why any such misapprehension is attributable to the State or somehow makes the State's Birth Certificate Policy more constitutionally infirm than it otherwise would be. And the Court does not see why public misapprehension of the nature, content, and significance of an official state document—surely a not uncommon event—contributes to a constitutional violation by the state. For example, if some relevant member of the public, being aware of a particular indictment, misperceives the indictment as being proof of (or perhaps even a record of a finding of) the defendant's guilt of the charge(s) in the indictment, surely that misperception should not be placed at the feet of the state in the event that, the defendant is acquitted and later wants to complain about the damage to his reputation stemming from the issuance of the indictment itself.

pretextual in the State's purported goal of obtaining and preserving a record of a (worthwhile)[44] observation as to which of two kinds of external genitalia a baby possesses. Nor does the Court see any pretext here. The contemplated preservation would not occur if, as Plaintiffs request and contrary to the Birth Certificate Policy, the sex designation could be changed on the birth certificate without a strikeout line indicating the prior designation of sex (based on birth appearance). To this, perhaps Plaintiffs would respond that the record of the person's sex (based on birth appearance) properly could be maintained elsewhere in some format, just not on the person's birth certificate. But the very notion of retaining *any* record of sex (based on birth appearance) of a transgender person—whether it appears with or without a strikethrough on a birth certificate, or merely in some kind of state data set never to be seen by the transgender person or anyone dealing with him or her—is something not contemplated by Plaintiffs and indeed inconsistent with their entire position in this case.[45]

---

[44] The Court does not see where Plaintiffs challenge what the Court believes to be patently true: that for medical, safety, security, demographic, and/or other reasons, it is useful to make a record of the biological category into which each baby falls. The Court further does not see where Plaintiffs allege that categorization by *external genitalia at the time of birth in particular* cannot prove useful. And indeed it can. Consider the hypothetical scenario where a newborn infant goes missing for some reason, and law enforcement and other officials are on the lookout for the baby. A record of the baby's external genitalia well could prove useful for officials seeking to find and confirm the identity of the baby once found; a record of the baby's "sex" in any other sense well may not.

[45] Plaintiffs have not asserted that the record of sex (based on birth appearance) could be maintained in some other format, let alone explained how exactly that might work. More particularly, Plaintiffs have not explained how such an historical record could be kept in a manner that is not offensive to them; presumably Plaintiffs would find offensive any suggestion that the record of their sex (based on birth appearance) was of any value whatsoever; to the contrary, Plaintiffs' position clearly would have to be that the retention of any such record would actually be inappropriate and indeed harmful to them (and anyone who cares about accuracy in official record-keeping) because (according to them, but not the Court) such record did not merely need to be updated at some point based on Plaintiffs' gender identity at that point, *but rather was incorrect from the outset.* (Amended Complaint at ¶¶ 96, 117, 143, 166) (stating, respectively, that each respective Plaintiff's "current Tennessee birth certificate reflects the sex she was incorrectly assigned at birth"); (*Id.* at ¶ 214) (referring to the "sex [of "transgender people, including Plaintiffs," that] was incorrectly assigned to them at birth"). That being so, Plaintiffs' position is entirely inconsistent with the

Nor do Plaintiffs allege that there is anything constitutionally infirm about such observation being recorded, under the heading "sex," by calling the newborn baby either "male" or "female" based on kind of genitalia thus observed. This reality is not changed by the existence of, and Plaintiffs' grievance about, the Tennessee statute providing, in pertinent part, that "**[t]he sex of an individual shall not be changed on the original certificate of birth as a result of sex change surgery.**" Tenn. Code Ann. § 68-3-203(d). This provision is perfectly consistent with the notion that with respect to sex, a Tennessee birth certificate is intended to reflect only circumstances (as it happens, the person's external genitalia) at *the time of birth*. With that as the intent, there is no reason why the original designation of sex (based on birth appearance) should be changed based on circumstances that arise at some point after birth.

Ultimately, there are no colorable grounds to deny that the Birth Certificate Policy says nothing about a person's "true sex," sex after birth, or gender identity, and instead in relevant part says something only about sex (based on birth appearance). As noted, Plaintiffs' counter to this reality is to assert, contrary to Defendants, that each person's gender identity is the same as their sex, and that therefore to say something about a person's sex is to say something about the person's gender identity. But, as discussed above, this is not true when what is being said about a person's sex is being said only about the person's sex (based on birth appearance).

Plaintiffs' assertion here brings to mind *Ray v. McCloud*, 507 F. Supp. 3d 925, (S.D. Ohio 2020), in which "[t]he parties and their experts dispute[d] whether sex and gender identity are the same thing or distinct categories" and the state-official defendants asserted that "the sex marker

---

notion (which the Court accepts, as noted above) that it is legitimate for a state to keep records of sex (based on birth appearance) for all persons.

So the Court is left with a blanket assertion by Plaintiffs that they want, need, and deserve a complete expungement of any record whatsoever—in any form—of their sex (based on birth appearance).

on a birth certificate identifies only biological sex at the time of birth, distinct from gender identity, and thus is 'accurately recorded at birth' under the statute." *Id.* at 935 n.8. The court in *Ray* ultimately found that it need not resolve the dispute.

The undersigned likewise finds, albeit for a different reason, that it is unnecessary (and perhaps even inappropriate at this stage) to resolve a theoretical dispute over whether "sex" and "gender identity" are different things or categories.[46] The Court finds that the birth certificate does not purport to say in any way what a person's "sex" is at any point after birth, and that its purported statement about "sex" at the time of birth is in reality a statement only about external genitalia. So even if (as Plaintiffs claim) "sex" in whatever sense they mean it is determined by (and not distinct from) gender identity, "sex" in *the very limited sense* that the birth certificate means it (*i.e.*, sex (based on birth appearance)) undisputedly is distinct from gender identity, as both sides agree that gender identity transcends mere biological features such as external genitalia. As so it simply does not matter for present purposes whether "sex" in some other, perhaps broader or more metaphysical sense, is distinguishable from gender identity.

---

[46] The Court notes that there is considerable (though far from unanimous) support for Defendants' position in case law and legal scholarship. *See, e.g., DeJohn v. Temple Univ.*, 537 F.3d 301, 319 (3d Cir. 2008) ("The term 'gender' has recently acquired a meaning distinct from 'sex.'"); William C. Sung, *Taking the Fight Back to Title VII: A Case for Redefining "Because of Sex" to Include Gender Stereotypes, Sexual Orientation, and Gender Identity*, 84 S. Cal. L. Rev. 487, 539 n. 154 (2011) (noting that although the terms sex and gender "may have been synonymous at one point, they are now conceptually distinct—sex refers to the anatomical characteristics that define men and women, while gender refers to the cultural norms associated with masculinity and femininity"). And the Court realizes that if the two are indeed generally distinct, that does not necessarily mean that they are distinct for all purposes. *See, e.g., Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999) ("'Gender' has often been used to distinguish socially- or culturally-based differences between men and women from biologically-based sex differences, but we have not considered 'sex' and 'gender' to be distinct concepts for Title VII purposes."). The Court also realizes that when it comes to issues like gender or gender identity, viewpoints more than a few years old are liable to be criticized (fairly or unfairly) as outdated or obsolete; this is because such viewpoints seem to be subject to unusually rapid change and because, as indicated by cases like *DeJohn* (which by now does not necessarily reflect the most "recent" viewpoint), there appears to be increased attention in ascertaining the most "recent" viewpoint. Of course, as to what the most recent viewpoint is as to whether "gender" has "a meaning distinct from 'sex,'" *DeJohn*, 537 F.3d at 319, the answer may depend on the viewpoint from which such meaning is being ascertained.

Plaintiffs also rely on the fact that Tennessee allows changes to some of the historical information on a birth certificate, such as the names of parents in the case of adoption. The Court is aware that *Ray* placed great importance on the fact that Ohio (like Tennessee) permitted changes to certain other information on the birth certificate that was accurately reported at the time of birth. The Court declines to place any material weight on this fact, for several reasons. First, the fact that Tennessee allows changes to some information does not mean that it is constitutionally required to allow changes to other information. Second, and relatedly, as discussed above, Plaintiffs' whole theory as to why equal protection requires the State to allow changes to the designation of sex (based on birth appearance) is based on a false premise, namely that such designation ultimately proves to have been incorrect when made in the case of a transgender person. Third, Plaintiffs have not plausibly alleged any facts suggesting that the refusal to allow changes to the designation of sex (based on birth appearance) is in fact the result of anti-transgender animus, and indeed Plaintiffs themselves point to a Tennessee state practice (enabling changes to the sex designation on a current state identification document) that actually indicates otherwise. Fourth, there are discernible policy reasons why a state might choose to allow the kinds of changes Tennessee allows (including case-specific changes of no statistical value) while declining to allow the kinds of changes that Tennessee allows; for example, keeping and maintaining records of sex (based on birth appearance) has a value in the potential compilation of statistics that are important from demographic, scientific, and other perspectives.[47]

---

[47] The Court does not presume that the State *actually* compiles statistics based on sex designation at birth—such as, for example, the ratio of live births of "males" versus live births of "females." Neither the Amended Complaint nor the parties' briefing indicates that this is (or is not) the case. But it is possible that the State does so, through its Office of Vital Records; both the Centers for Disease Control and Prevention (CDC) and the U.S. Census Bureau have seen fit to publish certain statistics regarding the ratio of live births of "males" versus live births of "females." *See, e.g.*, Table 11. Selected demographic characteristics of births, by race and Hispanic origin of mother: United States, 2021, National Vital Statistics Reports Volume 72,

The Court will add some closing thoughts in connection with Plaintiffs' equal protection claim. A Tennessee birth certificate has a blank space to fill in for the category denominated "Sex," and the State contemplates this being filled out with either "male" or "female" depending on external genitalia.[48] Suppose instead that the space was for a category denominated "External genitalia," and was to be completed with either a "P" (instead of "male") or a "V" (instead of "female") based of course on external genitalia. In that scenario, the birth certificate reflects no "sex" designation of any kind, and so obviously a claim of disparate treatment could not possibly be based upon the claim that the birth certificate assigns a "sex" to a person that may be different from the person's gender identity. Additionally, Plaintiffs do not assert any constitutional issues with a birth certificate categorizing persons by *external genitalia* (if untethered to any notion of "sex") at the time of birth. The alleged constitutional infirmity here is based entirely use of (i) the word "sex" to describe categorization based on external genitalia at the time of birth, and (ii) the words "male" and female" to describe the alternative categories into which a person may fall at birth. What is currently in question is the constitutional significance of the birth certificate's use of *those three specific words* (as to opposed to other, perhaps even random, words or terms that could have been used), in the particular case of transgender persons who wish to change their respective "sex" designation from "male" to "female" or vice versa. The Court struggles to find

---

Number 1 January 31, 2023 (cdc.gov) . Table 80. Births and Birth Rates, and Fertility Rates by Race, Sex, and Age: 1980 to 2008, https://www.census.gov/library/publications/2011/compendia/statab/131ed/births-deaths-marriages-divorces.html (last visited May 30, 2023). Although Defendants do not assert any particular purpose for maintaining accurate records regarding sex (based on birth appearance), they do assert that the State has a legitimate interest in maintaining accurate records regarding sex (based on birth appearance). Again, the Court here is not assessing the relative weight the State's interest in maintaining the Birth Certificate Policy (finding so doing unnecessary because the Court rejects Plaintiffs' theory of disparate treatment); instead, it is merely noting that there are conceivable reasons why it is more important to maintain unaltered records of persons' sex designation than to maintain unaltered records of, for example, person's parents' names.

[48] The facts in this sentence are, in the Court's view, subject to judicial notice and undisputed.

that the State's use of the particular term "sex" merely to describe categorization based on external genitalia—hardly an exceptional concept—is of constitutional significance where, as here, there is no non-conclusory allegation that the use of the term in this way in this context actually is being for some more nefarious (discriminatory) purpose. And the Court likewise struggles to find that the use of the particular terms "male" and "female" to describe persons with penile and vulvic external genitalia, respectively—again, hardly an exceptional concept—is of constitutional significance where, as here, there is no non-conclusory allegation that the use of the terms in this way in this context actually is for some discriminatory purpose.

In summary, Plaintiffs' claim of disparate treatment to support their equal protection claim depends on the validity of a particular proposition. The proposition is that the designation of sex on a transgender person's Tennessee birth certificate is, and was from its inception, flat-out incorrect because under the Birth Certificate Policy such designation must perpetually be based on external genitalia at the time of birth, even though (according to Plaintiffs) the designation is incorrect in the case of a transgender person because the designation is inconsistent with the person's "true sex," *i.e.*, gender identity. Unless that assertion is valid, Plaintiffs cannot and do not plausibly allege that transgender persons, unlike cisgender persons,[49] are denied the right to correct every kind of mistake that may afflict a birth certificate's designation of sex. But the assertion is invalid because nothing about a person's ultimate gender identity can render incorrect a designation that: (a) clearly and patently is based solely on external genitalia without any reference to "true sex," to any other notion of sex, or to gender identity; and (b) has not plausibly been alleged to constitute a designation of sex for any transcendent purpose or indeed any purpose other

---

[49] For a cisgender person, by definition, the designation of sex would never be incorrect on the grounds that the person's sex designation on a birth certificate is inconsistent with the person's gender identity.

than the limited purpose of a Tennessee birth certificate. For this reason, Plaintiffs fail to state a valid equal protection claim.

II.    Substantive Due Process Claim

In Count II, Plaintiffs assert a substantive due process claim based primarily on the following allegations:

199.    The substantive protections of the Due Process Clause, as well as other constitutional provisions, give rise to a right to privacy, protecting information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure. Government infringement of these protections requires courts to apply strict scrutiny to such government action.

200. Forced disclosure of a person's transgender status violates that person's fundamental right to privacy. The fact that a person is transgender constitutes highly personal and intimate information. A reasonable person would find the involuntary disclosure of one's transgender status to be deeply intrusive.

201. The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity at risk. This harm burdens and interferes with the ability of transgender persons to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary.

202. Tennessee's Birth Certificate Policy violates transgender persons', including Plaintiffs', fundamental right to privacy by causing disclosure of their transgender status and by depriving them of significant control over the circumstances around such disclosure. Moreover, Tennessee's existing practice of showing a strike-out line for permissible corrections to birth certificates, as delineated by Tenn. Comp. R. & Regs. 1200-07-01-.10, is similarly violative of the Fourteenth Amendment, because to the extent it applies to transgender individuals, this practice would disclose a person's transgender status on the face of the birth certificate.

. . .

204.    The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity. These protections extend to personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity.

205. The fundamental protections of an individual's autonomy encompass the right to define and express one's gender identity, including a right not to be treated in a manner contrary to one's sex, as defined by one's gender identity, by the government. The right to define and express one's gender identity is indeed among the most intimate imaginable, relating to matters that individuals are uniquely positioned to understand and define for themselves.

206. When the government identifies individuals by their sex in official documents, the constitutional protections that shelter individual and bodily autonomy, dignity, and personhood prohibit the government from interfering with the right to live in accordance with one's gender identity.

207. By enforcing Tennessee's Birth Certificate Policy, Defendants deny recognition of a transgender person's true sex and necessarily impose significant harms on that person. The government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining, indeed denying, their very identity and existence, but also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

(Doc. No. 199-207).[50] Plaintiffs thus make two substantive due process claims. The first is a claim that the Birth Certificate Policy violates their right to informational privacy. And the second is that the Birth Certificate Policy violates their right to personal autonomy.

A. *Alleged right to informational privacy*

A district court in this circuit recently provided a helpful summary of current law in the Sixth Circuit regarding the right to informational privacy:

"The Sixth Circuit ... has developed and applied a different approach to assessing informational privacy claims" that "requires that the asserted privacy interest implicate a fundamental right." *Lambert v. Hartman*, 517 F.3d 433, 442 (6th Cir. 2008); *see also Wilson v. Collins*, 517 F.3d 421, 429 (6th Cir. 2009) ("[T]he Sixth Circuit has held that the Constitution does not encompass a general right to nondisclosure of private information. Instead, the Sixth Circuit has continued to restrict the right of privacy to those rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.'") (citation omitted).

---

[50] One might ask whether the alleged existence of such a risk is belied by the fact (an undisputable one, in the view of the undersigned) that many transgender persons (including multiple Plaintiffs herein) affirmatively desire to be known as transgender and/or publicly identify themselves as such. The Court answers this question in the negative, since a desire or a willingness to publicly identify oneself as transgender could reflect courage in the face of danger, rather than the absence of a danger. So the Court does not in any way discount the allegation of risk specifically on the ground that some persons do not seek to avoid disclosure of their transgender status.

In *Lee v. City of Columbus, Ohio*, the Sixth Circuit surveyed its prior case law regarding a privacy interest in medical records:

> With regard to the dissemination of medical information, we have acknowledged that "a person possesses no reasonable expectation that his medical history will remain completely confidential[;] [t]his is not to say that a person has no interest in protecting, to some extent, the confidentiality of his medical records." *In re Zuniga*, 714 F.2d 632, 641 (6th Cir. 1983) (citing *Whalen v. Roe*, 429 U.S. [589], 606-07, 97 S. Ct. 869, 51 L.Ed.2d 64 [(1977)]). However, under our interpretation of privacy rights, we have not yet confronted circumstances involving the disclosure of medical records that, in our view, are tantamount to the breach of a "fundamental liberty interest" under the Constitution. *See, e.g., Summe v. Kenton Cnty. Clerk's Office*, 604 F.3d 257, 270-71 (6th Cir. 2010) (county's release of medical record of deputy county clerk to citizen pursuant to open records request did not implicate a right fundamental or implicit in the concept of ordered liberty so as to violate constitutional right to privacy); *Wilson*, 517 F.3d at 428-29 (state prisoner who brought a § 1983 action did not have a fundamental privacy interest in the information contained in his DNA profile retained in state and national DNA-indexing systems); *Jarvis v. Wellman*, 52 F.3d 125, 126 (6th Cir. 1995) (disclosure of rape victim's medical records to an inmate by prison officials "does not rise to the level of a breach of a right recognized as 'fundamental' under the Constitution" so as to state cognizable § 1983 action); *In re Zuniga*, 714 F.2d at 642 (affirming the enforcement of a subpoena duces tecum issued by a grand jury commanding psychotherapists to produce patient information); *Gutierrez v. Lynch*, 826 F.2d 1534, 1539 (6th Cir. 1987) (city ordinance that required employees on sick leave for more than thirty days to complete a form providing the City with medical information was legitimate request and did not invade former employee's right to privacy); *Gen. Motors Corp. v. Dir. of Nat'l Inst. for Occupational Safety*, 636 F.2d 163, 165-66 (6th Cir. 1980) (enforcement of a subpoena issued by the National Institute for Occupational Safety and Health for the production of medical records of automaker's employees, in conjunction with research on workplace health hazards, did not intrude upon protected privacy interests, where safeguards against the improper disclosure of the confidential information could be implemented).

636 F.3d 245, 260-61 (6th Cir. 2011). Moreover, Sixth Circuit has identified an informational-privacy interest of constitutional dimension only in very limited circumstances: 1) where the release of personal information could lead to bodily harm, *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998) (disclosure of undercover officers' personal information to defense counsel for

alleged drug conspirators violated privacy rights because it "created a very real
threat to the officers' and their family members' personal security and bodily
integrity, and possibly their lives"); and 2) where the information released was of a
sexual, personal, and humiliating nature, *Bloch v. Ribar*, 156 F.3d 673, 684 (6th
Cir. 1998) (disclosure of "highly personal and extremely humiliating details of a
rape" violated privacy rights); *see also Kenny v. Bartman*, No. 16-2152, 2017 WL
3613601 at *6, 2017 U.S. App. LEXIS 16640 at *17 (6th Cir. 2017) (repeating that
the Sixth Circuit has recognized a constitutionally-protected informational-privacy
interest in only these two circumstances).

*Brown v. Penick*, No. 1:22-CV-P99-GNS, 2022 WL 16702802, at *3–4 (W.D. Ky. Nov. 3, 2022)

(brackets in original). Significantly, "only after a fundamental right is identified should the court

proceed to the next step of the analysis—the balancing of the government's interest in

disseminating the information against the individual's interest in keeping the information private."

*Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008) (citing *Kallstrom*, 136 F.3d at 1061).

A decade after *Kallstrom* was decided, in *Lambert*, the Sixth Circuit described *Kallstrom*

as "holding that police officers' privacy interest in their personnel files were of a constitutional

dimension where the city 'created a very real threat to the officers' and their family members'

personal security and bodily integrity, and possibly their lives.'" *Id.* at 439 (quoting *Kallstrom*,

136 F.3d at 1063). And it described *Kallstrom*'s holding as "rest[ing] on the finding that the city's

disclosure had created a risk that the officers' personal information might fall into the hands of

persons likely to seek revenge upon the officers" and had created a 'very real threat' to the officers'

and their family members' bodily integrity and possibly even their lives." *Id.* at 441 (quoting

*Kallstrom*, 136 F.3d at 1063).

The Court finds that Plaintiffs have not plausibly alleged facts suggesting the existence of

a right to informational privacy of the type recognized in *Kallstrom*. As relevant to the personal

security and bodily integrity concerns in *Kallstrom*, the Amended Complaint alleges only that "[a]

person's transgender status (and medical diagnosis of gender dysphoria) constitutes deeply

personal and sensitive information . . . the disclosure of which can jeopardize a person's safety and risk bodily harm," that a Tennessee birth certificate "subjects transgender people to harassment and even violence," and that "[a] national survey conducted by the National Center for Transgender Equality in 2015 revealed that nearly one third of respondents who had shown an identification document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted." (Amended at ¶ 57-58). The Court recognizes that disclosure to an individual that a person is transgender *can* jeopardize the person's safety, *can* risk bodily harm to the person, and *can* subject transgender persons to violence from that individual (if the individual is violent and hateful); as discussed below, the disgrace of anti-transgender hate crimes do occur in this country. But in the Court's view, *Kallstrom* requires more than the existence of *some risk or possibility* of bodily harm resulting from disclosure. And indeed more must be required, lest the scope of information deemed protected by substantive due process become far too large and inconsistent with the Sixth Circuit's caution in making disclosure of information a matter of substantive due process.[51]

As for the reference to the 2015 study, it adds very little, in the view of the Court. It conveys no information at all about how many assaults were suffered by transgender persons, or when any such assaults occurred. And the Court believes it is indisputable that the frequency of attacks against transgender persons in or before 2015—perhaps (as far as the Amended Complaint

---

[51] Take for example, a state's disclosure of the fact that a person has been charged with assault (aggravated or simple). Particularly if the person is released on bond, the person absolutely is at *some* risk (and is *subject to*) of bodily harm in the form of revenge attack from the alleged victim or persons associated with the alleged victim. But that does not mean that the person can validly assert an interest of constitutional dimension in protection from disclosure of that information. (If the person could, presumably the state's significant interest in granting public access to such information what prevail over the person's interest, but nevertheless, the state would be forced to litigate the issue, when under *Kallstrom* it should not have to, because the risk is insufficiently concrete).

indicates) years or even decades prior to 2015—is by no means necessarily indicative of the frequency of such attacks today, given changing societal attitudes about transgender persons.

For these reasons, the Court finds, consistent with Defendants' argument on this point, that the Amended Complaint does not allege the kind of case-specific, concrete risk of bodily harm that *Kallstrom* seems to require. It alleges only that transgender persons generally are at some risk of bodily harm based on their transgender status—this sad fact is true, just as it is true that persons belonging to groups (even majority groups) of many kinds are at risk of violence based on their status as a member of that group. The Courts views such allegations as insufficient under *Kallstrom*. The question, then, is whether the Court can excuse the absence of such allegations on the grounds that it is obvious that any transgender person necessarily would be facing a substantial risk of bodily harm.

Hate crimes certainly do occur in this country, including crimes of violence against transgender persons because they are transgender. For example, for 2021, the most recent year for which Federal Bureau of Investigation crime data statistics are available, the Court takes judicial notice of the fact that the data reflects that 278 persons were reported to be the victims of anti-transgender crimes.[52] *Supplemental Hate Crime Statistics,* https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime (last accessed May 31, 2023).[53] Based on the population of the United States as a whole, this means that approximately .00009 percent of persons in the U.S. were the victim of an anti-transgender crime. This means that if, for example, one in a thousand persons was known or identifiable as transgender so as to be targeted specifically due to transgender status, .09 percent of such persons (less than one in one

---

[52] A small percentage of these crimes were crimes not reflecting a risk of bodily harm (like larceny).

[53] Notably, the data covers law enforcement agencies covering the vast majority of the U.S. population, namely, 302,298,384 persons.

thousand) would have been reported to have been the victim of an anti-transgender attack in that year. And if, for example, one in a hundred persons was known or identifiable as transgender so as to be targeted specifically due to transgender status, .009 percent of such persons (less than one in ten thousand) would have been reported to have been the victim of an anti-transgender attack in that year.

The Court does not presume that this number (278) is a particularly accurate reflection of the number of anti-transgender hate-crime incidents and victims. Some of these reported incidents may ultimately prove not to have actually been anti-transgender hate crimes; by the same token, a small percentage of the U.S. population is not covered by this data, and surely some anti-transgender hate crimes go unreported (or, at least, unreported as anti-transgender hate crimes). But what this data tends to show is that the Court cannot disregard Plaintiffs' failure to allege a likelihood of anti-transgender bias against Plaintiffs on the grounds that the likelihood is obvious (and thus inferable in Plaintiffs' favor when construing the Amended Complaint) based on available information; thankfully, available data does not reflect that in any one year—or more to the point, that in any spans of years across a lifetime—the heinous act of anti-transgender crime is statistically at all likely to be visited upon any particular Plaintiff (or other transgender person). Accordingly, the Court cannot find that Plaintiffs have plausibly alleged a liberty interest under *Kallstrom*.

That leaves the possibility of a liberty interest under *Bloch*. The Court believes that reasonable minds could disagree on whether Plaintiffs have plausibly alleged that they possess such a liberty interest. But in the Court's view, the core requirement of *Bloch* for a liberty interest to attach to particular information is that the information be sexual, personal, *and* humiliating in nature. The Amended Complaint certainly alleges (and the Court easily accepts as true) that being

transgender is a personal matter. But the Court cannot agree that it is plausible that being transgender is sexual or humiliating. The Amended Complaint at no point speaks in terms of being transgender as being a matter of sexuality, and indeed it defines being transgender in a manner that is utterly unrelated to sexual preferences, orientation, attitudes, and activities. Still less does the Amended Complaint associate being transgender with having *particular* sexual preferences, orientation, attitudes, and activities. And of course, the Amended Complaint does not allege (and the Court would refuse to accept as true anyway) that being transgender is humiliating; there is no basis for the Court to find anything humiliating about being transgender, and so there is no basis to find that information indicating someone is transgender would ever be humiliating. And the Court cannot find that under *Bloch*, a liberty interest attaches to non-humiliating information, even if the information is personal and sexual in nature. Were the rule otherwise, the scope of information to which a liberty interest would attach would be exceedingly broad.[54]

B. *Alleged right to decisional privacy, liberty, dignity and individual autonomy*

Plaintiffs' Opposition alternatively posits of a violation of various other purported fundamental rights, namely, the rights of decisional privacy, liberty, dignity and individual autonomy.[55] The Court understands that decisional privacy, liberty, dignity and individual autonomy are very important things. But in assessing the extent to which something (even

---

[54] For example, it would mean that a liberty interest would attach to the mere fact that a biological male had a biological child—a matter that is obviously personal but also would be sexual (given the manner in which biological males carry out their role, even in the case of artificial insemination, in creating biological children).

[55] The Amended Complaint does not describe these rights in precisely the same way, but the Court will not quibble over any differences and instead will treat the Amended Complaint as asserting the same alleged rights upon which Plaintiffs' Opposition relies.

something important) is a protected by substantive due process, the devil tends to be in the details. And with one exception, the details do not fall in Plaintiffs' favor.

First, although the right to "liberty" obviously exists under the (very words of) the Due Process Clause, the Court does not see where Plaintiffs have established that there is a discrete right to "decisional privacy," "dignity," and "individual autonomy." In Plaintiffs' Opposition, Plaintiffs assert the latter three as discrete rights, (Doc. No. 71 at 18), although later they make clear that they are asserting these rights as essentially sub-rights that exist under the umbrella of the right to liberty, pursuant to *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). (*Id.* at 19). So Plaintiffs' invocation of the right to liberty is actually an invocation of these alleged three sub-rights, and not an invocation of some additional kind of sub-right that falls under the right to liberty. Notably, to assert the existence of a right to "decisional privacy," "dignity," and "individual autonomy," Plaintiffs rely on no appellate authority at all (be it binding or not binding on this Court) other than *Obergefell.* But *Obergefell* actually did not recognize these rights. Instead, not without reason, it recognized only narrower rights. [56] Specifically, *Obergefell* recognized a right, under the umbrella right to "liberty" protected by the Fourteenth Amendment,

---

[56] If "decisional privacy," "dignity," and "individual autonomy" *per se* were protected as fundamental rights as Plaintiffs' claim, and thus protected by a requirement of strict scrutiny of anything deemed a restriction upon them, the range of even routine government actions subject to strict scrutiny would be boundless absent some meaningful circumscribing of those terms. So, for example, an individual's tax return in many cases requires an individual to disclose various decisions that (although ostensibly financial) the individual well may consider very personal (if not necessarily confidential)—including, for example, whether to own a home and how to support the individual's family and plan for the individual's retirement. If the right to "decisional privacy" were construed in a sufficiently broad manner, the requirement of the individual to disclose these particular decisions on his or her tax return would be subject to strict scrutiny—something the government well may be unable to satisfy with respect to particular decisions. This is problematic because it seems untenable to say that the due process clause prohibits the government from requiring disclosure of such decisions on a tax return.

The question then would become how to define "decisional privacy," "dignity," and "individual autonomy" in order to reasonably circumscribe these respective rights. The question is a dicey one because the terms are ambiguous, subjective and value laden. And Plaintiffs offer no suggestions for how to define these terms for purposes of ascertaining due-process protection.

to "*certain specific rights* that allow persons, within a lawful realm, to define and express their identity" and a right to "*certain personal choices* central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 576 U.S. at 651–52, 663 (emphases added). These rights are narrower than a broad-based right to right to "decisional privacy," "dignity," and "individual autonomy"—and the distinction, far from being merely semantic, instead goes to the very nature and scope of the rights at issue.

Regarding the latter of the two rights identified by *Obergefell*, Plaintiffs have not identified (let alone plausibly identified) a particular *personal choice* that is supposedly infringed by the Birth Certificate Policy or Tennessee birth certificates more generally. Plaintiffs do not allege an infringement of the choice to be transgender. Indeed, unsurprisingly they do not allege that being transgender is a choice at all. And such allegation would not have squared with Plaintiffs' definition of being transgender, which requires having a particular gender identity, something that is alleged to be not a matter of choice but rather of own's innate, biologically-based sense of oneself that is fixed at an early age. (Doc. No. 59 at ¶ 24). And neither the Amended Complaint not Plaintiffs' Opposition refer to any other personal choice that allegedly is infringed.

Regarding the former of the two rights identified by *Obergefell*, the Court concludes without difficulty that it is broad enough to encompass the right of transgender persons "to define and express their [gender] identity." *Obergefell*, 576 U.S. at 651–52. It is simply hard to imagine that an "identity" as important as *gender* identity would not be within the scope of the "identity" to which *Obergefell* was here referring. So the Court does recognize this particular interest as being protected by substantive due process.

But the Court finds that the Birth Certificate Policy and Tennessee birth certificates do not infringe—or even implicate—Plaintiffs' liberty interest in defining and expressing their gender

identity (or, for that matter, their "true sex," which as noted Plaintiffs allege is the same as gender identity). As the Court has stated repeatedly above, Tennessee birth certificates do not say anything about "true sex" or gender identity. Therefore, it is not plausible that Tennessee birth certificates or the Birth Certificate Policy stand in the way of transgender persons expressing either their gender identity or their "true sex" as they perceive it, let alone stand in the way of transgender persons "defining" (which carries connotations of something more internal than "expressing") themselves in terms of either of these characteristics.

C. *Alleged forced disclosure of transgender status*

As just discussed, the Court has found that (a) Plaintiffs have plausibly alleged one (and only one) applicable liberty interest protected by substantive due process, and (b) that Plaintiffs have not plausibly alleged an infringement on that liberty interest. This alone is enough to require dismissal of Plaintiffs' substantive due process claim. But there is an alternative reason: except insofar as this claim is based on the right to express and define one's identity,[57] this claim depends entirely on the notion that the Birth Certificate Policy forces transgender persons to disclose their transgender status, and this notion is entirely implausible given the allegations of the Amended Complaint itself.

As for how the Birth Certificate Policy "forces" transgender persons to disclose their transgender status, Plaintiffs allege a person's transgender status is involuntarily disclosed every time they present their birth certificate to a third party (Amended Complaint, ¶ 209). But for a transgender person's transgender status to be disclosed to the third party, the person's gender

---

[57] This aspect of the substantive due process claim is, in the Court's way, distinguishable from other aspects of Plaintiffs' substantive due process claim because it is based not on an alleged forced disclosure of transgender status, but rather on an alleged infringement of a right of expression and self-definition. As indicated elsewhere herein, this claim overlaps with Plaintiffs' First Amendment claim and seems more like a First Amendment claim than a claim of unconstitutional forced disclosure of personal information.

identity would have to be disclosed to the third party; according to the Amended Complaint, to have the status of a transgender person, a person's gender identity must diverge from the sex designation on the person's birth certificate (Amended Complaint, at ¶ 26), so a person's transgender status is not disclosed to a third party unless the person's gender identity is disclosed to the third party. So Plaintiffs must plausibly allege that the State is responsible for a forced disclosure of not only a transgender person's sex (based on birth appearance), but also the transgender person's *gender identity*. And Plaintiffs do not make any such allegations regarding the latter kind of disclosure, let alone allegations that are supported by factual matter.

And no such allegation would have been plausible anyway. As defined by Plaintiffs, gender identity is a "person's core internal sense of their own gender," is "innate" and has origins in a person's brain. (Doc. No. 59 at ¶ 23, 24). In other words, "gender identity" is a matter of *what one thinks internally about oneself*. So unless Plaintiffs could plausibly allege that the State literally is forcing transgender persons (by threats, intimidation, etc.) to disclose—disclose, specifically, to whomever may have come to learn what sex designation was on their birth certificates—internal thoughts about themselves, Plaintiffs could not plausibly allege that the State is forcing transgender persons to disclose their respective gender identities whenever they present their birth certificates. This would have been, to put it mildly, far-fetched. And in any event, Plaintiffs do not allege any such thing.

Perhaps Plaintiffs took the view that they did not need to show any forced disclosure of their gender identity because supposedly their gender identity would be obvious anyway to anyone who learned of the sex designation in their birth certificate, thus supposedly eliminating any separate requirement for Plaintiffs to show actual forced disclosure by the State of their gender

identities.[58] But any such viewed would be flawed because, as just noted, by Plaintiffs' own reckoning a person's particular gender identity is a matter of one's internal thoughts and thus cannot possibly be "obvious" to anyone else based on external appearances. This being a free society, persons generally are allowed to appear, dress, behave, and be denominated however they want—irrespective of (and untethered to) not only the sex designation on their birth certificate, but *also* their gender identity.

More specifically, the fact that someone with a male sex designation looks or acts in a purportedly traditional "feminine" manner *absolutely does not necessarily mean* that the person's gender identity is female. The Court believes it is indisputable—not least because surely Plaintiffs would concede that are various ways of looking, acting, and being "male" (or "female")—that such a person well could retain a male gender identity even while presenting himself largely or even primarily in a purportedly traditional female manner. Likewise, the fact that someone with a female sex designation looks or acts in a purportedly traditional "masculine" manner absolutely does not necessarily mean that the person's gender identity is male. The Court believes it is indisputable that such a person well could retain a female gender identity while presenting herself in a purportedly traditional male manner.

The Court likewise finds it indisputable that at least for many decades, there have been numerous persons of both sexes (based on birth appearance) and both gender identities who play ice hockey, wear pants, wear earrings, have hair short, have long hair, hold public office, are chief executive officers of companies, are clerics, are combat veterans, are stay-at-home parents, drink straight bourbon, play fantasy football, have husky voices, play guitar, cry in public, visit

---

[58] Under such a view, the alleged obviousness of a transgender person's gender identity would in essence count as a "disclosure" of the person's identity, and moreover such disclosure would count as a "forced" disclosure for which the State is responsible.

therapists, do yoga, are six feet tall or taller, are muscular, and use profanity. The list of activities, and internal and externally-facing characteristics and features, that are neither gender-specific nor sex-specific goes on and on. And in a telling example from more recent years, there are persons of both sexes (based on birth appearance) and both gender identities that marry persons who are of the male sex (based on birth appearance), persons of both sexes (based on birth appearance) and gender identities that marry persons whose gender identity is male, persons of both sexes (based on birth appearance) and gender identities that marry persons who are of the female sex (based on birth appearance), persons of both sexes (based on birth appearance) and gender identities that marry persons whose gender identity is female. In short, nearly the full range of life activities are engaged in by persons of each sex (based on birth appearance) and gender identity, even if not always with the same frequency. The Court has in mind a few activities for which this is not or may not be the case (such as belonging to, or serving in specific roles in, particular secular or religious organizations), but they clearly are few and far between. Similarly, generally the full range of features comprising a person's external appearance are possessed by persons of each sex (based on birth appearance) and gender identity, even if the features may more frequently be associated more with one sex (based on birth appearance) or one gender identity than with the other.

So the Court rejects out of hand the notion that gender identity, defined by Plaintiffs as something internal, somehow is conveyed based on external appearance created by activities,

dress, or physical features.[59] The Court would be surprised if Plaintiffs disagreed about this.[60] And yet it appears that for whatever reason—perhaps unwittingly—Plaintiffs have made the crucial assumption that a person's gender identity is necessarily revealed by external cues and that this somehow results in a "forced disclosure" on the part of the State. This assumption is invalid because, as defined by Plaintiffs, a person's gender identity can be revealed only by the person himself or herself disclosing his or her internal feelings about this—a disclosure that would be a voluntary one on the part of the person, rather than one forced by the State (unless, as of course Plaintiffs do not allege at all, let alone plausibly, the State via threats or intimidation literally forced the person to divulge his or her internal feelings).

Plaintiffs argue, "Defendants cannot have it both ways. Defendants cannot claim they are not responsible for the disclosure of a person's transgender status through their birth certificate, but then claim that 'the sex designation on a birth certificate is government speech.'" (Doc. No. 71 at 14-15 (quoting Doc. 66 at 18)). Plaintiffs here posit a false dichotomy. Even if (as is debatable but accepted arguendo by the Court herein) the State is responsible for disclosure of a transgender person's sex (based on birth appearance) whenever the person presents his or her birth certificate to someone else, as just discussed that does *not* mean that the person's transgender status has been disclosed at all; still less does it necessarily mean that the State would be responsible for *forcing* a disclosure. So there is nothing inconsistent with saying both that the sex designation on the birth

_____

[59] The Court here is referring only to gender identity, not biological sex. So none of this discussion is to deny that people are typically able without much difficulty to determine, or make accurate assumptions as to, whether other persons are male or female, when those categories are defined (contrary to Plaintiffs' approach) in terms of biology.

[60] The Court by no means assumes that Plaintiffs take the view that persons today can, must, or typically do act, dress, or otherwise present themselves consistently in conformance with traditional gender-based roles and stereotypes. And yet, as discussion herein, such an assumption strikes the Court as necessary to support Plaintiffs' view that a transgender person's transgender status is disclosed whenever a transgender person's sex (based on birth appearance) is disclosed.

certificate is government (state) speech and also that that the State is not responsible for the disclosure of a person's transgender status through the person's birth certificate.

For all of these reasons, the Court concludes that Plaintiffs have failed to state a claim for violation of substantive due process.

III.    <u>First Amendment Claim</u>

In support of Plaintiffs' First Amendment claim, the Amended Complaint alleges:

214. The Birth Certificate Policy violates the First Amendment rights of transgender people, including Plaintiffs, to refrain from speaking by forcing them to identify with a sex that was incorrectly assigned to them at birth and conflicts with who they are. It also prevents transgender people from accurately expressing their gender identity.

215. The Birth Certificate Policy also forces transgender people to disclose their transgender status, thereby compelling them to disclose private, sensitive, and personal information that they may not want to be publicly known or that may expose them to discrimination, harassment, and violence.

216. The Birth Certificate Policy further violates the First Amendment rights of transgender people, including Plaintiffs, to refrain from speaking, compelling them instead to endorse the government's position as to their own gender, as well as on the meaning of sex generally, through the birth certificate they must show to others. The gender marker listed on Plaintiffs' birth certificates conveys the state's message that sex is determined solely by the appearance of external genitals at the time of birth and never deviates from that—a message that is inconsistent with the medical and scientific understanding of sex and to which each Plaintiff strongly objects.

217. The Birth Certificate Policy violates the First Amendment right of transgender people, including Plaintiffs, to speak by preventing them from accurately expressing their gender.

(First Amended Complaint, ¶ 214-217).[61]

_____

[61] Paragraph 215 is included in the allegations concerning an alleged First Amendment violation, but the Court views it as actually reiterating the Amended Complaint's concerns and allegations set forth with respect to the alleged substantive due process violation. Plaintiffs' Opposition, it is true, does present the same concerns as grounds for separately finding a First Amendment violation. (Doc. No. 71 at 24-26). But the Court's above-stated rationale for rejecting the substantive due process claim grounded on these concerns applies equally to the First Amendment challenge to the extent that it is grounded on those same concerns.

Putting matters somewhat differently in Plaintiffs' Opposition, Plaintiffs argue in their brief that "forcing transgender Tennesseans to maintain and produce birth certificates containing the state's ideological message about their gender, rather than their own truthful message, Tennessee unconstitutionally compels their speech" and that "Defendants' labored attempts to cast this as 'government speech' are wholly without merit." (Doc. No. 71 at 20).

Without begrudging Plaintiffs their feelings on the matter,[62] the Court nevertheless must reject the argument. In the Court's view, Plaintiffs' entire theory is grounded on multiple false premises. First, as discussed above, the Amended Complaint does not plausibly allege that Tennessee birth certificates or the Birth Certificate Policy are conveying any message about "sex" other than one about persons' external genitalia at the time of their respective births, let alone any message about persons' gender or gender identity.

---

[62] Plaintiffs are of course allowed to feel that way about the Birth Certificate Policy, and the Court does not purport to say that such feelings are "wrong." But the Court needs to base its decision on what the Birth Certificate Policy allegedly does and does not do, rather than on how Plaintiffs feel about or perceive it.

There are many conceivable applications of this principle to identification documents that can and often are used and/or expected to be used for various purposes, including obtaining government benefits and employment, and the undersigned would apply this principle in every such context. Imagine, for example, a First Amendment challenge to the issuance and content of a social security card based on the grounds that it allegedly forces a person to identify himself or herself as a mere number, is inconsistent with the person's self-identity as an individual that cannot be reduced to a mere number, and thus prevents the person from expressing such self-identity. One might be sympathetic to those feelings, or at least the overall gist of those feelings.

Or imagine a Selective Service registration card for a Selective Service registrant who does not meet the (non-perfunctory) qualifications for conscientious-objector status. (The Court understands that conscientious objectors can choose alternative service rather than military service, but that other persons cannot). One can imagine such a registrant challenging the registration card on First Amendment grounds, arguing that the card forces him to identify himself as a potential user of lethal force and as a mere cog in a national military machine, is inconsistent with his self-identity as a pacifist, and prevents him from expressing himself as being anti-war. Again, one might be sympathetic to those feelings.

But any court addressing such a challenge has to focus on what the respective card actually says and does, and not on how the plaintiff feels about or perceives what the card is saying and doing. A birth certificate is different from these cards, and Plaintiffs' First Amendment challenge is different from these hypothetical challenges. But what is the same is the imperative for the Court to keep the above-referenced focus.

Second, the Birth Certificate Policy does not "force" Plaintiffs to "identify" with anything or prevent transgender persons from expressing anything, including their gender identity. Rather, as discussed above (perhaps to the point of redundancy, alas),[63] all that the Birth Certificate Policy does is require that a record of sex (based on birth appearance) be made and preserved on a birth certificate, irrespective of any subsequent sex-change operation or gender identity that does not align with sex (based on both appearance).

Regarding the designation of sex (based on birth appearance) allegedly "conflict[ing] with who the plaintiffs are," the sex designation in one sense actually is *consistent* with who Plaintiffs themselves say they are. The Amended Complaint states, of course, that each Plaintiff is transgender. (Amended Complaint at ¶¶ 1, 18, 82, 105, 124, 150). But Plaintiffs themselves allege that "for transgender people, the sex designation on their original birth certificate is inaccurate." (*Id.* ¶ 4). So the allegedly "inaccurate" sex designation is precisely the thing that makes Plaintiffs what that they themselves say they are, *i.e.*, transgender.

The Court realizes that Plaintiffs presumably mean something different when referring to "who they are." That is, they likely are referring not to their status as transgender persons, but rather to their gender identity as female when the sex (based on birth appearance) on their birth certificates is recorded as "male." But if one thing is clear these days, it is that there is no conflict between being male in terms of sex (based on birth appearance) and being female in gender identity, or vice versa. Indeed, that appears to be one of the very tenets of transgenderism, by Plaintiffs' own account: "gender identity . . . reflect[s] a person's core internal sense of their own gender," (Amended Complaint, ¶ 3), something wholly separate from external genitalia at the time

---

[63] The Court at times has sacrificed brevity, and erred on the side of redundancy, in order to be as clear as possible as to what it is and is not saying—which is something that easily could be misunderstood in a case like the instant one, without the kind of repetition of the Court at times has chosen to engage in herein.

of birth. Tennessee's Birth Certificate Policy is geared entirely to making a statement about external genitalia (as of the time of birth), and not about gender identity—or, for that matter, gender or sex roles or anything else.[64] If Tennessee birth certificates purported to state a gender identity for the persons whose births are being certified, then in some cases conflicts would arise between Tennessee birth certificates and a person's gender identity. But Tennessee birth certificates do not do this.

As indicated above, collectively, Tennessee birth certificates and the Birth Certificate Policy reflect the views that persons can be divided into two categories based on external genitalia at the time of birth, that it is worth making and retaining a record of the category into which each person falls, that it is appropriate to refer to this categorization a categorization based on sex (as surely people have consistently done worldwide since the dawn of civilization), and that it is appropriate to refer to the two categories as male and female (as, again, surely people have consistently done worldwide since the dawn of civilization).[65] Plaintiffs have not plausibly alleged that, collectively, Tennessee birth certificates and the Birth Certificate Policy suggest that persons cannot transcend these categories, that there are no other ways to categorize people, that there are

---

[64] For example, the Birth Certificate Policy is not alleged, let alone plausibly alleged, to have fostered or promoted: (i) the view that "sex," as that term is used on a Tennessee birth certificate (*i.e.,* sex (based on birth appearance)), is the only acceptable, legitimate, or intelligible notion of "sex"; (ii) a particular view as to what it means to be "male" or "female" for purposes of anything other than classification by birth appearance; (iii) the view that sex (based on birth appearance), is determinative of gender or gender identity; (iv) the view that there are only two *genders* (as distinguished from only two *identifiable sets of external genitalia that a person can have at the time of birth*); or (iv) the view that sex (based on birth appearance), is indicative of how persons should perceive themselves, perceive their role in family or society, or conduct themselves in private or in society. If the Birth Certificate Policy did any of these things, the Court's analysis necessarily would be different. But it does not; as used on a Tennessee birth certificate, a "sex" designation is simply a statement about what external genitalia a person had at the time of birth.

[65] Perhaps one could characterize these views as reflecting an "ideological message," although such characterization strikes the undersigned as a touch hyperbolic. But if there is an "ideological message" here, it is not the particular ideological message that Plaintiffs claim it is, *i.e.*, "an ideological message about their gender." (Doc. No. 71 at 20)

no other ways to conceive of "sex," that there are no other ways to conceive of "male" or "female," or that whatever "sex" a person is for purposes of a Tennessee birth certificate is the person's sex generally or for all purposes.

Indeed, Tennessee birth certificates do not state any position on anything other than external genitalia at the time of birth. True, they state this position via use of the terms "male," "female," and "sex," but as noted above the Court does not find the use of these terms to trigger a constitutional infirmity. Thus, even assuming arguendo for the moment that Plaintiffs somehow are deemed to be forced to "endorse" any messages on their birth certificates, and/or are "prevented" from expressing a contrary message, those messages would not be the messages Plaintiffs claim they are—namely, that their gender identity is aligned with their sex (based on birth appearance), that their gender identity is male, and that they are something other than who Plaintiffs self-identify themselves to be. Rather, the message would be merely a message about the Plaintiffs' external genitalia at the time of birth. And if the Court is correct in this regard, this is fatal to Plaintiffs' First Amendment claim, which is premised entirely on the notion that the message is about the person's "sex" in some sense that transcends mere sex (based on birth appearance) (Amended Complaint at ¶ 214), that the message is about the person's gender or gender identity (*Id.* at ¶ 214, 217), and that the (or at least one) message is that "sex is determined solely by the appearance of external genitalia at the time of birth and never deviates from that." (*Id.* at ¶ 214, 216).[66]

_____

[66] Plaintiffs claim that "the state's message [is] that sex is determined solely by the appearance of external genitals at the time of birth and never deviates from that." (Amended Complaint, at ¶ 216). But Plaintiffs provide no support whatsoever for the notion that the state has such a message. And to the contrary, Plaintiffs suggest that Tennessee has no "law or regulation that states a person's sex must be determined solely by their external genitalia at the time of birth." (Doc. No. 93 at 3). So if the State has any message that sex is determined solely by the appearance of external genitals at the time of birth and never deviates from that, under Plaintiffs' own reckoning, the message would have to come from the content of the birth

Alternatively, even assuming arguendo that the messaging on a person's Tennessee birth certificate regarding the person's sex is what Plaintiffs claim it to be, the Court finds that such messaging does not comprise speech (let alone compelled speech) of the person. Arguing otherwise, Plaintiffs note that they cannot be made to be unwilling "couriers" of the state's messaging. (Doc. No. 71 at 19 (quoting *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). They then note that a person constitutes a courier of messaging whenever "'they are so closely linked with the expression [that they] appear to endorse it.'" *Id.* (quoting *New Does Child #1 v. Congress of United States*, 891 F.3d 578, 593 (6th Cir. 2018)). But these observations do not help Plaintiffs.

A person could be "linked" with the sex designation on their birth certificates in, at most, up to three different ways. One is the obvious and basic fact that the sex designation *relates* to the person. But there is nothing about the bare fact that a message in a document relates to a person that suggests that the person endorses any message on a document; to take just one of innumerable examples, a finding on a jury verdict form reflecting that a criminal defendant is guilty obviously relates to that defendant, but that in no way suggests that the defendant endorses the finding that the defendant is guilty. A second potential manner of linkage is the person having *the power to create or control* the sex designation. But this manner does not exist in Tennessee, due to the Birth Certificate Policy; indeed, that is the very crux of Plaintiffs' entire lawsuit. And since this kind of

---

certificates themselves and the Birth Certificate Policy, which prohibits any change to the sex designation based on anything other than the fact that the designation incorrectly reflects the external genitalia the person had at the time of birth. But as noted herein, Plaintiffs have not plausibly suggested that a Tennessee birth certificate's designation of sex says anything at all about what a person's sex is in any other sense, including in the more transcendent sense of gender identity that Plaintiffs embrace and wish to express.

link does not even exist, it cannot foster the appearance that the person endorses the sex designation.[67]

A third and final manner of linkage is the person *presenting, to some third party,* the birth certificate reflecting messaging regarding the person's sex designation. Of course, this can and does happen from time to time. The question is whether such presentation gives the appearance that the presenter endorses the message regarding sex designation. On this question, the two sides respectively rely on different aspects of *Wooley v. Maynard*, 430 U.S. 705 (1977). Plaintiffs rely on the Court's holding (and accompanying rationale) that a state motto on a vehicle's license plate (New Hampshire's "Live Free or Die" motto") constitutes compelled speech of the driver of the vehicle. Defendants rely on a footnote containing dicta distinguishing a hypothetical claim based on the presence of the national motto on U.S. currency from the claim in *Wooley*, which as noted was based on the presence of a state motto on a vehicle's license plate.

The Court finds each side's reliance inapplicable here and thus unsupportive of its position. Plaintiffs' reliance on the holding of *Wooley* is inapt because the issue in *Wooley*, unlike in the present case, was not whether vehicle owners were being made to appear to endorse the message at issue (the motto on the license plate); this is perhaps unsurprising, given that anyone paying attention would know that vehicle owners were carrying around the motto because state law required it irrespective of whether they endorsed it. The majority's concern was that state law "[required] that appellees use their private property as a 'mobile billboard' for the State's

_____

[67] Under the precise language relied on here by Plaintiffs, it would not matter if someone viewing the birth certificate might reasonably (albeit mistakenly) conclude that the person did have the power to change the designation on a Tennessee birth certificate. And even if it that did matter, the fact that someone could reasonably (though mistakenly) be understood to have the power to change the sex designation is by no means enough to suggest that the person endorses the designation; in particular, it would not necessarily be reasonable to conclude that the person surely must endorse the sex designation or else they would have gone through any available procedure to change the designation.

ideological message or suffer a penalty" and that "[a]s a condition to driving an automobile a virtual necessity for most Americans [sic] the [appellees] must display "Live Free or Die" to hundreds of people each day." *Wooley*, 430 U.S. at 715. The footnote from *Wooley* on which Defendants rely further makes clear that the Court's concern was not at all with whether a person was being made to appear to endorse a message, but rather with the requirement to *publicly advertise* the message. *See id.* at 717 n. 15 ("[W]e note that currency, which is passed from hand to hand, differs in significant respects from an automobile, which is readily associated with its operator. Currency is generally carried in a purse or pocket and need not be displayed to the public. The bearer of currency is thus not required to publicly advertise the national motto."). The Court's point—one unrelated to whether an appearance of endorsement was created—was that the appellees could not be made to tote around the State's message in a very public manner (even if no appearance was created that the appellees were endorsing that message). The upshot of *Wooley* seems to be that under certain circumstances—in particular when persons are co-opted by the state to act as mobile billboards announcing a message publicly to many persons— the state's message becomes compelled speech of those persons, period.[68]

Plaintiffs do not rely on this principle. Nor could they, because the public nature of the allegedly compelled messaging is entirely absent in the case of birth certificates. Plaintiffs themselves so indicate when (appropriately) distinguishing their case from *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015) on which Defendants rely. (Doc. No. 71 at 29) ("Birth certificates [unlike license plates, which were the message medium in *Walker*

---

[68] And of course this makes perfect sense. If a state law required all drivers in the state to display bumper stickers of one particular political party, naturally such display would be protected by and offensive to the First Amendment—even if it could be said that no appearance was created that any particular driver endorsed the message inasmuch as the driver was required to have the bumper sticker whether or not he or she endorsed the message

just as they were the messaging medium in *Wooley*], have not historically or typically been used by state governments to broadcast messages. Birth certificates contain personal identification information, are typically kept confidential, and therefore do not serve the purpose of broadcasting government viewpoints."). So Plaintiffs' reliance on *Wooley* is inapt.[69]

Plaintiffs are relying on a principle not implicated by *Wooley*, *i.e.*, that a state's message is treated as a person's speech if the person is being made to appear to endorse the message. Plaintiffs' view is that as a result of the Birth Certificate Policy, they are being made to appear to endorse the sex designation on their birth certificate. This is a very fact-specific assertion, and the parties simply are unable to point the Court to case law involving circumstances similar enough for the case law to be instructive. The Court agrees with Plaintiffs that *Walker* is factually inapt in light of the distinction between messaging via a license plate and messaging via a birth certificate. But the Court does not perceive Plaintiffs to identify a usefully analogous case, either.

As indicated above, the question here boils down to whether, in those situations in which a transgender person presents his or her birth certificate, he or she is being made (as a result of the Birth Certificate Policy) to appear to endorse the sex designation on the birth certificate. The mere fact that a person presents a document to a third-party does not mean that the person endorses or is appearing to endorse everything stated in the document; to the contrary, experience shows that people often present documents under circumstance that would disabuse anyone of the notion that

---

[69] Defendants' reliance on the distinction made by the Supreme Court in a footnote in *Wooley* is likewise flawed. That is, the Supreme Court did not make that distinction in the context of deciding whether state messaging should be deemed an individual's speech specifically *because the person was being made to appear to endorse the messaging*. And it is inapt additionally because the basis for the distinction was that unlike the motto found on U.S. currency, the New Hampshire state motto was found on something (a vehicle, via its attached license plate) "readily associated with its operator [the putative "courier" of the motto]." 430 U.S. at 717 n.15. In the present case, the message (regarding sex designation) is found in something that (unlike U.S. currency) is readily associated with its alleged courier, *i.e.*, the birth certificate of the person at issue.

the person is endorsing all (or perhaps even any) of the contents of the document. True, when a person presents his or her birth certificate to a third party, they objectively appear to endorse at least some of the contents. But *what* contents, exactly? That logically would depend on the purpose for which the birth certificate is being presented; this is because if the purpose has nothing to do with particular information on the document, it is not reasonable to assume that the person paid enough attention to such information to even be aware of it at the time of presentation—let alone that the person endorses the accuracy of such information.

For example, if a Tennessee birth certificate is being presented to establish legal eligibility for things such as employment in the United States, the presenting person reasonably would be understood to endorse the birth certificate's statement regarding where they were born (somewhere in Tennessee). If the birth certificate is being presented to establish eligibility for age-restricted activities or government benefits, the presenting person reasonably would be understood to endorse the birth certificate's statement regarding when he or she was born. Other information on the birth certificate typically would not be related at all to why the person is presenting the birth certificate, and thus the person cannot reasonably be understood to endorse the accuracy of such information. Such information would include the time of day of birth, a parent's residential address or age at the time of birth, and the date the birth certificate was received by the local registrar. Surely such information, in almost all cases, is entirely unrelated to the reason for presenting the birth certificate to a third party, and naturally would obviously be potentially unnoticed (or unremembered by) the presenter; thus the presenter cannot reasonably be taken to endorse the accuracy of such information.

What about the sex designation? If Plaintiffs were to present the birth certificate, surely it would not be for a purpose related to the sex designation. In rare circumstances, perhaps, a

cisgender person would present the birth certificate for a purpose related to the sex designation—for example, to show the sex designation itself is or to support the assertion of a gender identity consistent with that designation, in order to establish eligibility for sex-restricted or gender-restricted activities. But the Court cannot conceive of circumstances under which any of the *Plaintiff*s would do so; to the contrary, Plaintiffs would never present their respective birth certificates specifically to establish their respective sex designations or gender identities, because in their view so doing would serve only to establish the *wrong* sex and gender identity.

In short, in the Court's view it is indisputable that a person presenting a document may or may not appear to be endorsing the accuracy of any particular information in the document. And Plaintiffs have not plausibly alleged that there are occasions when they present their birth certificates, they appear to be endorsing the sex designation. Thus, under the test on which Plaintiffs primarily rely, the messaging associated with the sex designation on a birth certificate does not constitute Plaintiffs' speech.

Quoting (in a confusing manner)[70] language from the Supreme Court, Plaintiffs assert additionally that messaging becomes unconstitutionally compelled speech when persons who observe the items conveying the messaging routinely and reasonably interpret the items as conveying messaging on the courier's behalf. (Doc. No. 71 at 19). However, the Court rejects that assertion because the quoted language clearly does not purport to contain a test for a constitutional

---

[70] Plaintiffs here write, "Government speech becomes impermissible, unconstitutional compelled speech when 'persons who observe' the message 'routinely—and reasonably—interpret them as conveying some message on the [courier's] behalf.'" (Doc. No. 71 at 19 (quoting *Pleasant Grove City, Utah v. Summan*, 555 U.S. 460, 471 (2009)). Plaintiffs' use of the quote from *Summan* is flawed because it obscures the meaning and significance of the word "them" in the quote, a word that actually makes no sense as Plaintiffs present it, out of context, in the quote; in fact, "them" reflects that the Supreme Court was drawing a distinction between *the thing(s) conveying the message* (which in *Summan* were various public monuments) and the *message itself*. To Plaintiffs' advantage, the Court above has generously paraphrased Plaintiffs' invocation of *Summan* so that it actually makes sense.

violation; at best, it is a description of certain facts relevant to whether a constitutional violation might occur in a particular case. And Plaintiffs have not shown, and the Court has been unable to determine, that the applicable constitutional test actually is whether persons who observe the items conveying the messaging routinely and reasonably interpret the items as conveying messaging on the courier's behalf. So the Court declines to conduct an analysis under this purported test.[71]

In summary, the Court finds that Plaintiffs have not plausibly alleged that their presentation of a Tennessee birth certificate actually operates to convey the alleged offensive message that Plaintiffs claim that it operates to convey. Alternatively, the Court finds that Plaintiffs have not adequately alleged that any messaging conveyed in conjunction with any presentation by Plaintiffs of their birth certificates constitutes the speech of Plaintiffs. For these reasons, the Court concludes that Plaintiffs have failed to state a claim to their rights to free speech under the First Amendment.

<u>CONCLUSION</u>

In the view of the undersigned, the instant case is not grist for a broad-based discussion about transgenderism or the status and rights of transgender persons in Tennessee or the United States. Instead, it is a discrete legal dispute over the constitutionality of a specific alleged policy of the State of Tennessee (based on a longstanding Tennessee statute) concerning birth certificates in particular. The Court's responsibility is to assess the viability of the particular claims before it, construing the Amended Complaint in favor of Plaintiffs but taking note of any logical fallacies in Plaintiffs' theories and rejecting Plaintiffs' suggestion to treat the Birth Certificate Policy as doing things that (based on Plaintiffs' own allegations) it simply does not do.

---

[71] This purported test is similar, but not identical, to the test the Court has acknowledged and applied above, namely, whether the person conveying the message is so closely linked to the message that they appear to endorse it. The outcomes of the two tests would likely, but not necessarily, be the same. But in any event, the former (merely purported) test need not be conducted because it has not been shown to be an actual test.

Such assessment requires more than spouting off platitudes (be they ostensibly "pro transgender" or "anti-transgender") or deferring to any purportedly analogous non-precedential decision. In the view of the undersigned, the assessment requires getting fairly far into the weeds about what, based on the particular allegations of the Amended Complaint, the Birth Certificate Policy does, a Tennessee birth certificate actually says, a case like *Wooley* is actually about, and the implications actually are of presenting a Tennessee birth certificate to a third-party. The undersigned has endeavored to do exactly that. In so doing, he is fully aware that other judges might conduct an entirely different kind of analysis. But it falls to the undersigned to do the analysis he thinks appropriate, and he has exactly that, confident that other kinds of analysis conceivably could inappropriately gloss over the vital matters as to which the undersigned has gotten into the weeds.

Stepping out of the weeds for a moment, the Court makes one additional observation of a more general nature. In broad strokes, the Amended Complaint is grounded on the notion that the Birth Certificate Policy somehow prevents Plaintiffs from "correctly and accurately identifying [their] gender to the world." (Amended Complaint, at ¶ 4). This notion is not credible. Nothing stops Plaintiffs from announcing their gender to the world, irrespective of their birth certificates' designation of sex (based on birth appearance). This is true for various reasons indicated above, not least that it seems undisputable that in this country gender identity is widely viewed (contrary to Plaintiffs' belief, apparently) to be something separate from "sex" (however sex is to be determined, whether based on external genitalia and otherwise). And nothing herein is intended to suggest that Plaintiffs should refrain from announcing their gender identity to the world as they see fit—including by derogating the sex designation of their birth certificates.

Perhaps it would be a good idea for the State to have a policy that would allow changes to birth certificates based on gender identity. Doubtless some Tennesseans would think that such a policy would be more sensitive and helpful to transgender persons and more in line with contemporary mores. Others might be unmoved by such concerns or may, for example, think that a birth certificate is just that—a *birth* certificate—and thus should reflect a designation of sex (based on birth appearance) that is unaffected by post-birth events, circumstances, or realizations. Alternatively, perhaps some (though not all) of Plaintiffs' concerns could be alleviated by a state policy to issue, essentially, optional "current-gender-identity certificates," wherein the state document recognizes persons' gender identity even if (and especially if) it is incongruent with their birth certificate.

But it is not for this Court to say what Tennessee's policy should be. Instead, this Court's role is to opine as to whether the current policy has been plausibly alleged by Plaintiffs to violate one or more of the Equal Protection Clause, substantive due process, or the Free Speech Clause of the First Amendment. For the reasons discussed herein, the Court concludes that it has not.[72]

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[72] Because the Court finds that Plaintiffs have not plausibly alleged that the State is constitutionally required (despite and contrary to current state law) to allow the changes to a birth certificate's sex designation, it need not address whether the State is constitutionally required to cease its "strikeout line" practice as to any such changes.